Andrew Goodman, Esq. (State Bar No. 115685)
**GOODMAN LAW OFFICES**
**A PROFESSIONAL CORPORATION**
30700 Russell Ranch Road
Suite 250
Westlake Village, CA. 91362
TELEPHONE: (818) 802-5044
FACSIMILE: (818) 975-5256
E-Mail: agoodman@andyglaw.com

Attorneys for Petitioning Creditors

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF CALIFORNIA – LOS ANGELES DIVISION

In re:

**THOMAS VINCENT GIRARDI,**

Debtor.

Case No. 2:20-bk-21020-BR

[Chapter 7]

**DECLARATION OF PAUL CODY IN SUPPORT OF PETITIONING CREDITORS' EMERGENCY MOTION FOR APPOINTMENT OF INTERIM TRUSTEE PURSUANT TO 11 U.S.C. § 303(g)**

**Hearing Date:**
**DATE: December __, 2020**
**TIME: _______ A.M./P.M.**
**CTRM: "1668"**
**255 E. Temple Street**
**Los Angeles, CA. 90012**

[Filed As Part Of Application For Order Shortening Time]

**DECLARATION OF PAUL CODY**

I, Paul Cody, hereby declare:

1. I am, and at times herein mentioned was, the Director, President and CEO of California Attorney Lending II ("CAL II") and if called to testify I could and testify to the facts stated herein of my own personal knowledge. I am over the age of eighteen years old. I make this declaration in support of the *Petitioning Creditors' Motion for Appointment of an Interim Trustee Pursuant to 11 U.S.C. § 303(g)* ("Motion")

2. CAL II provides loans to contingency fee law firms and other financial resources to plaintiffs' firms for working capital, portfolio financing, and post-settlement funding. Such loans are personally guaranteed by the law firm's principal attorneys and secured by a first priority upon all assets of the obligors, including rights to payment from the firm's contingency fee cases. CAL II and its affiliates are market leaders in the attorney lending industry and have provided over $1.5 billion in working capital credit lines and other innovative financial products to the plaintiffs' bar since 2000.

3. Girardi & Keese, d/b/a Girardi Keese ("GK"), is a plaintiffs' law firm based in Los Angeles, California practicing in the areas of personal injury, defective products, sexual abuse, toxic torts, business law, employment law, and aviation law. The current status of GK is unknown and it is unclear whether GK is actively prosecuting cases in which it has been retained as counsel for plaintiff. A significant number of GK's attorneys have resigned in recent months and currently I am unable to determine if GK employs attorneys other than Thomas V. Girardi ("Girardi") and his brother, Jack Girardi. As of the date of this Declaration, GK's website (www.girardikeese.com) is not active.

4. Since CAL II has conducted business with GK and based on my review of documents provided to CAL II, a significant number of GK's matters were undertaken on a contingency basis such that GK would receive payment of its legal fees only if a case resolves in favor of GK's clients.

5. Girardi is the founding partner of GK and purports to hold 100% ownership of GK. GK and Girardi are referred to collectively in this declaration as "Debtors".

6. As the President & CEO of CAL II, it is part of my job to review the files of borrowers who are in default of their obligations under their promissory notes, security agreements, personal guaranties, and other agreements of a similar nature, and to work with the borrowers to resolve the delinquency, or if necessary, to oversee the legal enforcement of the agreements.

7. I am familiar with CAL II's file for the loans made to GK and personally guaranteed by Girardi. I have reviewed the loan documents between CAL II and the Debtors and I am familiar with the Debtors' loan status and events of default. Except as stated otherwise, all information stated in this declaration is based upon my personal knowledge, or from the business records of CAL II, which are made at or near the time that the records are created and/or executed and are maintained in the regular course of its business, and which are currently in CAL II's custody.

