Ronald Richards (SBN: 176246)
   ron@ronaldrichards.com
Morani Stelmach (SBN: 296670)
   morani@ronaldrichards.com
**LAW OFFICES OF RONALD RICHARDS**
   **& ASSOCIATES, APC**
P.O. Box 11480
Beverly Hills, California 90213
Tel:   310.556.1001
Fax:  310.277.3325

**Special Litigation Counsel for Elissa D.
Miller, Chapter 7 Trustee for the bankruptcy
estate of Girardi Keese**

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

### LOS ANGELES DIVISION

| | |
|---|---|
| In re | Case No. 2:20-bk-21020-BR |
| THOMAS V. GIRARDI, | Chapter 7 |
|      Debtor. | **DECLARATION OF SPECIAL LITIGATION COUNSEL RONALD RICHARDS IN SUPPORT OF OPPOSITION TO MOTION FOR RELIEF FROM STAY** |
| | Date:  November 2, 2021<br>Time:  10:00 a.m.<br>Ctrm.:  1668<br>      255 E. Temple Street<br>      Los Angeles, CA 90012 |

**DECLARATION OF RONALD RICHARDS IN SUPPORT OF OPPOSITION TO MOTION FOR RELIEF
FROM STAY**

## DECLARATION OF RONALD RICHARDS

I, Ronald Richards, declare[1]:

1.  I am managing shareholder of the Law Offices of Ronald Richards & Associates, APC, who was appointed as Special Litigation Counsel for the GK Estate. I make this declaration in support of the GK Trustee's Opposition and of my own personal knowledge, unless otherwise stated.

2.  I have been licensed to practice law for over 26 years. I am licensed in multiple jurisdictions and practice law on both coasts. I have numerous state and federal published opinions. I have moved the law in many directions and have appeared before this Court, many, many times.

3.  On August 26, 2021, I filed the first amended complaint an adversary action 2:21-ap-01155-BR against Erika Girardi. A true and correct copy is attached as Exhibit "A" to this declaration.

4.  The complaint that is the subject of this relief from stay motion that is pending against Erika Girardi only asserts a cause of action for constructive trust and accounting, counts I & II. (See Doc. # 258, Exh A).

5.  On July 18, 2021, the District Court in Chicago Illinois in the Edelson Action stayed the constructive trust cause of action. A true and correct copy of that order is attached as Exhibit "B". The court based its stay on the constructive trust cause of action being an asset of the GK Estate, citing 11 USC 362(a)(3). Specifically, on page 33 of the order, the Court states, "Off the bat, it seems obvious that Edelson's request for a constructive trust is subject to a stay under section 362(a)(3). As stated clearly in Edelson's complaint, it "seeks the imposition of a constructive trust on all money transferred from Boeing to [Girardi Keese] in connection with the Lion Air settlements." Compl. ¶ 95. If Edelson were to succeed on a constructive trust theory, "the value of [Girardi or Girardi Keese's] bankruptcy estate would be reduced . . .

---

[1]    All capitalized terms not defined herein shall have the meanings ascribed to them in the GK Trustee's Opposition.

**DECLARATION OF RONALD RICHARDS IN SUPPORT OF OPPOSITION TO MOTION FOR RELIEF FROM STAY**

because [the] property in which the debtor holds legal but not equitable title as of the commencement of the case . . . is property of the estate . . . to the extent of the debtor's legal title." See In re Nat. Century Fin. Enters., Inc., 423 F.3d 567, 575 (6th Cir. 2005);"

6. The finding by the District Court is res judicata on the moving party and is "obvious" to any bankruptcy practitioner.   The Plaintiff cannot seek relief from stay in this Court to pursue GK Estate transfers to Erika Girardi, yet, that is exactly what they are trying to do in their Complaint which has already been stayed by the Court in Illinois. There is no mention of this District Court stay order in the moving papers.

7. The only remaining cause of action in the Edelson Action as it would apply to Erika Girardi is for accounting. The GK Trustee's complaint already seeks accounting.

8. The GK Trustee is also already doing a forensic accounting.

9. The Plaintiff is not representing any of its former Boeing clients at this time. Their action is only for their legal fees.  They are no different than any other attorney who was allegedly swindled by Thomas Girardi.

10. Allowing the Plaintiff relief from stay so they can pursue their claims for attorneys' fees would only further deplete Erika Girardi's resources and interfere with our complaint which is seeking the same remedy of accounting.

11. The GK Trustee believes that opening the flood gates to every creditor claiming Erika Girardi received their portion of settlements would be contrary to the orderly administration of claims.

12. The right to accounting from Girardi Keese belongs to the GK Estate, not Edelson.

13. It is not efficient or economical for one firm in Chicago, Illinois to be seeking accounting from Erika Girardi while the GK Trustee is seeking the same accounting.

14. The GK Trustee is asking this Court to deny the motion as she believes it will further interfere with resolution of this case, delay this case until the above issues are decided in Chicago, and further deplete scarce assets of Erika for no reason other than to take the same discovery available here.

**DECLARATION OF RONALD RICHARDS IN SUPPORT OF OPPOSITION TO MOTION FOR RELIEF
FROM STAY**

15. To force the GK Trustee's Special Litigation Counsel's target to have to go through more stress and aggravation for accounting, defies logic at this point in time. The litigation relating to accounting and GK Estate transfers and direct liability to Erika Jayne belong in front of one court, this Court, not piecemealed across America.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.  Executed on October 18, 2021

RONALD RICHARDS

**DECLARATION OF RONALD RICHARDS IN SUPPORT OF OPPOSITION TO MOTION FOR RELIEF FROM STAY**

# EXHIBIT "A"

Ronald Richards (CA Bar No. 176246)
    ron@ronaldrichards.com
Morani Stelmach (CA Bar No. 296670)
    morani@ronadlrichards.com
Law Offices of Ronald Richards & Associates, APC
P.O. Box 11480
Beverly Hills, California 90213
Telephone:  310.556.1001
Facsimile:  310.277.3325

Special Litigation Counsel for Elissa D. Miller, Chapter 7 Trustee

# UNITED STATES BANKRUPTCY COURT

# CENTRAL DISTRICT OF CALIFORNIA

# LOS ANGELES DIVISION

| | |
|---|---|
| In re<br><br>GIRARDI KEESE,<br><br>     Debtor. | Case No. 2:20-bk-21022-BR<br><br>Chapter 7 |
| ELISSA D. MILLER, Chapter 7 Trustee,<br><br>     Plaintiff,<br><br>v.<br><br>ERIKA N. GIRARDI, an individual; EJ GLOBAL, LLC, a limited liability company; and PRETTY MESS, INC., a corporation,<br><br>     Defendants | Adv. Proc. No. 2:21-ap-01155-BR<br><br>**TRUSTEE'S FIRST AMENDED COMPLAINT FOR:**<br><br>**1) DECLARATORY RELIEF; 2) TURNOVER OF PROPERTY OF THE ESTATE PURSUANT TO 11 U.S.C. § 542; (3) AVOIDANCE AND RECOVERY OF FRAUDULENT TRANSFER; (4) CONVERSION; (5) CONSTRUCTIVE TRUST; (6) ACCOUNT STATED; (7) OPEN BOOK ACCOUNT; (8) MONEY HAD AND RECEIVED; (9) UNJUST ENRICHMENT; AND (10) ACCOUNTING**<br><br>Date:     TBD<br>Time:     TBD<br>Place.:    Courtroom 1668<br>United States Bankruptcy Court<br>255 East Temple Street<br>Los Angeles, CA 90012 |

///

EXHIBIT "A"

1    For her First Amended Complaint for (1) Declaratory Relief; (2) Turnover of

2  Property of the Estate Pursuant to 11 U.S.C. § 542; (3) Avoidance and Recovery of

3  Fraudulent Transfer; (4) Conversion; (5) Constructive Trust; (6) Account Stated; (7) Open

4  Book Account; (8) Money Had and Received; (9) Unjust Enrichment; and (10) Accounting

5  (the "Complaint"), plaintiff Elissa D. Miller, the duly appointed, qualified and acting

6  Chapter 7 Trustee (the "Trustee" or "Plaintiff") for the bankruptcy estate of debtor Girardi

7  Keese (the "Estate"), alleges as follows:

8    **STATEMENT OF JURISDICTION, PARTIES AND PROCEEDINGS**

9    1.    This Court has jurisdiction over this proceeding pursuant to 28 U.S.C. §§

10  157(b)(1) and 1334(a), as this is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (E),

11  (H) and (O).  Venue properly lies in this judicial district pursuant to 28 U.S.C. § 1409(a),

12  in that the instant proceeding is related to a case under title 11 of the United States Code

13  which is still pending.

14    2.    Plaintiff Elissa D. Miller is the duly appointed, qualified and acting Chapter 7

15  Trustee of the bankruptcy estate (the "Estate") created in the instant Chapter 7

16  bankruptcy case pending in the Los Angeles Division of the United States Bankruptcy

17  Court for the Central District of California which is styled <u>In re Girardi Keese</u>, bearing

18  Case No. 2:20-bk-21022-BR (the "Bankruptcy Case").

19    3.    Girardi Keese (the "Debtor") is the debtor in the Bankruptcy Case and this

20  case was initiated by the filing an involuntary petition for relief under Chapter 7 of Title 11

21  of the United States Code on December 18, 2020 (the "Petition Date").  The Court

22  entered the Order for Relief on the involuntary petition on January 13, 2021.

23    4.    Plaintiff is informed and believes, and on that basis alleges thereon, that at

24  all times mentioned herein, defendant Erika N. Girardi ("Erika") is an individual that

25  resides and/or has conducted business within the jurisdiction of this Court and is the wife

26  of Thomas Girardi, owner and controlling member of the Debtor.

27    5.    Plaintiff is informed and believes, and on that basis alleges thereon, that at

28  all times mentioned herein, defendant EJ Global, LLC ("EJG") is a California limited

TRUSTEE'S FIRST AMENDED COMPLAINT

EXHIBIT "A"

1  liability company conducting business within the jurisdiction of this Court.  EJG was
2  formed in 2008 and is exclusively owned and controlled by defendant Erika.  Defendant
3  Erika is the only manager and sole 100% member of EJG.  Defendant Erika filed her
4  income from EJG on Schedule C of her personal income tax returns for many years
5  because she was the sole owner and member of EJG.    Defendant Erika going back to
6  2008, was the only manager of the EJG.  The articles of organization show EJG was only
7  managed by Erika.  Defendant Erika was the only one in control of EJG.
8        6.    Plaintiff is informed and believes, and on that basis alleges thereon, that at
9  all times mentioned herein, defendant Pretty Mess, Inc. ("PMI") is a California corporation
10 conducting business within the jurisdiction of this Court.  PMI was formed in 2021 as a
11 successor entity to EJG and is also owned and controlled exclusively by defendant Erika.
12 Defendant Erika is the only office or director of PMI.  It was formed by her business
13 manager, who was referred to her by Lisa Rinna, a cast mate of Erika's on her television
14 show, "The Real Housewives of Beverly Hills".  Plaintiff alleges that in order to avoid the
15 large liability to EJG and its alter ego Erika Girardi, Erika incorporated PMI as a personal
16 services company, just like EJG, and has diverted her going forward income to this entity
17 to avoid creditors of EJG and Erika Girardi.  PMI is a mere continuation of EJG, a
18 personal services corporation using the same expenses previously paid by the Debtor.
19 Erika is the same 100% owner of both EJG and PMI and the formation of PMI is for the
20 fraudulent purpose of escaping liability for EJG and Erika's debts.  Specifically, it was
21 only after she left Thomas Girardi and the Debtor stopped paying for EJG and Erika's
22 debts, did Erika incorporate PMI which does nothing different that EJG.  Both entities are
23 tax pass through to the same beneficial owner, Erika Girardi.
24        7.    Plaintiff is informed and believes, and on that basis alleges thereon, that at
25 all times mentioned herein, defendants EJG and PMI is the alter ego of each other and of
26 defendant Erika, in that each of them has maintained such a unity of interest and
27 ownership that the separate personalities of the entities and the individual defendant no
28 longer exist.

3        TRUSTEE'S FIRST AMENDED COMPLAINT

EXHIBIT "A"

8.      Plaintiff further alleges that the entity EJG is completely a shell entity, has no capital in it whatsoever, has a single owner, with no separate books, current bank accounts, or other indicia of corporate formality.   EJG was a personal service company for Erika Girardi aka Erika Jayne.   EJG meets all requirements for an alter ego finding. Clearly, if EJG was allowed to shield Erika Girardi from over $25,000,000 in expenses just spent on her, there would be an egregious inequitable result.   The existence of EJG was merely an instrumentality to funnel a large scale tax fraud from the Debtor to the benefit of Defendant Erika.   No one else but Defendant Erika benefitted from the expenses described below.   In response to the demand letter by the Trustee, Erika has taken the ludicrous position that since she did not receive the payments directly from the Debtor she is not liable and if EJG is liable, it would not expand to her personally as she was just a member.   The Plaintiff alleges that all payments and monies received by Erika were via her American Express card issued to her personally with her own number, and vendors picked by her and all of the payments were directed by her.   Just like she has taken the ludicrous position that attorneys may not comment about her case and facts related to her conduct, she has not stopped there.   She attempts to create a distinction between handing her money directly versus paying all of her bills directly. The distinction, like her prior motion for reconsideration is meritless.   Any payments made for her benefit are her responsibility.

9.      Erika, EJG, and PMI all have the same attorney representing them in this action further showing they are all one in the same.   The attorney believes all of the interests are completely aligned which further supports each of them are the alter ego of one another.

10.      Defendants Erika, EJG and PMI are collectively referred herein as the "Defendants").

## **GENERAL FACTUAL ALLEGATIONS**

11.      Plaintiff is informed and believes and, on that basis alleges thereon, that in or around August 2012, the Court entered an Order approving a settlement agreement in

1  the Marston v. Marston state court action, San Bernardino Superior Court Case Number

2  CIVRS 910950 (the "Court Approved Settlement Agreement").  A true and correct copy of

3  the Court Approved Settlement Agreement is attached hereto, marked as Exhibit "A" and

4  incorporated herein by this reference.

5          12.      Plaintiff is informed and believes and, on that basis alleges thereon, that the

6  Debtor diverted and transferred its right to receive attorneys' fees from the Court

7  Approved Settlement Agreement in the form of an ongoing stream of payments from the

8  State of California Lottery to the Defendants (the "Lottery Payments").

9          13.      Plaintiff is informed and believes and, on that basis alleges thereon, that the

10  Defendants received more than $242,658 in payments from the State of California Lottery

11  from 2012 to 2021.  The Defendants are scheduled to still receive $78,000 in payments

12  from the State of California Lottery in years 2022 through 2025.  The payments are part

13  of a continuous course of conduct and are on-going.  Erika directly agreed to receive the

14  payments, personally signed the lottery forms directing the payments to her, and on

15  information and belief, approved the stipulation authorizing the payments to her.  Erika

16  even withheld the 2021 payment.  At all times prior to 2021, Erika concealed the

17  existence of the lottery payments settlement and payment instructions. Even though

18  Erika signed the California Lottery Payee Setup in Exhibit C, she willfully concealed this

19  income or assignment from the Trustee AFTER the Chapter 7 relief was entered and was

20  confronted by the Trustee's Special Counsel.  The Ninth Circuit has held that in

21  fraudulent transfer cases, when some transfers occur outside the statute of limitations

22  and some occur within the statute of limitations, a court "may presume that the earliest

23  payments received by the investor are payments against the investor's claim for

24  restitution." Donell v. Kowell, 533 F.3d at 762, 774 (9th Cir.2008).  In this case, Plaintiff

25  alleges that the fact that notwithstanding the concealment by Erika of these lotter

26  payments, any statute is reset upon the next payment becoming due as the transfer is

27  not complete until the last payment in 2025.  Plaintiff alleges that any applicable statutes

28  of limitation would run no earlier than 2032, seven years after the last payment.  Plaintiff

EXHIBIT "A"

1  further alleges that the Trustee's Complaint was filed within one year of discovering

2  Erika's diversion of the lottery proceeds    (See <u>Donell v. Mojtahedian</u>, 976 F. Supp. 2d

3  1183, 1189 (C.D. Cal. 2013).

4      14.    Plaintiff intercepted and is currently holding funds in the amount of

5  $19,760.00 which represents the Lottery Payments for the year 2021, which funds the

6  Plaintiff is currently holding in trust pursuant to an agreement with defendant Erika

7  pending resolution of this dispute and further order of the Court.  A true and correct copy

8  of the letter agreement regarding 2021 Lottery Payments is attached hereto, marked as

9  Exhibit "B" and incorporated herein by this reference.    Erika refuses to release this

10  payment even though she has no legal claim to the money as she was not an attorney

11  who earned any fees.   The fact that Erika has claimed that the Lottery Payments is her

12  money and refuses to release it shows her knowledge and admission as to the nature of

13  the Debtor's income and operations.

14      15.    Plaintiff is informed and believes and, on that basis alleges thereon, that

15  Lottery Payments belong to the Girardi Keese bankruptcy estate and that none of the

16  Lottery Payments made to the Defendants have been repaid to the Debtor and remain

17  outstanding.    A true and correct copy of the demand letter regarding the Lottery

18  Payments is attached hereto, marked as Exhibit "C" and incorporated herein by this

19  reference.  Erika has contended that the Debtor may have received some of the Lottery

20  Payments alleged herein.  It was Erika who directed the Lottery Payments.  To the extent

21  the Debtor has already received some of the earlier Lottery Payments, the Debtor will

22  credit those from the prayer in this action.

23      16.    Plaintiff is informed and believes and, on that basis alleges thereon, that the

24  Defendants received jewelry and other luxury items purchased using the Debtor's funds

25  (the "Luxury Items").   As discovery is taken, the Trustee will outline the specific luxury

26  items.  Erika is aware of the $25,000,000 plus in expenses paid for her and she is in the

27  best position to itemize her jewelry, clothes, and other personal property.

28  ///

6    TRUSTEE'S FIRST AMENDED COMPLAINT

EXHIBIT "A"

17.     Plaintiff is informed and believes and, on that basis alleges thereon, that diverting and/or transferring of the Lottery Payments and the Luxury Items to the Defendants are collectively referred herein as the "Transfers."

18.     Plaintiff is informed and believes and, on that basis alleges thereon, that the Debtor and the Defendants conspired to conceal the Transfers and keep these assets away the Debtor's creditors.  Plaintiff is further informed and believes and, on that basis alleges thereon, that due to the concealment of the Transfers, the Trustee only recently discovered the Transfers and therefore any applicable deadlines and statute of limitations are tolled.

19.     Plaintiff is informed and believes and, on that basis alleges thereon, that additionally, based on the Debtor's books and records and tax returns, the Debtor is owed no less than $25,592,261.26 plus interest in receivables from the Defendants (the "Receivables").

20.     Specifically, the Receivables have been identified as no less than $25,592,261.26 in payments made by the Debtor for charges made by the Defendants. The payments by the Debtor were exclusively for the benefit of the Defendants.   The expenses consist largely of expenses to promote Erika personally.  Moreover, the over $14,000,000 in American Express charges were made by Erika on a card issued to her. The other $11,000,000 or so in vendor payments were made for Defendant Erika's benefit only.  None of the payments appear to be legitimate law firm payments but for the sole benefit of Defendant Erika's massive spending, glam squad, talent professionals, image professionals, travel, clothes, purses, shoes, jewelry and other lavish expenses that were meticulously added to the Debtor's books as a valid and enforcement open book account and account stated and receivable.

21.     Plaintiff further alleges that Defendant Erika received the complete benefit of the Receivables and does not get any sort of immunity or windfall from the Debtor's tax fraud for her community property law firm and entertainment business.

///

EXHIBIT "A"

22.     Plaintiff will contend it will not be a defense to this Complaint simply because Defendant Erika contends she did not know her husband was maintaining a debt.  It would be a miscarriage of justice, if Defendant Erika was allowed to simply walk completely free of owing over $25,000,000 to the Estate.  Erika signed all of her tax returns, numerous credit card slips, and was well aware of the money she spent on the Debtor's credit cards and the Debtor's payment of her personal expenses.  Her feigned willful blindness and ostrich approach to these expenditures will do absolutely nothing to limit her liability.

