Rafey S. Balabanian (SBN 315962)
rbalabanian@edelson.com
EDELSON PC
150 California Street, 18th Floor
San Francisco, California 94111
Tel: 415.212.9300/Fax: 415.373.9435

*Counsel for Interested Party Edelson PC*

# UNITED STATES BANKRUPCY COURT

## CENTRAL DISTRICT OF CALIFORNIA – LOS ANGELES DIVISION

In re:

THOMAS VINCENT GIRARDI,

*Debtor*.

Case No. 2:20-bk-21020-BR

[Chapter 7]

**REPLY BRIEF IN SUPPORT OF EDELSON PC'S MOTION TO CLARIFY AUTOMATIC STAY**

Hon. Barry Russell

Date: November 16, 2021
Time: 10:00 AM
Courtroom: 1668

# **TABLE OF CONTENTS**

**BACKGROUND** ...................................................................................... 5

   **I.**   *Lion Air* **and the collapse of Girardi Keese**.................................... 5

**II.**   **The Trustee/Erika's coordinated efforts to hold Edelson off.** ....................7

**DISCUSSION** ...................................................................................... 12

   **I.**   **The Trustee/Erika do not provide any basis in law to extend the automatic stay to bar** *Edelson v. Girardi.* .......................................................... 14

      **A.**   **Edelson will not collect estate assets, so there is no basis to suspend a separate suit against a non-debtor.** ..................................................... 14

      **B.**   **Client agreement to the fee split has nothing to do with whether Erika can claim a stay.** .......................................................... 17

**II.**   **The Trustee and Erika's mutual desire to make things easy on Erika is no reason to extend a stay to her.** ....................................................... 20

**CONCLUSION**.......................................................................................... 24

# **TABLE OF AUTHORITIES**

## **Cases**

*Edelson v. Girardi*,
    No. 2020-cv-07115 (N.D. Ill. 2020) ........................................................*passim*

*In re Beard*,
    595 B.R. 274 (Bankr. E.D. Ark. 2018) ............................................................ 16

*In re Corey*,
    892 F.2d 829 (9th Cir. 1989) .......................................................................... 16

*In re Girardi Keese*,
    No. 2:20-bk-21022-BR (C.D. Cal. Bankr. 2020)......................................*passim*

*In re Kirst*,
    559 B.R. 757 (Bankr. D. Colo. 2016) ............................................................ 16

*In re Lion Air*,
    No. 2018-cv-07686 (N.D. Ill. 2018) ....................................................... 5, 6, 21

*In re Metro. Mortg. & Sec. Co., Inc.*,
    325 B.R. 851 (Bankr. E.D. Wash. 2005) ........................................................ 17

*In re Perryman*,
    No. BAP NC-21-1036-BFS, 2021 WL 4742673
    (B.A.P. 9th Cir. Oct. 8, 2021) ........................................................................ 15

*In re Torrez*,
    132 B.R. 924 (Bankr. E.D. Cal. 1991) ............................................................ 15

## **Rules**

ABA MODEL R. 6.1(b)....................................................................................... 24

FED. R. EVID. 1002 ............................................................................................ 19

CAL. R. OF PROF'L CONDUCT, R. 3.10(a) ............................................................. 1

C.D. Cal. Bankr. R. 9013–1(f) ................................................................................. 20

**Other Authorities**

@ronaldrichards, TWITTER (Nov. 3, 2021 at 8:31 AM),
    https://twitter.com/RonaldRichards/status/1455890418898440193 ................ 11

@ronaldrichards, TWITTER (Nov. 3, 2021 at 8:57 AM)
    https://twitter.com/RonaldRichards/status/1455896809398800389 ................. 11

@erikajayne, TWITTER (Sept. 25, 2021),
    https://twitter.com/erikajayne/status/1441639978983825415?s=20 ................ 11

Amanda Bronstad, *Erika Girardi Accuses Edelson of Unethical and Illegal Fee Agreement with Girardi Keese*, (Nov. 3, 2021),
    https://www.law.com/therecorder/2021/11/03/erika-girardi-accuses-edelson-of-unethical-and-illegal-fee-agreement-with-girardi-keese/ ................................. 12

*Attorney Ronald Richards Claims Lisa Rinna Owes $3.45 Million on Home and Reveals She's Being Sued For Copyright Violations, Dubs RHOBH Cast 'Mean Girls' While Offering Support To Former Co-Stars Lisa Vanderpump and Denise Richards*, ALLABOUTRH.COM (Jul. 20, 2021),
    https://www.allabouttrh.com/2021/07/20/attorney-ronald-richards-claims-lisa-rinna-owes-3-45-million-on-home-and-reveals-shes-being-sued-for-copyright-violations-dubs-rhobh-cast-mean-girls-while-offering-support-to-former-co-stars-l/ .......................................................................................................... 13

Amanda Bronstad, *Erika Girardi's lawyer, Chicago plaintiffs' lawyer, trustee's lawyer trade charges*, (Nov. 3, 2021),
    LAW JOURNAL ................................................................................................ 11

Johnni Macke, *Erika Jayne's Salary Will Be 'Much Higher' If She Continues on 'Real Housewives of Beverly Hills'*, USMAGAZINE.COM (Oct. 12, 2021)
    https://www.usmagazine.com/entertainment/news/erika-jaynes-rhobh-salary-will-be-much-higher-if-she-returns/ ............................................................... 12

1

2

3

███████████████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████ ............................................................. 10

4

5

6

Up and Adam! YouTube Interview, *Erika Girardi and Ronald Richards Find
Common Ground In Opposing The Motion! (SUBSCRIBERS ONLY!)*, YOUTUBE
(Oct. 19, 2021),
        https://youtu.be/moFKmGIuyVs?t=2144 ......................................................... 22

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

1    This bankruptcy is unlike most. Most debtors haven't defrauded hundreds of

2    people, much less people who have already been injured, by abusing a position of

3    immense trust as their counsel. And while all bankruptcies face the important task of

4    determining and distributing the assets of the debtor, this one carries far heavier

5    freight: lifting a cloud on the justice system itself.

6    Watching these proceedings from the sidelines—both close to home here in LA

7    and thousands of miles away in Indonesia—are Girardi Keese's dozens of victims.

8    What they should see is a return of the money that Girardi Keese stole from them,

9    and they should also see the process of the justice system righting itself. With respect

10   to the proceedings aimed against Erika Girardi ("Erika"), though, what they are

11   seeing is closer to a spin-off reality TV show—one in which the special counsel for

12   the Girardi Keese Trustee, who is tasked with pursuing Erika, is instead secretly

13   colluding with her to thwart Edelson's investigation so as to protect their own

14   interests at the expense of the clients.

15   In their first round of responses to this motion, Edelson was bewildered to find

16   the Girardi Keese Trustee ("the Trustee") and Erika to be opposing the motion in one

17   voice. Far stranger, however, was the barrage of e-mails that the firm received shortly

18   thereafter from special counsel to the Trustee, Ronald Richards, unethically

19   threatening[1] to reveal information that would do "damage" to the firm if Edelson did

20   not agree to table the motion and accept financial records that he said would show

---

[1]    It is, of course, black letter law that an attorney cannot use the threat of ethics charges to gain an advantage in litigation. CAL. R. OF PROF'L CONDUCT, R. 3.10(a) ("A lawyer shall not threaten to present criminal, administrative, or disciplinary charges to obtain an advantage in a civil dispute."). The fact that Mr. Richards was so willing to do this, while serving in a critical position, is disturbing to say the least. Given that both Mr. Richards and Erika both concede they don't even know the full facts, the behavior becomes even more problematic.

1    Erika had not received any client funds in connection with *Lion Air*.

2         In response, Edelson immediately said that it would not engage in this bizarre

3    shakedown. The purported "damage" the Trustee intended to do was parroting a

4    motion already filed in the *Edelson v. Girardi* litigation, which had been denied from

5    the bench—claiming that the fee split agreement between Edelson and Girardi Keese

6    hadn't been perfected by getting client sign-off in writing. To Edelson, the issue is

7    remarkable only for the questions it raised about the Trustee's conduct: Why bring

8    this up now, with frantic urgency, when it had been raised by Thomas Girardi's

9    ("Tom's") former partners (and co-defendants) months ago? Why not spend some

10    time to do a full investigation into the facts and law before making these threats?

11    Perhaps more fundamental to the bankruptcy, if this was in fact the Trustee's

12    position, how could it apportion the fees from any of the dozens of clients and

13    settlements for which the estate still intended to collect fees? And what had the

14    Trustee's counsel privately discussed with Erika about these issues, which naturally

15    involve confidential client documents?

16         These questions went unanswered. But Edelson did review the account records

17    provided by the Trustee. And far from foreclosing the possibility that Erika received

18    settlement money from the *Lion Air* cases, it showed the opposite: money that

19    belonged to the surviving widows and orphans of the victims of that plane crash had,

20    in fact, been used to make payments for Erika or her companies. Specifically:

21         •    As of ▮▮▮▮▮▮▮, the Girardi Keese Client Trust Account at Torrey

22    Pines Bank contained ▮▮▮▮▮▮. The only credit to that account between

23    ▮▮▮▮▮▮▮▮▮▮ was a payment of ▮▮▮▮▮▮▮▮▮, which

24    were ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

25    ▮▮▮▮▮.

26         •    Between ▮▮▮▮▮▮▮▮▮, Girardi Keese transferred

27

1  ████████████████████ from the Client Trust Account to the Nano Banc

2  operating account with memo lines ████████████ tied to Girardi Keese's

3  ██████████████████████. But this well exceeded the amount properly

4  deductible from ████████████████, which was only ████████.

5  • On ██████████, the balance of the Nano Banc operating account was

6  just ████████. Between ████████████ and ████████████, the only deposits

7  into the account were ██████████████.

8  • On ████████████, the Nano Banc operating account made payments to

9  ████████████ of ████████████ and ████████████.

10  • The Trustee's Statement of Financial Affairs lists ██████████ of dollars in

11  payments to ████████████ on ████████████ for the benefit of ████████

12  ██—██'s company. (*See In re Girardi Keese*, No. 2:20-bk-21022-BR, dkt.

13  620 (C.D. Cal. Bankr.).)

14  • That money can only have come from a single place: ██████████████

15  ██████████. Given the starting balance of the trust account, it is mathematically

16  impossible for any less than ██████████ of the transfers to the Nano Banc

17  account to have come from anywhere other than ██████████████████.

18  • There are suspicious payments, as well, to the ████████████████

19  ██████.

20  The above revelations meant that Edelson would not cede to the Trustee's

21  demands and drop its investigation. Instead, Edelson offered to work cooperatively

22  and consider whatever additional information the Trustee was willing to share. Radio

23  silence followed, until last Tuesday.

24  That is when Erika, not the Trustee, supplemented her already-filed response

25  with a brief bristling with adjectives—illegal, unethical, unenforceable—but lacking

26  completely in substance. Erika's counsel says he reviewed documents (without

27

1    attaching any) which are no longer in Erika's possession (or perhaps never were) that

2    purportedly show that Girardi Keese didn't properly inform the clients about the

3    intended fee split with Edelson. But the connection to *this* motion is absent: if, in fact,

4    the *Edelson v. Girardi* case is doomed to fail, that court will decide the issues

5    (though, it has already rejected this argument as premature once). Further, if

6    Edelson's claim in this bankruptcy is defective, then the Trustee can oppose it in the

7    normal course, just like any other invalid claim. Getting Edelson to stand down here,

8    however, finds no support in the facts and law.

9        Most importantly, as Edelson has made clear in numerous public statements

10    and court filings, Edelson PC has not and will never take a penny in fees until the

11    clients have been made completely whole. Based on those assurances, there is little

12    risk that Edelson's investigation will somehow obstruct the Trustee's ability to

13    administer the bankruptcy estate and pay creditors. Far more concerning is the made-

14    for-TV performance that the Trustee and Ms. Girardi ginned up: it seems quite clear

15    that Mr. Richards put Erika up to filing her supplemental response, and then

16    immediately embarked on a social media tour claiming this was the first he'd learned

17    of the filing—though he agreed wholeheartedly that this kneecaps Edelson's efforts

18    to investigate Erika. This attempt to mislead and manipulate the Court should be

19    flatly rejected and called out for what it is. The point, though, is crystal clear: Mr.