8. In or around July 5, 2011, GK and CAL II entered into a loan transaction (as amended, the "Loan") in which GK borrowed the principal amount of $3,500,000 for the purpose of funding its operations. The Loan was secured against, among other things, GK's rights to payment for its representation of clients in various continency fee cases. Girardi, the principal partner of GK, acted as guarantor of the Loan, and he provided CAL II with a list of GK cases for which GK expected to receive attorneys' fees. CAL II duly filed a UCC-1 against GK on July 6, 2011, which was designated as Filing No. 11-7275806299 and consistently "continued" to preserve its primacy. True and correct copies of the loan agreements and UCC filings evidencing Debtors' secured debt to CAL II are attached hereto as **Exhibit 1.**

9. Between 2011 and 2019, CAL II and Debtors entered into several iterations of the credit arrangement in which Debtors increased the principal amount of the debt to up to $8 million. CAL II duly filed several continuations and amendments to its financing statements to maintain its perfected security interests in ***all*** assets of the Debtors, including proceeds in all GK cases. In recognition of CAL II's continuing lien against the GK assets, Girardi intermittently updated the list of GK cases to reflect new cases in which GK had been retained and old cases which had been settled or dismissed.

10. On or around November 8, 2019, GK executed and delivered to CAL II that certain Fourth Amended and Restated Promissory Note, in the maximum amount of $8,000,000, and secured by CAL II's continuing security interests in substantially all of the Debtors' respective assets. As part of the consideration given to CAL II, the Debtors duly executed and delivered to CAL II that certain Confession to Judgment dated November 12, 2019, pursuant to CCP §§ 1132-1134 ("Confession to Judgment"), and agreed to entry of judgment without trial if, after Debtors' default under the Loan and notice thereof, the Debtors did not cure the default. The parties agreed that judgment would be (i) in the amount of $8,000,000 (plus any other advances and legal expenses, less any payments made by GK), (ii) for immediate possession of GK's collateral, and (iii) for post-judgment attorneys' fees and expenses. A true and correct copy of the Confession to Judgment is attached hereto and incorporated herein as **Exhibit 2.**

11. In 2015, unbeknownst to CAL II and without its knowledge or consent, Girardi and GK entered into a loan agreement with a competitor of CAL II, a California entity known as Law Finance Group ("LFG"), which granted GK a loan in an unknown amount, purporting to be secured by the same collateral granted to CAL II. LFG also filed a UCC-1 to evidence an all-asset competing lien against both GK and Girardi personally on or about November 5, 2015. *See* Request for Judicial Notice in Support of Motion ("RJN"), Ex. "J" **[Bates Stamp Pg. 176]** [LFG UCC-1]

12. On or about April 11, 2016, again unbeknownst to CAL II, and without its knowledge or consent, GK and Girardi sought yet another loan from an Arizona lender called Stillwell Madison, LLC ("Stillwell"), which issued a loan to GK in the amount of $6,500,000 and again, purported to be secured by the same collateral granted to CAL II and to LFG. Stillwell also filed a UCC-1 to evidence an all-assert competing lien against the Debtors. RJN, Ex. "V". **[Bates Stamp Pg. 322].**

13. By accepting the loans from LFG and Stillwell, GK and Girardi breached numerous covenants contained in the CAL II loan agreement that prevented GK from incurring any further indebtedness or placing any additional liens (even subordinated liens) on CAL II's collateral. For example, in the CAL II loan documents, the Debtors expressly covenanted, among

other things, not to "create, incur, assume or have any indebtedness or other obligation...arising from the borrowing of any money or...pursuant to any guaranty or other contingent obligation, except for indebtedness and other obligations...fully and accurately described in the response to question 7 contained in the Questionnaire set forth in Exhibit A attached to and made a part of this Agreement" without the CAL II's prior written consent.

14. Further, in executing each iteration of the Loan documents, Debtors were required to identify in writing all liens against the collateral. In each of the five iterations of the security agreement between 2011 and 2019, Debtors represented in each one that, other than certain bank liens against real property and various equipment liens, there were no other liens against the collateral.