23.     Erika has direct knowledge that for at least 12 years, all of her expenses were being paid by the Debtor as she was generating them.  Moreover, Erika has repeatedly contended, "It is expensive to be me".  In fact, there was an entire publicly aired episode on "The Real Housewives of Beverly Hills" entitled, "It's Expensive to Be Me".  (Season 7, Episode 7).  The glam cannot be supported by a sham.  This decade long spending spree was improperly paid for by Erika's community property law firm.  Erika has repeatedly contended that she is entitled to any left over money from this Estate.   She has signed years of joint tax returns.  Even though knowledge is not required for liability, it is alleged she knew exactly where the money was coming from when her $175,000 per month spending budget was paid each month by the law firm on the law firms credit card issued to her personally as well as the submissions for payment were made by her and her alone.  Erika directed all of her personal vendors to be paid by the law firm. Only Erika knew that her entire singing, acting, bling, brand, glam squad, and other Erika only expenses were completely funded by the Debtor.  Even to this today, it is alleged that Erika continues to receive funding from other sources of unknown origin to cover her extravagant lifestyle.

24.     Erika shows no sign of slowing down with the continued tax frauds which she benefitted from for years, income tax avoidance schemes referenced in this Complaint, and belief that she can just hide large sources of income under the banner of privacy.    The Trustee's Special Litigation counsel has now been asking for many

EXHIBIT "A"

months, where is the source of income that has generated over $600,000 in expenditures to Erika personally.  Erika has refused to disclose who or how she is getting access to large swaths of capital to finance frivolous legal activities and threatening letters to the Trustee's Special Litigation Counsel.  Notwithstanding the Court's findings and exclusion of any proffered evidence, Erika continues to file frivolous appeals and takes meritless positions all geared towards hindering the Trustee's investigation.  Erika believes she is above the law and is entitled to shield and conceal her sources of capital from the Trustee's Special Litigation Counsel notwithstanding they are not privileged.  Her reckless and shotgun approach to litigation are all consistent with her husband's menacing and threatening litigation style.  Erika directed her counsel at least five times on August 25, 2021 to threaten the Trustee's Special Litigation Counsel with Rule 11 sanctions if he did not drop most of the Trustee's complaint.    All of Erika's threats only prove her direct involvement in the litigation and her desperate attempts to try and intimidate her opponents with a chronic stream of motions to disrupt the investigation and the Trustee's choice of counsel.

25.    The Receivables, in the form of an open book account, has been entered and maintained each year since 2008 on the Debtor's books and records and tax returns. The book account is based upon a contract that is implied by the parties' conduct, business records, excel spread sheets, and other writings. Plaintiff alleges the book account had entries and were added to it from time to time.  EJG and Erika had financial transactions with the Debtor.  The Debtor in a regular course of business kept an electronic account of the debits and credits of the transactions, EJG, Erika, and the successor entity PMI, owe money on the account, and the amount due is specified in paragraph 19 and elsewhere herein.  The last entry for the Receivables was as recent as June 2020. Interest is accruing at 10% per year on the Receivables.

26.    It is further alleged that "[a]ctions to recover on an account stated or a book account accrue on the date of the last item or entry in the account." Prof'l Collection Consultants, Cal. App. 5th at 966, 214 Cal.Rptr.3d 419; Cal. Civ. P. Code § 337(2)

EXHIBIT "A"

1  ("Where an account stated is based upon an account of more than one item, the time
2  shall begin to run from the date of the last item."); <u>R.N.C. Inc. v. Tsegeletos</u>, 231
3  Cal.App.3d 967, 971-972, 283 Cal.Rptr. 48 (1991) ("the four-year period of limitations on
4  a book account begins as of the last entry in the book account."). <u>Ordinario v. LVNV</u>
5  <u>Funding, LLC</u>, 721 F. App'x 602, 604 (9th Cir. 2017).   The statute expires for an open
6  book account on June 20, 2024.

7          27.    Plaintiff is informed and believes and, on that basis alleges thereon, that
8  although demand has been made, none of the Receivables owed by the Defendants to
9  the Debtor have been repaid to the Debtor and remain outstanding.   A true and correct
10  copy of the demand letter regarding the Receivables is attached hereto, marked as
11  Exhibit "D" and incorporated herein by this reference.   A redacted copy of her Schedule C
12  from Erika's 2018 personal federal income tax return is attached as Exhibit "E" showing
13  she is the 100% owner of EJG.   Statement 8 of the Schedule C specifically shows, for
14  example, that in 2018, Erika claimed $2,127,004.00 in expenses for her own company
15  but which were paid for by the Debtor.    The expenses detailed on Statement 8 of the
16  Schedule C show that the Debtor paid for the professionals that created and maintained
17  the brand Erika Jayne and benefitted only Defendant Erika.   A whopping $1,466,197.00
18  was paid for production only and $508,448.00 in professional services in 2018 alone.
19  Erika Girardi personally signed these tax returns.   Erika is charged with knowledge of the
20  contents of the return.   The expenses only benefitted her brand and performer career.

21          28.    Plaintiff is informed and believes and, on that basis alleges thereon, that
22  defendant Erika has used her glamor and notoriety to continue to aid and abet in sham
23  transactions that have occurred with respect to large transfers of assets from the Debtor
24  to the Defendants.

25  ///
26  ///
27  ///
28  ///

EXHIBIT "A"

**FIRST CLAIM FOR RELIEF**

**(Declaratory Relief)**

29.     Plaintiff realleges each and every allegation contained in paragraphs 1 through 28 of this Complaint and, by this reference, incorporates said allegations as though set forth fully herein.

30.     An actual controversy exists between the Plaintiff and the Defendants concerning their respective rights and duties in that the Trustee contends that the Defendants currently have no ownership interest in the Lottery Payments and the Luxury Items and that the Lottery Payments and the Luxury Items are property of the Estate. Whereas, the Defendants may dispute the Trustee's contention and may assert an ownership interest in the Lottery Payments and the Luxury Items.

31.     Plaintiff desires a judicial determination of her rights and duties and a declaration that the Defendants have no ownership interest in the Lottery Payments and the Luxury Items and that the Lottery Payments and the Luxury Payments are property of the Estate.

**SECOND CLAIM FOR RELIEF**

**(Turnover Of Property Of The Estate Pursuant To 11 U.S.C. § 542(a))**

32.     Plaintiff realleges each and every allegation contained in paragraphs 1 through 31 of this Complaint and, by this reference, incorporates said allegations as though set forth fully herein.

33.     Plaintiff is informed and believes and, on that basis alleges thereon, that the Lottery Payments, the Luxury Items  and the Receivables are all property of the Estate pursuant to, among other things, 11 U.S.C. § 541.  Plaintiff also alleges that based upon the receipt of the benefit of the payments from the Debtor in the amount of $25,592,261.26, the Defendants shall turnover any property purchased with those payments made to vendors on the Defendants' behalf.

34.     Plaintiff is informed and believes and, on that basis alleges thereon that the Defendants are in possession, custody or control, during this bankruptcy case, of

11     TRUSTEE'S FIRST AMENDED COMPLAINT

EXHIBIT "A"

1  property that the Trustee may use, sell or lease under 11 U.S.C. § 363 and such property

2  is not of inconsequential value or benefit to the Estate.

3  **THIRD CLAIM FOR RELIEF**

4  **(Turnover Of Property Of The Estate Pursuant To 11 U.S.C. § 542(b))**

5      35.    Plaintiff realleges each and every allegation contained in paragraphs 1

6  through 34 of this Complaint and, by this reference, incorporates said allegations as

7  though set forth fully herein.

8      36.    Plaintiff is informed and believes and, on that basis alleges thereon, that the

9  Lottery Payments, the Luxury Items and the Receivables are all property of the Estate

10  pursuant to, among other things, 11 U.S.C. § 541.  Plaintiff also alleges that based upon

11  the receipt of payments from the Debtor for $25,592,261.26, the Defendants shall

12  turnover any property purchased with those payments made to vendors on the

13  Defendants' behalf.

14      37.    Plaintiff is informed and believes that the Defendants owe a debt that is

15  property of the Estate and that is matured, payable on demand, or payable on order and

16  such debt may not be offset under 11 U.S.C. § 553 against a claim against the Debtor.

17  **FOURTH CLAIM FOR RELIEF**

18  **(Avoidance Of Fraudulent Transfer, Actual Intent, Pursuant To [11**

19  **U.S.C. §§ 544(b) and 548 and Cal. Civ. Code § 3439.04(a)(1))**

20      38.    Plaintiff realleges each and every allegation contained in paragraphs 1

21  through 37 of this Complaint and, by this reference, incorporates the allegations as

22  though set forth fully herein.

23      39.    Plaintiff is informed and believes and, based thereon, alleges that the

24  Transfers were made with the actual intent to hinder, delay or defraud the Debtor's

25  creditors.

26      40.    By reason of the foregoing, the Transfers are avoidable pursuant to 11

27  U.S.C. §§ 544(b) and 548 and Cal. Civ. Code § 3439.04(a)(1).

28  ///

TRUSTEE'S FIRST AMENDED COMPLAINT

EXHIBIT "A"

1

## FIFTH CLAIM FOR RELIEF

2

**(Avoidance Of Fraudulent Transfer, Constructive Intent, Pursuant To**

3

**11 U.S.C. §§ 544(b) and 548 and Cal. Civ. Code § 3439.05)**

4  41.    Plaintiff realleges each and every allegation contained in paragraphs 1

5  through 40 of this Complaint and, by reference, incorporates the allegations as though

6  set forth fully herein.

7  42.    Plaintiff is informed and believes and, based thereon, alleges that the

8  Transfers were made for less than reasonably equivalent value at a time when the Debtor

9  was insolvent or as a result of which the Debtor became insolvent.

10  43.    By reason of the foregoing, the Transfers are avoidable pursuant to 11

11  U.S.C. §§ 544(b) and 548 and Cal. Civ. Code § 3439.05.

12

## SIXTH CLAIM FOR RELIEF

13

**(Avoidance Of Fraudulent Transfer, Constructive Intent, Pursuant To**

14

**11 U.S.C. §§ 544(b) and 548 and Cal. Civ. Code § 3439.04(a)(2)(A))**

15  44.    Plaintiff realleges each and every allegation contained in paragraphs 1

16  through 43 of this Complaint and, by reference, incorporates the allegations as though

17  set forth fully herein.

18  45.    Plaintiff is informed and believes and, based thereon, alleges that the

19  Transfers were made without the Debtor receiving reasonably equivalent value in

20  exchange for the Transfers, and that at the time of the Transfers, the Debtor was

21  engaged or was about to engage in a business or a transaction for which their remaining

22  assets were unreasonably small in relation to the business or transaction.

23  46.    By reason of the foregoing, the Transfers are avoidable pursuant to 11

24  U.S.C. §§ 544(b) and 548 and Cal. Civ. Code § 3439.04(a)(2)(A).

25  ///

26  ///

27  ///

28  ///

13        TRUSTEE'S FIRST AMENDED COMPLAINT

EXHIBIT "A"

**SEVENTH CLAIM FOR RELIEF**

**(Avoidance Of Fraudulent Transfer, Constructive Intent, Pursuant To**

**11 U.S.C. §§ 544(b) and 548 and Cal. Civ. Code § 3439.04(a)(2)(B))**

47.   Plaintiff realleges each and every allegation contained in paragraphs 1 through 46 of this Complaint and, by this reference, incorporates the allegations as though set forth fully herein.

48.   Plaintiff is informed and believes, and based thereon, alleges that the Transfers were made without the Debtor receiving reasonably equivalent value in exchange for the Transfers, and that the Debtor intended to incur, or reasonably should have believed that the Debtor would incur, debts beyond the Debtor's ability to pay as they became due.

49.   By reason of the foregoing, the Transfers are avoidable pursuant to 11 U.S.C. §§ 544(b) and 548 and Cal. Civ. Code § 3439.04(a)(2)(B).

**EIGHTH CLAIM FOR RELIEF**

**(Recovery Of Avoided Transfer Pursuant To 11 U.S.C. § 550(a))**

50.   Plaintiff realleges each and every allegation contained in paragraphs 1 through 49 of this Complaint and, by this reference, incorporates the allegations as though set forth fully herein.

51.   By reason of the foregoing, Plaintiff is entitled to recover the Transfers or their value from the Defendants pursuant to 11 U.S.C. § 550(a).

**NINTH CLAIM FOR RELIEF**

**(Conversion)**

52.   Plaintiff realleges each and every allegation contained in paragraphs 1 through 51 of this Complaint and, by this reference, incorporates the allegations as though set forth fully herein.

///

///

///

14      TRUSTEE'S FIRST AMENDED COMPLAINT

EXHIBIT "A"

53.     The Lottery Payments, the Luxury Items and the Receivables are all property of the Estate and the Defendants have substantially, intentionally, actually and wrongfully interfered with the Plaintiff's right of possession of the Lottery Payments, the Luxury Items and the Receivables.

54.     The Defendants have refused to return the Lottery Payments, the Luxury Items and the Receivables despite Plaintiff's demand for same and instead the Defendants have received and/or diverted the Lottery Payments, the Luxury Items and Receivables to themselves for their own benefit.

55.     Plaintiff is entitled to damages against the Defendants for conversion of the Lottery Payments, the Luxury Items and the Receivables in an amount to be proved at trial pursuant to Cal. Civ. Code § 3336.

56.     Plaintiff also alleges that base upon the receipt of payments from the Debtor for $25,592,261.26, the Defendants shall turnover any property purchased with those payments made to vendors on the Defendants behalf.  The funds used to make those payments, on information and belief, came from wrongfully appropriated settlement funds due clients of the Debtor and other joint ventures, attorney's fees splitting cases or other victims of the Debtor's former owner, Thomas Girardi.  Discovery will show that Erika was not entitled to the benefit of the expenses paid for her by the Debtor with other parties' earmarked funds.

**TENTH CLAIM FOR RELIEF**

**(Constructive Trust)**

57.     Plaintiff realleges each and every allegation contained in paragraphs 1 through 56 of this Complaint and, by this reference, incorporates said allegations as though set forth fully herein.

EXHIBIT "A"

58.    By virtue of the Defendants' wrongful acts, the Defendants hold the wrongfully acquired funds and property of the Estate and proceeds acquired in exchange for the wrongfully acquired funds and property of the Estate as constructive trustees for the benefit of the Plaintiff and the Estate.

## ELEVENTH CLAIM FOR RELIEF

### (Account Stated)

59.    Plaintiff realleges each and every allegation contained in paragraphs 1 through 58 of this Complaint and, by this reference, incorporates said allegations as though set forth fully herein.

60.    Plaintiff is informed and believes and, on that basis alleges thereon, that within the last four (4) years an account was stated in writing between the Debtor and the Defendant wherein it was agreed that the Defendants were indebted to the Debtor for the the Receivables.   The Receivables owed to the Debtor by the Defendants remain outstanding in an amount in excess of $25,000,000 or in an amount to be proved at trial, plus interest at the maximum rate permitted by law.

## TWELFTH CLAIM FOR RELIEF

### (Open Book Account)

61.    Plaintiff realleges each and every allegation contained in paragraphs 1 through 60 of this Complaint and, by this reference, incorporates said allegations as though set forth fully herein.

62.    Plaintiff is informed and believes and, on that basis alleges thereon, that within the last four (4) years, the Defendants became indebted to the Debtor on an open book account for money due on account of the Receivables (an amount no less than $25,592,261.26 or in an amount to be proved at trial) for monies provided to or for the benefit of the Defendants and for which the Defendants agreed to pay.

63.    No part of the Receivables have been paid although demand has been made and there is now due, owing, and unpaid from the Defendants to the Debtor a sum no less than $25,592,261.26 or in an amount to be proved at trial, plus interest at the

16    TRUSTEE'S FIRST AMENDED COMPLAINT

maximum rate permitted by law.

## THIRTEENTH CLAIM FOR RELIEF

### (Money Had And Received)

64.     Plaintiff realleges each and every allegation contained in paragraphs 1 through 63 of this Complaint and, by this reference, incorporates said allegations as though set forth fully herein.

65.     Plaintiff is informed and believes and, on that basis alleges thereon, that within the last four (4) years, the Defendants received and/or benefitted from the Receivables in an amount no less than $25,592,261.26 or in an amount to be proved at trial from the Debtor that was intended for the use and benefit of the Debtor.

66.     No part of the Receivables have been paid although demand has been made and there is now due, owing and unpaid from the Defendants to the Debtor an amount no less than $25,592,261.26 or in an amount to be proved at trial, plus interest at the maximum rate permitted by law.

## FOURTEENTH CLAIM FOR RELIEF

### (Unjust Enrichment)

67.     Plaintiff realleges each and every allegation contained in paragraphs 1 through 63 of this Complaint and, by this reference, incorporates said allegations as though set forth fully herein.

68.     As a result of the wrongful acts of the Defendants alleged herein, the Defendants have been unjustly enriched at the expense of the Estate and its creditors. The Defendants have derived and continue to derive benefit from their wrongful acts.

69.     The Defendants are under an obligation to pay the Plaintiff and the Estate all amounts by which the Defendants have been unjustly enriched in an amount according to proof.

///

///

///

EXHIBIT "A"

## FIFTEENTH CLAIM FOR RELIEF

### (Accounting)

70.    Plaintiff realleges each and every allegation contained in paragraphs 1 through 69 of this Complaint and, by this reference, incorporates said allegations as though set forth fully herein.

71.    The Defendants are in possession of money and property including, but not limited to, the Lottery Payments, the Luxury Items and the Receivables, that rightfully belong to the Estate as were fraudulently obtained by the Defendants.  The amount owed by the Defendants to the Estate cannot be easily ascertained without an accounting of the money and property received by the Defendants.

72.    Plaintiff also alleges that the EJG and Erika received from the Debtor $25,592,261.26.  The Plaintiff needs an accounting of those funds.

**WHEREFORE**, Plaintiff prays for judgment against the Defendants as follows:

**On the First Claim for Relief**:

1.    For a judgment that the Defendants have no ownership interest in the Lottery Payments and the Luxury Items and the Lottery Payments and the Luxury Items are property of the Estate;

**On the Second and Third Claims for Relief**

2.    For a judgment against the Defendants for turnover of the Lottery Payments, the Luxury Items, the Receivables and any profits and proceeds thereof under 11 U.S.C. § 542(a) and/or 542(b);

**On the Fourth, Fifth, Sixth and Seventh Claims for Relief**:

3.    For a judgment against the Defendants that the Transfers be avoided;

**On the Eighth Claim for Relief:**

4.    For a judgment against the Defendants that the Transfers, or their respective value, be recovered for the benefit of the estate pursuant to 11 U.S.C. § 550;

**On the Ninth Claim for Relief:**

5.    For a judgment against the Defendants for conversion of the Lottery

TRUSTEE'S FIRST AMENDED COMPLAINT

EXHIBIT "A"

1  Payments, the Luxury Items and the Receivables in an amount to be proved at trial

2  pursuant to Cal. Civ. Code § 3336;

3       **On the Tenth Claim for Relief:**

4       6.      For a judgment against the Defendants declaring that the wrongfully

5  acquired funds and property of the Estate and proceeds acquired in exchange for the

6  wrongfully acquired funds and property of the Estate are held in trust for the benefit of the

7  Plaintiff and the Estate;

8       **On the Eleventh, Twelfth and Thirteenth Claims for Relief:**

9       7.      For a judgment against the Defendants in an outstanding amount of no less

10 than $25,592,261.26 or in an amount to be proved at trial, plus interest at the maximum

11 rate permitted by law.

12      **On the Fourteenth Claim for Relief:**

13      8.      For a judgment against the Defendants ordering the Defendants to pay the

14 Plaintiff and the Estate all amounts by which the Defendants have been unjustly enriched

15 in an amount according to proof;

16      **On the Fifteenth Claim for Relief:**

17      9.      For a judgment against the Defendants ordering an accounting of all money

18 and property received by the Defendants from the Debtor and for payment of the amount

19 due from the Defendants as a result of the accounting;

20      **On All Claims for Relief:**

21      10.     For such other and further relief as the Court deems just and proper.