20    Richards and Erika are apparently willing to say or do anything they need to in order

21    to keep Edelson's investigation away from Erika Girardi and clear the way for Mr.

22    Richards and Erika to negotiate a back room settlement.

23        Mr. Richards and Erika can litigate this case on Twitter all they'd like. They're

24    welcome to orchestrate fit-for-the-tabloids fights among themselves and other reality

25    celebrities aimed, seemingly, at ratings rather than justice. In the end, Edelson

26    willingly concedes the reality TV playing field to both of them.

27

1    Fortunately for the victims of Tom and Girardi Keese, however, this is a court

2    of law, not a TV show. And in this Court, the content of the oppositions—

3    notwithstanding the invectives and sleight of hand—must have legal and factual

4    significance. On that score, the oppositions miss their mark entirely. The reality (in

5    Court, not TV) is that the Trustee and Erika have failed to provide a basis for this

6    Court to halt the firm in proceeding with *Edelson v. Girardi*. Beyond that, which

7    alone should end the inquiry, they also fail to proffer any practical reason to do so: if

8    Edelson finds money belonging to either estates or the clients, it will return it, for

9    free. And, if it is only Edelson that will conduct a legitimate, non-conflicted

10   investigation of what money Erika took—a fact that increasingly seems to be the

11   case—that is all the more reason for the Court to grant the motion.

12   **BACKGROUND**

13   **I.    *Lion Air* and the collapse of Girardi Keese**

14   Edelson PC served as co-counsel with the Girardi Keese firm to represent the

15   surviving families of victims of the Lion Air plane crash. *See In re Lion Air*, No.

16   2018-cv-07686 (N.D. Ill.). These clients—the widows and orphans of those killed in

17   the crash—all live in Indonesia. The suits were filed against Boeing in Illinois (where

18   Boeing is based), and ultimately reached confidential settlements for each family.

19   But most of the settlement money never made it to the victims. Thomas and

20   Erika Girardi had, famously and for years, spent enormous sums to prop up a

21   glittering lifestyle fit only for reality TV. While it was near-impossible to believe

22   given his stature in the legal community—and only after months of investigation—

23   Edelson ultimately concluded that Tom and Girardi Keese had, in fact, stolen not just

24   Edelson PC's fees in connection with the *Lion Air* case but the life-changing sums of

25   money that belonged to the clients. Girardi Keese, it became clear, operated as a

26   Ponzi scheme: when new client money came in, Tom paid clients and creditors sums

1  long-since-overdue—but just enough to keep them at bay—and then proceeded to

2  steal the rest.

3      Attorneys from Edelson filed a motion for rule to show cause in the *Lion Air*

4  case, and a separate action—*Edelson v. Girardi*—to identify any money held by

5  Tom, Erika, and others that belonged to the *Lion Air* clients, and hold it in

6  constructive trust. (*See* Mot. for Rule to Show Cause, *In re Lion Air*, No. 2018-cv-

7  07686, dkt. 842 (N.D. Ill. Dec. 2, 2020); Compl., *Edelson v. Girardi*, No. 2020-cv-

8  07115, dkt. 1 (N.D. Ill. Dec. 2, 2020).) Edelson PC's efforts resulted in Tom being

9  held in contempt and being ordered to pay a multi-million dollar judgment to the

10  victims. It caused the Court to, sua sponte, refer the matter to the U.S. Attorney's

11  office to consider criminal charges. It resulted in Tom losing his law license and

12  being barred from having the opportunity to steal from clients in the future. And, of

13  course, it led to the long overdue implosion of Girardi Keese and the immediate twin

14  bankruptcies of Tom individually and the Girardi Keese law firm. Edelson has also

15  been pursuing contempt proceedings against Girardi Keese's former partners—David

16  Lira and Keith Griffin—in the *Lion Air* action, which is now set for December 8 and

17  9. Meanwhile, it has continued in discovery in the *Edelson v. Girardi* action, and

18  obtained a default against Erika's company, EJ Global. (*See* Minute Order, *Edelson v.*

19  *Girardi*, No. 2020-cv-07115, dkt. 40 (Feb. 5, 2021).)

20      Lira and Griffin moved to dismiss the case but succeeded only in staying the

21  constructive trust claims against them in light of the bankruptcy. A summons has

22  been issued for Erika but has not been served. The firm now intends to serve Erika

23  (and may amend in light of new facts) and sought clarification from this Court that

24  proceeding to do so does not violate the automatic stay. (*See* dkt. 258.) Edelson filed

25  that motion in the above-captioned bankruptcy, because they knew it was the likely

26  forum where Erika might retreat to claim protection from the stay. (*See id.*)

27

1    Critically, Edelson is sensitive to exactly what it might find in proceeding on

2    the *Edelson v. Girardi* claims: if client money is found, Edelson has committed to

3    giving it back to the clients; if it finds money that either estate has title in, it has

4    committed to returning that money to the respective estate it belongs to. Indeed,

5    Edelson has committed to taking on this work *pro bono*, without a tax to the estate or

6    the clients. In its opening motion, Edelson made clear that it will not pursue any

7    funds in which the Thomas Girardi estate has a title. (*See id.*) The firm now similarly

8    assures—and has already assured a few times—the Girardi Keese estate that it will do

9    the same. The Trustee overseeing the individual bankruptcy saw the wisdom in this

10   and did not oppose Edelson's motion. (Dkt. 270.) But in a strange twist, the Girardi

11   Keese Trustee and Erika both opposed the motion on largely the same grounds.

12   (Dkts. 268, 272.) Stranger still is what happened next.

13   **II.    The Trustee/Erika's coordinated efforts to hold Edelson off.**

14   After Edelson filed its opening motion, Mr. Richards—special counsel to the

15   Trustee—reached out to the firm's counsel to try to broker a backroom deal. (Decl. of

16   J. Eli Wade-Scott, ("Wade-Scott Decl."), attached as Ex. 1, ¶ 3.) He did not want

17   Edelson to proceed against Erika. (*Id.*) Instead, he offered to provide certain records

18   of the Girardi Keese operating account which, he said, would show that there is no

19   case to proceed in *Edelson v. Girardi* against Erika. (*Id.*) Mr. Richards claimed that

20   he was concerned about imposing an additional burden on Erika's finances while he

21   tried to reach a settlement with her. (*Id.*)

22   Edelson was willing to listen, seeing no need to bring Erika into the case if

23   there was not liability on any ultimate theory in the case. (*Id.* ¶ 4.) The Parties

24   stipulated to move the hearing date and attempt to resolve Edelson's motion. (Dkt.

25   273.) But later that night, the firm received an e-mail from Mr. Richards, and he

26   ultimately demanded an immediate phone call the next day. (Wade-Scott Decl. ¶ 5.)

27

1    Lead counsel for the firm were preparing for a federal appellate argument and advised

2    Mr. Richards that this did not seem like an emergency. (*Id.*) Nevertheless, Mr.

3    Richards insisted that counsel immediately get on the phone so that the Trustee and

4    Edelson could "resolve this without any damage." (*Id.*)

5        Once on the phone, it quickly became clear that the Trustee intended to renew

6    an argument made by Keith Griffin weeks before in the *Edelson v. Girardi* case—in a

7    motion for judgment on the pleadings that was denied from the bench—and publicly

8    accuse Edelson of unethical conduct. (*See* Griffin Mot. for Judgment, *Edelson v.*

9    *Girardi*, No. 2020-cv-07115, dkt. 95 (N.D. Ill. Aug. 30, 2021); *id.* at dkt. 97 (minute

10   entry denying motion).) The firm made clear that it was not moved by the argument:

11   if the proof of claim in this case is not sufficient, the Trustee should make those

12   arguments at the appropriate time (if there is even the remote possibility that Edelson

13   will be paid on it). (*See* E-mail from J. Eli Wade-Scott to Ronald Richards, Ex. 1-B to

14   Wade-Scott Decl., at 10-11.) Edelson also reminded the Trustee the impropriety of

15   trying to leverage a purported ethics issues to try to bully Edelson into dropping its

16   investigation of a target in this case. (*Id.*)

17       The Trustee and Edelson agreed that the Trustee would produce certain

18   financial records (the 2020 year of checks and statements from the Girardi Keese

19   operating account) which Mr. Richards continued to insist would foreclose the

20   possibility of Erika Girardi having *Lion Air* client funds. (Wade-Scott Decl. ¶ 6.)

21   Because the Trustee—and, Mr. Richards implied, others—intended to amend their

22   oppositions with the supposed damaging information, however, the firm was given

23   just three and a half business days to complete the review and advise the Trustee what

24   it intended to do. (*Id.*) Edelson undertook the review, all the while with Mr. Richards

25   continuing to barrage the firm with frenetic e-mails to determine if Edelson was

26   going to withdraw the motion. (*Id.*)

27

1   Even hamstrung with a few days to review, it immediately became clear that **in**

2   **fact payments had been made for Erika or her companies from** *Lion Air*

3   **settlement money.** Edelson advised Mr. Richards and his co-counsel, Mr. Strok, in a

4   detailed letter that the review showed that—far from foreclosing the propriety of

5   pursuing the *Edelson* case against Erika—there was all the more reason to do so. (*See*

6   Letter from J. Eli Wade-Scott to Ronald Richards, attached as Ex. 1-D to Wade-Scott

7   Decl. at 23-24.) As described in detail in the letter, the preliminary analysis showed:

8   • As of ███████████, the Girardi Keese Client Trust Account at

9   Torrey Pines Bank contained only ████████. The only credit to that account

10   between ████████████████ was a wire transfer for ████████

11   ████████████, representing the ████████████████

12   ████████████.

13   • Between ████████████████████ in five separate

14   checks, Girardi Keese transferred ████████ from the Client Trust Account to

15   the Nano Banc operating account with memo lines ████████████ followed by

16   the amount of the check and ████████████—Girardi Keese's ████████

17   ████████████████. But the amount properly deductible from ████████

18   ████████████████████ only totaled ████████████

19   ████████████████.

20   • On ████████████, the balance of the Nano Banc operating

21   account was only ████████. Between ████████████ and ████████████, the

22   only deposits into the account were ████████████████. On ████████████, the

23   Nano Banc operating account made payments to ████████████ of

24   ████████ and ████████████.

25   • The Trustee's Statement of Financial Affairs lists ████████ of

26   dollars in payments to ████████████ on ████████████ for the benefit of

27

1   ████████████—███'s company. (*See In re Girardi Keese*, No. 2:20-bk-

2   21022-BR, dkt. 620.)

3       • That money can only have come from a single place: ██████

4   ██████████████. Given the starting balance of the trust account, it is

5   mathematically impossible for any less than ████████ of the transfers to the

6   Nano Banc account to have come from anywhere other than ██████████

7   ██████.

8       • There are other suspicious payments as well, including to the

9   ████████████████.[2] Edelson has asked whether this was for the

10  benefit of Erika or her companies and have not received a response.

11      The firm also tried to impart on the Trustee the impropriety of the Trustee

12  aligning itself so closely with Erika on an issue that seemed irrelevant to the pending

13  motion. (*See id.*) Edelson posed a number of questions to the Trustee about what the

14  basis was for its claims, the impact that this argument would have on the

15  administration of the rest of the estates, and—critically—what had been exchanged

16  with Erika in order to coordinate this. (*Id.*)

17      The better part of a week passed without a word from the Trustee. Then, on

18  November 2, 2021, Erika's counsel, Evan Borges of Greenberg Gross LLP, filed a

19  "supplemental" response in which she lambasted the firm, based on supposedly

20  "newly discovered evidence," for purportedly entering into "illegal, unethical, and

21  _____

22  [2]   Erika, during this period, ████████████████████████████████

23  ████████████████████████████████████████████████

24  ████████████████████████████████████

25  ████████████████████████████████████████████

26  ██████████████.