15. In 2017, GK, once more without CAL II's knowledge or consent, secured financing from LFG in the approximate amount of $15,000,000 which was secured by the same collateral as granted to CAL II in 2013 and to Stillwell in 2016, again in breach of the covenants contained in CAL II loan documents. GK and Girardi had now re-pledged CAL II's collateral three times to two other lenders, without CAL II's knowledge and consent and in violation of the contractual covenants owed to CAL II.

16. Also in 2017 and without CAL II's knowledge or consent, the Debtors secured *yet another* loan from a Texas lender known as Virage Funding, which filed an original UCC-1 against GK and Girardi's assets on August 18, 2017. The amount of that indebtedness is believed to be approximately $9,000,000.

17. In 2018, and without CAL II's knowledge or consent, GK and Girardi secured additional financing from Nano Bank and further encumbered CAL II's collateral in breach of the covenants set forth in the CAL II loan documents. RJN, Ex. "O" **[Bates Stamp Page 272]**. The Debtors had now re-pledged CAL II's collateral yet another two times, rendering these funding arrangements ***the fourth and fifth times that GK and Girardi had improperly granted security interests in the same collateral originally granted to CAL II in 2013.*** Having secured tens of millions of dollars in loan proceeds (upon information and belief, a total of more than $39,000,000), from five different lenders, GK and Girardi had created a web of deceit

surrounding the law firm, its financing and its collateral that was bound to disastrously unravel—which it did.

18. In October 2019, Girardi was back again, asking CAL II for a multi-million dollar loan increase. This time, the public record revealed the Debtors' borrowings from LFG and Stillwell, and we confronted Girardi about them. In response, on October 25, 2019, Girardi wrote a letter to CAL II representing that: (i) the LFG loan ($17M) had been paid "by putting in a large sum of my own money" (i.e. our lien on GK's attorneys' fees had not been violated); (ii) he would "sign a stipulated judgment" in our favor; (iii) he would simultaneously send a letter to defense counsel in certain settled cases known as the *In re Lion Air* cases directing defendant to pay that portion of the settlement which represented his legal fees up to $3.5M, directly to CAL II; and (iv) that one of his largest cases, *Porter Ranch* (further described in Paragraph 32 below), was now worth almost a billion dollars and that he believed "very reasonable settlement would be in the $900 million area." A true and correct copy of Girardi's October 25, 2019 letter is attached hereto and incorporated herein as **Exhibit 3** and a true and correct copy of Girardi's November 8, 2019 letter to the *In re Lion Air* cases defense counsel attached hereto and incorporated herein as **Exhibit 4.**

19. Girardi also told us that the Stillwell loan was in dispute and that he had counterclaims which exceeded the amount due under the Stillwell Loan. In any event, he said, CAL II had a first lien position dating back to 2013 and that CAL II was fully protected. In further recognition of CAL II's continuing lien against the GK assets, in the years running up to this point, Girardi intermittently updated the list of GK's cases to reflect new cases in which GK had been retained and old cases which had been settled or dismissed.

20. Based upon all of the additional protections offered by Girardi as described above, including the Confession of Judgment; the $3.5M paydown on the *In re Lion Air* cases; and the *Porter Ranch* settlement estimate of $900M; as well as his representations that Law Finance was paid off with his own funds; that the Stillwell loan was in dispute; and his promise not to seek any further loans without our permission, we consented and entered into that certain Fourth Amended and Restated Promissory Note dated November 8, 2019.

21. Unbeknownst to CAL II at that time (and without the required disclosure by Debtors under the CAL II Loan), within just months of entering into forbearance agreements with LFG and Stillwell, Debtors had defaulted under such agreements. RJN, Ex. "U" [Stillwell order on app for writ of attach].**[Bates Stamp Pg. 311]**

22. On or around January 17, 2019, LFG sued Debtors for breach of the loan agreement and Girardi's personal guaranty thereof. RJN, Ex. H. **[Bates Stamp Pg. 120]**. Ultimately, LFG obtained entry of stipulated judgment in the amount of approximately $6,000,000. RJN, Ex."I". **[Bates Stamp Pg. 170]**. As noted above, by October 2019, CAL II was informed that the entire LFG obligation had been satisfied by letter from Girardi. *See* Ex. [3 or 4] hereto. Debtors refuse to disclose how exactly this $17,000,000 obligation was satisfied, but presumably it was satisfied improperly with attorneys' fees' constituting or derived from CAL II's collateral.