22

23 DATED:  August 26, 2021              Respectfully submitted,

24                                     LAW OFFICES OF RONALD RICHARDS &
                                       ASSOCIATES, APC
25

26                              By:        _/s/ Ronald Richards_
                                       Ronald Richards
27                                     Attorneys for Elissa D. Miller, Chapter 7 Trustee
28

EXHIBIT "A"

# EXHIBIT A

EXHIBIT "A"

1   MATTHEW R. EASON  SBN 160148
    KYLE K. TAMBORNINI  SBN 160538
2   LAW OFFICES OF EASON & TAMBORNINI
    1819 K Street, Suite 200
3   Sacramento, CA  95814
    Tel: (916) 438-1819
    Fax: (916) 438-1820

5   Attorneys for Defendant

**F I L E D**
SUPERIOR COURT
COUNTY OF SAN BERNARDINO
RANCHO CUCAMONGA DISTRICT

AUG – 2 2012

BY _____
CHRISTINA L. BANDFIELD, DEPUTY

SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF SAN BERNARDINO – RANCHO CUCAMONGA

DISTRICT

| | |
|---|---|
| MAURICE MARSTON, ET AL | Case No.: CIVRS 910950 |
| Plaintiffs, | |
| v. | STIPULATION AND [PROPOSED] ORDER AUTHORIZING CALIFORNIA LOTTERY TO DISBURSE LOTTERY WINNINGS & FINAL DISMISSAL OF ACTION |
| NATALIE MARSTON-SALEM, f/k/a or a/k/a NATALIE MARSTON | |
| Defendant. | |

        Plaintiff Maurice L. Marston ("Plaintiff") and defendant Natalie E. Marston-Salem

("Defendant") hereby stipulate, through their undersigned counsel of record, to the following

Order:

        1.      Defendant Natalie E. Marston-Salem was entitled to receive twenty (20) annual

payments of $260,000.00 for twenty (20) years from the California Lottery winnings.  Pursuant

to Government Code section 8880.325 ("Section 8880.325"), California Lottery Regulation

section III(B)(2) ("Regulation III(B)(2)"), and the June 12, 2012 settlement agreement between

Plaintiff and Defendant attached hereto as Exhibit 1, the Court hereby approves an assignment

by the Defendant of 100% of the gross annual amount of California Lottery winnings less

Federal taxes and deductions authorized by law for the calendar year 2012 as follows:

STIPULATION AND ORDER FOR ASSIGNMENT Page 1

EXHIBIT "A"

a.  60% ($156,000.00) to Maurice L. Marston and Nancy Norton-Marston

b.  13.34 % ($34,684.00) to █████ ███

c.  13.33% ($34,658.00) to Erika Girardi

d.  13.33% ($34,658.00) to ████████████

2.  Pursuant to Government Code section 8880.325 ("Section 8880.325"), California Lottery Regulation section III(B)(2) ("Regulation III(B)(2)"), and the June 12, 2012 settlement agreement between Plaintiff and Defendant attached hereto as Exhibit 1, the Court hereby approves an assignment by the Defendant of 75% of the gross annual amount of California Lottery winnings of $260,000.00 less Federal taxes and deductions authorized by law for the calendar years 2013 through 2025 as follows:

a.  45% ($117,000) to Maurice L. Marston and Nancy Norton-Marston

b.  10 % ($26,000) to ███████████

c.  10% ($26,000) to Erika Girardi

d.  10 % ($26,000) to █████████████

Defendant will retain $65,000.00 or twenty-five percent (25%) of the gross amount of California Lottery winnings for the calendar years 2013 through 2025.  For the calendar years 2026 through 2028, Defendant will receive one hundred percent (100%) of the gross annual amount of the California Lottery winnings of $260,000.00.

3.  The Court authorizes the California Lottery to disburse the above stated amounts, less federal taxes and deductions that the Lottery is required by law to withhold, to Plaintiff and the assignees set forth in Paragraph 1 herein.

4.  The Lottery will pay the balance of the lottery prize to Defendant Natalie E. Marston-Salem after the allocations set forth in Paragraph 2a. – d. herein.

5.  Additionally, pursuant to Section 8880.325 and Regulation III(B)(2), the Court finds as follows:

(a)  Defendant/Winner's name on California Lottery claim form:  Natalie E. Marston. She was later married and changed her name to Natalie E. Marston-Salem.

(b)  Defendant/Winner's address and social security number:  Confidential/has already

EXHIBIT "A"

1    been provided to the California Lottery;

2            (c)    Plaintiff/Assignee's name: Maurice L. Marston and Nancy Norton-Marston

3    (Federal taxes will be paid under Maurice L. Marston's Social Security Number as provided

4    under separate cover);

5            (d)    Plaintiff/Assignee's address, birth date, and social security number:

6    Confidential/will be provided to the California Lottery under separate cover;

7            (e)    Additional assignees' names: ███████████, Erika Girardi, and ███

8    ███████████;

9            (f)    Additional assignees' addresses, birth dates, and social security numbers:

10   Confidential/will be provided to the California Lottery under separate cover;

11           (g)    Defendant/Winner has reviewed and understands the terms of the foregoing

12   assignment; understands that she will not receive the assigned prize payments or a portion

13   thereof for the payments assigned; has entered into the agreement of her own free will without

14   undue influence or duress and not under the influence of drugs or alcohol; has had an opportunity

15   to retain and consult with an independent financial and tax advisor(s) concerning the effect of the

16   assignment, who have fully advised her about the tax consequences of the assignment; and has

17   been represented by independent legal counsel, Matthew R. Eason, Eason & Tambornini, ALC

18   who has advised her of her legal rights and obligations under the assignment and whose State

19   Bar of California number is 160142;

20           (h)    Defendant/Winner is married and her spouse has executed this stipulation

21   disclaiming any interest, as provided in his Declaration, and there are no other non-spouse co-

22   owners, claimants, or lien holders asserting a claim against Defendant/Winner's lottery winnings,

23   including, but not limited to, payments that are the subject of this assignment;

24           (i)    Defendant/Winner has obtained and filed with the Court a notification from the

25   California State Lottery of any liens, levies, or claims, and the Controller's office of any offsets

26   asserted as of that time against Defendant/Winner, as reflected in their respective official records

27   as of the time of the notification; and

28           (j)    The California Lottery and the State of California are not parties to the proceeding

STIPULATION AND ORDER FOR ASSIGNMENT Page 3

EXHIBIT "A"

1    and the California Lottery and the State of California may rely upon this order in disbursing the

2    lottery prize payments that are the subject of this order.  Further, upon payment of lottery prize

3    monies pursuant to an order of the court, the California Lottery, the director, and commission

4    and the employees of the California Lottery, and the State of California shall be discharged of

5    any and all liability for the lottery prize paid, and these persons and entities shall have no duty or

6    obligation to any person asserting another interest in, or right to receive, the lottery prize

7    payment.

8          6.      The June 5, 2012 annual lottery payment that is currently being held by the

9    Lottery will be disbursed upon confirmation of the assignment and the necessary time to set up

10   the payees.

11         7.      The Court hereby dismisses the above-captioned action with prejudice with each

12   party to bear its own attorneys' fees and court costs.

13

14   Dated: July 30, 2012

                                        Natalie E. Marston-Salem, Defendant

15

16   Dated: July 30 2012

                                        John Salem, Consenting Spouse

17

18   Dated: July 30, 2012

                                        Maurice L. Marston, Plaintiff

19

20   Dated: July 30, 2012

21                                      Nancy Norton-Marston, Consenting
                                        Spouse

22

23                              ORDER

24   IT IS SO ORDERED.

25        AUG 0 2 2012

26   DATED: ~~July ~~~~~~~, 2012~~            JOSEPH R. BRISCO

27                                      HONORABLE JOSEPH R. BRISCO
                                        Judge of the Superior Court
28

STIPULATION AND ORDER FOR ASSIGNMENT Page 4

EXHIBIT "A"

## SETTLEMENT AGREEMENT

This Settlement Agreement ("Agreement") is entered into as of June __, 2012, by and between Maurice Marston ("Plaintiff"), Natalie Marston Salem ("Defendant"). Plaintiff and Defendant are also sometimes referred to herein collectively as the "Parties" and/or individually as a "Party."

## RECITALS

WHEREAS, on September 29, 2009, Plaintiff filed a action for damages, declaratory relief, and injunctive relief against the Defendant. The case is commonly known as Marston v. Marston, San Bernardino Superior Court Case Number CIVRS 910950 ("The Action");

WHEREAS, on November 29, 2011, judgment was entered in "The Action" on behalf of the Plaintiff and against the Defendant;

WHEREAS, Defendant appealed that judgment;

WHEREAS, the Parties, their respective counsel, and Nancy Marston attended a settlement conference before the Fourth District Court of Appeals Presiding Justice Manuel A. Ramirez.

WHEREAS, as of the drafting of this agreement, the California Lottery has made the first three years of a twenty year payout to the Defendant. The 2012 payment representing year four has not yet been made.

WHEREAS, because of the time, expense and uncertainties associated with further litigation between the Parties and in exchange for the mutual considerations exchanged and agreed to by the Parties under this Agreement, the Parties agree to fully, finally and completely resolve and settle all issues between the Parties, as expressly set forth in this Agreement;

## TERMS

1.    In connection with the Recitals set forth above, which are all fully incorporated herein by reference, the Parties hereby agree to fully, finally and completely resolve and settle all past and present disputes, known and unknown, between them.

2.    Defendant has paid Plaintiff in consideration of this agreement the sum of $135,000.

3.    As of the drafting of this agreement, the payment for 2012 (year 4) from the California State Lottery has not been issued. The parties agree that the proceeds of that payment will be surrendered promptly to the Plaintiff. If the check comes in made payable to the Defendant, the Defendant will negotiate the check, and immediately upon confirmation of availability of funds will submit the entire funds to the Plaintiff. If the check comes in made payable to multiple parties which include the Defendant, Defendant will promptly execute the check and surrender the check to the Plaintiff.

6-6-12

EXHIBIT "A"

4.      The parties agree that the Defendant will voluntarily assign to Plaintiff, or his to his named assignees a seventy-five percent (75%) portion of the payments for years five (5) through seventeen (17) (Calendar years 2013-2025). Defendant will retain a twenty-five (25%) portion of the payments for years five (5) through seventeen (17) (Calendar years 2013-2025), and she shall retain 100% of the payments for years eighteen (18) through twenty (20) (Calendar years 2026- 2028).

5.      Plaintiff will apply for, and Defendant will cooperate in, the executing of court documents to have the assignments contemplated above approved by a court of competent jurisdiction pursuant to Government Code Section 8880.325(j).

6.      Upon satisfaction of the terms above, the Defendant will file a notice of abandonment of appeal, and the Plaintiff will cause to be filed a satisfaction of judgment in full.

7.      In consideration of the Settlement Payment, and promises of the Parties specified in this Agreement, the Parties hereby fully, finally and forever release, acquit, exonerate, waive, settle and discharge, each other, and each Party's attorneys, insurance carriers, agents, servants, representatives, employees, subsidiaries, affiliates, directors, board members, partners, officers, directors, shareholders, predecessors, successors-in-interest, assigns, heirs, spouses, and all persons acting by, through, under or in concert with them, of and from any and all past and present claims, demands, obligations, actions, causes of action, damages, costs, attorneys' fees, losses of service, expenses, liability, suits, and compensation of any nature whatsoever, whether based in tort, contract, or any other theory of recovery arising from the recitals set forth above, including without limitation any claim or claims that may have been filed between them. The foregoing is hereinafter referred to as the "Released Matters."

8.      The Parties acknowledge that they are familiar with section 1542 of the California Civil Code, which provides as follows:

> "A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor."

9.      Except for the obligations set forth in this Agreement, the Parties, after consulting with their respective counsel, hereby waive and relinquish any and all rights and benefits which they may have under, and which may be conferred upon them by, the provisions of Section 1542 regarding the Released Matters to the fullest extent that they may lawfully waive such rights or benefits. The Parties declare that they understand the full nature, extent and import of Section 1542 of the California Civil Code and have been so advised, and/or have had the opportunity to be so advised, by their respective attorneys.

10.     The Parties each represent and warrant that they/it are the sole owner of all rights, title, and interests in and to all of the Released Matters settled under this Agreement and that they have not heretofore assigned, transferred, or purported to assign and/or transfer to any person or entity any matters, or portions thereof, settled and released under this Agreement.

11.     The settlement, releases and other matters set forth herein are a compromise and

MM 6·6·12

EXHIBIT "A"

settlement of disputed and contested claims between the Parties, and nothing contained herein shall be construed as an admission by any Party of any obligation and/or liability of any kind to any other Party.

12.    This Agreement contains and embodies the entire agreement of the Parties with regard to the obligations under this Agreement and to the Released Matters covered in this Agreement, and no representations, inducements, or other agreements, oral or otherwise, not embodied herein, exist nor shall they be of any force or effect. This Agreement can only be modified or amended by a subsequent written agreement signed by the Parties.

13.    This Agreement is binding upon and shall inure to the benefit of the Parties, their respective agents, employees, representatives, shareholders, officers, directors, partners, board members, divisions, corporations, subsidiaries, parents, affiliates, assigns, heirs, predecessors, spouses, and successors, past, present, and future, and all of their insurers, guarantors, sureties and reinsurers.

14.    The Parties to this Agreement shall each be deemed to have drafted this Agreement, such that no ambiguity in this Agreement, if any, shall be construed against any Party.

15.    The Parties shall each bear their own costs, expenses and fees, of all kind, including attorney, consultant, and expert fees, up through the date this Agreement is entered into, regarding the Released Matters.

16.    The Parties agree to execute any and all such other documents and perform such other acts as are necessary to give effect to the intent and purposes of this Agreement.

17.    If any part, provision, condition, or term of this Agreement, or the application thereof to any person, Party or circumstance, shall to any extent be invalid or unenforceable, the remainder of this Agreement shall not be affected thereby, and each part, provision, condition or term of this Agreement shall be valid and enforceable to the fullest extent permitted by law.

18.    Nothing in this Agreement, whether express or implied, is intended to confer any rights or remedies under or by reason of this Agreement on any persons other than the Parties hereto. This Agreement and the performance of the Parties' obligations hereunder are for the sole and exclusive benefit of the Parties.

19.    This Agreement is entered into and shall be subject to the laws of the State of California. Any dispute shall be resolved before the Superior Court of the County of Riverside which shall retain exclusive jurisdiction over this matter.

20.    This Agreement may be signed in counter-parts, all of which taken together shall be construed as one original. Telefaxed signatures shall constitute original signatures.

21.    Each Party hereto represents and warrants that it is represented by, or has had the opportunity to consult with, legal counsel and that it is authorized to sign this Agreement and bind the respective Party hereby and that all acts necessary to confer such authority have been duly, properly and legally taken.

MM 6-6-12

EXHIBIT "A"

IN WITNESS WHEREOF, the parties hereto have executed or caused this Agreement to be executed as of the date first written above.

Dated: June 12, 2012

Natalie Marston-Salem

Dated: June 6, 2012

Maurice Marston

Page 4 of 4

6·6·12
mm

EXHIBIT "A"

# EXHIBIT B

EXHIBIT "A"



Evan C Borges
Direct Dial: (949) 383-2860
EBorges@GGTrialLaw com

June 28, 2021

**VIA E-MAIL: ron@ronaldrichards.com**

Ronald Richards
Special Counsel to Chapter 7 Trustee, Girardi Keese Estate
Law Offices of Ronald Richards & Associates, A.P.C.
P.O. Box 11480
Beverly Hills, CA 90213

          Re:      **In re Girardi Keese; CACB Case No. 2:20-bk-21022-BR**

Dear Ronald:

          This letter sets forth the agreement effective as of June 28, 2021 (the "Agreement")
between Elissa D. Miller, in her capacity as chapter 7 trustee for bankruptcy debtor Girardi
Keese ("GK") (the "Trustee") on the one hand, and party in interest Erika Girardi ("Ms. Girardi")
on the other hand, regarding the proceeds of a certain check (the "Check") dated June 9, 2021,
bearing check number ▓▓▓▓▓ and received at the offices of GK from the State of California,
made payable to Erika N. Girardi, based on a gross amount of $26,000, from which the State of
California withheld federal taxes of $6,240.00, resulting in a net payment amount of **$19,760.00**
(the "Check Proceeds").

          1.      **Endorsement and Deposit of Check By Trustee in Trust Account**.  Ms. Girardi
consents to the Trustee endorsing the check with Ms. Girardi's signature "for deposit only" and
depositing the check into the trust account of GK, over which the Trustee represents that she has
exclusive control.  The Trustee further agrees to hold and segregate the Check Proceeds in the
GK trust account, subject to the terms of this Agreement.

          2.      **Check Proceeds Retained in Trust Account**.  The Trustee and Ms. Girardi agree
that the Check Proceeds shall be held by the Trustee in the GK trust account and shall not be
released or distributed absent (a) a further written agreement signed by the Trustee and Ms.
Girardi, or (b) a binding and final court order.

          3.      **Mutual Reservation of Rights**.  The Trustee and Ms. Girardi reserve all rights
and claims as to entitlement to the Check Proceeds and the subject matter of this Agreement.

EXHIBIT "A"

GREENBERG GROSS LLP

Ronald Richards
June 28, 2021
Page 2

     4.    **Mutual Cooperation**.  The Trustee and Ms. Girardi agree to cooperate with one another in exchanging information relevant to resolution of entitlement to the Check Proceeds and the subject matter of this Agreement.

     5.    **Miscellaneous**.  This Agreement contains the entire agreement between the parties regarding the subject matter hereof.  This Agreement may not be modified or amended verbally, and only may be modified or by a writing signed by both of the parties hereto.  This Agreement may be signed in counterpart copies by pdf electronic signatures of the parties, which shall be deemed original signatures, and which together shall constitute the fully executed Agreement.

     By their signatures below, the Trustee and Ms. Girardi agree to this Agreement.

              Very truly yours,

              Evan C. Borges

IT IS SO AGREED.

By: _____
    Elissa D. Miller, in her capacity as chapter 7 trustee
    for bankruptcy debtor Girardi Keese

By: _____
    Erika Girardi

ECB:CW

EXHIBIT "A"

**GREENBERG GROSS LLP**

Ronald Richards
June 28, 2021
Page 2

     4.    **Mutual Cooperation**.  The Trustee and Ms. Girardi agree to cooperate with one another in exchanging information relevant to resolution of entitlement to the Check Proceeds and the subject matter of this Agreement.

     5.    **Miscellaneous**.  This Agreement contains the entire agreement between the parties regarding the subject matter hereof.  This Agreement may not be modified or amended verbally, and only may be modified or by a writing signed by both of the parties hereto.  This Agreement may be signed in counterpart copies by pdf electronic signatures of the parties, which shall be deemed original signatures, and which together shall constitute the fully executed Agreement.

     By their signatures below, the Trustee and Ms. Girardi agree to this Agreement.

     Very truly yours,

     Evan C. Borges

IT IS SO AGREED.

By: _____
     Elissa D. Miller, in her capacity as chapter 7 trustee
     for bankruptcy debtor Girardi Keese

By: _____
     Erika Girardi

ECB:CW

EXHIBIT "A"

# EXHIBIT C

EXHIBIT "A"

LAW OFFICES OF

# **R**onald **R**ichards and **A**ssociates

**A Professional Corporation**
**310-556-1001 Los Angeles Office**
**202-508-1060 DC Office**

**\*Admitted in the following
Courts:\***
All Fed. and State Cts. in
California, 2nd, 9th & 11th Circuit,
C.O.A's., ED of Michigan, D of
Colorado, W.D. of Tenn., District
of Columbia D.C.,
The United States Supreme Court
(U.S.S.C.)
**Bar Membership:**
California
District of Columbia

Office Locations:

Richards Law Building
West Hollywood, CA

CA Mailing Address:
PO Box 11480
Beverly Hills, CA  90213

DC Office Address:
1629 K ST. Suite 300
Washington D.C., 20006

EMAIL: RON@RONALDRICHARDS.COM
WEBSITE: WWW.RONALDRICHARDS.COM

June 10, 2021

Mr. Peter Mastan
Dinsmore & Shohl LLP
550 S. Hope Street, Suite 1765
Los Angeles, CA 90071

Dear Mr. Mastan,

## **DEMAND FOR REIMBURSEMENT AND ASSIGNMENT OF LOTTERY PAYMENTS**

As you are aware, our office is Special Counsel to Elissa D. Miller, Trustee of the Girardi Keese Chapter 7 Estate.

I am attaching for your review a lottery payee set up dated 6/26/2012, made payable to your client, Erika Nay Girardi.  A stipulation and court order for disbursement of Girardi Keese Attorneys Fees.  A settlement agreement for attorneys' fees for Girardi Keese.  Finally, a disbursement letter from Girardi Keese signed by ████████.