27

1 unenforceable fee-sharing agreements between Edelson and GK." (Dkt. 280 at 2.)

2 The body of the brief focuses on the letters that Edelson attached to the firm's proof

3 of claim, which Keith Griffin authored to memorialize the fee split between the firms.

4 (*See id.* at 5.) But Mr. Borges submits an opaque declaration stating that "[he] was

5 able to review, but not obtain or retain copies of, underlying fee agreements between

6 GK and its clients in the Lion Air litigation." (Decl. of Evan Borges ("Borges Decl."),

7 dkt. 280, ¶ 3.) He hastens to add that "[f]or the avoidance of doubt, my client Ms.

8 Girardi never had and does not have any of the fee agreements between GK and the

9 Lion Air clients." (*Id.*)

10  True to his aspirations of becoming a reality TV lawyer and social media

11 influencer, Mr. Richards, for his part, ran to Twitter to send out the brief to his

12 followers with feigned surprise, describing it as a "[b]reaking" "bombshell filing."

13 (@ronaldrichards, Twitter (Nov. 3, 2021 at 8:31 AM),

14 https://twitter.com/RonaldRichards/status/1455890418898440193.) He responded to

15 his followers, further by implying that he had not orchestrated the whole event, but

16 offering support for Erika saying she "is correct if there no signed fee agreements,

17 need to see their response." (*Id.*) He then went to a pre-arranged appearance on his

18 favored YouTube podcast publicizing the charade. (*Id.* (Nov. 3, 2021 at 8:57 AM),

19 https://twitter.com/RonaldRichards/status/1455896809398800389.) He then placed

20 quotes in article after article, each tweeted out to his tens of thousands of followers—

21 at times tagging Erika to reach her nearly half-million followers as well—pretending

22 further at ignorance. (*Id.*, *e.g.*, Amanda Bronstad, *Erika Girardi's lawyer, Chicago*

23 *plaintiffs' lawyer, trustee's lawyer trade charges*, Law Journal (Nov. 3, 2021).).[3]

24

25 [3]  For his part in the charade, Borges kept the story going by running to the press

26

## **DISCUSSION**

Thomas Girardi and his firm stole millions from their clients. Erika, it is becoming increasingly clear, took some of those victims' money to buy a life fit for television. But despite that fraud being revealed, she and the Girardi Keese Trustee are well into a backroom deal to let Erika off with minimal scrutiny by the Trustee. When Edelson insisted that it would genuinely investigate Erika, the Trustee/Erika mutually agreed to adopt the old Tom Girardi playbook that Erika had learned sitting beside Tom during their 20-year marriage and continuing after her sham divorce filing: bully, threaten, lie, attack, and kick up as much dust as possible in hopes that questions will land elsewhere. There should be no doubt that Erika and Richards also realized something more cynical: By running this playbook, they both guarantee that they will stay in the tabloid press, meaning more Twitter followers for Richards and a larger paycheck for Erika's next season of performing in the Real Housewives franchise. *See* Johnni Macke, *Erika Jayne's Salary Will Be 'Much Higher' If She Continues on 'Real Housewives of Beverly Hills'*, UsMagazine.com (Oct. 12, 2021), https://www.usmagazine.com/entertainment/news/erika-jaynes-rhobh-salary-will-be-much-higher-if-she-returns/; *see also* @erikajayne, Twitter (Sept. 25, 2021), https://twitter.com/erikajayne/status/1441639978983825415?s=20 ("Now what would make [the reunion episodes] 4 parts?? Me.").

---

and making outlandish claims that Edelson—the only firm who is not looking to profit from Tom's fraud—somehow comes to this case without "clean hands." Amanda Bronstad, *Erika Girardi Accuses Edelson of Unethical and Illegal Fee Agreement with Girardi Keese*, (Nov. 3, 2021), https://www.law.com/therecorder/2021/11/03/erika-girardi-accuses-edelson-of-unethical-and-illegal-fee-agreement-with-girardi-keese/. As the motion makes clear, and as Mr. Borges conceded privately, he has no evidence to support his claim, but rather was simply guessing.

1    Taking a step back, what the Trustee/Erika are saying is that Edelson—which

2    has never taken any fees in connection with any of its work on the *Lion Air* cases[4] or

3    these proceedings—and the only firm to successfully hold Tom and his firm to

4    account—has behaved unethically because, based only on the most opaque

5    guesswork, Tom Girardi failed to properly inform the clients about the fee split by

6    getting their sign-off in writing. The result of this backward argument is that Erika

7    gets to keep her fortune, Richards gets to skim 40% of the top of whatever small

8    settlement he secures from her, and presumably, Girardi Keese winds up with all the

9    fees, which will be pooled and ultimately paid to secured creditors like its litigation

10   funders. Edelson going away is a key part of that plan.

11   Erika could not have found a better partner for this project. Mr. Richards—an

12   aspiring reality star himself—seems primarily focused on increasing his social media

13   following (on which he's had genuine success, going from 2,000 followers to over

14   35,000 since he started tweeting about this case).[5] And like any poorly produced

15   reality TV show, Erika and Richards scrambled to manufacture a fake public record,

16   staging Erika's opposition and having Richards announce it as "breaking news"—

17   _____

18   [4]    In fact, David Lira twice sent Edelson money that he claimed was its share of

19   the fees from certain *Lion Air* settlements, which Edelson refused to accept and still
     has possession of as far as the checks that were sent.

20   [5]    Sensing opportunity to further increase his reach, Mr. Richards recently

21   threatened to pursue Lisa Rinna, Erika's co-star on the Real Housewives, too. Lara
     Sophia, *Attorney Ronald Richards Claims Lisa Rinna Owes $3.45 Million on Home*

22   *and Reveals She's Being Sued For Copyright Violations, Dubs RHOBH Cast 'Mean*
     *Girls' While Offering Support To Former Co-Stars Lisa Vanderpump and Denise*

23   *Richards*, ALLABOUTRH.COM (Jul. 20, 2021),

24   https://www.allaboutrh.com/2021/07/20/attorney-ronald-richards-claims-lisa-rinna-
     owes-3-45-million-on-home-and-reveals-shes-being-sued-for-copyright-violations-

25   dubs-rhobh-cast-mean-girls-while-offering-support-to-former-co-stars-l/.

26

1    followed by a pre-arranged media campaign—but pretending all the while that he

2    hadn't coordinated it.

3        This circus would be laughable if the subject matter were not so serious. The

4    Girardi Keese fraud is a stain on the legal profession and the judicial system, and this

5    Court faces a difficult task in remedying it. The Court should focus on the merits,

6    something that every brief from the Trustee/Erika's combined opposition misses

7    entirely. There is no legal basis—across any of these briefs—to extend an automatic

8    stay to Erika. Moreover, the Trustee/Erika are wrong on the practicalities: Edelson's

9    work in the *Edelson v. Girardi* action will benefit everyone, and Edelson has

10   committed to undertaking the work *pro bono*. Edelson feels an obligation to work for

11   the benefit of the victims, and do whatever is necessary to wash away the stain

12   embossed on the legal profession by Tom's and Girardi Keese's decades of

13   wrongdoing. The Court should allow us this critical work to proceed.

14

15   **I.      The Trustee/Erika do not provide any basis in law to extend the automatic
            stay to bar *Edelson v. Girardi*.**

16

17          **A.      Edelson will not collect estate assets, so there is no basis to
                    suspend a separate suit against a non-debtor.**

18

19          On the law of automatic stays, there is little that Edelson and the Trustee/Erika

20   actually disagree about. Neither opposition presents any argument that the automatic

21   stay applies to Erika generally, either as a result of this bankruptcy or the Girardi

22   Keese bankruptcy. (*See* Girardi Keese Trustee's Br. at 6 ("The GK Trustee does not

23   contest that the stay does not extend to Erika personally.").) Nor does Edelson

24   disagree with the Trustee/Erika's position that if the firm was to find assets belonging

25   to either estate from Erika, those assets would be subject to the stay—not collectible

26   in a judgment but required to be turned over to the respective estate that such assets

27

1  belong to. *See In re Perryman*, No. BAP NC-21-1036-BFS, 2021 WL 4742673, at *2

2  (B.A.P. 9th Cir. Oct. 8, 2021) (automatic stay bars "any act to create, perfect, or

3  enforce any lien against property of the estate").

4        Given that everyone is on the same page about what happens to the money that

5  Edelson finds, it is difficult to identify the actual *legal* basis of the Trustee/Erika's

6  argument that the *Edelson* action can't continue against Erika—a non-party to either

7  bankruptcy. The legal basis of the Trustee's brief boils down to a litany of

8  conditionals, each of which is easily answered: (1) that Edelson's claims "*may*

9  involve property of the GK estate" (they do not); (2) that the Girardi Keese Trustee

10  can't determine "*whether* Edelson is seeking to recover [the] property of the GK

11  estate" (it is not); and (3) despite Edelson's investigation showing otherwise, "it is not

12  yet possible to determine which property belongs to the GK estate" (it is). (Girardi

13  Keese Trustee's Br. at 6) (emphasis added).[6]

14        Honing in on the Trustee's legal argument rather than its practical one—the

15  latter is the bulk of the brief, and is addressed below—the "hook" to block Edelson

16  hinges on this third proposition: the supposed impossibility of telling what does and

17  does not belong to the bankruptcy estates. The only way that proceeding against Erika

18  in the *Edelson v. Girardi* action could possibly be barred is if in doing so the firm will

19  unintentionally collect estate assets in pursuing its claims. *In re Torrez*, 132 B.R. 924,

20  938 (Bankr. E.D. Cal. 1991) ("The protections of the automatic stay only enure to the

21  benefit of the debtor, property of the debtor, or property of the estate."). But it is far

22  from impossible to separate the money: discovery so far has already revealed that it is

23

24       [6]    Erika's first brief echoes the same, hedging legal argument: "As explained in

25  the Trustee's Opposition, the automatic stay applies to the Edelson complaint to the

26  extent it seeks to recover assets of the GK or the Tom Girardi bankruptcy estate."
(Erika's Joinder & Opp. to Edelson PC's Mot. at 5.)

27

1    possible to directly trace *Lion Air* settlement funds to payments made by Girardi

2    Keese on Erika or her company's behalf. The point of proceeding in the *Edelson v.*

3    *Girardi* action—and doing the work in discovery—is to figure that out.

4        Either way, the estates are protected twice over from Edelson actually

5    collecting assets in which the estates have equitable title. First, Edelson has made

6    commitments—and it does so again here—to identify and not pursue any asset in

7    which either estate has title. (This was sufficient for the Thomas Girardi Trustee, and

8    should be enough for the Girardi Keese Trustee, too.) Second, in order to actually

9    prevail on any form of turnover claim, Edelson will have to prove to the *Edelson v.*

10    *Girardi* court that assets belong to the firm. Edelson can't win a turnover case against

11    Erika Girardi unless she is in possession of the firm's property, not that of either

12    estate. Conversely, there is no legal basis to prevent the firm from pursuing property

13    that belongs to it and in which the estate would have—at most—only bare legal title.

14    *See In re Corey*, 892 F.2d 829, 835 (9th Cir. 1989) ("The state court judgment also

15    did not interfere with the Ellis bankruptcy proceedings, as the state court never

16    purported to grant title to the Louis or to affect Ellis's use or possession of the

17    Silversword Inn. The judgment thus did not affect Ellis's rights as a debtor under the

18    federal bankruptcy laws."); *In re Kirst*, 559 B.R. 757, 763 (Bankr. D. Colo. 2016)

19    ("Thus, the transfer of bare legal title does not constitute a fraudulent transfer."). The

20    estate cannot collect money in which it lacks title. *See In re Kirst*, 559 B.R. at 763; *In*

21    *re Beard*, 595 B.R. 274, 288 (Bankr. E.D. Ark. 2018) ("Because bare legal title has

22    no 'tangible, economic value,' a debtor's transfer of bare legal title does not

23    constitute a fraudulent transfer and cannot be avoided under § 548."). The court in

24    *Edelson v. Girardi* well understands this line, as the Trustee/Erika point out. (*See*

25    Trustee Br. at 7, quoting *Edelson v. Girardi*.). Edelson will not, and cannot, collect

26    the property of the estate.