23. Further unknown to CAL II, was that on or about May 24, 2019, Stillwell had filed suit against Debtors (who again failed to disclose same to CAL II) for breach of contract and fraud. RJN, Ex. "S". By *ex parte* application, Stillwell obtained right to attach orders in the amount of nearly $6,000,000. RJN, Ex. "S" **[Bates Stamp Pg 295]**.. In its July 14, 2020, written ruling, the court found, among other things, that based on the significant evidence of Debtors' nonpayment of lenders and service providers, ***Debtors are "insolvent*** "in...that they are generally not paying their debts as they become due."' *Id.* at 9 (emphasis added). The Debtors have never disclosed to CAL II that a California court had declared GK insolvent.

24. Once again unknown to CAL II and never disclosed by the Debtors, was that former clients were also seeking substantial recovery from GK for, among other things, settlement amounts owed to them. Apparently, the Debtors' former clients Joseph Ruigomez, Kathleen Ruigomez, and Jaime Ruigomez (collectively, the "Ruigomezes") sued Debtors on or around June 26, 2019, for conversion, breach of fiduciary duty, and breach of contract, seeking payment of settlement funds owed to the Ruigomezes as a result of a settlement they reached with Pacific Gas and Electric. RJN, Ex. "P". **[Bates Stamp Pg 275]** A stipulated judgment against

Debtors was entered April 20, 2020 in the principal amount of $11,000,000. RJN, Ex. "Q". **[Bates Stamp Page 281]**.

25. In an effort to avoid turning over assets to the Ruigomezes after they sought to enforce their judgment, the Debtors agreed to assign certain rights to attorneys' fees belong to CAL II. The Debtors have now allegedly agreed to place the $23,000,000 in *Abikzer* (as defined below) settlement funds into a Qualified Settlement Fund and to improperly pay Ruigomezes from the attorneys fees' earned in that case of approximately $5,700,000—monies that should be paid to CAL II based upon its first priority perfected lien on those funds. None of this was learned by CAL II until the last 60-75 days.

26. On July 20, 2020, following a call to CAL II seeking more money, Girardi sent a letter to CAL II saying that "the firm has never been more successful"—this following a ruling ***six days earlier that had adjudged GK insolvent***. Girardi further boasted that he will "settle one of the larger cases for a billion dollars" and that GK owed him "$103 million for money I put up for costs." A true and correct copy of Girardi's July 20, 2020 letter is attached hereto and incorporated herein as **Exhibit 5.** CAL II declined to provide GK with any additional financing.

27. By letter to CAL II dated August 3, 2020, Girardi persisted, claiming that he was in "desperate need of funds." A true and correct copy of Girardi's August 3, 2020 letter is attached hereto and incorporated herein as **Exhibit 6.**

28. On August 6, 2020, Girardi continued to pressure CAL II for funds, stating that with respect to his *Abikzer* litigation, the defendant had "agreed to pay $90,000,000 as soon as the Courts reopen," which, it turns out, was a complete fabrication. A true and correct copy of Girardi's August 6, 2020 letter is attached hereto and incorporated herein as **Exhibit 7.** CAL II continued to decline to provide any additional funding to the Debtors.

29. As payment to GK of attorneys' fees from certain settled cases is imminent, in an amount which we believe may be as much as $10,000,000 (see Paragraph 31 below), there is a significant risk that this collateral will be paid to creditors other than CAL II or otherwise dissipated.

30. On October 27, 2020, CAL II secured judgment against the Debtors in the sum of $6,250,589.59 plus post-judgment interest and reasonable attorneys' fees and costs incurred in collecting the judgment ("Judgment"). The Judgment also grants CAL II the right to immediate possession of the personal property of GK. A true and correct copy of the Confession To Judgment is attached to this Declaration as **Exhibit "2"**.