We would like to have the remaining payments assigned to the Estate immediately. We would also like to have the Estate reimbursed for the payments received since June of 2012 to the present.

Based on the attached evidence, we are demanding an execution of a new lottery payee form to Elissa D. Miller, Chapter 7 Trustee, for the Girardi Keese estate, as well as a wire of the proceeds that have been previously tendered, to the attached bank account for the Trustee.

1

Here is the breakdown as we see it:

$34,658.00 paid in 2012.
$208,000.00 for years 2013 to 2021
$78,000 for the years, 2022 to 2025.

Please feel free to call me to discuss this matter.   This demand will expire within
ten days from today's date before we take further steps to recover these funds for the
Estate and prevent further dissipation of Estate assets.

Sincerely,

Ronald Richards, Esq.

2

EXHIBIT "A"



CALIFORNIA LOTTERY
## PAYEE SETUP

Please complete, sign, obtain notarization, and return this form to the following address:

**California Lottery**
**Attn: Investments Section**
**700 North 10th Street**
**Sacramento, CA 95811**

The following information is required to properly set up your file, and will determine the appropriate tax withholding rate. Please see information about Federal Tax Reporting below.

### PLEASE PRINT IN INK OR TYPE

| NAME (FIRST, MIDDLE, LAST) | | HOME TELEPHONE NO. | WORK TELEPHONE NO. |
|---|---|---|---|
| ERIKA NAY GIRARDI | | | |

| MAILING ADDRESS (STREET, RURAL ROUTE, OR PO BOX) | CITY | STATE | ZIP CODE |
|---|---|---|---|
| 1126 Wilshire Boulevard | Los Angeles | CA | 90017 |

| COUNTRY (If not USA) | SOCIAL SECURITY/TAX ID NO. | DATE OF BIRTH | DRAW DATE |
|---|---|---|---|
| | | 6 ████ 9 | |

| ARE YOU A U.S. CITIZEN? [X] YES [ ] NO | IF NOT A U.S. CITIZEN, YOUR RESIDENT STATUS | [ ] Resident | [ ] Non-Resident |
|---|---|---|---|

*I certify under penalty of perjury under the laws of the State of California that the foregoing is true and correct.*

| SIGNATURE | DATE |
|---|---|
| *[signature]* | 6/26/12 |

### NOTARY PUBLIC ACKNOWLEDGMENT

State of  California                                    County of  Los Angeles

On  June 26, 2012                          before me, Shirleen H. Fujimoto, Notary   personally
                                                                                              Public
appeared  Erika Girardi _____ who proved to me on the basis of satisfactory evidence to
be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same
in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the
person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing  paragraph is true and correct.

WITNESS my hand and official seal.

*[signature]* Shirleen H. Fujimoto

SHIRLEEN H. FUJIMOTO
COMMISSION # 1933089
Notary Public - California
LOS ANGELES COUNTY
My Comm. Expires May 15, 2015
(Seal)

**INFORMATION ABOUT FEDERAL TAX REPORTING:** The California Lottery (Lottery) is required by Internal Revenue Code Treasury Regulations, § 31.3402(a)-1 to withhold income on the proceeds of a single wager which exceeds $5,000. The withholding rate for income tax depends on your personal resident status. The Lottery is currently required to withhold federal taxes at the rate of 25% for a U.S. citizen and resident aliens; 30% for non-resident aliens, and 28% for U.S. citizens and resident aliens who do not have a Social Security Number.

**PRIVACY NOTICE:** The State Information Practices Act of 1977 (Civil Code § 1798.17) and the Federal Privacy Act (Public Law 93-579) require that this notice be provided when the Lottery collects personal information from individuals. Social Security numbers and birth dates are used for identification purposes only, except as required by state and federal law. Providing the requested information will prevent delays in receipt of annual prize payments.

The information you provide may be disclosed to state and federal government agencies including, but not limited to: the State Controller's Office, State Franchise Tax Board, Department of Health Services, and the Federal Internal Revenue Service.

You have the right to access your personal information maintained by the Lottery by contacting the California Lottery, 700 North 10th Street, Sacramento, CA 95811, Attention: Public Records Act Coordinator.

CSL 1270 (R06/11)

Event No. TV ████ ████   1476

GIRARDI | KEESE
LAWYERS

August 2, 2012

**SENT VIA U.S. PRIORITY MAIL**

MR. MAURICE MARSTON
8780 19th Street - #460
Alta Loma CA 91701

    Re:   **Marston v. Marston**

Dear Maurice:

    I am enclosing herewith a copy of the **STIPULATION AND ORDER AUTHORIZING CALIFORNIA LOTTERY TO DISBURSE LOTTERY WINNINGS AND FINAL DISMISSAL OF ACTION ("ORDER")** as signed by the Honorable Joseph Brisco on August 2, 2012.

    As you will note from this ORDER, you will receive payments from the California Lottery, pursuant to Paragraph 2, for the next twelve (12) years or for calendar years 2013 – 2025.   You will receive within sixty (60) days the payment set forth in paragraph 1 of this ORDER.   Please keep the enclosed ORDER in a safe place for future reference.  It is on file with the State Lottery Commission.

    If there is a change in the address as set forth in the Payee Setup Form which you previously executed, you must so notify the State Lottery for receipt of future payments.

        Very truly yours,

        GIRARDI | KEESE

    ■■■■■■■■/ata
Enclosure

1126 WILSHIRE BOULEVARD • LOS ANGELES, CALIFORNIA • 90017-1904
TELEPHONE: 213-977-0211 • FACSIMILE: 213-481-1554

EXHIBIT "A"

# EXHIBIT D

EXHIBIT "A"

LAW OFFICES OF

# Ronald Richards and Associates

**A Professional Corporation**
**310-556-1001 Los Angeles Office**
**202-508-1060 DC Office**

**\*Admitted in the following**
**Courts:\***
All Fed. and State Cts. in
California, 2nd, 9th & 11th Circuit,
C.O.A's, ED of Michigan, D of
Colorado, W.D. of Tenn., District
of Columbia D.C.,
The United States Supreme Court
(U.S.S.C.)
**Bar Membership:**
California
District of Columbia

Office Locations:

Richards Law Building
West Hollywood, CA

CA Mailing Address:
PO Box 11480
Beverly Hills, CA  90213

DC Office Address:
1629 K ST. Suite 300
Washington D.C., 20006

EMAIL: RON@RONALDRICHARDS.COM
WEBSITE: WWW.RONALDRICHARDS.COM

August 18, 2021

Evan C. Borges, Esq.
Greenberg Gross LLP
650 Town Center Drive, Suite 1700
Costa Mesa, California 92626

**VIA EMAIL PDF:  EBorges**

Dear Mr. Borges,

As you know, our office is Special Counsel to the Trustee Elissa Miller for the
Girardi Keese Chapter 7 Bankruptcy Estate.

Please consider this a formal demand for payment of the receivable in favor of
Girardi Keese against EJ Global, LLC and Erika Girardi in the amount of $25,592,261.26
plus $2,559,226.10 in interest through June 2021.  The open book account has been
entered and maintained each year since 2008.  The last entry was in June of 2020.  Interest
is accruing at 10% per year.

I have attached a breakdown of the figure to the penny.  These charges were all for
the benefit of Erika Girardi and EJ Global, LLC, which was 100% owned by Erika Girardi.
These charges were made by Erika Girardi and were exclusively for her benefit.  Her LLC
was filed on her personal return for many years as a Schedule C since she was the sole
owner.  Mrs. Girardi signed under penalty of perjury the return and personally approved
the charges allocated to the breakdown.

EXHIBIT "A"

For the sake of this letter, we are presuming that Mrs. Girardi accurately represented her receivable to the Internal Revenue Service.   We are also presuming that all of the charges on her personally assigned American Express Card and other personal Erika Jayne aka Erika Girardi vendors were exclusively for her benefit.

We are reserving all rights to add additional common counts or claims and this letter should not be construed as a limitation of any those rights.

If you have any questions, please do not hesitate to contact me.

Sincerely,

Ronald Richards, Esq.
Special Counsel

EXHIBIT "A"

**Girardi Keese**
**Summary of Net Payments Charged to EJ Global Receivable Account**
**For the Period 2008 - 2020**

| Payee | Net Amount |
|---|---|
| AMERICAN EXPRESS | $14,259,012.84 |
| McDONALD SELZNICK ASSOC., INC. | 1,532,774.88 |
| UNKNOWN | 1,417,587.50 |
| PARADIGM MANAGEMENT LLC | 1,260,000.00 |
| KIDSQUARED, INC. | 863,880.93 |
| CAK ENTERTAINMENT, INC. | 450,000.00 |
| GREENBERG TRAURIG LLP | 260,000.00 |
| TROY JENSEN INC | 252,100.00 |
| SANRE' ENTERTAINMENT | 220,000.00 |
| CITRUSONIC, LLC | 205,838.54 |
| BLOC TALENT AGENCY, INC. | 171,991.50 |
| THE DANICA GROUP LLC | 170,108.71 |
| DNA INC. | 156,600.00 |
| JEREMY SULLIVAN | 150,000.00 |
| AWESTRUCK PRODUCTIONS, INC. | 142,800.00 |
| JASMINE VEGA | 137,896.67 |
| MARCO BOLLINGER PHOTOGRAPHY | 134,264.00 |
| MMA | 133,154.73 |
| CLEAR TALENT GROUP | 130,334.93 |
| REGINAL A. MATHIS LLC | 125,000.00 |
| PRESTON MENESES | 114,500.00 |
| IMMACULATE ASSISTANCE AGENCY | 108,373.91 |
| STEPHANIE SHEPHERD | 102,596.77 |
| GERALD HELLER | 100,000.00 |
| CLOUTIER-REMIX | 98,012.37 |
| HOT ROLLER INC. | 97,683.80 |
| HOCHMAN SALKIN ROSCHER PEREZ P.C. | 94,111.77 |
| JON KOOREN | 88,934.00 |
| GARY BALLEN | 88,808.68 |
| ORLANDO PUERTA | 88,000.00 |
| MMK MANAGEMENT | 80,939.41 |
| RICHARD LEHER | 80,000.00 |
| TMG INTERNATIONAL | 80,000.00 |
| MICHAEL NUNEZ | 76,818.40 |
| BOBBY SHAW PROMOTIONS | 76,000.00 |
| FRANCESCO GALASSO | 75,681.00 |
| CENTERSTAGING MUSICAL PROD INC | 75,144.98 |
| ROGERS & COWEN | 69,274.89 |
| MISSSHIU INC | 66,875.00 |
| ARCHER PRODUCTIONS LLC | 65,628.21 |
| LEVINE COMMUNICATIONS OFFICE | 62,475.00 |

EXHIBIT "A"

**Girardi Keese**
**Summary of Net Payments Charged to EJ Global Receivable Account**
**For the Period 2008 - 2020**

| Payee | Net Amount |
|---|---|
| MATTHIAS HEIDEMANNS | 60,000.00 |
| PHILIP SANDHAUS | 60,000.00 |
| ELIAS TAHAN | 59,950.00 |
| OUTBOUND INC. | 59,100.00 |
| KIMBERLY C. KYEES | 58,875.00 |
| MVA PUBLIC RELATIONS GROUP | 55,000.00 |
| MILES HIGH PRODUCTIONS | 51,486.84 |
| APOLLO JETS | 45,161.69 |
| JAREK RIEWER | 44,200.00 |
| THE HUNGRY CREATIVE AGENCY LLC | 43,447.00 |
| MITCH SCHNEIDER ORGANIZATION | 42,717.12 |
| CHUCK OLINER | 41,665.00 |
| THERESE WILLIS | 37,017.50 |
| MICHAEL GATSWIRTH | 36,000.00 |
| RAFELSON MEDIA CONSULTING INC. | 34,300.00 |
| GO 2 TALENT AGENCY INC | 30,786.14 |
| MICHAEL GRUBER | 30,000.00 |
| BRYAN CROSS, LLC | 29,705.29 |
| SCOTT BARNES | 28,300.00 |
| PRISCILLA RANGEL | 28,282.40 |
| 1645 N. VINE ST. 705, LLC | 27,980.00 |
| GUI SCHOEDLER | 21,600.00 |
| MONGOOSE ATLANTIC, INC. | 21,140.00 |
| JULIANA Z. INC. | 19,500.00 |
| JOHN RITTENOUR | 18,000.00 |
| LORENZO CALDERON | 17,532.00 |
| COLBY COLON | 17,500.00 |
| OPUS BEAUTY | 17,415.00 |
| ANDREW DIPALMA | 17,000.00 |
| BRITTEN PARK | 16,400.00 |
| MARCO BOLLINGER | 16,350.00 |
| MELROSE STUDIOS, INC | 15,156.01 |
| JOSEPH FISHER | 15,000.00 |
| MATT WATERHOUSE | 15,000.00 |
| MICHAEL SCHMIDT STUDIOS INC. | 14,530.00 |
| LAURENTIUS PURNAMA | 14,469.00 |
| THE HOLLYWOOD REPORTER | 13,360.00 |
| BLOCNYC | 12,970.00 |
| KATIE BERENSON | 12,502.79 |
| MARTIN MILLIGAN | 11,887.75 |
| LEE DAGGER | 10,500.00 |

**Girardi Keese**
**Summary of Net Payments Charged to EJ Global Receivable Account**
**For the Period 2008 - 2020**

| Payee | Net Amount |
|-------|-----------:|
| MARC JACKSON BURROWS | 10,500.00 |
| LOS ANGELES TIMES MAGAZINE | 10,400.00 |
| ESCAPE PRODUCTIONS INC. | 10,000.00 |
| VIDEO STATIC | 10,000.00 |
| POLITO EPPICH ASSOCIATES LLP | 9,700.00 |
| CoCo de Mer | 9,029.52 |
| ISABEL PEREZ | 9,000.00 |
| E5 GLOBAL MEDIA LLC | 8,480.00 |
| BLAH BLAH MUSIC LTD. | 8,223.92 |
| WOODMAR INC | 7,527.54 |
| RALPHI ROSARIO INC. | 7,000.00 |
| JACOB R. ARCHER | 6,775.00 |
| BERNIE GRUNDMAN MASTERING | 6,700.78 |
| EN ROUTE TRAVEL | 6,191.80 |
| BOB GAIL ENTERPRISES,INC | 6,045.58 |
| HECTOR FONSECA | 6,000.00 |
| KGS STUDIOS LTD | 6,000.00 |
| L.A. MODELS | 6,000.00 |
| TYPRODUCTIONS | 6,000.00 |
| CHRIS ALBA | 5,500.00 |
| EXTREMEDYS HAND & FOOT SPA | 5,160.00 |
| MARCO MARCO | 5,030.00 |
| AMPLE ENTERTAINMENT, INC | 5,000.00 |
| JODY DEN BROEDER | 5,000.00 |
| JOHN RUSSO PHOTOGRAPHY | 5,000.00 |
| JOY FERNBACH HARN | 5,000.00 |
| MAMS TAYLOR | 5,000.00 |
| MIXMASTERED RECORDS | 5,000.00 |
| THREE SIX ZERO GROUP | 5,000.00 |
| HSMPR | 4,800.00 |
| KATHERINE DELANY | 4,675.00 |
| THE LOOK PARTNERSHIP LLC | 4,500.00 |
| NAILS BY SARAH B | 4,444.79 |
| BRANDON SHOWERS PHOTOGRAPHY | 4,052.00 |
| HITS MAGAZINE, INC. | 4,000.00 |
| MDM ARTISTS, INC. | 4,000.00 |
| UNDOCUMENTED MANAGEMENT | 4,000.00 |
| WIZARDZ OF OZ | 3,900.00 |
| COLIN YEO | 3,800.00 |
| THE BASEMENT DANCE CENTER | 3,575.00 |
| SIMON THIRLAWAY INC. | 3,500.00 |

EXHIBIT "A"

**Girardi Keese**
**Summary of Net Payments Charged to EJ Global Receivable Account**
**For the Period 2008 - 2020**

| Payee | Net Amount |
|---|---|
| PREMIERE VALET SERVICE | 3,330.00 |
| PETER GALVIN PRODUCTIONS | 3,288.91 |
| FRANCHISE TAX BOARD | 3,256.96 |
| GORDON LAKE | 3,200.00 |
| POWER PROMOTIONS | 3,187.30 |
| DUN & COMPANY | 3,072.10 |
| BILL HAMEL, INC. | 3,000.00 |
| CHRIS BREDESEN | 3,000.00 |
| COTTON GRAPHIC DESIGN | 3,000.00 |
| DJ LYNWOOD GROUP OF COMPANIES | 3,000.00 |
| RICHIE PANGILINAN | 3,000.00 |
| SAMUEL PISENO | 3,000.00 |
| TARA, INC. | 3,000.00 |
| TKC ENTERTAINMENT | 3,000.00 |
| TOO BOB FOR YOUR MOM | 3,000.00 |
| TRENDSETTER MEDIA & MARKETING | 3,000.00 |
| VINCENT PASSERI | 3,000.00 |
| WILLIAM CLARK | 3,000.00 |
| KIMBLE HAIR STUDIO | 2,980.29 |
| QBT MEDIA COMPANY | 2,980.19 |
| LIGHTENUP, INC. | 2,925.00 |
| JASON LEDER | 2,825.00 |
| CHRISTINE D'ANGELO | 2,646.12 |
| SOUNDCHECK LA, LLC | 2,571.00 |
| GUY FURIOUS PRODUCTIONS | 2,500.00 |
| ODYSSEY MAGAZINE | 2,500.00 |
| SACHA COLLISSON | 2,500.00 |
| ARNE KNUDSEN | 2,431.66 |
| ANTHONY SPENCER | 2,275.00 |
| KIMMIE K | 2,250.00 |
| ELECTRO LIGHTING, LLC | 2,200.00 |
| KIM KIMBLE | 2,100.00 |
| STAGE THIS | 2,020.00 |
| WARREN CONFECTIONS CORP. | 2,006.58 |
| HED PRODUCTIONS | 2,000.00 |
| SURFER ROSA RECORDS | 2,000.00 |
| SEAN KAYSEN | 1,950.00 |
| GRID AGENCY, INC. | 1,800.00 |
| KENNETH WORMALD | 1,800.00 |
| SETOLOGY | 1,800.00 |
| BRINN BIERMAN | 1,700.00 |

**Girardi Keese**
**Summary of Net Payments Charged to EJ Global Receivable Account**
**For the Period 2008 - 2020**

| Payee | Net Amount |
|-------|-----------:|
| CANDICE CRAIG | 1,700.00 |
| ERIN HERNANDEZ | 1,700.00 |
| JAMIE RUIZ | 1,700.00 |
| HONEYGUN LABS LLC | 1,500.00 |
| MICHAEL CARR | 1,500.00 |
| ONE STOP DIGITAL, INC. | 1,500.00 |
| PICNIC | 1,500.00 |
| SUSANNE BARTSCH | 1,500.00 |
| STEELE VFS, INC. | 1,435.00 |
| FRANK GALASSO | 1,400.00 |
| HEATHER HANES | 1,250.00 |
| ROBERT HOFFMAN | 1,250.00 |
| STARWORKS ARTISTS, LLC | 1,200.00 |
| NIGHTS OF NEON, INC | 1,190.83 |
| KIMBERLY McALLISTER | 1,150.00 |
| AMPED UP, LLC | 1,121.00 |
| JEREMIAH PITMAN | 1,100.00 |
| MARIO DEDIVANOVIC | 1,000.00 |
| MICHAEL DES BARRES | 1,000.00 |
| QUYNH STANLEY | 1,000.00 |
| JASON WAWRO | 950.00 |
| GROVEMASTERING | 875.00 |
| CUSTOM LIGHTING | 850.00 |
| PATRICIA WILLIAMS | 800.00 |
| CAPRICE | 775.00 |
| JOSEPH CORRIGAN | 750.00 |
| PURE MANAGEMENT NYC, LLC | 720.00 |
| JIMMY'S PERMIT SERVICE | 684.00 |
| DICK SMART | 666.67 |
| PHIL LUJAN | 645.83 |
| AXION BUSINESS GROUP | 630.63 |
| BRANDON NIZNIK | 600.00 |
| CRAIG STULL | 600.00 |
| LISA MITCHELL METHOD, INC | 600.00 |
| ANDREW R. POLAND | 550.00 |
| DERRICK ARMAND | 550.00 |
| IRA BOYD | 550.00 |
| JOSHUA LINKEY | 550.00 |
| STEVE FRANCIS | 550.00 |
| SIGN CENTRAL | 533.88 |
| DYLAN ZWICKER | 525.00 |

EXHIBIT "A"

**Girardi Keese**
**Summary of Net Payments Charged to EJ Global Receivable Account**
**For the Period 2008 - 2020**

| Payee | Net Amount |
|---|---|
| JEFF WESSELS | 525.00 |
| ROBERT DOWLING | 525.00 |
| VICTOR G. MAJOR | 525.00 |
| ERNEST WALTON | 500.00 |
| JARMAN, INC. | 500.00 |
| KATHERINE BORMAN | 500.00 |
| LEO ABRAHAM | 500.00 |
| MATES, INC. | 450.00 |
| DAVID BALLEN | 400.00 |
| LOS ANGELES COUNTY FIRE DEPT. | 386.37 |
| SO CAL SANITATION | 380.00 |
| SEAN SPILLANE | 340.00 |
| CHAD MICHAEL MORISETTE | 305.00 |
| DAVONEE SOU | 300.00 |
| OCTAVIO SANCHEZ | 300.00 |
| SHAMEL PUBLICATIONS, INC. | 300.00 |
| BRENDAN CRAIGHILL | 250.00 |
| DEANNA DELLACIOPPA | 250.00 |
| KAREN BLAKEMAN | 250.00 |
| BUSINESS FILINGS DIVISION | 239.00 |
| CHAD MICHAEL | 225.00 |
| ANTHONY ORTIZ | 200.00 |
| MICHAEL J. COHEN | 200.00 |
| ANNUAL FILING DIVISION | 195.00 |
| ANA RUTH SANTIZO | 120.00 |
| BUNKER PRINTING | 100.00 |
| LOS ANGELES TIMES | 100.00 |
| OFFICE OF FINANCE, CITY OF LA | 80.06 |
| SECRETARY OF STATE | 66.00 |
| Total | $25,592,261.26 |

# EXHIBIT E

EXHIBIT "A"

**SCHEDULE C**
**(Form 1040)**

Department of the Treasury
Internal Revenue Service  (99)

## Profit or Loss From Business
### (Sole Proprietorship)

► Go to *www.irs.gov/ScheduleC* for instructions and the latest information.
► Attach to Form 1040, 1040NR, or 1041; partnerships generally must file Form 1065.