27

1      Because of these facts, Edelson has never asked this Court to lift the automatic

2  stay, which should remain in place without modification. Instead, the firm sought to

3  be transparent with the Court and the Trustees about what it intended to do in *Edelson*

4  *v. Girardi* so that it would be clear that Edelson's actions will not violate the

5  automatic stay (and before Erika retreated to this proceeding to claim those

6  protections). As Edelson does not seek the property of either estate, there is no legal

7  basis to halt the proceeding. *In re Metro. Mortg. & Sec. Co., Inc.*, 325 B.R. 851, 857–

8  58 (Bankr. E.D. Wash. 2005) (where bankruptcy debtors had no "right or claim to

9  any of the [assets] . . . [the assets do not] constitute property of the estate."). The

10  motion should therefore be granted.

11

12         **B.**        **Client agreement to the fee split has nothing to do with whether
Erika can claim a stay.**

13

14      What the Trustee/Erika have tried to inject into this proceeding is a merits

15  argument that can be made, and already has been made, in *Edelson v. Girardi*. (*See*

16  Griffin Mot. for Judgment, *Edelson v. Girardi*, No. 2020-cv-07115, dkt. 95.) The

17  Court rejected it there as premature. (*Id.*) The "evidence" supporting the argument in

18  this venue is similarly non-existent (discussed below), so it should be rejected for the

19  same reason.[7]

20      But here, the argument is a complete misfit. The attack that Erika levies is

21  against the firm's proof of claim on fees, which has nothing to do with the automatic

22  stay supposedly applicable to her in a separate case. Worse, the result—if Erika could

23

24     _____

25  [7]    At best, it seems Erika's position is that the retainer agreements themselves
don't contain a fee split. This would make sense—Girardi Keese and Edelson

26  executed the co-counsel agreement after the clients were retained. Thus, agreement to
the fees can be in writing elsewhere.

27  

1   somehow convince the Court to deny proofs of claims based on this guesswork—

2   would be mind-boggling: Girardi Keese, who stole these clients' money, would,

3   according to her argument, *keep the entire fee* from the case if any is recovered.

4   While this is an incredible position for Erika to adopt, it is downright unacceptable

5   for the Trustee (who put Erika up to this) to do so. (The Trustee's apparent position to

6   date is already highly suspect: that Tom should be permitted to take his share of the

7   fees from the *Lion Air* clients, even though he used their cases as a vehicle to steal

8   money for himself, his firm, and his wife.)

9       Nor, it seems, is the Trustee in any way consistent about this. The Trustee has

10  struck numerous deals for fees post-bankruptcy, as recently as yesterday. (*See, e.g.*,

11  Mot. for Order Approving Compromise Regarding Allocation of Contingency Fees,

12  *In re Girardi Keese*, No. 2:20-bk-21022-BR, dkt. 845.) Edelson asked whether all of

13  these agreements had been signed off on—or were also, as Erika put it, *with the*

14  *Trustee's own lawyer publicly nodding in agreement*, "illegal, unethical,

15  unenforceable"—but received no answer.

16      To the extent the Trustee wishes to pursue its claim that the clients in fact

17  never agreed to the fee split, the parties in *Edelson v. Girardi* are welcome to argue

18  that it undermines Edelson's claim to fees—which they plainly will. And the Girardi

19  Keese Trustee should argue that it undermines the proof of Edelson's claim to fees on

20  the estate—which, candidly, Edelson does not expect to see recovery on anyway. But

21  asking this Court to decide this makes no sense: it asks this Court to extend a stay

22  where none can exist, by deciding a merits question that isn't before it, and based on

23  a record devoid of evidence.

24      This last point is worth dwelling on for a moment. Erika's counsel submitted a

25  declaration so elliptical that it almost requires a double-take, stating that:

26

27

> In the course of my investigation of the claims made by Edelson, I was able to review, but not obtain or retain copies of, underlying fee agreements between GK and its clients in the Lion Air litigation. All of the fee agreements that I saw were solely between GK and its clients in the Lion Air matter. None of the fee agreements referred to Edelson in any way. None of the fee agreements referred to any fee-splitting agreement between GK and Edelson, or the terms of any such fee splitting agreement. For the avoidance of doubt, my client Ms. Girardi never had and does not have any of the fee agreements between GK and the Lion Air clients.

(Borges Decl. ¶ 3.) This statement raises nothing but questions: What documents were actually reviewed? How were these documents reviewed without being "obtained?" Who provided them? Was it for all clients, or some? Reading between these very blank lines (and setting aside the unlikely possibility of perjury), it seems that the Trustee's counsel had an in-person sit down with counsel for Erika and showed him certain retainer agreements, in order to prop up the charade that this was Erika's idea to file this brief while protecting her from discovery. This does not prove that the clients did not agree to the fee split. Indeed, the retainers were executed well *before* Edelson was asked to serve as local counsel. The relevant question, which Erika and the Trustee conveniently ignore, is—at most—whether there are any writings between the clients and Tom's firm after Edelson was asked to assist in the case. Any such memorialization would likely be written in Indonesian and would have occurred, by definition, significantly after the retainer agreements were executed.

Even if the Court were to skip all of these questions, the Court can't consider the declaration at all as a blatant violation of the best evidence rule, among others. Fed. R. Evid. 1002. (We have raised other evidentiary objections contemporaneously in a separate filing.) And, without evidence, there is no merits decision for this Court

to make. In any event, Erika's "supplemental" brief should be stricken as improper. C.D. Cal. Bankr. R. 9013–1(f) (setting forth briefing procedure). If the Court does want to consider these issues now—the equivalent of granting summary judgment—Edelson would need the following discovery from the Girardi Keese Trustee:

1. All communications concerning *Lion Air* between the Trustee's counsel and Erika or her counsel.

2. All communications concerning fees with the *Lion Air* plaintiffs in Girardi Keese's possession, including the e-mail server.

3. All evidence of client agreement to any apportionment of fees in connection with any action in which the Trustee intends to take a fee into the Girardi Keese estate.

The Court should instead reject this and all other merits arguments that should properly made in *Edelson v. Girardi*,[8] and grant the motion.

## II.    The Trustee and Erika's mutual desire to make things easy on Erika is no reason to extend a stay to her.

Falling short on the law, the Trustee/Erika spend much of their briefs trying to shift focus with rhetoric. While the Trustee grudgingly acknowledges that "Edelson's commitment to its clients helped bring Thomas Girardi's misdeeds to light," (Girardi Keese Trustee's Br. at 2), the Trustee goes on to insist that Edelson's true aims here

---

[8]    For her part, Erika raises a jurisdictional argument about the lawsuit against her in *Edelson v. Girardi*. (Erika's Joinder & Opp. to Edelson PC's Mot. at 7–8.) This is perplexing, because this Court of course cannot decide them. If Erika is right, she will win her motion to dismiss and the merits of the *Edelson* action will have been decided in the correct forum.

1  are now to "receive favorable treatment," (*id.* at 3), seek a "windfall to Edelson" (*id.*

2  at 8), and "jump in front of thousands of other creditors and victims" (*id.* at 9). That

3  just isn't true. As discussed at length above, Edelson could only recover for itself

4  traceable money that was stolen from it—money the estates have no title in, and no

5  creditor can object to. More importantly, if Edelson finds traceable money that was

6  stolen from the clients, it will alert them and provide the roadmap to recovery. The

7  same would go for the estates.

8      But nobody needs to take Edelson's word for it—its track record speaks for

9  itself. Edelson undertook a months-long investigation that pulled back the curtain on

10  the Girardi Keese fraud without taking a penny in fees and refusing to cash checks

11  that were sent them for their work in the underlying cases. Edelson was asked to keep

12  the fraud quiet, exchanging silence for a judgment against the firm that would allow

13  Edelson to cut in line, but Edelson refused to do that also (though many others did,

14  including some the Trustee is presently working with). Edelson secured judgments

15  against Thomas Girardi and the Girardi Keese firm in the *Lion Air* proceedings on

16  behalf of the clients in that proceeding, similarly without payment, and will shortly

17  take a contempt motion against Girardi Keese's former partners to an evidentiary

18  hearing. (Minute Entry, *In re Lion Air*, No. 2018-cv-07686, dkt. 1251.) Edelson has

19  already returned twenty-three million dollars to Girardi's former clients, again

20  without taking a single cent of compensation. (*See* Stipulation Authorizing the

21  Release of Disputed Costs to Clients, *In re Girardi Keese*, No. 2:20-bk-21022-BR,

22  dkt. 340.) And, Edelson has done all this efficiently, without satellite disputes or

23  exhausting the resources of this Court. Edelson will—as it has done to date—impose

24  no charge for returning funds to the clients or to the estate, and then it will gladly take

25  its place firmly at the back of the line (where it should be joined by all other non-

26  client creditors).

27

1    On the other side of the ledger, the Trustee's position is remarkably muddy,

2    aside from being clear on the primary goal of preventing Edelson from pursuing

3    Erika Girardi. Out of one side of its mouth, the Girardi Keese Trustee opposes the

4    firm's motion because the Girardi Keese Trustee's investigation is at a preliminary

5    stage and there is no way of knowing what assets Erika has. (Girardi Keese Trustee's

6    Br. at 2.) Out of the other, Edelson understands—both from briefs and from

7    YouTube—that the Trustee's special counsel is trying to settle the case with Erika,

8    justifying his position with an extremely jarring choice of words given the context of

9    this case. As Richards explained, he perversely sees his goal as

10

11    **"Mak[ing] the plane land softly without blowing up the cockpit."**

12

13    See Up and Adam! YouTube Interview, *Erika Girardi and Ronald Richards Find*

14    *Common Ground In Opposing The Motion! (SUBSCRIBERS ONLY!)*, YOUTUBE

15    (Oct. 19, 2021), https://youtu.be/moFKmGIuyVs?t=2144, 36:31.

16    Even gritting one's teeth to get past this chilling choice of words—remember,

17    it was the surviving families of plane crash victims that started the dominoes falling

18    on the Girardi Keese fraud—no legitimate settlement should come before an

19    investigation is meaningfully complete. It certainly seems that hasn't happened.

20    Again, the few records that Richards insisted Edelson review on a four-day

21    turnaround revealed that *Lion Air* client money *was* used to pay for Erika's or her

22    companies' benefit. Edelson would prefer to think that this was mere sloppiness on

23    the Trustee's part. But the level of coordination evidenced by the Trustee/Erika

24    "supplemental" brief charade suggests far more scrutiny should be applied.

25    Ultimately, this about-face from Richards's stated mandate of pursuing Erika to

26    protecting her—and the improper threats that came with it—counsels only in favor of

1    granting Edelson's motion.

2         The Trustee/Erika last argue that Erika will be subject to defending a case in

3    two places, which will somehow impede this case. This is not true, both for the

4    reasons already stated—Edelson's work will help the estate and cost it nothing—but

5    also because Edelson has already demonstrated its willingness to work cooperatively

6    despite the present tone of these proceedings. If the Trustee and Erika provide

7    discovery sufficient to foreclose Erika's liability in the *Edelson v. Girardi* case, she

8    will not need to defend it. Conversely, to the extent that Erika is required to

9    participate in discovery in *Edelson v. Girardi*, it is largely the same burden she will

10   shoulder as a defendant or as a witness. Nothing is multiplied and—with the

11   Trustee's genuine cooperation—the burden on Erika can be diminished. In no way

12   does this preclude Edelson from proceeding. Moreover, the Trustee is taking the

13   position that Erika's legal fees are being paid by some mysterious benefactor,[9] all of

14   which, according to it, is happening outside of the estate. As such, the "resources"

15   supposedly being taxed has no impact on bankruptcy.