31. An important and valuable component of CAL II's collateral is GK's rights to payment for its representation of clients in a number of lawsuits. This is the one of the largest assets of most contingency fee law firms. As a result, CAL II is entitled to receive from its borrowers an up-to-date case list at least once per calendar quarter. Further CAL II conducts its own searches to locate cases in which the Borrower is listed as counsel. Since every case that is filed contains a docket number, that docket number is incorporated into a proprietary system maintained by CAL II. The company does not require any prospective borrower or current borrower to provide any privileged information, but if a case has been filed then it is a matter of public record and CAL II's legal auditors can review the docket to audit the purported value of the claim and the legal fees and expenses associated therewith, earned and unearned, due to the law firm in connection with client representation. In the opinion of CAL II's legal auditors, GK is expected to receive a minimum of $10,000,000 in legal fees from settlements already reached in the below listed cases, (the "Settled Cases") and payment of such Settled Cases is expected to be made imminently:

- *Gabriel Abikzer and Maria Abikzer v. Jeffrey Joel, City of Los Angeles, et al.*, Case No. BC706830, Superior Court of California – County of Los Angeles ("*Abikzer*");
- *Eileen A. Staats v. City of Palo Alto.*, Case No. 115-CV-284956, Superior Court of California – County of Santa Clara ("*Staats*");
- *Jane Doe v. Princess Cruise Lines, Ltd.*, Case No. 2:19-cv-9181, US District Court for the Central District of California—Los Angeles Division ("*Princess Cruise Lines*");
- *Saldana, et al. v. Garcia, et al.*, Case No. BC605449, Superior Court of California – County of Los Angeles ("*Saldana*");
- *Ricarte v. Victor Valley Medical*, Case No. CIVSD1717346, Superior Court of

California – County of San Bernardino ("*Ricarte*");

- *Estate of Timothy Sweeney, et al. v. Olympus America Inc.*, Case No. BC640556, California Superior Court – County of Los Angeles ("*Sweeney*");
- *McCarty v. Siung*, Case No. RGI 7856893, Superior Court of California - County of Alameda ("*Ghost Ship*"); and
- *Route 91* which arose out of the October 1, 2017 shooting in Las Vegas. In June, 2018, all pending actions were removed to federal court in the District Court of Nevada located in Clark County, Nevada. A settlement was reached pursuant to which $800 million dollars was supposedly to be deposited into a settlement fund by November 13, 2020. GK represents twenty-seven plaintiffs in that matter.

32. In addition to the above Settled Cases, several other cases are pending as to which GK is owed significant sums—in the tens of millions of dollars—for work performed on such cases ("Active Cases"). For instance, in just one consolidated active case, entitled *Southern California Gas Leak Cases*, JCCP4861 (Cal. Super. Ct., Los Angeles County), the Debtors represent over 8,000 clients who allegedly have been exposed to harmful chemicals (referred to herein as the "*Porter Ranch*" case). The Debtors have represented to CAL II that the gross settlement in that case is expected to be $1 billion. (*See*, *e.g.*, Exs 3 and 5 hereto.) However, the Debtors may never receive those fees as they still need to perform much additional legal work on this and the other cases and require funding for substantial case expenses related thereto.

33. Regrettably, the financial house of cards that GK and Girardi have built over the past several years threatens the very existence of the law firm, its representation of the clients and the value of CAL II's collateral. As a result, nearly all of GK attorneys have left the firm, taking with them, some of CAL II's collateral—the contingency fee recoveries—while a number of other attorneys are threatening to leave due to the firm's financial instability, gross financial mismanagement, lack of leadership and a law firm mired in litigation, writs of attachment and court orders—including a restraining order against Girardi personally for improperly harassing Stillwell's counsel (which, I was informed, he violated).