OMB No. 1545-0074

**2018**

Attachment
Sequence No.  **09**

Name of proprietor: ERIKA N. GIRARDI

Social security number (SSN):

**A** Principal business or profession, including product or service (see instructions)
PERFORMER

**B** Enter code from instructions ►

**C** Business name. If no separate business name, leave blank.
EJ GLOBAL LLC

**D** Employer ID number (EIN) (see instr.)

**E** Business address (including suite or room no.) ►

City, town or post office, state, and ZIP code

**F** Accounting method:  (1) [X] Cash  (2) [ ] Accrual  (3) [ ] Other (specify) ►

**G** Did you 'materially participate' in the operation of this business during 2018? If 'No,' see instructions for limit on losses ... [X] Yes  [ ] No

**H** If you started or acquired this business during 2018, check here .................................................. ►  [ ]

**I** Did you make any payments in 2018 that would require you to file Form(s) 1099? (see instructions)..................... [ ] Yes  [X] No

**J** If 'Yes,' did you or will you file required Forms 1099?.................................................................. [ ] Yes  [ ] No

### Part I    Income

| | | |
|---|---|---:|
| 1 | Gross receipts or sales. See instructions for line 1 and check the box if this income was reported to you on Form W-2 and the 'Statutory employee' box on that form was checked ............................ ► [ ]  **1** | 1,063,572. |
| 2 | Returns and allowances............................................................................. **2** | |
| 3 | Subtract line 2 from line 1 ........................................................................ **3** | 1,063,572. |
| 4 | Cost of goods sold (from line 42).................................................................. **4** | |
| 5 | **Gross profit.** Subtract line 4 from line 3. ........................................................ **5** | 1,063,572. |
| 6 | Other income, including federal and state gasoline or fuel tax credit or refund (see instructions)................................................................................ **6** | |
| 7 | **Gross income.** Add lines 5 and 6. .............................................................. ► **7** | 1,063,572. |

### Part II    Expenses. Enter expenses for business use of your home **only** on line 30.

| | | | | | | |
|---|---|---:|---|---|---|---:|
| 8 | Advertising .................. **8** | 175. | 18 | Office expense (see instructions)....... **18** | | |
| 9 | Car and truck expenses (see instructions).............. **9** | | 19 | Pension and profit-sharing plans ........ **19** | | |
| 10 | Commissions and fees......... **10** | | 20 | Rent or lease (see instructions): | | |
| 11 | Contract labor (see instructions). .............. **11** | | | **a** Vehicles, machinery, and equipment..... **20a** | | |
| 12 | Depletion.................... **12** | | | **b** Other business property.................. **20b** | | 37,289. |
| 13 | Depreciation and section 179 expense deduction (not included in Part III) (see instructions).............. **13** | | 21 | Repairs and maintenance............... **21** | | |
| | | | 22 | Supplies (not included in Part III)....... **22** | | 3,647. |
| | | | 23 | Taxes and licenses..................... **23** | | 17,748. |
| 14 | Employee benefit programs (other than on line 19) ........ **14** | | 24 | Travel and meals: | | |
| | | | | **a** Travel................................ **24a** | | 534,512. |
| 15 | Insurance (other than health) ... **15** | | | **b** Deductible meals (see instructions)....................... **24b** | | 3,489. |
| 16 | Interest (see instr.): | | 25 | Utilities ................................ **25** | | |
| | **a** Mortgage (paid to banks, etc.) ........ **16a** | | 26 | Wages (less employment credits)........ **26** | | |
| | **b** Other........................ **16b** | | 27 | **a** Other expenses (from line 48). .......... **27a** | | 2,127,004. |
| 17 | Legal and professional services **17** | | | **b** Reserved for future use ......... **27b** | | |

| | | | |
|---|---|---|---:|
| 28 | **Total expenses** before expenses for business use of home. Add lines 8 through 27a......................... ► | **28** | 2,723,864. |
| 29 | Tentative profit or (loss). Subtract line 28 from line 7. .................................................. | **29** | -1,660,292. |
| 30 | Expenses for business use of your home. Do not report these expenses elsewhere. Attach Form 8829 unless using the simplified method (see instructions). **Simplified method filers only:** enter the total square footage of: (a) your home: _____ and (b) the part of your home used for business: _____. Use the Simplified Method Worksheet in the instructions to figure the amount to enter on line 30. ......................... | **30** | |
| 31 | **Net profit or (loss).** Subtract line 30 from line 29. • If a profit, enter on both **Schedule 1 (Form 1040), line 12** (or **Form 1040NR, line 13**) and on **Schedule SE, line 2.** (If you checked the box on line 1, see instructions.) Estates and trusts, enter on **Form 1041, line 3.** • If a loss, you **must** go to line 32. | **31** | -1,660,292. |

32 If you have a loss, check the box that describes your investment in this activity (see instructions).

• If you checked 32a, enter the loss on both **Schedule 1 (Form 1040), line 12** (or **Form 1040NR, line 13**) and on **Schedule SE, line 2.** (If you checked the box on line 1, see the line 31 instructions.) Estates and trusts, enter on **Form 1041, line 3.**

• If you checked 32b, you **must** attach **Form 6198.** Your loss may be limited.

32a [X] All investment is at risk.
32b [ ] Some investment is not at risk.

**BAA  For Paperwork Reduction Act Notice, see the separate instructions.**    FDIZ0112L  09/24/18    Schedule C (Form 1040) 2018

EXHIBIT "A"

Schedule C (Form 1040) 2018  ERIKA N. GIRARDI                                                          Page 2

| **Part III** | **Cost of Goods Sold** (see instructions) | | |
|---|---|---|---|

33  Method(s) used to value closing inventory:  **a** ☐ Cost  **b** ☐ Lower of cost or market  **c** ☐ Other (attach explanation)

34  Was there any change in determining quantities, costs, or valuations between opening and closing inventory?
If 'Yes,' attach explanation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ☐Yes  ☐No

| | | | |
|---|---|---|---|
| 35 | Inventory at beginning of year. If different from last year's closing inventory, attach explanation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 35 | |
| 36 | Purchases less cost of items withdrawn for personal use . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 36 | |
| 37 | Cost of labor. Do not include any amounts paid to yourself . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 37 | |
| 38 | Materials and supplies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 38 | |
| 39 | Other costs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 39 | |
| 40 | Add lines 35 through 39 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 40 | |
| 41 | Inventory at end of year . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 41 | |
| 42 | **Cost of goods sold.** Subtract line 41 from line 40. Enter the result here and on line 4 . . . . . . . . . . . . . . . . . . . . | 42 | |

| **Part IV** | **Information on Your Vehicle.**  Complete this part **only** if you are claiming car or truck expenses on line 9 and are not required to file Form 4562 for this business. See the instructions for line 13 to find out if you must file Form 4562. |
|---|---|

43  When did you place your vehicle in service for business purposes? (month, day, year)    ▶ _____

44  Of the total number of miles you drove your vehicle during 2018, enter the number of miles you used your vehicle for:

    **a** Business _____    **b** Commuting (see instructions) _____    **c** Other _____

45  Was your vehicle available for personal use during off-duty hours? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ☐Yes  ☐No

46  Do you (or your spouse) have another vehicle available for personal use? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ☐Yes  ☐No

47a  Do you have evidence to support your deduction? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ☐Yes  ☐No

  **b** If 'Yes,' is the evidence written? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ☐Yes  ☐No

| **Part V** | **Other Expenses.** List below business expenses not included on lines 8-26 or line 30. |
|---|---|

SEE STATEMENT 8

_____

_____

_____

_____

_____

_____

_____

| | | |
|---|---|---|
| 48  **Total other expenses.** Enter here and on line 27a . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 48 | 2,127,004. |

Schedule C (Form 1040) 2018

FDIZ0112L  07/16/18

EXHIBIT "A"

| 2018 | FEDERAL STATEMENTS | PAGE 3 |
|------|--------------------|--------|

**CLIENT GIRATHO**    THOMAS V. AND ERIKA N. GIRARDI

10/11/19                                                                01:41PM

### STATEMENT 7

---

### STATEMENT 8 - PERFORMER
### SCHEDULE C, PART V
### OTHER EXPENSES

| | |
|---|---:|
| AGENT EXPENSE | $ 61,964. |
| BANK CHARGES | 103. |
| DESIGN | 500. |
| MANAGER | 4,278. |
| MARKETING | 66,247. |
| PHOTOGRAPHY | 3,310. |
| POSTAGE | 1,049. |
| PRODUCTION | 1,466,197. |
| PROFESSIONAL SERVICES | 508,448. |
| PROMOTION | 4,456. |
| SECURITY | 706. |
| TELEPHONE | 9,746. |
| TOTAL | $ 2,127,004. |

---

### STATEMENT 9

#### RENTAL AND ROYALTY EXPENSES

EXHIBIT "A"

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:
PO Box 11480
Beverly Hills, CA  90213


A true and correct copy of the foregoing document entitled (*specify*): _____
amended complaint
_____
_____

will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) August 26, 2021, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

X    Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL:**
On (*date*) _____, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be completed</u> no later than 24 hours after the document is filed.

☐    Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method <u>for each person or entity served</u>): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) June 23, 2021, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge <u>will be completed</u> no later than 24 hours after the document is filed.

Service information continued on attached page
☐
I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.


| August 26, 2021 | Ronald Richards | /s Ronald Richards |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*

**F 9013-3.1.PROOF.SERVICE**

EXHIBIT "A"

**2:21-ap-01155-BR Notice will be electronically mailed to:**

Ori S Blumenfeld on behalf of Interested Party Courtesy NEF
ori@marguliesfaithlaw.com,
Helen@MarguliesFaithLaw.com;Angela@MarguliesFaithLaw.com;Vicky@MarguliesFaithLaw.com

Evan C Borges on behalf of Defendant EJ Global, LLC, a limited liability company
eborges@ggtriallaw.com, cwinsten@ggtriallaw.com

Evan C Borges on behalf of Defendant Pretty Mess, Inc., a corporation
eborges@ggtriallaw.com, cwinsten@ggtriallaw.com

Evan C Borges on behalf of Defendant Erika Girardi
eborges@ggtriallaw.com, cwinsten@ggtriallaw.com

Craig G Margulies on behalf of Interested Party Courtesy NEF
Craig@MarguliesFaithlaw.com,
Vicky@MarguliesFaithlaw.com;Helen@MarguliesFaithlaw.com;Angela@MarguliesFaithlaw.com

Elissa Miller (TR)
CA71@ecfcbis.com, MillerTrustee@Sulmeyerlaw.com;C124@ecfcbis.com;ccaldwell@sulmeyerlaw.com

Ronald N Richards on behalf of Plaintiff Elissa Miller
ron@ronaldrichards.com, morani@ronaldrichards.com

Frank X Ruggier on behalf of Interested Party Courtesy NEF
frank@ruggierlaw.com, enotice@pricelawgroup.com

United States Trustee (LA)
ustpregion16.la.ecf@usdoj.gov

Timothy J Yoo on behalf of Interested Party Courtesy NEF
tjy@lnbyb.com

**2:21-ap-01155-BR Notice will not be electronically mailed to:**

EXHIBIT "A"

# EXHIBIT "B"

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **EDELSON PC,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | |
| | ) | |
| **THOMAS GIRARDI, GIRARDI KEESE,** | ) | |
| **ERIKA GIRARDI, EJ GLOBAL LLC,** | ) | |
| **GIRARDI FINANCIAL, INC., DAVID** | ) | **Case No. 20 C 7115** |
| **LIRA, KEITH GRIFFIN, JOHNSON** | ) | |
| **HUTCHINSON & LIRA LLP, ROBERT** | ) | |
| **FINNERTY, ABIR COHEN TREYZON** | ) | |
| **SALO, LLP, CALIFORNIA ATTORNEY** | ) | |
| **LENDING II, INC., STILLWELL** | ) | |
| **MADISON, LLC, and JOHN DOE 1-10,** | ) | |
| | ) | |
| **Defendants.** | ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

MATTHEW F. KENNELLY, District Judge:

Edelson PC brought this suit seeking to recover money it contends it is owed and disgorgement of money owed to clients in an underlying matter. Defendants David Lira and Keith Griffin have moved to dismiss the claims against them. Pursuant to Federal Rule of Civil Procedure 12(b)(2), Griffin contends that the Court lacks personal jurisdiction over him. Lira, under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(3), asserts that the Court lacks subject matter jurisdiction; this district is an improper venue for litigating these claims; and the claims against him must be automatically stayed under the Bankruptcy Code.[1]

---

[1] Lira includes Federal Rules of Civil Procedure 12(b)(2) and 12(b)(6) in his motion's title but does not advance any arguments related to these rules.

### Background[2]

Edelson alleges that Lira and Griffin, then attorneys at the law firm Girardi Keese, worked together with Thomas Girardi to embezzle settlement proceeds, commingled those proceeds with attorneys' fees that belonged to Edelson, and shared in the illicit profits.

At the center of the parties' dispute is litigation that followed a tragedy.  In October 2018, as the result of a fundamental system failure, Lion Air Flight 610 plunged into the Java Sea.  All 189 people on board were killed.  Investigators determined that the aircraft's anti-stall system had malfunctioned.  The malfunction that caused Flight 610 to crash was attributed to design defects and other failures by the Boeing Company, the plane's designer and manufacturer.

Nearly a dozen families of those who perished retained Girardi Keese, a California-based firm, to represent them in litigation against Boeing.[3]  Because the litigation took place in Chicago, Girardi Keese contracted with Edelson so that Edelson's attorneys would serve as local counsel and assist in the litigation and settlement process.

Two contracts governed the relationship between Girardi Keese and Edelson. The first contract provided that Edelson would receive 50 percent of the total attorneys'

---

[2] The following facts are drawn from Edelson's complaint.  Because the Court is considering a motion to dismiss, the Court accepts as true the well-pleaded factual allegations in the complaint and views those allegations in the light most favorable to Edelson.  *See Menzies v. Seyfarth Shaw LLP*, 943 F.3d 328, 332 (7th Cir. 2019).

[3] *See In Re: Lion Air Flight JT 610 Crash*, No. 18 C 7686 (N.D. Ill.).

2

EXHIBIT "B"

fees recovered by a specific portion of the clients.  Griffin presented and executed this contract.  The second contract guaranteed that Edelson would receive 20 percent of the total attorneys' fees recovered for another set of clients.  Lira presented and executed the second contract.

In 2020, the parties finalized individual settlements for each of the families Girardi Keese and Edelson represented.  The litigation against Boeing was dismissed on February 24, 2020.  Girardi Keese maintained total and exclusive control over communications with the clients throughout the litigation and the post-settlement process.  Therefore, Boeing transferred the clients' settlement payments to Girardi Keese, whose attorneys were responsible for disbursing funds to the clients.

Between February 2020 and December 2020, Edelson attorneys were in frequent communication with Lira and Griffin about the status of the settlement.  Initially, through April and May, Griffin and Lira maintained that Girardi Keese had not received any settlement funds because Boeing would fund the settlements only after it had received all the clients' executed settlement agreements and releases.  When Boeing signaled publicly that it would consider bankruptcy, an Edelson attorney expressed concern about the delay in finalizing the settlements.  Lira responded by e-mail and repeated that Boeing would release the settlement funds after receiving the agreements and releases.  Lira further explained that the settlement funds were paid by Boeing's insurer and were secured in an escrow account.

In June 2020, Lira informed Edelson that he had left Girardi Keese.  During a phone call with an unidentified person at Edelson, Lira said the settlement had been funded and that "the bulk of the funds were received and held by" Girardi Keese.  Lira

EXHIBIT "B"

wondered which firm should be held responsible for paying Edelson's share of the attorneys' fees—Girardi Keese or his new firm.  Edelson asked whether the clients had received their proceeds from the settlements, but Lira "failed to provide a coherent answer."  Compl. ¶ 46.  Then, in July 2020, Lira sent a letter to Edelson asserting that some of the firms' clients had received their settlement proceeds, and some had not.  With his letter, Lira included a portion of the attorneys' fees owed to Edelson and indicated that this was a partial payment of what was owed to the firm.

Edelson did not cash the check.  Instead, it sent a letter to both Girardi and Lira inquiring on the status of the settlement payouts and declining to "accept any monies until [it was] given adequate assurances that each and every one of our collective clients . . . received the entirety of the monies owed."  *Id.* ¶ 47.  Lira responded but did not say which clients had received full settlement payments and whether any clients were still owed money.  He further explained that because he was no longer with Girardi Keese, he no longer had any ongoing involvement in the cases.  Lira directed further questions to Griffin and Girardi, Girardi Keese's sole equity partner.

In July 2020, Edelson's managing partner, Rafi Balabanian, took the lead in communicating with Girardi Keese.  When Balabanian contacted Girardi and Griffin, he received many of the same answers Edelson's other attorneys had already received.  Griffin said that though Boeing had fully funded the settlements, the clients had not yet received the full amount owed to them.  He estimated that the clients were still owed about half of the settlement amount.  Griffin said he could not explain why the clients had not received their full settlements or when they would receive the remaining proceeds because Thomas Girardi had exclusive control over the firm's bank accounts,

EXHIBIT "B"

including the client trust accounts.  And, Griffin said, Girardi was not available to answer questions about this matter because he was unavailable due to serious illness.

Later in July, Balabanian was finally able to speak with Girardi.  To the extent Girardi provided an explanation for the delay, he blamed his illness and his clients' late submission of the settlement agreements and releases.  He promised to disburse the remaining money within a few days and said he would follow up once he had done so. Girardi kept neither promise.  Balabanian spoke to Girardi again in August 2020—after several unsuccessful attempts to touch base.  Girardi took umbrage at Balabanian's inquiries but nevertheless reported that he had made arrangement for his clients to receive the remainder of the money owed.

In September 2020, Griffin told Balabanian that Girardi Keese had wired half of the outstanding amount to clients, with the other half ready to be sent the next week. But although Griffin said he would send proof of the wired funds, he never did. Regardless, Edelson attorneys were under the impression that the clients had been paid and all that remained to be paid were its own fees.  In November 2020, Lira wrote Edelson that Girardi had transferred some portion of the attorneys' fees generated from the litigation to a litigation funder.  Edelson expressed concern, again.