16        In the end, the Court and the bar are confronted with a significant tension:

17   every dollar in these estates should be found and conserved until every client is paid,

18   but the Superfund site that is the Girardi Keese law practice is finding itself with an

19   ever-growing clean-up crew. That fact does not mean that counsel should be raiding

20   the estate first—followed by insider creditors—all while likely leaving the victims

21   out in the cold. Instead, as attorneys, we have an obligation to ensure that the judicial

22   system is fair and works for ordinary people. The lawyers involved should and have

23

24   _____

25   [9]     Erika, in her latest appearance on the "reunion" episode of the Real

26   Housewives told a different story, suggesting that her salary is being used to pay her
     attorneys' fees. By definition, someone is not telling the truth.

27

1  an obligation to try to right this wrong *pro bono* as Edelson has committed to doing.[10]

2  ABA MODEL R. 6.1(b) ("Every lawyer has a professional responsibility to provide

3  legal services to those unable to pay. . . In fulfilling this responsibility, the lawyer

4  should . . . participat[e] in activities to improve the law, the legal system, or the legal

5  profession."). At the very least, no one should impede the only attorneys who thus far

6  have been willing to do so.

7                                          **CONCLUSION**

8          The motion should be granted.

9                                          Respectfully submitted,

10                                         EDELSON PC,

11  Dated: November 9, 2021              By: /s/Rafey S. Balabanian_____

12

13                                         Rafey S. Balabanian
                                           (SBN 315962)
14                                         rbalabanian@edelson.com
                                           EDELSON PC
15                                         150 California Street, 18th Floor
                                           San Francisco, California 94111
16                                         Tel: 415. 212.9300/Fax: 415.373.9435

17

18

19

20

21

22

23

24

25

26  [10]      Richards has remarkably suggested that victims should be skeptical of lawyers
    serving *pro bono*. What that says about this counsel's own motives is alarming.

27

# Exhibit 1

1

2

3

4

5

6

7               **UNITED STATES BANKRUPCY COURT**

8       **CENTRAL DISTRICT OF CALIFORNIA – LOS ANGELES DIVISION**

9

10

11 | In re:                          | Case No. 2:20-bk-21020-BR

12 | THOMAS VINCENT GIRARDI,          | [Chapter 7]

13 |                    *Debtor*.     |

14 |                                  | **DECLARATION OF J. ELI WADE-
                                        SCOTT IN SUPPORT OF EDELSON**
15 |                                  | **PC'S MOTION TO CLARIFY
                                        AUTOMATIC STAY**
16

17

18       Pursuant to 28 U.S.C. § 1746, I hereby state and declare as follows:

19       1.      I am counsel to Edelson PC ("Edelson") in connection with the *Lion Air*

20   litigation. I am over the age of eighteen. This declaration is based upon my personal

21   knowledge except as otherwise noted. If called upon to testify to the matters herein, I

22   could and would competently do so.

23       2.      I was part of a series of calls and correspondence with special counsel

24   for the Trustee, Ronald Richards, as well as counsel for the Trustee, Phillip Strok,

25   after Edelson filed its motion to clarify the scope of the automatic stay.

26

27

3.    Mr. Richards reached out to Rafey Balabanian about the firm's filing, which Mr. Balabanian forwarded to me. *See* Exhibit 1-A, E-mail from Ronald Richards to Rafey S. Balabanian (October 7th, 2021 at 2:22 PM). I followed up, and Alex Tievsky and I spoke with Mr. Richards on October 12, 2021. Mr. Richards expressed that he did not want the firm to proceed in the *Edelson v. Girardi* action. Instead, he was willing to share certain documents that he expected would foreclose Erika's liability in *Edelson v. Girardi*. Mr. Richards shared that he intended to reach a settlement with Erika and facing the *Edelson v. Girardi* action would expend her resources and interfere with settlement efforts.

4.    We agreed in principle that Edelson would be willing to accept information from the Trustee's analysis of Girardi Keese's financial records, and if they foreclosed the possibility that Erika had received any *Lion Air* settlement funds, Edelson would withdraw the motion. The Parties agreed to move the hearing date to November 16 to further discuss that possibility, and submitted a stipulation on Thursday, October 21, 2021 to that effect.

5.    Late that night, Mr. Richards e-mailed demanding that the firm produce the retainer agreements with the clients. *See* Exhibit 1-B, E-mail from Ronald Richards to Alex Tievsky and J. Eli Wade-Scott (October 21, 2021 at 7:40 PM). The firm was preparing for an appellate argument, and did not immediately respond the next morning—prompting more follow-up from Mr. Richards. *See id.*, E-mail from Ronald Richards to Alex Tievsky and J. Eli Wade-Scott (October 22, 2021 at 11:18 AM). We asked why there was such urgency, at which point Mr. Richards demanded a call. *See id.*, E-mails between Richards and Wade-Scott (October 22, 2021). He explained that the urgency was because counsel for the Trustee "want[ed] to avoid withdrawing our opposition and filing a new one, also, other counsel will be doing the same." Mr. Richards insisted that it was important to get on the phone with him

1    and Phillip Strok in order to "resolve this without any damage." *See id.*, E-mail from

2    Ronald Richards to J. Eli Wade-Scott and Alex Tievsky (Oct. 22, 2021 at 2:32 PM).

3          6.     Jay Edelson and I spoke to Mr. Richards and Mr. Strok near the end of

4    the business day on Friday, October 22. Mr. Richards set forth a confusing position

5    that made clear he (and perhaps others) intended to argue that there were no written

6    fee agreements, but it was not at all clear what facts or law that argument was based

7    on. Overall, Mr. Richards insisted that the Trustee would now provide certain

8    financial records from the Girardi Keese operating account that would foreclose

9    claims against Erika. Consistent with the earlier agreement to accept information that

10   would allow us to proceed efficiently against Erika, Edelson agreed to review them.

11   *See* Exhibit 1-C, E-mail from J. Eli Wade-Scott to Phillip Strok and Ronald Richards

12   (Oct. 22, 2021 at 6:11 PM). But Mr. Richards insisted that we needed to do so in time

13   for him (and again, others) to prepare a supplementary response: three and a half

14   business days later, on the following Thursday. Mr. Richards peppered us with more

15   e-mails in the intervening days seeking updates.

16         7.     Despite the short time to review, we did so. As set forth in the attached

17   letter that we subsequently sent to Mr. Strok and Mr. Richards, even our initial

18   review showed that payments had been made with *Lion Air* client money for the

19   benefit of Erika or her companies. *See* Exhibit 1-D, Letter from J. Eli Wade-Scott to

20   Ronald Richards and Phillip Strok (Oct. 28, 2021). After we advised Mr. Strok and

21   Mr. Richards of our findings, we have not heard from either of them.

22        I declare under penalty of perjury that the foregoing is true and correct.

23   Executed on November 9, 2021 at San Francisco, California.

24

25                            /s/J. Eli Wade-Scott

26                            J. Eli Wade-Scott

27

# Exhibit 1-A

**Edelson**

---

## Fwd: [Ext] RE: QUESTION

---

**From:** Ronald Richards <ron@ronaldrichards.com>
**Date:** October 7, 2021 at 2:24:52 PM PDT
**To:** rbalabanian@edelson.com
**Subject:** [Ext] RE: QUESTION

Or we can jointly ask we can do it on video since you will be in SF and I will be on the East Coast, that could work to see if he will give us permission.

---

**From:** Ronald Richards
**Sent:** Thursday, October 7, 2021 2:22 PM
**To:** rbalabanian@edelson.com
**Subject:** QUESTION

Hi Rafey,

Can we please move this hearing to 11/16 at 2:00pm as I will be there in person in case the judge wants an in person hearing. I will be on the East Coast on 11/2 and could not make an in person.

We can also see if we can come to an agreement on the relief.  The Trustee may have to oppose the motion the way it is framed.   The Estate owns all the fraudulent conveyance claims against Erika and there is no funds from Boeing money to her we are aware of.  Can we please have a call to discuss scheduling?

Also, why do you need relief from stay?  there is already pending actions against Erika.  No one has sought relief from stay which is another issue I wanted to speak to you about.  If you are pursuing claims that would belong to either Estate, then that issue will not change because of the relief from stay request.   Please let me know as soon as possible.

Sincerely,

Ronald Richards, Esq.

Special Counsel to Chapter 7 Trustee, Girardi Keese Estate 5
Law Offices of Ronald Richards & Associates, A.P.C.

310-556-1001 Office
310-271-3223 Fax
www.ronaldrichards.com

Mailing Address:
P.O. Box 11480
Beverly Hills, CA 90213





**A multi jurisdictional practice with bar admissions on the East and West Coast**

***CONFIDENTIALITY NOTICE*** This electronic mail transmission has been sent by an attorney. This message and any files or text attached to it are intended only for the recipients named above, and contain information that may be confidential or privileged. If you are not an intended recipient, you must not read, copy, use or disclose this communication. Please also notify the sender by replying to this message, and then delete all copies of it from your system. Thank you.

_____

THINK GREEN. PLEASE CONSIDER THE ENVIRONMENT BEFORE YOU PRINT THIS MESSAGE. THANK YOU.

# Exhibit 1-B



Eli Wade-Scott <ewadescott@edelson.com>

**[Ext] RE: [Ext] RE: [Ext] RE: [Ext] RE: [Ext] Re: [Ext] RE: QUESTION, REQUEST FOR YOUR SIGNED RETAINER AGREEMENTS**

**Ronald Richards** <ron@ronaldrichards.com>                                                    Fri, Oct 22, 2021 at 2:54 PM
To: Eli Wade-Scott <ewadescott@edelson.com>
Cc: Alex Tievsky <atievsky@edelson.com>, "Philip E. Strok" <pstrok@swelawfirm.com>

Dial in has been circulated.  Thank you.

---

**From:** Eli Wade-Scott <ewadescott@edelson.com>
**Sent:** Friday, October 22, 2021 12:40 PM
**To:** Ronald Richards <ron@ronaldrichards.com>
**Cc:** Alex Tievsky <atievsky@edelson.com>; Philip E. Strok <pstrok@swelawfirm.com>
**Subject:** Re: [Ext] RE: [Ext] RE: [Ext] RE: [Ext] Re: [Ext] RE: QUESTION, REQUEST FOR YOUR SIGNED RETAINER AGREEMENTS

Ron -

Speaking frankly, we don't appreciate either the tone or the opaque approach to these communications. We can't imagine how this issue is so important that it needs to be handled in this frenetic way. Nevertheless, we will move things around, and Jay and I will get on the phone with you at 4 CT. Do you want to circulate a dial-in?

Eli

On Fri, Oct 22, 2021 at 2:32 PM Ronald Richards <ron@ronaldrichards.com> wrote:

Yes, we want to avoid withdrawing our opposition and filing a new one, also, other counsel will be doing the same.  We want to avoid positions taken in the filings which could be viewed as negative by you that are not helpful to you.

We are not going to go back and forth in email.  I also have all the records now to provide with a resolution.

If you don't want to hear it, we don't need to have a call.  However, you would be doing your client a big disservice.  We are both very busy as well but this is important enough for both of us to make time to try and resolve this without any damage.  Will you agree to a call at 200pm, yes or no?  It can't wait until Monday.

Just let me know.

Thank you,

Sincerely,

Ronald Richards, Esq.

Special Counsel to Chapter 7 Trustee, Girardi Keese Estate
Law Offices of Ronald Richards & Associates, A.P.C.
310-556-1001 Office
310-277-3325 Fax
www.ronaldrichards.com

Mailing Address:
P.O. Box 11480
Beverly Hills, CA 90213





**A multi jurisdictional practice with bar admissions on the East and West Coast**

***CONFIDENTIALITY NOTICE*** This electronic mail transmission has been sent by an attorney. This message and any files or text attached to it are intended only for the recipients named above, and contain information that may be confidential or privileged. If you are not an intended recipient, you must not read, copy, use or disclose this communication. Please also notify the sender by replying to this message, and then delete all copies of it from your system. Thank you.
_____
THINK GREEN. PLEASE CONSIDER THE ENVIRONMENT BEFORE YOU PRINT THIS MESSAGE. THANK YOU.