34. As a result of Debtors' significant debt obligations, the numerous judgments obtained against Debtors, the pending litigation against Debtors, and the active enforcement efforts against Debtors, Debtors' cash flow has been constrained and they are not able to pay their debts as they come due. In addition, there is a significant risk that Debtors' financial strain will impair the Debtors' abilities to operate and obtain optimal results for their clients.

35. Part of GK's business model entails the representation of multiple clients—sometimes up to thousands separate plaintiffs—with similar claims arising from the same incident. Other plaintiffs with similar claims are often represented by co-counsel. As a result, if GK's clients lose confidence in GK's abilities or stability, many of them may believe they have a ready solution: terminate GK and hire co-counsel, who is already knowledgeable about the case, to represent them in the action. If GK is terminated, it may lose all or part of any settlement or award paid out in the Active Cases to which GK otherwise would be entitled if it were not terminated and be instead limited to having to establish and prove a claim for fees based on quantum meruit for work performed. If an interim trustee is immediately appointed, the trustee can take control of these cases, retain counsel capable of prosecuting or settling the cases

36. On top of all of the litigation and enforcement efforts by creditors, Girardi is also in the midst of a highly publicized divorce from his wife, Erika Girardi, who was featured on Real Housewives of Beverly Hills. This results in yet another party making claim to the assets of GK and Girardi.

37. As a result of all of the above, on December 4, 2020, CAL II sought appointment of a receiver ("Receivership Motion") over GK's operations in the Superior Court of California for the County of Los Angeles in Case No. 20STCP03546. Creditor Stillwell joined in this *ex parte* application.

38. After the Receivership Motion was filed the Debtors, CAL II, a plaintiff's law firm known as Abir Cohen Treyzon Salo, LLP ("ACTS"), and a collection agent designated by ACTS had entered into an agreement for the transfer of responsibility for certain cases from GK to ACTS and for the segregation, preservation, and distribution of certain proceeds from such cases. I am informed and believe that prior to the Petition Date (as defined in the Motion), ACTS begun

the process of associating into various cases as counsel of record pursuant to an agreement with GK.

39. At the hearing on the Receivership Motion, the court stated it was inclined to appoint a receiver over GK and, based on CAL II's tentative withdrawal of the Receivership Motion based on its agreement with the ACTS law firm, continued the hearing on the Receivership Motion to allow the parties to decide whether to continue pursuing it.

40. Before the Receivership Motion was decided, CAL II, Stillwell, and ACTS reached an agreement in principle concerning the segregation and preservation of funds constituting GK's lenders' collateral. In light of the agreements reached with the ACTS firm, CAL II decided to withdraw the Receivership Motion. It was further mooted by order of the US District Court for the Northern District of Illinois entered an order providing for the appointment of a trustee and freezing all assets of the Debtors.

41. CAL II has learned of several attempts by competitors of GK to divert sums owing to GK to themselves both before and after the Freeze Order, as well as before and after the Petition Date. For instance, in connection with a settlement reached in the *Abizkzer* case, GK is owed over $7 million for its legal work performed on behalf of clients in that case. I am informed and believe that plaintiff's law firm Edelson, PC ("Edelson") solicited GK's clients to persuade them to change counsel from GK to Edelson, citing GK's financial downfall and legal troubles. Edelson recently replaced GK as counsel for plaintiffs in *Abikzer*. Notwithstanding GK's rights to significant sums for its legal work on those cases, Edelson now challenges GK's rights to payment, and it has even directed the defendant in that case, the City of Los Angeles, to pay the portion owed to GK to Edelson directly. If an interim trustee is not appointed, there is a significant risk that assets of GK, including its rights to payment, will be significantly impaired without oversight, transparency, or regard for GK's creditors' interests.

///

///

///

///

42. I believe that the immediate appointment of an interim trustee over the Debtors is imperative at this time to bring order and discipline to the chaos that has become the firm of GK and to preserve and maximize assets of the bankruptcy estate.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 24th day in December 2020, in Buffalo, New York.

Paul Cody