When Balabanian talked with Griffin next—Girardi was again receiving medical treatment—he learned that Girardi had not paid his clients the remaining amount due. Worse, Griffin said that he was skeptical that Girardi or the Girardi Keese firm had the financial means to satisfy the firm's obligations to its clients or to Edelson.  In the final analysis, a substantial portion of the settlement funds were never disbursed to Girardi Keese's clients, and Edelson was never paid the share of the attorneys' fees it was

EXHIBIT "B"

owed.

In December 2020—after Edelson filed the complaint in this case—a number of Girardi Keese's creditors filed involuntary Chapter 7 bankruptcy petitioners against the firm and Girardi in the United States Bankruptcy Court for the Central District of California. The bankruptcy court opened Chapter 7 cases against the firm and Girardi, and trustees have been appointed to manage the respective estates. Neither Lira nor Griffin has filed for bankruptcy.

## Discussion

Before turning to the merits, the Court addresses the standards for considering the defendants' motions. Griffin challenges the sufficiency of Edelson's complaint under Rule 12(b)(2). A complaint is not deficient just because facts demonstrating personal jurisdiction are not included among the complaint's allegations. *Purdue Rsch. Found. v. Sanofi-Synthelabo, S.A.*, 338 F.3d 773, 782 (7th Cir. 2003). When a defendant moves to dismiss a complaint under Rule 12(b)(2), however, the plaintiff must establish the existence of jurisdiction. *Curry v. Revolution Lab'ys*, LLC, 949 F.3d 385, 392 (7th Cir. 2020) (internal quotation marks omitted). When, as here, a court has not held an evidentiary hearing (Griffin did not seek one), the plaintiff only bears "the burden of making a prima facie case for personal jurisdiction." *Id.* at 393.

When considering a Rule 12(b)(2) motion, the Court is permitted to consider affidavits, but "in evaluating whether the prima facie standard has been satisfied, the plaintiff is entitled to the resolution in its favor of all disputes concerning relevant facts presented in the record." *Id.* (alterations accepted) (internal quotation marks omitted). Therefore, though the Court must accept as true "any facts in the defendants' affidavits

6

that do not conflict with anything in the record," *id.*, "[t]he plaintiff is entitled to have any

conflicts in the affidavits (or supporting materials) resolved in its favor." *Purdue Rsch.*

*Found.*, 338 F.3d at 783.

Lira seeks dismissal under Rules 12(b)(1) and (b)(3).  He first challenges

Edelson's standing under Rule 12(b)(1).  When considering a challenge to subject

matter jurisdiction, "the court must first determine whether a factual or facial challenge

has been raised."  *Silha v. ACT, Inc.*, 807 F.3d 169, 173 (7th Cir. 2015).  In a facial

challenge to subject matter jurisdiction, the defendant argues that the plaintiff has

insufficiently alleged a basis for subject matter jurisdiction.  *Id.*  Because the plaintiff is

the party who invoked federal jurisdiction, when faced with a facial challenge, he "bears

the burden of establishing the required elements of standing."  *Lee v. City of Chicago*,

330 F.3d 456, 468 (7th Cir. 2003)

In a factual challenge, the defendant contends that "the complaint is formally

sufficient but . . . that there is *in fact* no subject matter jurisdiction."  *Apex Digital*, 572

F.3d at 444 (internal quotation marks omitted).  When weighing factual challenges, a

court must look past "the jurisdictional allegations of the complaint and view whatever

evidence has been submitted on the issue to determine whether in fact subject matter

jurisdiction exists."  *Id.* (internal quotation marks omitted).  Plaintiffs undergoing a factual

challenge to standing must establish standing by a preponderance of the evidence.

*See Kathrein v. City of Evanston*, 636 F.3d 906, 914 (7th Cir. 2011).

Rule 12(b)(3) allows dismissal for improper venue.  *RAH Color Techs., LLC v.*

*Quad/Graphics, Inc.*, No. 17 C 4931, 2018 WL 439210, at *1 (N.D. Ill. Jan. 16, 2018).

When reviewing a motion to dismiss under 12(b)(3), courts "assume[ ] the truth of the

EXHIBIT "B"

allegations in the plaintiff's complaint, *unless* contradicted by the defendant's affidavits." *Deb v. SIRVA, Inc.*, 832 F.3d 800, 809 (7th Cir. 2016).  The "low" burden of establishing proper venue rests with the plaintiff.  *RAH Color Techs., LLC*, 2018 WL 439210, at *1 ("[T]he plaintiff's burden in defending a Rule 12(b)(3) motion is low because courts resolve factual conflicts in the plaintiff's favor.").

A.    **Griffin's motion to dismiss**

With the proper standards in mind, the Court begins its analysis by considering the issue of personal jurisdiction.  This case was brought under the Court's diversity jurisdiction.  *See* 28 U.S.C. § 1332.  As such, the Court may exercise personal jurisdiction only if an Illinois state court would have jurisdiction over the defendant.  *See Citadel Grp. Ltd. v. Washington Reg'l Med. Ctr.*, 536 F.3d 757, 760 (7th Cir. 2008) ("A federal court sitting in diversity has personal jurisdiction only where a court of the state in which it sits would have such jurisdiction.").  Illinois law permits its courts to exercise jurisdiction to the extent allowed by both the Illinois and federal constitutions.  *Colucci v. Whole Foods Mkt. Servs., Inc.*, No. 19-CV-8379, 2021 WL 1222804, at *2 (N.D. Ill. Apr. 1, 2021); 735 Ill. Comp. Stat. 5/2-209(c).  Because "the Illinois Constitution is co-extensive with the Federal Constitution, jurisdiction is proper as long as it meets due process requirements."  *Id.* (citing *Noboa v. Barcelo Corporacion Empresarial, SA*, 812 F.3d 571, 572 (7th Cir. 2016)); *see also Citadel Grp. Ltd.*, 536 F.3d at 761 ("We have previously noted . . . that no case has yet emerged where due process was satisfied under the federal constitution but not under the Illinois constitution . . . . thus, we will proceed with the federal analysis.").

There are two types of personal jurisdiction, general and specific.  *Goodyear*

EXHIBIT "B"

*Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011).  General jurisdiction exists only "in the limited number of fora in which the defendant can be said to be 'at home.'"  *Advanced Tactical Ordnance Sys., LLC v. Real Action Paintball, Inc.*, 751 F.3d 796, 800 (7th Cir. 2014), as corrected (May 12, 2014).  Specific jurisdiction, by contrast, exists when a "defendant's contacts with the forum" are "directly related to the conduct pertaining to the claims asserted."  *Brook v. McCormley*, 873 F.3d 549, 552 (7th Cir. 2017).

Griffins argues that the Court does not have general jurisdiction over him because he is not and never has been domiciled in Illinois.  Edelson makes no counterargument.  Therefore, the Court will limit its discussion to specific personal jurisdiction.  *Cf. Rogers v. City of Hobart*, 996 F.3d 812, 818 (7th Cir. 2021) ("Here, Mr. Rogers focuses solely on [specific jurisdiction], so we need not evaluate whether he could show general jurisdiction.").

Specific jurisdiction exists when: (1) "the defendant's contacts with the forum state . . . show that it purposefully availed itself of the privilege of conducting business in the forum state or purposefully directed its activities at the state"; (2) "the plaintiff's alleged injury . . . [arose] out of the defendant's forum-related activities"; and (3) "any exercise of personal jurisdiction must comport with traditional notions of fair play and substantial justice."  *Lexington Ins. Co. v. Hotai Ins. Co., Ltd*., 938 F.3d 874, 878 (7th Cir. 2019) (alterations accepted) (internal quotation marks omitted).

### 1.    Purposeful availment

"[T]he nature of the purposeful-direction/purposeful-availment inquiry depends in large part on the type of claim at issue."  *Felland v. Clifton*, 682 F.3d 665, 674 (7th Cir.

9

EXHIBIT "B"

2012).  To determine whether a defendant has purposefully availed himself of the privilege of conducting business in the forum state, courts look to see if there are "minimum contacts between the defendant and the forum State."  *Lexington Ins. Co.,* 938 F.3d at 879 (internal quotation marks omitted).  A defendant may not be "haled into a jurisdiction solely as a result of random, fortuitous, or attenuated contacts, or of the unilateral activity of another party or third person."  *Curry*, 949 F.3d at 396 (internal quotation marks omitted).

In a breach-of-contract suit, personal jurisdiction typically will turn "on whether the defendant purposefully availed himself of the privilege of conducting business in the forum state."  *Felland*, 682 F.3d at 674; *see also Tamburo v. Dworkin*, 601 F.3d 693, 702 (7th Cir. 2010) ("Personal jurisdiction in breach-of-contract actions often turns on whether the defendant 'purposefully availed' himself of the privilege of conducting business or engaging in a transaction in the forum state.").  By contrast, the personal jurisdiction inquiry in a case involving an intentional tort typically focuses "on whether the conduct underlying the claim was purposely directed at the forum state."  *Felland*, 682 F.3d at 674 (alterations accepted) (internal quotation marks omitted) (citing *Tamburo*, 601 F.3d at 702).  There are three requirements to demonstrate "purposeful direction" in the intentional torts context:  "(1) intentional conduct (or 'intentional and allegedly tortious' conduct); (2) expressly aimed at the forum state; (3) with the defendant's knowledge that the effects would be felt—that is, the plaintiff would be injured—in the forum state."  *Tamburo*, 601 F.3d at 703.

"The relevant contacts are those that center on the relations among the defendant, the forum, and the litigation."  *Advanced Tactical Ordnance Sys.*, 751 F.3d at

10

801.  But not all contacts are created equal.  Purposeful availment is demonstrated

through the defendant's suit-related conduct and that conduct's substantial connection

with the forum state.  *Id.*  "The mere fact that defendant's conduct affected plaintiffs with

connections to the forum [state] does not suffice to authorize jurisdiction."  *Id.*

(alterations accepted) (internal quotation marks omitted); *see also Walden v. Fiore*, 571

U.S. 277, 285 (2014) (stating that minimum contacts are "the defendant's contacts with

the forum [state] itself, not the defendant's contacts with persons who reside there").

"Contacts between the plaintiff or other third parties and the forum do not satisfy this

requirement."  *Advanced Tactical Ordnance Sys.*, 751 F.3d at 801.

Turning to the case before the Court, Edelson asserts that several facts

demonstrate Griffin's purposeful availment.  First, in order to litigate in Illinois, Griffin

prepared and executed with Edelson one of the two contracts that retained Edelson as

local counsel.  Second, Griffin submitted petitions to practice *pro hac vice* in Illinois,

designated a Chicago-based Edelson attorney as his associated Illinois attorney, and

registered with the Illinois Attorney Registration and Disciplinary Commission (IARDC).

And third, Griffin flew to Chicago on separate occasions to participate in in-person

mediations for the *Lion Air* case.

Griffin disagrees.  He says he was, at all times identified in the complaint, "a W-2

employee" of Girardi Keese.  Dkt. no. 42-9 ¶ 1.  Given his status as an employee, Griffin

argues that during the relevant times, his actions were on behalf of his employer and

"cannot be manipulated into any individual conduct of purposeful availment."  Griffin's

Br. at 10.  In other words, Griffin contends that the contacts cited by Edelson are

irrelevant because they were undertaken not on his own behalf but on behalf of his

11

EXHIBIT "B"

employer.[4]

    With regard to the Court's jurisdiction over Edelson's contract claims (breach of contract and unjust enrichment), the Court concludes that Griffin purposefully availed himself "of the privilege of conducting business or engaging in a transaction" in Illinois. *See Tamburo*, 601 F.3d at 702. Several facts support this conclusion. First, the fee-sharing contract that Griffin executed. The Supreme Court has "emphasized that parties who reach out beyond one state and create continuing relationships and obligations with citizens of another state are subject to regulation and sanctions in the other State for the consequences of their activities." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 473 (1985) (internal quotation marks omitted); *see also Walden*, 571 U.S. at 285 ("Accordingly, we have upheld the assertion of jurisdiction over defendants who have purposefully 'reach[ed] out beyond' their State and into another by, for example, entering a contractual relationship that 'envisioned continuing and wide-reaching contacts' in the forum State.").

    At bottom, the complaint alleges that Griffin did just that. The complaint alleges that Girardi Keese wanted to engage Edelson as local counsel so that Griffin could

---

[4] In his reply brief, Griffin argues that personal jurisdiction is barred by Illinois's so-called fiduciary shield doctrine, which "denies personal jurisdiction over an individual whose presence and activity in the state in which the suit is brought were solely on behalf of his employer or other principal." *See Fletcher v. Doig*, 125 F. Supp. 3d 697, 716 (N.D. Ill. 2014) (internal quotation marks omitted). That argument was not made in his initial brief. Instead, Griffin cited only federal caselaw and (seemingly) argued that his status as an employee precluded personal jurisdiction under federal due process principles. *See* Griffin's Br. at 9–10. Thus, Griffin's argument under the fiduciary shield doctrine is forfeited. *See O'Neal v. Reilly*, 961 F.3d 973, 974 (7th Cir. 2020) ("[W]e have repeatedly recognized that district courts are entitled to treat an argument raised for the first time in a reply brief as waived.").

EXHIBIT "B"

appear in Illinois courts on behalf of the *Lion Air* clients.[5]  Griffin, on behalf of Girardi

Keese, signed and executed an agreement to this effect.  He, along with other

defendants, received and benefited from the legal services provided by Edelson in

Illinois.  Though Griffin argues that he was not a party to the agreement he signed—a

fact that is arguably neither dispositive in or even important to determining whether he

purposefully availed himself of Illinois and its laws—the complaint alleges otherwise.

*See* Compl. ¶ 106 ("Defendants GK, Girardi, and Griffin, and Lira breached their

contractual obligations by not paying Edelson its share of attorney's fees.").  At this

stage, the Court accepts the well-pleaded allegations from the complaint.  *See Menzies*,

943 F.3d at 332.

     The second and third facts that Edelson offers to support personal jurisdiction are

that Griffin requested permission to practice *pro hac vice* in Illinois and registered with

the IARDC, the administrative agency charged with regulating Illinois's lawyers.  Finally,

Edelson says, Griffin traveled to Chicago on two occasions to participate in in-person

mediations that resulted in the *Lion Air* settlements at issue in this case.  *See Walden*,

571 U.S. at 285 ("And although physical presence in the forum is not a prerequisite to

jurisdiction . . . physical entry into the State—either by the defendant in person or

through an agent, goods, mail, or some other means—is certainly a relevant contact.").

These are not "random, fortuitous, or attenuated contacts."  *See Curry*, 949 F.3d at 396

(internal quotation marks omitted).  Rather, each was deliberate and directly connected

---

[5] Griffin contends that he did not appear in the *Lion Air* Illinois state court proceedings or
make an appearance in federal court once the case was removed.  Griffin's Reply Br. at
3.  He does not explain why this would matter, but in any event his non-appearance
would not undermine or negate his other contacts with Illinois.

EXHIBIT "B"

to the matters at issue in the present case.

Regarding jurisdiction over Edelson's intentional tort claim (conversion), the Court concludes that Edelson has sufficiently shown that Griffin's alleged conduct with respect to that claim was purposely directed at Illinois. *See Tamburo*, 601 F.3d at 702. There can be no question that the complaint alleges Griffin's conduct was intentional. Edelson alleges that Griffin participated in the "theft and subsequent cover-up" of the *Lion Air* settlement proceeds paid by Boeing. Pl.'s Resp. Br. at 17; *see* Compl. ¶¶ 40–56. Likewise, there can be no doubt Griffin knew his conduct, to the extent it deprived Edelson of fees it was owed, was aimed at or would be felt in Illinois, the state where Edelson is based. Edelson alleges that Griffin and his co-defendants assumed control of the agreed upon attorney's fees, deprived Edelson of this property, and despite multiple demands refused to transfer Edelson the amount it was owed. *See* Compl. ¶¶ 114–20.

Griffin argues that because all of these contacts were in furtherance of his employer's interest, he cannot have purposefully availed himself of Illinois and its laws. That argument does not wash. (Again, Griffin has forfeited for present purposes the fiduciary shield argument asserted for the first time in his reply brief.) Federal due process principles do not permit Griffin to use his status as an employee to shield him from personal jurisdiction. *Calder v. Jones*, 465 U.S. 783, 790 (1984) ("Petitioners are correct that their contacts with California are not to be judged according to their employer's activities there. On the other hand, their status as employees does not somehow insulate them from jurisdiction. Each defendant's contacts with the forum State must be assessed individually."). Having assessed Griffin's actions vis-à-vis

14

EXHIBIT "B"

Illinois, the Court concludes that Edelson has shown contacts sufficient to support jurisdiction over Griffin here.

### 2.    Arise out of or relate to

"The proper exercise of specific jurisdiction requires that the defendant's minimum contacts with the forum state be *suit-related*."  *Curry*, 949 F.3d at 401 (internal quotation marks omitted).  Until recently, the Supreme Court had not elaborated on this requirement beyond stating that "the plaintiff must also show that his injury 'arises out of' or 'relates to' the conduct that comprises the defendant's contacts."  *See Felland*, 682 F.3d at 676; *see also Tamburo*, 601 F.3d at 708.  This lack of elaboration has led to "difficulty in applying" the requirement and "conflict among the circuits."  *Tamburo*, 601 F.3d at 708.  The split centers around "how close the causal connection must be; more specifically, the circuits disagree about whether the defendant's contacts must have been the factual cause of the plaintiff's injury, the factual and proximate cause, or perhaps some intermediate standard between the two."  *Felland*, 682 F.3d at 676.   It does not appear the Seventh Circuit has taken a firm position in this debate.  *See id*. at 676–77 (citations omitted) ("We have suggested in passing that a mere 'but for' causal relationship is insufficient to establish the required nexus between a defendant's contacts and the underlying cause of action, but we have declined to definitively resolve the question.")

In a recent case, the Supreme Court clarified that this inquiry does not require the claim to result from the in-defendant's state contacts.  *See Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1026 (2021) ("[W]e have never framed the specific jurisdiction inquiry as always requiring proof of causation—*i.e.*, proof that

EXHIBIT "B"

the plaintiff's claim came about because of the defendant's in-state conduct.").  Instead, the Supreme Court's "most common formulation of the rule demands that the suit 'arise out of *or relate* to the defendant's contacts with the forum.'"  *Id.*  In other words, specific jurisdiction can be satisfied with a causal showing *or* "another 'activity or occurrence' involving the defendant that takes place in the State."  *Id.* (alterations accepted).

Griffin contends that *Ford Motor* is distinguishable because that case involved a company that "systematically served a market in Montana and Minnesota for the very vehicles that the plaintiffs allege malfunctioned and injured them in those States."  *See id.*, 141 S. Ct. at 1028; Griffin's Reply Br. at 4–5.  That difference might matter if the Court were analogizing the facts in this case to the facts in *Ford Motor*.  But the fact that Griffin is not a multinational corporation with systematic contacts does not shield him from the Supreme Court's more general proposition:  the Court has "never framed the specific jurisdiction inquiry as always requiring proof of causation."  *Ford Motor Co*, 141 S. Ct. at 1026; *see also id.* at 1033 (Alito, J., concurring) ("Ford . . . asks us to adopt an unprecedented rule under which a defendant's contacts with the forum State must be proven to have been a but-for cause of the tort plaintiff 's injury.  The Court properly rejects that argument . . .").  Thus, the Court is not persuaded that *Ford Motor* should not apply in this case.

Griffin argues that all the claimed wrongdoing that led to this suit took place in California and thus the Court may not exercise jurisdiction over him.  Griffin Br. at 9.  ("[A]ny injury suffered by the Plaintiff did not arise from any forum-related activity by Defendant Griffin.").  This argument is akin to the one made by the petitioner in *Ford Motor*.  *See Ford Motor*, 141 S. Ct. at 1026 (explaining Ford's view that "[j]urisdiction

EXHIBIT "B"

attaches 'only if the defendant's forum conduct *gave rise* to the plaintiff's claims.'").  The

Supreme Court rejected that argument, and so does this Court.  *See id.* at 1026 ("Ford's

causation-only approach finds no support in this Court's requirement of a 'connection'

between a plaintiff's suit and a defendant's activities.").  It may be true that many, if not

all of, the alleged actions regarding Griffin's involvement in withholding the attorneys'

fees took place in California.[6]  If so, however, that would only shut down the "arises out

of" route to personal jurisdiction, not the "or related to" route.