**From:** Eli Wade-Scott <ewadescott@edelson.com>
**Sent:** Friday, October 22, 2021 12:27 PM
**To:** Ronald Richards <ron@ronaldrichards.com>
**Cc:** Alex Tievsky <atievsky@edelson.com>; Philip E. Strok <pstrok@swelawfirm.com>
**Subject:** Re: [Ext] RE: [Ext] RE: [Ext] Re: [Ext] RE: QUESTION, REQUEST FOR YOUR SIGNED RETAINER AGREEMENTS

Ron,

While we appreciate that you have responded quickly, you are not addressing our questions. The idea that it is not our concern whether you are working within your purview is strange to say the least. And saying "anything that effects [sic] our case with [sic] Erika Jayne" is within your domain, just leads to the question: why would information about our claims impact Erika? And, again, why the extreme urgency over this?

In terms of a phone call, we have explained that we are not available right now.  We have a 7th Circuit argument on Monday we are preparing for. If there is some kind of time urgency, we can move things around and make time. If not, just let us know your position and we can all move forward efficiently.

Best,

Eli

On Fri, Oct 22, 2021 at 2:24 PM Ronald Richards <ron@ronaldrichards.com> wrote:

Paging Eli,

Can we send out a dial in for 200pm?  Did my tech issue cause my emails now to go to spam? They said they fixed it.

**From:** Ronald Richards
**Sent:** Friday, October 22, 2021 11:59 AM
**To:** Eli Wade-Scott <ewadescott@edelson.com>
**Cc:** Alex Tievsky <atievsky@edelson.com>; Philip E. Strok <pstrok@swelawfirm.com>
**Subject:** RE: [Ext] RE: [Ext] Re: [Ext] RE: QUESTION, REQUEST FOR YOUR SIGNED RETAINER AGREEMENTS

HI Eli,

First, you don't need to worry how my firm represents the Trustee versus Phillip.

Second, anything that effects our case with Erika is within our purview.  You have a motion pending that effects my target.

Third, Phillip and I could have a call with you at 200pm PST to elaborate our position, and hopefully resolve this matter.  Can you make that call? I will send out a dial in.  I also got tech issue fixed.

Sincerely,

Ronald Richards, Esq.

Special Counsel to Chapter 7 Trustee, Girardi Keese Estate
Law Offices of Ronald Richards & Associates, A.P.C.
310-556-1001 Office
310-277-3325 Fax
www.ronaldrichards.com

Mailing Address:
P.O. Box 11480
Beverly Hills, CA 90213





**A multi jurisdictional practice with bar admissions on the East and West Coast**

***CONFIDENTIALITY NOTICE*** This electronic mail transmission has been sent by an attorney. This message and any files or text attached to it are intended only for the recipients named above, and contain information that may be confidential or privileged. If you are not an intended recipient, you must not read, copy, use or disclose this communication. Please also notify the sender by replying to this message, and then delete all copies of it from your system. Thank you.
_____
THINK GREEN. PLEASE CONSIDER THE ENVIRONMENT BEFORE YOU PRINT THIS MESSAGE. THANK YOU.

---

**From:** Eli Wade-Scott <ewadescott@edelson.com>
**Sent:** Friday, October 22, 2021 11:34 AM
**To:** Ronald Richards <ron@ronaldrichards.com>
**Cc:** Alex Tievsky <atievsky@edelson.com>; Philip E. Strok <pstrok@swelawfirm.com>
**Subject:** Re: [Ext] Re: [Ext] Re: [Ext] RE: QUESTION, REQUEST FOR YOUR SIGNED RETAINER AGREEMENTS

Ron -

We're fairly confused by this on a number of levels. First, our understanding is that you are representing the Trustee solely with respect to claims against Erika. Are you now, in some way, involved more broadly? Second, as you know, while we are technically a creditor we have made clear that we will not take any money until the clients have been fully paid (and even then, we would give the money to charity). Given the value of the estate, and our position more generally, we do not believe that it's a sound expenditure of resources to try to suss this out now (if ever). This is especially true given that

the claims deadline hasn't even passed. Nevertheless, to the extent you are interested in the Trustee in this regard and assuming the Trustee wants to spend resources on this issue, our proof of our claim at present is based on what it says it is—the written agreement with Girardi Keese (and Lira/Griffin), which establishes our right to fees.

Finally, so we have a better sense of the context of all of this, could you explain why all of a sudden you believe this is such a pressing issue that you wanted it resolved within a few hour timeframe?  We are at a loss over here.

Eli

On Fri, Oct 22, 2021 at 12:38 PM Ronald Richards <ron@ronaldrichards.com> wrote:

> I have never heard of those things.  I will call them now.

---

**From:** Alex Tievsky <atievsky@edelson.com>
**Sent:** Friday, October 22, 2021 9:55 AM
**To:** Ronald Richards <ron@ronaldrichards.com>
**Cc:** Eli Wade-Scott <ewadescott@edelson.com>
**Subject:** Re: [Ext] Re: [Ext] RE: QUESTION, REQUEST FOR YOUR SIGNED RETAINER AGREEMENTS

Understood. As a general matter, you can assume that we have received your emails, even if we do not send an immediate acknowledgement.

That said, your domain's DNS record is not properly configured, which can cause your emails to be routed to spam for some users. You may want to ask your tech staff to set up SPF or DKIM so this doesn't happen anymore, particularly if you frequently have trouble with people not receiving your messages. The following banner appears on every email we receive from you.



**Alexander G. Tievsky | Edelson PC**

350 North LaSalle Street, 14th Floor
Chicago, Illinois 60654
312.589.6379 (direct) | 312.589.6370 (firm) | 312.589.6378 (fax)

atievsky@edelson.com | www.edelson.com

---

CONFIDENTIALITY AND LIABILITY FOR MISUSE.
The information contained in this communication is the property of Edelson PC.  It is confidential, may be attorney work product, attorney-client privileged or otherwise exempt from disclosure under applicable law, and is intended only for the use of the addressee(s).  Unauthorized use, disclosure or copying of this communication or any part thereof is strictly prohibited.  If you have received this communication in error, please notify Edelson PC immediately by return e-mail and destroy this communication and all copies thereof, including all attachments.
Pursuant to requirements related to practice before the U.S. Internal Revenue Service, any tax advice contained in this communication (including any attachments) is not intended to be used, and cannot be used, for purposes of (i) avoiding penalties imposed under the U.S. Internal Revenue Code or (ii) promoting, marketing or recommending to another person any tax-related matter.

On Fri, Oct 22, 2021 at 11:32 AM Ronald Richards <ron@ronaldrichards.com> wrote:

> Of course I didn't expect you to respond in two business hours but I thought you would acknowledge receipt of the email this morning and I just wanted you to know that it was some thing that I want to address for her because she asked me about it so I thought you would say OK will have them to you by X or that's there are no other documents other than what's in the claim this is what I wanted to clarify for her.
>
> Sorry if that didn't come out clearly in my initial email or my subsequent email just let me know when you can send those over or clarify if that's it that's all I need to know sorry again if I wasn't clear.  Email is not always the best communicator

11

*Sincerely,*

Ronald Richards, Esq.
Law Offices of Ronald Richards & Associates, A.P.C.
310-556-1001 Office
310-277-3325 Fax
www.ronaldrichards.com

Mailing Address:
P.O. Box 11480
Beverly Hills, CA 90213



**A multi jurisdictional practice with bar admissions on the East and West Coast**

***CONFIDENTIALITY NOTICE*** This electronic mail transmission has been sent by an attorney. This message and any files or text attached to it are intended only for the recipients named above, and contain information that may be confidential or privileged. If you are not an intended recipient, you must not read, copy, use or disclose this communication. Please also notify the sender by replying to this message, and then delete all copies of it from your system. Thank you.

THINK GREEN. PLEASE CONSIDER THE ENVIRONMENT BEFORE YOU PRINT THIS MESSAGE. THANK YOU.

On Oct 22, 2021, at 9:28 AM, Alex Tievsky <atievsky@edelson.com> wrote:

Ron,

Two business hours is not a reasonable time to demand a response to a non-urgent question. Perhaps you do not have other matters pending, but we do, including a federal appellate argument on Monday. We'll respond promptly, but in due course, and after discussing the matter with our client. Thanks.

Alex

Alexander G. Tievsky | Edelson PC

350 North LaSalle Street, 14th Floor
Chicago, Illinois 60654
312.589.6379 (direct) | 312.589.6370 (firm) | 312.589.6378 (fax)

atievsky@edelson.com | www.edelson.com

CONFIDENTIALITY AND LIABILITY FOR MISUSE.
The information contained in this communication is the property of Edelson PC.  It is confidential, may be attorney work product, attorney-client privileged or otherwise exempt from disclosure under applicable law, and is intended only for the use of the addressee(s).  Unauthorized use, disclosure or copying of this communication or any part thereof is strictly prohibited.  If you have received this communication in error, please notify Edelson PC immediately by return e-mail and destroy this communication and all copies thereof, including all attachments.
Pursuant to requirements related to practice before the U.S. Internal Revenue Service, any tax advice contained in this communication (including any attachments) is not intended to be used, and cannot be used, for purposes of (i) avoiding penalties imposed under the U.S. Internal Revenue Code or (ii) promoting, marketing or recommending to another person any tax-related matter.

On Fri, Oct 22, 2021 at 11:18 AM Ronald Richards <ron@ronaldrichards.com> wrote:

Hi Alex and Eli,

Just following up on the follow. I have to address this with the Trustee so can you have that to me by COB?

This should be something you can clear up immediately.

Thank you in advance.

Sincerely,

Ronald Richards, Esq.
Law Offices of Ronald Richards & Associates, A.P.C.
310-556-1001 Office
310-277-3325 Fax
www.ronaldrichards.com

Mailing Address:
P.O. Box 11480
Beverly Hills, CA 90213





**A multi jurisdictional practice with bar admissions on the East and West Coast**

***CONFIDENTIALITY NOTICE*** This electronic mail transmission has been sent by an attorney. This message and any files or text attached to it are intended only for the recipients named above, and contain information that may be confidential or privileged. If you are not an intended recipient, you must not read, copy, use or disclose this communication. Please also notify the sender by replying to this message, and then delete all copies of it from your system. Thank you.
_____

THINK GREEN. PLEASE CONSIDER THE ENVIRONMENT BEFORE YOU PRINT THIS MESSAGE. THANK YOU.

**From:** Ronald Richards
**Sent:** Thursday, October 21, 2021 7:40 PM
**To:** Alex Tievsky <atievsky@edelson.com>
**Cc:** 'Eli Wade-Scott' <ewadescott@edelson.com>
**Subject:** QUESTION, REQUEST FOR YOUR SIGNED RETAINER AGREEMENTS

Hi Alex,

Since you have put your right to fees front and center, I had your claim pulled as part of our diligence in this matter.   Are the two agreements attached to your claim the ones you are relying on for your assertion that you have a right to a portion of the Boeing settlements that went into the GK Trust account?  Please confirm there are no other written agreements.  If there are other agreements, please send them over immediately.

Thank you in advance of your prompt response to this request.  If you send over any further fee agreements, I will promptly confirm receipt tomorrow.

Sincerely,

Ronald Richards, Esq.

Special Counsel to Chapter 7 Trustee, Girardi Keese Estate
Law Offices of Ronald Richards & Associates, A.P.C.
310-556-1001 Office
310-277-3325 Fax
www.ronaldrichards.com

Mailing Address:
P.O. Box 11480
Beverly Hills, CA 90213





**A multi jurisdictional practice with bar admissions on the East and West Coast**

***CONFIDENTIALITY NOTICE*** This electronic mail transmission has been sent by an attorney. This message and any files or text attached to it are intended only for the recipients named above, and contain information that may be confidential or privileged. If you are not an intended recipient, you must not read, copy, use or disclose this communication. Please also notify the sender by replying to this message, and then delete all copies of it from your system. Thank you.
_____

THINK GREEN. PLEASE CONSIDER THE ENVIRONMENT BEFORE YOU PRINT THIS MESSAGE. THANK YOU.