Griffin's contacts with Illinois are undoubtedly related to Edelson's claims.  In

order to appear in Illinois court, Griffin prepared and executed a contract that made

Edelson local counsel.  That contract guaranteed Edelson a portion of the *Lion Air*

settlement and it is the basis for each of Edelson's claims against Griffin.  For the

underlying case, Griffin executed petitions for permission to practice *pro hac vice* in

Illinois, appointed an Illinois-based Edelson attorney as his associated Illinois attorney,

and registered with the state's regulating body for attorneys.  Griffin also flew to Chicago

to participate in mediations for the underlying litigation; these mediations led to the

settlement at the heart of this matter.

Along with his causation argument, Griffin also asserts that the Court lacks

personal jurisdiction over him for the same reasons discussed in *Wallace v. Herron*, 778

---

[6] Griffin says that his all his communications with Edelson about the fee dispute took
place in California and were with Rafey Balabanian, a California-based lawyer.  *See*
Griffin Br. at 11 (citing Dkt. no. 42-1).  Therefore, Griffin claims, Edelson's claims cannot
have arisen out of his conduct in Illinois.  Yet, Edelson has submitted an affidavit from
Ari J. Scharg, an Edelson attorney based in Illinois, who swears that Griffin
communicated with him about the settlements as well.  *See* Dkt. no. 78-5.  It is unclear if
Griffin and Scharg specifically discussed the fee dispute or even if these
communications were related to other allegations in the complaint.

EXHIBIT "B"

F.2d 391 (7th Cir. 1985), and *Cote v. Wadel*, 796 F.2d 981 (7th Cir. 1986).  Those

cases, however, bear little resemblance to this one.  In *Wallace*, the defendant-

attorneys "lacked the necessary minimum contacts with Indiana" because the asserted

contacts were attenuated.  *Wallace*, 778 F.2d at 394.  Three of the defendants had

never had contact with Indiana having "[n]ever set foot in Indiana, conducted business

in Indiana, or been licensed to practice law in Indiana."  *Id.*  Though one defendant had

come to Indiana "on one occasion to take depositions," the controversy at the heart of

the case did not arise out of her single contact with Indiana.  *Id.*  And although the

defendants filed motions on behalf of their clients, those motions were not filed in

Indiana.  *Id.*  The case for jurisdiction in *Cote* was even weaker than in *Wallace*.  *Cote*,

796 F.2d at 984.  The plaintiff brought a malpractice suit against his attorney and the

attorney's law firm, but "there was no act or omission" by the defendants that occurred

in the forum state.  *See id.*  Because the "only significant connection between the suit

and [the forum state] was that the plaintiff live[d] there," jurisdiction was improper.  *Id.*

As established above, Griffin's contacts are far stronger than the contacts (or lack

thereof) in *Wallace* and *Cote*.  Griffin traveled to Illinois to participate in the underlying

litigation.  He contracted with an Illinois based firm so that he could appear in an Illinois

court.  He executed the necessary paperwork to represent the *Lion Air* plaintiffs in

Illinois.  Finally, Griffin's contacts with the state are related to Edelson's claims, as those

contacts are related to the underlying litigation and its settlement, out of which Edelson's

fee claims arise.  Said differently, this suit has the "essential foundation" for specific

jurisdiction:  a strong relationship between Griffin, Illinois, and the claims presented.

*See Ford Motor*, 141 S. Ct. at 1028.  As such, the Court concludes that the connection

18

between the plaintiff's claims and Griffin activities is "close enough to support jurisdiction." *See id* at 1032.

### 3.    Traditional notions of fair play and justice

There is one final step.  The Court must ensure that the "exercise of jurisdiction does not offend traditional notions of fair play and substantial justice." *Curry*, 949 F.3d at 402 (internal quotation marks omitted).  To make this determination, the Court may evaluate:

> the burden on the defendant, the forum State's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief, the interstate judicial system's interest in obtaining the most efficient resolution of the underlying dispute, and the shared interest of the several States in furthering fundamental substantive social policies.

*Purdue Rsch. Found.*, 338 F.3d at 781 (7th Cir. 2003) (alterations accepted).  "When the defendant's minimum contacts with the forum are relatively weak (although existent), these considerations may militate in favor of the exercise of jurisdiction." *Id.*

Griffin claims that exercising personal jurisdiction over him would run afoul of traditional notions of fair play and substantial justice, for two reasons.  First, he says "it cannot be disputed that the burdens on [him] to litigate [are] substantial" because he is a "now-unemployed attorney residing in California."  Griffin Br. at 13.  Though the Court sympathizes with Griffin, it is not persuaded by this argument.  "[A]s long as the plaintiff has made a threshold showing of minimum contacts, that showing is generally defeated only where the defendant presents 'a compelling case that the presence of some other considerations would render jurisdiction unreasonable.'" *Curry*, 949 F.3d at 402.  Griffin's personal circumstances, while unfortunate, are not unreasonable or a proper basis to decline to exercise jurisdiction over him.

19

EXHIBIT "B"

Griffin's second argument is that Edelson cannot obtain "convenient and effective relief" in this Court because Girardi Keese has filed for bankruptcy and cannot be sued or cross-claimed.  Griffin Br. at 14 (internal quotation marks omitted).  As discussed earlier, the complaint alleges that Griffin was a party to the contract.  *See* Compl. ¶ 106 ("Defendants GK, Girardi, and Griffin, and Lira breached their contractual obligations by not paying Edelson its share of attorney's fees.").  If Edelson establishes this, Griffin would be individually liable on the breach-of-contract claim.  And even if the complaint did not assert a breach of contract against Griffin, he is still named as a defendant on Edelson's conversion claim and would be individually liable on that claim if Edelson prevails.  The fact that Griffin cannot assert a claim against Girardi for contribution or indemnification in any place other than bankruptcy court has no bearing on the proper exercise of jurisdiction here.

In short, Griffin had sufficient contacts with Illinois that are clearly related to the claims in this suit.  The Court is convinced that exercising jurisdiction over Griffin would not offend traditional notions of fair play and substantial justice.  For these and the other reasons discussed, the Court concludes that it may exercise personal jurisdiction over Griffin and therefore denies his motion to dismiss.

## B.    Lira's motion to dismiss

Next, the Court considers Lira's arguments for dismissal.

### 1.    Standing

In federal courts, a plaintiff must meet the "irreducible constitutional minimum of standing" to establish that his claim is justiciable.  *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).  To establish Article III standing, a plaintiff must demonstrate that:

EXHIBIT "B"

(1) he "has suffered an injury in fact that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical"; (2) his "injury is fairly traceable to the challenged action of the defendant"; and (3) "it is likely, as opposed to merely speculative, that [his] injury will be redressed by a favorable decision." *Silha*, 807 F.3d 173 (internal quotation marks omitted).

In drive-by fashion, Lira argues that Edelson may not assert its claims for conversion, nor seek the remedies of constructive trust or accounting, because Edelson seeks to recover fees on behalf of the *Lion Air* clients—the plaintiffs in the underlying case, with whom Edelson no longer has an attorney-client relationship with.[7]  Though this argument is barely developed in Lira's initial brief, as Edelson itself recognizes, the Court is "duty-bound" to consider standing whenever the question arises.  *See Robertson v. Allied Sols., LLC*, 902 F.3d 690, 698 (7th Cir. 2018) ("Article III's requirements must be continuously met throughout the life of a case.").

 Lira does not say whether his challenge to Edelson's standing is a facial challenge or a factual one, so the Court will consider Lira's arguments under both analyses, starting with the facial challenge.  When considering a facial challenge to subject matter jurisdiction, the Court accepts "all well-pleaded factual allegations as true and draw[s] all reasonable inferences in favor of the plaintiff."  *Silha*, 807 F.3d at 173. As noted earlier, the plaintiffs have the burden of establishing that they meet the requirements for standing.  *See Disability Rts. Wis., Inc. v. Walworth Cty. Bd. of Supervisors*, 522 F.3d 796, 800 (7th Cir. 2008).  The Court considers Edelson's

---

[7] Lira does not challenge Edelson's standing to assert its the breach-of-contract claim.

EXHIBIT "B"

standing on each of the challenged remedies or claims separately.

First up is the request for an accounting.[8]  Edelson has sufficiently alleged that it suffered an injury in fact (the loss of attorneys' fees it was owed) and that its injury was the result of the defendants' actions (the alleged theft and cover-up).  Lira does not contest this.  Instead, Lira asserts that by pursuing an accounting, Edelson is seeking relief on behalf of the *Lion Air* clients, not on its own behalf.   Specifically, Lira points to language in the complaint where Edelson says that it seeks "an accounting of all funds transferred from Boeing that were intended for any GK client (inclusive of any transfers to third parties associated with, or transfers made for the benefit of, GK) related to settlements in *In Re: Lion Air Flight JT 610 Crash* and a full accounting of what subsequently became of those funds."  Compl. ¶ 16; *see also id.* at 29, ¶ B.

The Court disagrees.  The availability of an accounting is dependent on the facts of the case.  *See Tufo v. Tufo*, 2021 IL App (1st) 192521, ¶ 93.  Looking to the complaint's full allegations, it is plain that Edelson does not seek this remedy on behalf of the *Lion Air* plaintiffs.  Edelson claims that it has no knowledge of the "whereabouts, distribution, allocation, or transfer" of the "large, but confidential sum of money" from the settlement.  Compl. ¶¶ 97–98.  And because Edelson is not certain which defendant "is responsible, in what amount, for its damages," it seeks an accounting of the all transactions or records relating to the settlement.  *Id.* ¶¶ 99–100.  An accounting of all

---

[8] An accounting is an equitable remedy.  *See Kempner Mobile Elecs., Inc. v. Sw. Bell Mobile Sys.*, 428 F.3d 706, 715 (7th Cir. 2005).  A plaintiff seeking the remedy of an accounting must allege "the absence of an adequate remedy at law."  *Id.*  Moreover, the plaintiff must allege at least one of the following: "(1) a breach of a fiduciary relationship, (2) a need for discovery, (3) fraud, or (4) the existence of mutual accounts which are of a complex nature."  *Id.*

EXHIBIT "B"

*Lion Air* transactions makes sense and seems prudent, as the fee-sharing agreements between Edelson and Girardi Keese are dependent on the settlement amount for the *Lion Air* clients.  In other words, in order for Edelson to know and prove what it is owed, it reasonably needs to "trace the stolen funds and . . . understand the nature of the financial relationship" among the defendants.  Pl.'s Resp. Br. at 6.  That is enough to confer standing for this equitable remedy.

Next is Edelson's request for a constructive trust as a remedy for the defendants' unjust enrichment.[9]  Again, Lira asserts that Edelson lacks standing to pursue this remedy because it is for the benefit of the *Lion Air* plaintiffs.   In its complaint, Edelson alleges that it has a "contractually created property right to specific percentages of the attorneys' fees" generated by the Boeing settlement funds.  Compl. ¶¶ 86–87.  Edelson further alleges that the funds owed to Edelson are "commingled with the funds owed to the Lion Air clients" and that the defendants have distributed these funds among themselves.  *Id.* ¶ 88.  Edelson says that it believes "principles of equity and good conscience, as well as the Rules of Professional Conduct," require that the *Lion Air* plaintiffs receive what is owed to them before Edelson receives what it is owed.  *Id.* ¶ 94.  For this reason, Edelson asks that a constructive trust be imposed "for the benefit of the Lion Air clients first, then for the benefit of Plaintiff, if sufficient funds remain in

---

[9] Like an accounting, constructive trust is an equitable remedy.  *See DeGeer v. Gillis*, 707 F. Supp. 2d 784, 796 (N.D. Ill. 2010) ("[C]ourtsf have consistently affirmed that the imposition of a constructive trust is a particular type of remedy.").  "A constructive trust is a device used . . . to compel one who unfairly holds property to convey the property to the party to whom it justly belongs."  *People ex rel. Hartigan v. Candy Club*, 149 Ill. App. 3d 498, 502, 501 N.E.2d 188, 191 (1986).  Constructive trusts may be imposed when "a party has received money properly belonging to another under circumstances that, in equity, the party ought not be allowed to retain."  *Jackson v. Callan Pub., Inc.*, 356 Ill. App. 3d 326, 334, 826 N.E.2d 413, 423 (2005).

EXHIBIT "B"

trust." *Id.* ¶ 95.

The Court agrees with Lira, in part.  To the extent Edelson seeks a constructive trust to be imposed for the benefit of the *Lion Air* clients, it lacks the standing to do so. All parties agree that Edelson no longer has an attorney-client relationship with the *Lion Air* plaintiffs.  Without that relationship, Edelson lacks standing to vindicate those plaintiffs' rights.  *Kowalski v. Tesmer*, 543 U.S. 125, 129–30, (2004) ("We have adhered to the rule that a party 'generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties' . . . . [W]e have recognized an [existing] attorney-client relationship as sufficient to confer third-party standing.").  Though Edelson argues that principles of equity and good conscience, as well as the Illinois Rules of Professional Conduct, require it to seek a constructive trust for both itself and the *Lion Air* clients, that argument cannot overcome the requirement for Edelson to have standing to assert its claims and to seek its requested remedies.  *See Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 185 (2000) ("[P]laintiff must demonstrate standing separately for each form of relief sought.").  Edelson cites no case to the contrary, and the Court has not been able to identify any.

But the fact that Edelson lacks standing to seek a constructive trust on behalf of the *Lion Air* plaintiffs does not mean it lacks standing to seek a constructive trust over the property *belonging to Edelson* that it alleges the defendants unjustly hold.  *See Jackson*, *356* Ill. App. 3d at 334, 826 N.E.2d at 423.  Again, Lira does not contest that Edelson has an injury in fact and that its injury was the result of the defendants' actions. And there is no question that Edelson's injury can be redressed by the imposition of a

24

EXHIBIT "B"

constructive trust.  If Lira and the other defendants are in possession of money to which they are not entitled because it is owed to Edelson and "in equity and good conscience [they] ought not retain it, a constructive trust can be imposed to avoid unjust enrichment."  *See Nat'l Union Fire Ins. Co. of Pittsburgh v. DiMucci*, 2015 IL App (1st) 122725, ¶ 76, 34 N.E.3d 1023, 1045 (internal quotation marks omitted).

Third to consider is Edelson's claim for conversion.  In its complaint, Edelson alleges that it "has an absolute and unconditional right to the immediate possession of the attorneys' fees, once the appropriate settlement funds have been transferred to the Lion Air clients."  Compl. ¶ 117.  It further alleges that though it "made numerous demands" on the defendants for an accounting and for payment, its requests were ignored.  *See id.* ¶ 118.  Instead, the defendants "assumed control and ownership over the attorneys' fees and refused to provide them."  *Id.* ¶ 119.

As with the previously discussed remedies, Lira argues that Edelson lacks standing to pursue its conversion claim because it seeks to vindicate the rights of the *Lion Air* plaintiffs.  The Court disagrees.  The only mention of the *Lion Air* clients in Edelson's claim for conversion is an allegation in which Edelson explains that under the fee-sharing contracts, it "has an absolute and unconditional right to the immediate possession of the attorneys' fees, once the appropriate settlement funds have been transferred to the Lion Air clients."  Compl. ¶ 117.  That allegation does not amount to seeking a remedy on behalf of a third party.  Unlike with its unjust enrichment claim and with the remedy of constructive trust, Edelson limits its conversion claim and the resulting damages to its "share of the attorneys' fees."  *Id.* ¶ 120.  Given that Edelson has sufficiently alleged injury, causation, and redressability, the Court concludes that

EXHIBIT "B"

Edelson has standing to bring its conversion claim.

Consideration of Lira's standing challenge as a factual attack produces the same results as the facial attack did.  Though "a facial attack does not challenge the alleged facts themselves . . . . a factual attack does [by] testing the existence of the jurisdictional facts underlying the allegations."  *Bazile v. Fin. Sys. of Green Bay, Inc.*, 983 F.3d 274, 279 (7th Cir. 2020) (citation omitted).  And although "a plaintiff undergoing only a facial attack enjoys treatment of her allegations as true," a plaintiff undergoing a factual attack does not have that benefit.  *Id.*  Instead, courts considering factual attacks to subject matter jurisdiction "may consider and weigh evidence outside the pleadings to determine whether it has power to adjudicate the action."  *Id.*  Furthermore, once a factual attack is launched, "the plaintiff must support each controverted element of standing with . . . a showing by a preponderance of the evidence, or proof to a reasonable probability, that standing exists."  *Id.* at 278 (citations omitted).

Looking to Lira's arguments, he only attacks Edelson's standing for the constructive trust, conversion, and accounting on the basis that the remedies and claim are premised on the rights of plaintiffs Edelson no longer represents.  The Court has already concluded that neither the conversion claim nor the request for an accounting directly implicate the rights of third parties.  Lira has produced no evidence that would undermine that conclusion.  In fact, the only evidence outside the pleadings that Lira cites are three exhibits that show that Edelson is no longer representing the *Lion Air* plaintiffs—a fact Edelson does not dispute.  *See* dkt. nos. 44-9, 44-10, 44-11, 44-12, and 44-13.

With regard to the constructive trust claim, because Edelson does not dispute

EXHIBIT "B"

that it has no existing attorney-client relationship with the *Lion Air* plaintiffs, the Court's analysis on this issue is likewise unchanged.  As noted above, Edelson cannot seek a constructive trust on behalf of the *Lion Air* plaintiffs.  But, for the reasons already discussed, Edelson may still seek a constructive trust for the property it alleges it is entitled to that the defendants unjustly hold.

There is one last matter to address before moving on.  In addition to the portions of the complaint already considered above, Lira cites a few other portions of the complaint that reference the *Lion Air* clients, their injuries, or what is owed to them.  These statements are not coupled with any particular claim or remedy.  *See* Compl. at 1–2 ("Plaintiff . . . brings this lawsuit to recover monies due and owing to itself, as well as to seek the disgorgement of all monies due and owing to all clients of Girardi Keese in the matter of *In Re: Lion Air Flight JT 610 Crash*"); *id.* ¶ 7 ("And while the present Complaint is brought in part to enforce Plaintiff's fee agreement with GK, those fees are not the primary focus of this Complaint; rather, this Complaint also seeks to force GK . . . to uphold its fiduciary duty to the surviving families of the victims of Lion Air Flight 610 that it agreed to represent"); *id.* ¶ 16 ("this lawsuit requests that the Court order . . . (2) the disgorgement of all [Boeing settlement] funds from any Defendant (or any non-party) who is improperly in receipt of those funds; (3) the transfer of those funds to the appropriate client recipients; and, *only after those steps have been accomplished* (and any other remedial steps the Court deems warranted), (4) the payment of the contractually required attorneys' fees to Edelson PC"); *id.* at 29 ¶ F (asking the Court to require "the transfer of all Lion Air client funds to the appropriate client recipients"); *id.* at 30 ¶ G (requesting that the Court require "the payment of all contractually required

27

attorneys' fees to Edelson PC, only after the Court confirms the full and complete payment to the Lion Air clients).

Edelson says that these statements are best read in line with its view that the "principles of equity and good conscience, as well as the Rules of Professional Conduct," require that the *Lion Air* plaintiffs receive what is owed to them before Edelson receives what it is owed. *See id.* ¶ 94. But, as the Court has already explained, to the extent Edelson seeks any remedy on behalf of the *Lion Air* plaintiffs, it lacks standing to do so. Edelson admits it no longer has an attorney-client relationship with the *Lion Air* plaintiffs, and without some other basis for standing, Edelson is permitted to vindicate only its own interests and rights. *See Kowalski*, 543 U.S. at 129–30.

In sum, Edelson has standing to seek the equitable remedies of constructive trust and accounting, as well as to pursue its claim for conversion. It may not, however, seek relief on behalf of the *Lion Air* plaintiffs.

### 2.    Automatic bankruptcy stay

Lira next argues that this suit should be automatically stayed pursuant to 11 U.S.C. § 362(a)(1) and (a)(3).[10] The automatic stay is a powerful tool. *Fox Valley Const. Workers Fringe Ben. Funds v. Pride of Fox Masonry & Expert Restorations*, 140 F.3d 661, 666 (7th Cir. 1998). The relevant provisions of section 362 read:

> (a) Except as provided in subsection (b) of this section, a petition filed under section 301, 302, or 303 of this title, or an application filed under section 5(a)(3) of the Securities Investor Protection Act of 1970, operates as a stay, applicable to all entities, of--

---

[10] It is worth noting that the Court has already stayed the case as to Girardi and Girardi Keese based on their pending bankruptcy cases. *See* Dkt. no. 48.