--
Eli Wade-Scott | Edelson PC

350 North LaSalle Street, 14th Floor
Chicago, Illinois 60654
312.242.0859 (direct) | 312.589.6370 (firm) | 312.589.6378 (fax)
ewadescott@edelson.com | www.edelson.com

CONFIDENTIALITY AND LIABILITY FOR MISUSE.

# Exhibit 1-C

**Edelson**

## Re: [Ext] Girardi Keese - Edelson Motion for Relief from Stay

**Eli Wade-Scott** <ewadescott@edelson.com>                                  Fri, Oct 22, 2021 at 6:11 PM
To: "Philip E. Strok" <pstrok@swelawfirm.com>
Cc: Jay Edelson <jedelson@edelson.com>, Ronald Richards <ron@ronaldrichards.com>, Alex Tievsky <atievsky@edelson.com>

Phil -

As we made clear on the phone call, it seems that there's a fundamental failure to understand the salient facts. On the provisions of our agreement:

> 1. The confidentiality term isn't correct. It's not possible for the contempt proceeding protective order to govern, as that would preclude use in the relevant proceedings. (See *Lion Air*, dkt. 1192 ("Confidential Information shall not be used or disclosed by the parties, counsel for the parties or any other persons identified in subparagraph (b) for any purpose whatsoever other than in **this litigation**, including any appeal thereof[.]").) We obviously need to use these records in the *Edelson v. Girardi* case, or as they might be needed in the bankruptcy action (we don't foresee that happening, but for example if the records don't match statements that you'd later make to the bankruptcy judge, we'd have a right and likely a duty to tell the judge that, albeit under seal). As a solution, we will (1) agree to keep the documents confidential consistent with the substantive terms of the contempt proceeding protective order as if they had been entered in the *Edelson v. Girardi* case and the bankruptcy, (2) until a protective order is entered in the *Edelson v. Girardi* case, at which point that will govern.

> 2. Paragraph 2 isn't correct either. If those records demonstrate that there aren't traceable funds going to Erika, we will withdraw the motion. Our guess (based on your representations) is that the checks are going to previous clients and people who have no relationship to Erika, and we'd have no reason to think that those types of transfers would have gone to her. But we can't make a blanket promise without seeing the records about any questions that they will raise. For example, if money went to Erika's son, attorney, or friends of hers, then we likely have additional questions about whether these records foreclose the case. We will agree to review these by Thursday, October 28 at 3 PM CT and let you know if we're withdrawing the motion.

Further memorializing our call, Ron said that in exchange for us agreeing to stand down and withdraw the motion, you (and perhaps others, discussed below) would not raise arguments that would undermine our proof of claim. We said that did not move us. To the extent you think there's a problem with our proof of claim, you should make whatever arguments you like—it's not proper leverage, nor particularly relevant, for this issue.

Ron also said on the call that there were no retainer agreements in GK's files for these clients. To confirm: does that mean that, according to the Trustee, there are no retainer agreements all? What is that search based on? And are you saying that there was no written client agreement to the fee split? If so, what is that search based on? Did you mean something else? Last, we'd like to understand if you have disclosed this information to Erika's attorney? It seemed to us that Erika would be among the movants filing amended oppositions. We'd like to understand all of the foregoing right away.

Thanks,

Eli

On Fri, Oct 22, 2021 at 5:05 PM Philip E. Strok <pstrok@swelawfirm.com> wrote:

> Jay and Eli-
>
> The Trustee is willing to provide Edelson PC ("Edelson") with the Nano Banc 2020 bank records for the account ending in 0096 (the "Nano Banc Records") on the following terms:
>
> 1. The Nano Banc Records will be subject to the terms of the Confidentiality Order for Use Only in Contempt Proceedings entered as Docket No. 1199 by the United States District for the Northern District of Illinois in Lead Case No. 18-cv-07686; and
> 2. Edelson will advise the Trustee, through its counsel, by 1:00 p.m. PDT on October 28, 2021 whether it intends to withdraw its pending relief from stay motion in the Thomas Girardi bankruptcy case, based upon the records showing no transfers of Edelson's alleged attorney's fees to Erika Girardi and/or her related companies.

16

Please respond to this email by affirmatively indicating Edelson's agreement to these terms. Upon receipt of Edelson's written email agreement to be bound by these terms, I will forward the Nano Banc Records.

Regards,

PHIL

  

**Philip E. Strok**

Attorney

Smiley Wang-Ekvall, LLP

3200 Park Center Drive, Suite 250

Costa Mesa, CA  92626

Telephone: 714.445.1000

Direct: 714-445-1020

Facsimile: 714.445.1002

Email: pstrok@swelawfirm.com

Website          Vcard

Confidentiality Notice: This communication (including any attachments) is only for the use of the intended recipient and may contain confidential and/or privileged information. If any reader of this communication is not the intended recipient, then any use, disclosure or copying is strictly prohibited and may be unlawful. If you have received this communication in error, then please immediately notify the sender by return email, and delete this communication and all copies from your system. Thank you.

IRS Circular 230 Disclosure: Only formal opinions satisfying specific requirements may be relied on for the purpose of avoiding certain penalties under the Internal Revenue Code. This communication is not intended as an opinion for purposes of satisfying any such requirements, and any advice contained in this communication (including any attachments) cannot be used or relied upon for the purpose of avoiding penalties under the Internal Revenue Code, or for the purpose of promoting, marketing or recommending to anyone any transaction or matter addressed herein.

--
Eli Wade-Scott | Edelson PC
350 North LaSalle Street, 14th Floor
Chicago, Illinois 60654
312.242.0859 (direct) | 312.589.6370 (firm) | 312.589.6378 (fax)
ewadescott@edelson.com | www.edelson.com

 @EdelsonPC   Edelson-PC   EdelsonLaw

---

CONFIDENTIALITY AND LIABILITY FOR MISUSE.

The information contained in this communication is the property of Edelson PC.  It is confidential, may be attorney work product, attorney-client privileged or otherwise exempt from disclosure under applicable law, and is intended only for the use of the addressee(s).  Unauthorized use, disclosure or copying of this communication or any part thereof is

strictly prohibited.  If you have received this communication in error, please notify Edelson PC immediately by return e-mail and destroy this communication and all copies hereof, including attachments.

Pursuant to requirements related to practice before the U.S. Internal Revenue Service, any tax advice contained in this communication (including any attachments) is not intended to be used, and cannot be used, for purposes of (i) avoiding penalties imposed under the U.S. Internal Revenue Code or (ii) promoting, marketing or recommending to another person any tax-related matter.

# Exhibit 1-D

October 28, 2021

*Via e-mail*

Ronald Richards
Law Offices of Ronald Richards & Associates
P.O. Box 11480
Beverly Hills, CA 90213
ron@ronrichards.com

Phillip E. Strok
Smiley Wang-Ekvall, LLP
3200 Park Center Drive, Suite 250
Costa Mesa, CA 92626
pstrok@swelawfirm.com

**Re: *In re Thomas Vincent Girardi*, 2020-bk-2102, Stay as to Erika Girardi**

Mr. Richards and Mr. Strok:

I'm writing to summarize our discussions to date on our serving Erika Girardi in the *Edelson v. Girardi* matter and suggest a path for resolving our pending, contested motion in the *Thomas Girardi* bankruptcy. In short, we have tried to review the documents you sent over in the time provided, but they have just raised more questions—numerous payments to ███████ ███████ and payments for ███████████████ as a few examples. These documents do not, as you represented they would, foreclose the possibility of a claim in the *Edelson* matter against Erika. We would accordingly ask that you either (1) further assist in our investigation of Erika, or (2) drop your opposition to the investigation itself.

**I.      *Our discussions to date.***

To quickly go over the history here: We filed our motion in Thomas Girardi's individual bankruptcy, as that was where we expected Erika to try to get bankruptcy protections. Mr. Richards called to let us know that you were going to oppose our motion—representing the bankruptcy trustee for Girardi Keese—because it would interfere with Mr. Richards's efforts to pursue Erika in connection with that bankruptcy.

As we said at the time, that did not add up. Your interests and ours should be aligned in pursuing Erika. We'd already said, in our filing, that any estate funds that we identified in our case against Erika would be turned over to the estate. More importantly, any client funds that we found would be turned over to the clients. We'd be doing all of that *pro bono*, with no cost to the clients or the estate. The Thomas Girardi Trustee saw the benefit in that and did not oppose our motion. But you said that you did. So you filed your opposition, which was joined completely by Erika.

Our reservations about that notwithstanding, we agreed to a compromise in principle. You offered to provide us documents that would foreclose Erika's liability as a defendant in the *Edelson* case if we'd agree not to move forward. We of course agreed to that—and, as you'll see below, we remain open to doing that—because if discovery forecloses a claim, there's no need to proceed.

But after we agreed in principle to do that, Mr. Richards sent us an e-mail last Thursday night demanding that we send over retainer agreements with the clients, which was followed by a barrage of e-mails on Friday and then a demand for a phone call. Despite the fact that we were preparing for a Seventh Circuit argument, Jay and I dropped everything in order to accommodate this newfound urgency and got on the phone with both of you. The point you needed to so urgently make was this: you intended to attack our proof of claim, or evidently attack the *Edelson v. Girardi* case itself, as lacking a written fee-sharing agreement with the clients unless we agreed to withdraw our motion.

That approach—as we discussed last week and reiterate now—is improper. If your point is that there is some ethical issue here, it is without question improper to leverage that to your own benefit, and we won't engage in it. If your point is that the proof of claim is defective, the Girardi Keese Trustee is welcome to attack our claim, but that is a poor use of resources at this juncture—there are many former Girardi Keese clients in front of us in line that we demand to be paid first, and we don't expect to see a recovery. Finally, if your point is that the *Edelson v. Girardi* claim will fail because of lack of evidence, that's an argument for the defendants in that case to make (and already did make), not an argument for someone that should be on the same side as us.

This last point is where are our concerns are taking root. Mr. Richards seems to be making the defendants' arguments for them without—as we said on our call—having a full grasp of the facts or the law. That suggests a single-minded goal of preventing us from getting anywhere near Erika Girardi. Your opposition to our motion is of one voice with Erika's but no one else's, including the Trustee in the relevant case. If you decide to go forward in adding to that response—an extraordinary thing to do, without a basis in the rules—you will again be working as Erika's advance team in making the arguments for her and in the wrong forum. Given that in this respect you seem to be acting as an arm of Erika, we're not particularly interested in revealing our trial strategy to you with a very important contempt hearing coming up.[1] Our suggestion is you do more due diligence, as discussed further below.

To the extent this is just some kind of "turf war," we'd ask that you set that aside for the benefit of the injured people here. We are not standing in your way, and are looking to affirmatively help you get the estate money to the estate, and the client money to the clients, if we come across any. We will get that to the rightful holders without taking any kind of fee, as we've said numerous times. Candidly, everyone involved here should be working *pro bono*. The Girardi fraud represents a massive blot on the legal profession, and has undermined the

---

[1]    When we previously dealt with Mr. Strok separately in connection with the contempt proceeding, he was helpful and reasonable in assisting us in that matter. Your conduct now represents a sharp departure.

promise of justice that injured people get when they bring their claims to the courts. Righting that wrong is one that all of us in the bar have an obligation to do, without money as the goal. *E.g.,* Model R. of Prof'l Responsibility 6.1(b)(3) (lawyers should dedicate *pro bono* services to "improving the law, the legal system or the legal profession"). Even if you decide not to take that obligation on, you shouldn't stand in the way of someone that is trying to.

Unfortunately, some of your conduct has raised more questions for us beyond a routine dispute about who's in charge. We posed many questions last week about whether you are affirmatively trying to protect Erika or assist her in the *Edelson v. Girardi* case, all of which have gone unanswered. We would like to know the answers to those and related questions, below:

1. You said to us that there are no retainer agreements in the GK files. Does that mean, according to the Trustee, that there are no retainer agreements? What search is that based on?

2. If not that, is it the Trustee's position that there was no written client agreement to the fee split? You've said that you are "operating on the assumption that [Edelson] do[es] not have a written fee sharing agreement." What is that assumption based on? Please provide us with everything in the Girardi Keese files with respect to the *Lion Air* cases if this is your position.