EXHIBIT "B"

(1) the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title;

. . .

(3) any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate.

11 U.S.C. § 362(a).

Courts begins its analysis by considering section 362(a)(1). "On the filing of a bankruptcy petition, the stay automatically stops any other proceedings against the debtor." *Fox Valley*, 140 F.3d at 666. Non-bankrupt third parties generally are not protected by the stay, unless the debtor and the non-bankrupt third party "have such a similarity of interests that failure to protect the third party will mean that the assets of the debtor itself will fall into jeopardy." *Id.* (citing *See A.H. Robins Co. v. Piccinin*, 788 F.2d 994, 998 (4th Cir. 1986)). Both Girardi and Girardi Keese have filed for bankruptcy in the Central District of California. Lira, however, has not filed for bankruptcy, nor has an involuntary bankruptcy petition been filed against him. Instead, he contends the stay should apply to claims against him because he has a right to indemnification against Girardi Keese or Girardi under equitable principles and a statutory right to indemnification under California law.

To establish that he has a "similarity of interests" with Girardi and Girardi Keese such that this suit should be stayed, Lira says that this case presents an "unusual situation" that falls within an exception to the general rule. *See A.H. Robins Co.*, 788 F.2d at 999 (An example of an "unusual situation" is "a suit against a third-party who is entitled to absolute indemnity by the debtor on account of any judgment that might

29

result against them in the case.").  That exception would apply the automatic stay

pursuant to section 362(a)(1), where "'there is such identity between the debtor and the

third-party defendant that the debtor may be said to be the real party defendant and that

a judgment against the third-party defendant will in effect be a judgment or finding

against the debtor.'"  *Matter of Fernstrom Storage & Van Co.*, 938 F.2d 731, 736 (7th

Cir. 1991) (quoting *A.H. Robins Co.*, 788 F.2d at 999).

The problem with Lira's argument is that he is presenting it to the wrong court.

His contention must be adjudicated by the bankruptcy court in California, not this Court.

Lira misunderstands the applicability of *A.H. Robins Co.* when he suggests that section

362(a)(1), alone, results in a stay of the proceedings against him in this case.  The

purpose of section 362(a) "is to protect the debtor from an uncontrollable scramble for

its assets in a number of uncoordinated proceedings in different courts, to preclude one

creditor from pursuing a remedy to the disadvantage of other creditors."  *Fox Valley*,

140 F.3d at 66 (internal quotation marks omitted).  The plain words of section 362(a)(1)

do not "touch proceedings to enforce a court order against non-bankrupt third parties."

*See id.*  In other words, section 362(a)(1) does not, on its face, automatically stay

proceedings involving a non-debtor.  That is presumably why in *A.H. Robins Co.*, the

case Lira relies upon, the court premised the exceptions to the general rule regarding

the applicability of section 362(a)(1) on bankruptcy courts' authority under section

362(a)(1) and 11 U.S.C. § 105, which gives bankruptcy courts the authority to issue an

injunction that is necessary or appropriate to carry out the provisions of the Bankruptcy

Code.  *See A.H. Robins Co.*, 788 F.2d at 1002 ("The statutory power of the bankruptcy

court to stay actions involving the debtor or its property is not, however, limited to

EXHIBIT "B"

section 362(a)(1) and (a)(3).  It has been repeatedly held that 11 U.S.C. § 105 which

provides that the bankruptcy court 'may issue any order, process, or judgment that is

necessary or appropriate to carry out the provisions of this title,' 'empowers the

bankruptcy court to enjoin parties other than the bankrupt' from commencing or

continuing litigation.").

The Seventh Circuit has not yet had the opportunity to consider the correct

process for invoking an exception to the general rule regarding the applicability of

section 362(a)(1).  That is because in the handful of times the Seventh Circuit has

considered *A.H. Robins Co* or other exceptions to section 362(a)(1), it has found that

the non-debtor does not qualify for the exceptions.  *See Harley-Davidson Credit Corp. v.*

*JHD Holdings Inc.*, No. 19-CV-155-JDP, 2020 WL 7078828, at *1 (W.D. Wis. Dec. 3,

2020); *see, e.g., Matter of Fernstrom Storage & Van Co.*, 938 F.2d at 736 (deciding

non-debtor did fit within the exception from *A.H. Robins Co.* or another case and

affirming the bankruptcy court); *Fox Valley*, 140 F.3d at 666 (rejecting attorney's

argument that "the automatic stay deprived the district court of jurisdiction to sanction

him").

Other courts have considered *A.H. Robins Co.*, however, and they have come to

same conclusion this Court has.  *See, e.g., Patton v. Bearden*, 8 F.3d 343, 349 (6th Cir.

1993) ("It should be noted that . . . extensions [of section 362(a)(10) to non-debtors,

although referred to as extensions of the automatic stay, were in fact injunctions issued

by the bankruptcy court after hearing and the establishment of unusual need to take this

action to protect the administration of the bankruptcy estate.  Even if we were to adopt

the unusual circumstances test, the bankruptcy court would first need to extend the

EXHIBIT "B"

automatic stay under its equity jurisdiction pursuant to 11 U.S.C. § 105."); *In re Chugach Forest Prods., Inc.*, 23 F.3d 241, 247 (9th Cir. 1994) (citing *Patton* and reaching the same conclusion); *Harley-Davidson Credit Corp.,* 2020 WL 7078828, at *2 (citing both *Patton* and *Chugach* and reaching the same conclusion).

Even if Lira could invoke section 362(a)(1) here, the Court would deny a stay under that provision.  Lira asserts that a stay under section 362(a)(1) is required because he has a right of indemnification by Girardi or Girardi Keese under California's Labor Code.  Lira's Br. at 8; *see A.H. Robins Co.*, 788 F.2d at 999 (An example of an "unusual situation" is "a suit against a third-party who is entitled to absolute indemnity by the debtor on account of any judgment that might result against them in the case."). Lira has not shown that he is "entitled" to "absolute indemnity."  *See id.*  Section 2802(a) of the California Labor Code provides that:

> (a) An employer shall indemnify his or her employee for all necessary expenditures or losses incurred by the employee in direct consequence of the discharge of his or her duties, or of his or her obedience to the directions of the employer, even though unlawful, unless the employee, at the time of obeying the directions, believed them to be unlawful.

Cal. Lab. Code § 2802(a).  Lira's argument bypasses the last clause of the statute.  An employer is required to indemnify an employee *unless* the employee took actions that he knew were unlawful.  *See Dowie v. Fleishman-Hillard Inc.*, 422 F. App'x 627, 629 (9th Cir. 2011).  The complaint alleges that Lira knew his acts were unlawful.  *See* Compl. ¶ 54 ("Lira had knowledge of and cooperated with Girardi's misappropriation and conversion of settlement proceeds[.]").  Viewing the allegations in the light most favorable to the Edelson, Lira's chance of indemnification by his employer would not justify a stay.  *See Menzies*, 943 F.3d at 332.  Lira must "demonstrate his entitlement to

EXHIBIT "B"

indemnity under the criteria set forth in the statute" before claiming that his entitlement is absolute.  *See In re Bidermann Indus. U.S.A., Inc.*, 200 B.R. 779, 784–85 (Bankr. S.D.N.Y. 1996).

Though Lira may not invoke section 362(a)(1) to obtain a stay of these proceedings from this Court, he may be able to achieve the same result under section 362(a)(3).  Section 362(a)(3) prevents "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate." Though Edelson argues otherwise, the plain words of the provision go past protecting just the debtor and protect any property of the estate.  Another provision of the Code, 11 U.S.C. § 541(a), says that property of the estate includes "all legal or equitable interests of the debtor in property as of the commencement of the case."

Off the bat, it seems obvious that Edelson's request for a constructive trust is subject to a stay under section 362(a)(3).  As stated clearly in Edelson's complaint, it "seeks the imposition of a constructive trust on all money transferred from Boeing to [Girardi Keese] in connection with the Lion Air settlements."  Compl. ¶ 95.  If Edelson were to succeed on a constructive trust theory, "the value of [Girardi or Girardi Keese's] bankruptcy estate would be reduced . . . because [the] property in which the debtor holds legal but not equitable title as of the commencement of the case . . . is property of the estate . . . to the extent of the debtor's legal title."  *See In re Nat. Century Fin. Enters., Inc.*, 423 F.3d 567, 575 (6th Cir. 2005); *see also* 11 U.S.C. §541(d) (stating that property "in which the debtor holds . . . only legal title and not an equitable interest . . . becomes property of the estate under subsection (a)(1) or (2) of this section only to the extent of the debtor's legal title to such property, but not to the extent of any equitable

33

EXHIBIT "B"

interest in such property that the debtor does not hold.").  Therefore, Edelson's request

for a constructive trust must be stayed until the bankruptcy litigation is resolved.

Conversely, section 363(a)(3) does not automatically stay the conversion and

breach-of-contract claims against Lira.   The complaint alleges that Lira (along with the

other defendants), was a party to the fee arrangement contract he signed.  *See* Compl.

¶¶ 15, 103, 106.[11]  Edelson also alleges that Lira, with the other defendants, wrongfully

and without authorization assumed control and ownership of funds owed to Edelson and

converted those funds.  *See id.* ¶¶ 119–120.  Though Lira argues that judgment in favor

of Edelson on the conversion and breach-of-contract claims is tantamount to "immediate

possession of funds held by the bankruptcy estate," that is not so.  *See* Lira's Reply Br.

at 11; *see also id.* at 10.  On their face, these claims are based on Lira's conduct and

rest upon his own breach of duty, and thus they implicate Lira's individual liability.  In

short, the bankruptcy estates would not be disturbed by entry of a judgment against him

on these counts.

Last to consider is the remedy of an accounting.  Edelson requests that all

defendants be required "to provide a full and complete accounting of all funds

transferred from Boeing that were intended for any [Girardi Keese] client (inclusive of

any transfers to third parties associated with, or transfers made for the benefit of, Girardi

Keese) related to settlements in *In Re: Lion Air Flight JT 610 Crash*, and a full

accounting of what subsequently became of those funds." Compl. at 29, ¶ B.  Lira is a

---

[11] Lira repeatedly asserts that he was not a party to the fee-sharing contract.  But at this
stage, and on this issue, the Court is required to accept all facts alleged in the complaint
as true, view them in the light most favorable to Edelson, and draw all reasonable
inferences in its favor.  *See Menzies*, 943 F.3d at 332.

EXHIBIT "B"

defendant, and applying the remedy of an accounting *to him* would not impact the

bankruptcy estates.[12]  In sum, this remedy is unaffected by the automatic stay.

To summarize, Lira's request to stay this case in its entirety under section

362(a)(1) is inappropriate because the bankruptcy court would first need to extend the

automatic stay under its equity jurisdiction pursuant to 11 U.S.C. § 105.  Even if that

were not the case  , the Court would not stay the claims against Lira because he has

not shown that he is entitled to absolute indemnity from Girardi or Girardi Keese.

Regarding Lira's assertion that this case must be stayed under section 362(a)(3), only

Edelson's request for the remedy of constructive trust must be automatically stayed as

that is the only provision that directly touches the Girardi or Girardi Keese bankruptcy

estates.[13]

### Conclusion[14]

For the reasons stated above, the Court denies Griffin's motion to dismiss [dkt.

no. 41] and grants Lira's motion to dismiss [dkt. no. 43] in part, staying litigation on

---

[12] Lira contends that no settlement funds were transferred to him and that he never had
control over these funds.  These assertions ignore the allegations in the complaint.
Edelson makes clear that though it has no knowledge of the "whereabouts, distribution,
allocation, or transfer" of the *Lion Air* settlement proceeds, it believes the defendants do
and that they must therefore provide a full accounting.  *See id.* ¶¶ 98–100.

[13] Lira separately asks for an indefinite stay due to the pending bankruptcy proceedings
even if the automatic stay does not apply.  *See Munson v. Butler*, 776 F. App'x 339, 342
(7th Cir. 2019) ("[A] district court has inherent power to exercise its discretion to stay
proceedings to avoid unnecessary litigation of the same issues.").  The Court denies
this request.  Aside from the constructive trust, the remaining claims against him do not
warrant a stay.

[14] As noted at the April 6, 2021 status hearing, Lira's argument vis-à-vis venue is
underdeveloped and unsupported.  It is thus forfeited.  *See Batson v. Live Nation Ent.,
Inc.*, 746 F.3d 827, 833 (7th Cir. 2014); *Gonzales v. Madigan*, 403 F. Supp. 3d 670, 679
(N.D. Ill. 2019) (Kennelly, J.), aff'd, 990 F.3d 561 (7th Cir. 2021).

EXHIBIT "B"

Count 1 (Unjust Enrichment - Constructive Trust) under 11 U.S.C. § 362(a)(3) unless

and until the conclusion of the Girardi and Girardi Keese bankruptcy proceedings or

until the bankruptcy court orders otherwise.  Both defendants are directed to answer all

remaining claims by no later than August 9, 2021.  Rule 26(a)(1) disclosures, unless

already made, are to be made by August 16, 2021.  The parties are directed to confer

and attempt to agree upon a discovery and pretrial schedule and are to file by August

23, 2021 a joint status report setting out an agreed schedule or alternative proposed

schedules.  The case is set for a telephone status hearing on August 31, 2021 at 8:45

a.m., using call-in number 888-684-8852, access code 746-1053, though the Court

reserves the right to vacate the status hearing if it determines a hearing is not needed.

Counsel should wait for the case to be called before announcing themselves.

_____
MATTHEW F. KENNELLY
United States District Judge

Date:  July 19, 2021

36

EXHIBIT "B"

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is 3200 Park Center Drive, Suite 250, Costa Mesa, CA 92626.

 A true and correct copy of the foregoing document entitled (*specify*): **DECLARATION OF SPECIAL LITIGATION COUNSEL RONALD RICHARDS IN SUPPORT OF OPPOSITION TO MOTION FOR RELIEF FROM STAY** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1. <u>TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)</u>:**  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) October 19, 2021  I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☒ Service information continued on attached page.

**2. <u>SERVED BY UNITED STATES MAIL</u>:**
On (*date*)  October 19, 2021  , I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be completed</u> no later than 24 hours after the document is filed.

The Honorable Barry Russell
U.S. Bankruptcy Court
Roybal Federal Building
255 E. Temple Street, Suite 1660
Los Angeles, CA 90012

☐ Service information continued on attached page.

**3. <u>SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL</u>** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*)_____, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge <u>will be completed</u> no later than 24 hours after the document is filed.

☐ Service information continued on attached page.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| | | |
|---|---|---|
| <u>October 19,2021</u> | Gabriela Gomez-Cruz | */s/ Gabriela Gomez-Cruz* |
| *Date* | *Printed Name* | *Signature* |

---

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                  **F 9013-3.1.PROOF.SERVICE**

<u>**ADDITIONAL SERVICE INFORMATION** (if needed):</u>

1. <u>**SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")**</u>

- Rafey Balabanian    rbalabanian@edelson.com, docket@edelson.com
- Shraddha Bharatia    notices@becket-lee.com
- Ori S Blumenfeld    Ori@MarguliesFaithLaw.com,
  Helen@MarguliesFaithLaw.com;Angela@MarguliesFaithLaw.com;Vicky@MarguliesFaithLaw.com
- Richard D Buckley    richard.buckley@arentfox.com
- Marie E Christiansen    mchristiansen@vedderprice.com, ecfladocket@vedderprice.com,marie-christiansen-4166@ecf.pacerpro.com
- Jennifer Witherell Crastz    jcrastz@hrhlaw.com
- Ashleigh A Danker    Ashleigh.danker@dinsmore.com, SDCMLFiles@DINSMORE.COM;Katrice.ortiz@dinsmore.com
- Clifford S Davidson    csdavidson@swlaw.com, jlanglois@swlaw.com;cliff-davidson-7586@ecf.pacerpro.com
- Lei Lei Wang Ekvall    lekvall@swelawfirm.com, lgarrett@swelawfirm.com;gcruz@swelawfirm.com;jchung@swelawfirm.com
- Richard W Esterkin    richard.esterkin@morganlewis.com
- Timothy W Evanston    tevanston@swelawfirm.com, gcruz@swelawfirm.com;lgarrett@swelawfirm.com;jchung@swelawfirm.com
- Jeremy Faith    Jeremy@MarguliesFaithlaw.com,
  Helen@MarguliesFaithlaw.com;Angela@MarguliesFaithlaw.com;Vicky@MarguliesFaithlaw.com
- James J Finsten    , jimfinsten@hotmail.com
- James J Finsten    jfinsten@lurie-zepeda.com, jimfinsten@hotmail.com
- Alan W Forsley    alan.forsley@flpllp.com, awf@fkllawfirm.com, awf@fl-lawyers.net,addy.flores@flpllp.com
- Eric D Goldberg    eric.goldberg@dlapiper.com, eric-goldberg-1103@ecf.pacerpro.com
- Andrew Goodman    agoodman@andyglaw.com, Goodman.AndrewR102467@notify.bestcase.com
- M. Jonathan Hayes    jhayes@rhmfirm.com,
  roksana@rhmfirm.com;matt@rhmfirm.com;janita@rhmfirm.com;susie@rhmfirm.com;priscilla@rhmfirm.com;pardis@rhmfirm.com;russ@rhmfir
  m.com;rebeca@rhmfirm.com;david@rhmfirm.com;sloan@rhmfirm.com;boshra@rhmfir
- Marshall J Hogan    mhogan@swlaw.com, knestuk@swlaw.com
- Bradford G Hughes    bhughes@Clarkhill.com, mdelosreyes@clarkhill.com
- Razmig Izakelian    razmigizakelian@quinnemanuel.com
- Lewis R Landau    Lew@Landaunet.com
- Craig G Margulies    Craig@MarguliesFaithlaw.com,
  Vicky@MarguliesFaithlaw.com;Helen@MarguliesFaithlaw.com;Angela@MarguliesFaithlaw.com
- Peter J Mastan    peter.mastan@dinsmore.com, SDCMLFiles@dinsmore.com;Katrice.ortiz@dinsmore.com
- Edith R. Matthai    ematthai@romalaw.com, lrobie@romalaw.com
- Elissa Miller    emiller@sulmeyerlaw.com, emillersk@ecf.inforuptcy.com;ccaldwell@sulmeyerlaw.com
- Eric A Mitnick    MitnickLaw@aol.com, mitnicklaw@gmail.com
- Scott H Olson    solson@vedderprice.com, scott-olson-2161@ecf.pacerpro.com;ecfsfdocket@vedderprice.com,nortega@vedderprice.com
- Carmela Pagay    ctp@lnbyb.com
- Ambrish B Patel    apatelEI@americaninfosource.com
- Leonard Pena    lpena@penalaw.com, penasomaecf@gmail.com;penalr72746@notify.bestcase.com
- Michael J Quinn    mquinn@vedderprice.com, ecfladocket@vedderprice.com,michael-quinn-2870@ecf.pacerpro.com
- Matthew D. Resnik    matt@rhmfirm.com,
  roksana@rhmfirm.com;janita@rhmfirm.com;susie@rhmfirm.com;max@rhmfirm.com;priscilla@rhmfirm.com;pardis@rhmfirm.com;russ@rhmfir
  m.com;rebeca@rhmfirm.com;david@rhmfirm.com;sloan@rhmfirm.com
- Ronald N Richards    ron@ronaldrichards.com, morani@ronaldrichards.com
- Kevin C Ronk    Kevin@portilloronk.com, Attorneys@portilloronk.com
- Jason M Rund (TR)    trustee@srlawyers.com, jrund@ecf.axosfs.com
- William F Savino    wsavino@woodsoviatt.com, lherald@woodsoviatt.com
- Gary A Starre    gastarre@gmail.com, mmoonniiee@gmail.com
- Richard P Steelman    rps@lnbyb.com, john@lnbyb.com
- Philip E Strok    pstrok@swelawfirm.com, gcruz@swelawfirm.com;1garrett@swelawfirm.com;jchung@swelawfirm.com
- United States Trustee (LA)    ustpregion16.la.ecf@usdoj.gov
- Christopher K.S. Wong    christopher.wong@arentfox.com, yvonne.li@arentfox.com
- Timothy J Yoo    tjy@lnbyb.com

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                                    **F 9013-3.1.PROOF.SERVICE**