3. Have you disclosed this information to Erika or her counsel? Our understanding is that you would be moving, along with Erika, to withdraw your existing opposition and replace it. Please confirm if you have coordinated this effort with Erika and if so, how it was proper to share that confidential client information with her. Please also provide us with your communications with Erika or Erika's counsel about this matter, if any, so that we can put this question to rest.

4. Does the Trustee intend to claim that the Girardi Keese estate is entitled to attorneys' fees with respect to the *Lion Air* clients whose money Girardi Keese helped steal? If so, on what basis has the Trustee determined that the estate is or will be entitled to such fees?

5. Finally, it is concerning to us that the Girardi Keese Trustee has evidently elected to treat us differently from other creditors. If you have nothing in the files regarding the *Lion Air* cases (as you represented last week), has the Trustee done the same due diligence with regard to all other cases in which Girardi Keese is making a claim to fees? If not, how can it make a claim to fees in those cases? And in the instances where the Trustee has indicated that it will pay other counsel—either referring, local or otherwise—has the Trustee first assured itself that the clients had approved those fee-sharing agreements?

Thank you for your prompt response to the above questions. We also have some next steps to propose.

**II.**    *Next steps.*

We've done our best to review the documents that you provided us last Friday night and on the timeline you asked us to. But you're rushing us to sign off on something that is woefully incomplete on the basis that you need to file a second response brief. That time urgency is false: the rules provide no basis for giving you two bites at the apple. (If there were new developments here, this would be different, but this argument was already made in the *Edelson* matter, and we are bewildered by the urgency—were you unaware of the motion for judgment on the pleadings when you filed your original response?) In any event, we cannot agree to drop Erika on a four-business-day turnaround when the documents you've provided just raise more questions, discussed briefly below.

Our initial review of the documents has already revealed several suspect transactions:

1. The account makes electronic payments to ███████████████ every month, but checks are also drawn on the account to ███████████—as an example, nearly a██████ dollars' worth the same month many of the Boeing payments came in. We are working on tracing this money directly to the *Boeing* settlements. Here's an example of a preliminary analysis that may be subject to change as we learn more:

    As of ███████████, the Girardi Keese Client Trust Account at Torrey Pines Bank contained ████████. The only credit to that account between ███████████ ███████████ was a wire transfer for ████████████████, representing the ███████████████. Between ██████ in five separate checks (nos. ███████████████ ██████), Girardi Keese transferred ██████ from the Client Trust Account to the Nano Banc operating account with memo lines reading ██████ followed by the amount of the check and "████████████"—Girardi Keese's ███████████████.

    Given the starting balance of the trust account, it is mathematically impossible for any less than ██████ of the transfers to the Nano Banc account to have come from anywhere other than ████████████. But the amount properly deductible from ███████████████████ only totaled ████████████. We know that the money for fees was withdrawn first, because ███████████████. Accordingly, ███████████████████, was transferred to the Nano Banc account. (To be clear, this is also the analysis that gives ████████ the greatest chance of getting her money back, since any of that money we recover is going straight to her, without you or anyone else taking a cut.)

    As of ████████ the Nano Banc operating account had a balance of ████████. Between ████████ and ████████ the only deposits into the account were ███████████████. On ████████, Girardi Keese wrote two checks to ████████, for ██████ and ██████. That money can only have come from a single place: ███████████ The Trustee's Statement of

Financial Affairs lists ▮▮▮▮▮▮ of dollars in payments to ▮▮▮▮▮▮▮▮▮▮ on ▮▮▮▮▮▮▮ for the benefit of ▮▮▮▮▮▮▮▮▮▮—▮▮▮'s company.[2] Of course, we don't have the statements and other information that allowed the Trustee to conclude that these payments were for the benefit of that company (rather than, say, ▮▮▮▮▮▮▮). Would you share them with us? Does the Trustee believe that the payments for the benefit of ▮▮▮▮▮▮ on ▮▮▮▮▮▮▮▮▮ were made with funds belonging to the debtor, and if so, on what basis? Further, does the Trustee believe that she has the power to pursue these funds from ▮▮▮▮▮▮▮ or ▮▮▮ for the general benefit of Girardi Keese creditors, and, if so, on what basis?

2. There are also numerous payments to the ▮▮▮▮▮▮▮▮▮▮▮▮, which we're working on tracing. Do you know if those were for Erika's ▮▮?

Given that our review is not yet complete, we have to reject the time urgency, but we will continue to work collaboratively with you if that is what you want to do. We expect that these issues can be resolved. We will file our reply on November 9—as is our right under the rules—to correct some of the misstatements and arguments set forth in the opposition briefs. But we are happy to agree to stay ruling on the motion as we work through this. If you so desire, we will build in the right for you to file a supplemental brief afterwards, which preserves your resources until you know whether this dispute has crystallized. This procedure, most importantly, gives us time to answer our questions about transfers and payments out of the Nano Banc account.

In any event, we will continue to work with you—either while the Court is deciding the motion, or even after it should we succeed over your objection. If you will continue sharing information with us, we can meet your goal of lessening the burden on Erika.

Sincerely,

J. Eli Wade-Scott

---

[2] To the extent we are correct, there are two possibilities for why you repeatedly said that the bank records would conclusively show no traceable money. First, you were careless in your review of the records or did not understand what was in them. (This would be consistent with your manic rush to speak to us as well as your incorrect understanding about the retainer issue.) The other possibility is that you knew you were wrong and simply chose to act with a lack of candor. While we always err on the side of believing an attorney would not misrepresent facts, we are concerned that you initially insisted on a confidentiality agreement that would prohibit us from using the records in the bankruptcy case. Again, perhaps that was just another example of sloppiness, such as sending us unencrypted PDFs via e-mail. We will assume so, to give you the benefit of the doubt.

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:
150 California Street, 18th Floor, San Francisco, California 94111

A true and correct copy of the foregoing document entitled: **NOTICE OF MOTION AND MOTION FOR RELIEF FROM THE AUTOMATIC STAY UNDER 11 U.S.C. § 362 (with supporting declarations) (ACTION IN NONBANKRUPTCY FORUM)** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) __11/09/2021__, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☒ Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**:
On (*date*) __11/09/2021__, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☒ Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) _____, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| | | |
|---|---|---|
| __11/09/2021__ | Rafey Balabanian | /s/ Rafey Balabanian |
| *Date* | *Printed Name* | *Signature* |

This form is mandatory.  It has been approved for use in the United States Bankruptcy Court for the Central District of California.

June 2014                                    Page 9                          **F 4001-1.RFS.NONBK.MOTION**

1.   <u>TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF):</u>

Rafey Balabanian,
rbalabanian@edelson.com, docket@edelson.com
Shraddha Bharatia,
notices@becket-lee.com
Ori S Blumenfeld,
Ori@MarguliesFaithLaw.com, Helen@MarguliesFaithLaw.com,
Angela@MarguliesFaithLaw.com, Vicky@MarguliesFaithLaw.com
Richard D Buckley
richard.buckley@arentfox.com
Marie E Christiansen
mchristiansen@vedderprice.com, ecfladocket@vedderprice.com,marie-christiansen-
4166@ecf.pacerpro.com
Jennifer Witherell
Crastzjcrastz@hrhlaw.com
Ashleigh A. Danker
Ashleigh.danker@dinsmore.com, SDCMLFiles@DINSMORE.COM;
Katrice.ortiz@dinsmore.com
Clifford S Davidson
csdavidson@swlaw.com, jlanglois@swlaw.com; cliff-davidson-7586@ecf.pacerpro.com
Lei Lei Wang
Ekvalllekvall@swelawfirm.com, lgarrett@swelawfirm.com; gcruz@swelawfirm.com;
jchujc@swelawfirm.com
Richard W Esterkin
richard.esterkin@morganlewis.com
Timothy W Evanston
tevanston@swelawfirm.com, gcruz@swelawfirm.com; lgarrett@swelawfirm.com;
jchung@swelawfirm.com
Jeremy Faith
Jeremy@MarguliesFaithlaw.com, Helen@MarguliesFaithlaw.com;
Angela@MarguliesFaithlaw.com; Vicky@MarguliesFaithlaw.com
James J Finsten ,
jimfinsten@hotmail.com
James J Finsten
jfinsten@lurie-zepeda.com, jimfinsten@hotmail.com
Alan W Forsley
alan.forsley@flpllp.com, awf@fkllawfirm.com, awf@fl-lawyers.net,
addy.flores@flpllp.com, laura.rucker@flpllp.com
Eric D Goldberg
eric.goldberg@dlapiper.com, eric-goldberg-1103@ecf.pacerpro.com
Andrew Goodman
agoodman@andyglaw.com, Goodman.AndrewR102467@notify.bestcase.comM.
Jonathan Hayes
jhayes@rhmfirm.com, roksana@rhmfirm.com;matt@rhmfirm.com;
janita@rhmfirm.com;susie@rhmfirm.com; priscilla@rhmfirm.com;pardis@rhmfi

rm.com; russ@rhmfirm.com;rebeca@rhmfirm.com;
david@rhmfirm.com;sloan@rhmfirm.com
Marshall J Hogan
mhogan@swlaw.com, knestuk@swlaw.com
Razmig Izakelian
razmigizakelian@quinnemanuel.com
Lewis R Landau
Lew@Landaunet.com
Craig G Margulies
Craig@MarguliesFaithlaw.com, Vicky@MarguliesFaithlaw.com;
Helen@MarguliesFaithlaw.com; Angela@MarguliesFaithlaw.com
Peter J Mastan
peter.mastan@dinsmore.com, SDCMLFiles@dinsmore.com;
Katrice.ortiz@dinsmore.com
Edith R Matthai
ematthai@romalaw.com
Elissa Miller
emiller@sulmeyerlaw.com, emillersk@ecf.inforuptcy.com; ccaldwell@sulmeyerlaw.com
Eric A Mitnick
MitnickLaw@aol.com, mitnicklaw@gmail.com
Scott H Olson
solson@vedderprice.com, scott-olson-2161@ecf.pacerpro.com,
ecfsfdocket@vedderprice.com, nortega@vedderprice.com Carmela Pagay
ctp@lnbyb.com
Ambrish B Patel
apatelEI@americaninfosource.com
Michael J Quinn
mquinn@vedderprice.com, ecfladocket@vedderprice.com, michael-quinn-
2870@ecf.pacerpro.com
Matthew D. Resnik
matt@rhmfirm.com, roksana@rhmfirm.com; janita@rhmfirm.com; susie@rhmfirm.com;
max@rhmfirm.com;priscilla@rhmfirm.com;pardis@rhmfi
rm.com;russ@rhmfirm.com;rebeca@rhmfirm.com;david@rhmfirm.com;sloan@rhmfirm.
com
Ronald N Richards
ron@ronaldrichards.com, morani@ronaldrichards.com, justin@ronaldrichards.com
Kevin C Ronk
Kevin@portilloronk.com, Attorneys@portilloronk.com
Jason M Rund
(TR)trustee@srlawyers.com, jrund@ecf.axosfs.com
Gary A Starregastarre@gmail.com, mmoonniiee@gmail.com
Richard P Steelman
rps@lnbyb.com, john@lnbyb.com
Philip E Strok
pstrok@swelawfirm.com, gcruz@swelawfirm.com; 1garrett@swelawfirm.com;
jchung@swelawfirm.com

Christopher K.S. Wong
christopher.wong@arentfox.com, yvonne.li@arentfox.com
Evan C. Borges, Esq.
EBorges@GGTrialLaw.com

2.  <u>TO BE SERVED VIA U.S. MAIL:</u>

Debtor: Thomas Vincent Girardi
1126 Wilshire Boulevard Los Angeles, CA 90017

Broker: William Friedman
1608 Montana Avenue Santa Monica, CA 90403

Broker: Steve Enslow
78000 Fred Waring Drive Suite 202 Palm Desert, CA 92211

Courtesy Copy: Honorable Barry Russell United States Bankruptcy Court 255 E. Temple
St., Suite 1660 Los Angeles, CA 90012