Robert P. Goe - State Bar No. 137019
Brandon J. Iskander – State Bar No. 300916
**GOE FORSYTHE & HODGES LLP**
18101 Von Karman Avenue, Suite 1200
Irvine, CA 92612
rgoe@goeforlaw.com
biskander@goeforlaw.com

Telephone:  (949) 798-2460
Facsimile:   (949) 955-9437

Attorneys for Secured Creditor Arsani Sidarous

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

### LOS ANGELES DIVISION

| | |
|---|---|
| In re:<br><br>THOMAS VINCENT GIRARDI,<br><br><br>          Debtor. | Case No. 2:20-bk-21020-BR<br><br>Chapter 7<br><br>**RESPONSE OF SECURED CREDITOR ARSANI SIDAROUS TO TRUSTEE'S MOTION FOR ORDER (1) AUTHORIZING EMPLOYMENT OF JOHN MORAN AUCTIONEERS, INC. AS AUCTIONEER; (2) AUTHORIZING SALE OF CERTAIN PERSONAL PROPERTY OF THE ESTATE; AND (3) AUTHORIZING ABANDONMENT OR DESTRUCTION OF CERTAIN PERSONAL PROPERTY OF THE ESTATE; DECLARATION OF ARSANI SIDAROUS IN SUPPORT THEREOF**<br><br>**[MOTION DOCKET NO. 341]**<br><br>Hearing Date: July 12, 2022<br>Time:          10:00 a.m.<br>Place:         Courtroom 1668<br>                   Roybal Federal Building<br>                   255 E. Temple Street<br>                   Los Angeles, CA 90012 |

**TO THE HONORABLE BARRY RUSSELL, UNITED STATES BANKRUPTCY JUDGE, THE TRUSTEE AND HIS COUNSEL, THE OFFICE OF THE UNITED STATES TRUSTEE, AND ALL INTERESTED PARTIES:**

Secured creditor Arsani Sidarous ("Sidarous") files his response ("Response") to the Chapter 7 Trustee's Motion for Order: (1) Authorizing Employment of John Moran Auctioneers, Inc. as Auctioneer; (2) Authorizing Sale of Certain Personal Property of the Estate; and (3) Authorizing Abandonment or Destruction of Certain Personal Property of the Estate (Docket No. 341) ("Auction Motion") and respectfully represents as follows:

## I. SUMMARY OF RESPONSE

Sidarous holds liens recorded in 2019 that are more senior than those of California Attorneys Lending II, Inc. ("CAL II") whose lien was recorded in 2020. The Auction Motion in its present form lacks explanation as to what items specifically are to be sold and evidence that the Auction Motion is for the purpose of selling personal property, rather than fixtures. Further, the Auction Motion fails to discuss that the Trustee has not obtained Arsani Sidarous's consent to sell any of the contents of the Real Property (defined below) when they are his collateral on an unpaid $3.1 million secured loan.  Because the Auction Motion lacks evidence, is conclusory, and does not adequately provide for payment of Sidarous's lien, the Auction Motion as presently framed should be denied.

## II. FACTUAL HISTORY

1.   On or about October 25, 2019, Thomas V. Girardi ("Debtor") obtained a loan from ALT Financial, Inc. ("ALT") for $2.5 million ("ALT Loan").  (A true and correct copy of the promissory note and loan agreement for the ALT Loan is attached to the Declaration of Arsani Sidarous ("Sidarous Declaration") annexed hereto as **Exhibit "A."**)

2.   As security for the ALT Loan, ALT obtained and recorded a deed of trust ("ALT DOT") in the Official Records of the Los Angeles County Recorder's Office as Document Number 20191149333, secured by the real property located at 100 Los Altos Drive, Pasadena, CA 91105 ("Real Property").  (A true and correct copy of ALT's October 25, 2019 recorded deed of trust is attached to the Sidarous Declaration as **Exhibit "B."**)

3.    By Assignment of Deed of Trust recorded in the Official Records of the Los Angeles County Recorder's Office as Document Number 20191149334, Sidarous became the beneficiary of the ALT DOT.  (A true and correct copy of Sidarous's Assignment of Deed of Trust recorded October 25, 2019 is attached to the Sidarous Declaration as **Exhibit "C."**)

4.    Pursuant to the ALT Loan and ALT DOT, the "personalty" and fixtures located at the Real Property are Sidarous's collateral.  (See Sidarous Declaration, Ex. A, at 14.)  As set forth in the ALT DOT, the secured personalty includes:

> "Personalty" means . . . (ii) equipment and inventory owned by Borrower which are used now or in the future in connection with the ownership, management or operation of the Land or the Improvements or are located on the Land or in the Improvements, *including furniture, furnishings, machinery, building materials, appliances, goods, supplies, tools, books, records (whether in written or electronic form), computer equipment (hardware and software); (iii) other tangible personal property (other than Fixtures) which are used now or in the future in connection with the ownership, management or operation of the Land or the Improvements or are located on the Land or in the Improvements;* (iv) any operating agreements relating to the Land or the Improvements; (v) any surveys, plans and specifications and contracts for architectural, engineering and construction services relating to the Land or the Improvements; (vi) all other intangible property and rights relating to the operation of, or used in connection with, the Land or the Improvements, including all governmental permits relating to any activities on the Land or the Improvements and including subsidy or similar payments received from any sources, including a Governmental Authority;

(Sidarous Declaration, Ex. A, at 14 (emphasis added).)

4.    The ALT Loan further provides that ALT is secured by the fixtures located at the Real Property, as part of the loan agreement, which serves as both a security agreement and fixture filing.  (Sidarous Declaration, Ex. A, at 14 (emphasis added) ("'Mortgaged Property' means all of Borrower's present and future right, title and interest in and to all of the following: (1) the Land; (2) the Improvements; (3) *the Fixtures*; (4) *the Personalty*; (5) all current and future rights, including air rights, development rights, zoning rights and other similar rights or interests . . . ."); 15 ("This Instrument constitutes a financing statement with respect to any part of the Mortgaged Property that is or may become a Fixture, if permitted by applicable law.."); 20 ("This Instrument is also a fixture filing under the Uniform Commercial Code of California."))

5.     As security for the personalty and fixtures located at the Real Property, ALT recorded a fixture filing in the Official Records of the Los Angeles County Recorder's Office as Document Number 20191149335.   (A true and correct copy of ALT's October 25, 2019 fixture filing is attached to the Sidarous Declaration as **Exhibit "D."**)

6.     The Motion alleges CAL II has the senior lien on the assets to be auctioned pursuant to a UCC-1 originally filed only against Girardi Keese ("GK") in 2011, which CAL II "attempted" to perfect against Debtor in 2017 but was unsuccessful as the 2017 filing did not include any collateral description.   These issues are specifically discussed in the Chapter 7 Trustee's Motion to Approve Compromise filed May 19, 2021 [Docket No. 197] ("CAL II 9019 Motion").   (A true and correct copy of the CAL II 9019 Motion is attached to the Sidarous Declaration as **Exhibit "E."**) As discussed in the CAL II 9019 Motion (pages 5, lines 12-21) any lien of Cal II would be derived from its October 27, 2020 judgment obtained against GK and Debtor, which was a year after Sidarous was granted his liens.

7.     The involuntary bankruptcy petition was filed on December 18, 2020.   The Bankruptcy Court entered its Order for Relief on January 13, 2021.

8.     On June 9, 2022, Sidarous moved for relief from stay against the Real Property (Docket No. 336) ("Stay Motion"), which is now pending before the Court.

## III.   RESPONSE TO AUCTION MOTION

### A.   Any Sale of Furnishings and/or Fixtures is Subject to Sidarous's Lien

Through the Auction Motion, the Trustee seeks to employ an auctioneer and conduct an auction of unspecified items currently located at Real Property for no payment to Sidarous. Sidarous objects to this treatment as his proof of claim is clear that he is owed at least $3.1 million on account of the ALT Loan and is entitled to payment for the use of his collateral. Sidarous has not received any payment from the bankruptcy estate to date.   (Sidarous Declaration, ¶ 8.)

1.   The Trustee May Not Sell Furnishings Free and Clear of Sidarous's Lien Without Payment in Full to Sidarous or Without His Content

The Trustee relies on a UCC search as justification for failing to seek Sidarous's consent to the sale of furnishings at the Real Property or to otherwise pay Sidarous out of the proceeds therefrom.  However, the Estate is bound by the ALT Loan, which grants a security interest in effectively all the contents of the Real Property.

Here, the ALT DOT encumbering the Real Property specifically states that it is a "Security Agreement" secured by the "Personalty" located at the Real Property, which includes all furnishings and personal property of any kind.  (*See* Sidarous Declaration, Ex. B, at 2, 5 (the "Mortgaged Property" includes "the 'Personalty'," and "Personalty," *inter alia*, means "(ii) equipment and inventory owned by Borrower which are used now or In the future in connection with the ownership, management or operation of the Land or the Improvements or are located on the Land or in the Improvements, ***including furniture, furnishings***, machinery, building materials, ***appliances, goods, supplies, tools, books, records*** (whether in written or electronic form), computer equipment (hardware and software); (iii) ***other tangible personal property (other than Fixtures) which are used now or in the future in connection with the ownership***, management or operation of the Land or the Improvements or are located on the Land or in the Improvements").)

2.  <u>The Trustee May Not Sell Fixtures Free and Clear of Sidarous's Lien Without Payment in Full to Sidarous or Without His Content</u>

Further, the Trustee may not sell any fixtures free and clear of Sidarous's security interest as evidenced by the ALT fixture filing dated October 29, 2019.  (*See* Sidarous Declaration, Ex. D.)  California Civil Code Section 660 define fixtures as follows:

> ***A thing is deemed to be affixed to land when it is*** attached to it by roots, as in the case of trees, vines, or shrubs; or imbedded in it, as in the case of walls; or permanently resting upon it, as in the case of buildings; or ***permanently attached to what is thus permanent, as by means of cement, plaster, nails, bolts, or screws***; except that for the purposes of sale, emblements, industrial growing crops and things attached to or forming part of the land, which are agreed to be severed before sale or under the contract of sale, shall be treated as goods and be governed by the provisions of the title of this code regulating the sales of goods.

Cal. Civ. Code § 660 (emphasis added).  The Auction Motion does not specifically identify everything that the Trustee seeks to sell.  It appears that the only disclosure is at page 2 lines 13 through 14, which describes the items as including (but not limited to) "a Steinway piano, furniture, art, religious icons, statues, lamps, rugs, ceramics and glassware, clothing and shoes, and sports memorabilia."  (Auction Motion, at 2:13-14.)

Depending on the manner in which the items identified are placed, and the objective intention of the party that placed them,[1] several of the items identified by the Trustee may be fixtures, including: the piano, the furniture, the art, the religious icons, the statues, and the sports memorabilia.  As Sidarous has a senior security interest in both furnishings and fixtures, he objects to the sale of any contents of the Real Property without his consent or payment in full of his filed claim.

## B.   The Court Should Not Grant the Auction Motion Until the Trustee First Specifies in Detail the Items to be Sold and Why Each Item is Not Sidarous's Collateral

The Auction Motion lacks specificity as to what is to be sold and why said items are not subject to the security interest of Sidarous, either as personal property or as fixtures.  The Auction Motion is also conclusory in that it does not even attempt to differentiate between what is personal property versus fixtures.  Ultimately, because Sidarous is secured by both categories of property. the Trustee's motion in its present form must be denied for lack of evidence.

Finally, Sidarous objects to the Trustee's request to abandon and destroy "records" located at the Real Property, because Sidarous also has a lien on them as well.  (See Sidarous Declaration, Ex. B, at 4 ("'Personalty' means all: . . . (ii) . . . books, records (whether in written or electronic form) . . . ."))

/ / /

/ / /

/ / /

---

[1] *See Seatrain Terminals of California, Inc., v. County of Alameda*, 83 Cal. App. 3d 69, 74 (1978) (holding that the intention to affix property permanently to land must be determined by the physical facts or reasonably manifested outward appearances.)

**IV.    CONCLUSION**

For all of the foregoing reasons, Sidarous respectfully requests that the Auction Motion be denied.

Dated: June 28, 2022                                    Respectfully submitted by

                                                                     **GOE FORSYTHE & HODGES LLP**

                                                                     By: /s/ Robert P. Goe
                                                                             Robert P. Goe
                                                                             Brandon J. Iskander
                                                                             Attorneys for Secured Creditor Arsani
                                                                             Sidarous

## DECLARATION OF ARSANI SIDAROUS

I, Arsani Sidarous, declare and state as follows:

1. I am the beneficiary of a deed of trust recorded on October 25, 2019 in the Official Records of the Los Angeles County Recorder's Office against the real property located at 100 Los Altos Drive, Pasadena, CA 91105. I have personal knowledge of the facts set forth herein, and if called as a witness, I could and would competently testify thereto.

2. I make this declaration in support of my Response to the Chapter 7 Trustee's Motion for Order: (1) Authorizing Employment of John Moran Auctioneers, Inc. as Auctioneer; (2) Authorizing Sale of Certain Personal Property of the Estate; and (3) Authorizing Abandonment or Destruction of Certain Personal Property of the Estate (Docket No. 342) ("Auction Motion"). All capitalized terms not otherwise defined herein shall have the meaning set forth in the Response.

3. A true and correct copy of the promissory note and loan agreement for the ALT Loan is attached hereto as **Exhibit "A."**

4. A true and correct copy of ALT's October 25, 2019 recorded deed of trust is attached hereto as **Exhibit "B."**

5. A true and correct copy of my Assignment of Deed of Trust recorded October 25, 2019 is attached hereto as **Exhibit "C."**

6. A true and correct copy of ALT's October 25, 2019 fixture filing is attached hereto as **Exhibit "D."**

7. A true and correct copy of the Chapter 7 Trustee's Motion to Approve Compromise filed May 19, 2021 [Docket No. 197] is attached hereto as **Exhibit "E."**

8. On or about February 15, 2022, I caused to be Proof of Claim 56-1 for $3,103,263.50 plus allowable charges under Section 506(b) of the Bankruptcy Code.

9. To date, I have not received any payment from the bankruptcy estate.

10. To the best of my knowledge, the Trustee has not contacted me or my counsel to request my consent to the sale of personal property and/or fixtures located at the Real Property. I do not consent to the proposed sale in the Auction Motion.

///

1       I declare under the penalty of perjury under the laws of the United States of America that

2  the foregoing is true and correct to the best of my knowledge.

3       Executed on June 28, 2022, at Irvine, California.

4

5                                       Arsani Sidarous

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A

# PROMISSORY NOTE
### (California)

**US $2,500,000.00**                                                                                      **October 7, 2019**

FOR VALUE RECEIVED, the undersigned, **THOMAS V. GIRARDI** (together with such party's or parties' successors and assigns, "**Borrower**"), jointly and severally (if more than one) promises to pay to the order of **ALT FINANCIAL NETWORK, INC., a California corporation**, the principal sum of **TWO MILLION FIVE HUNDRED THOUSAND AND 00/100 DOLLARS (US $2,500,000.00)**, with interest on the unpaid principal balance, as hereinafter provided.

1.      **Defined Terms.**

(a)      In addition to defined terms found elsewhere in this Note, as used in this Note, the following definitions shall apply:

**Business Day**:  Any day other than a Saturday, a Sunday or any other day on which Lender or the national banking associations are not open for business.

**Default Rate**:  An annual interest rate equal to **four percentage points (4%)** above the Fixed Interest Rate. However, at no time will the Default Rate exceed the Maximum Interest Rate.

**Disbursement Date**:  The date of the initial disbursement of Loan proceeds hereunder.

**First Payment Due Date: December 1, 2019.**

**Fixed Interest Rate**:  The annual interest rate of **11 percent (11%)**.

**Indebtedness**:  The principal of, interest on, or any other amounts due at any time under, this Note, the Loan Agreement (other than the Environmental Indemnity), the Mortgage or any other Loan Document (other than any guaranty), including prepayment premiums, late charges, default interest, and advances to protect the security of the Mortgage under Section 7 of the Mortgage or any other applicable provision of the Loan Agreement, the Mortgage or any other Loan Document or as permitted by law.

**Lender**:  The holder(s) from time to time of this Note.

**Loan**:  The loan evidenced by this Note.

**Loan Agreement**:  That certain Loan Agreement dated as of the date of this Note by and between Borrower and Lender, as such agreement may be amended from time to time.

**Maturity Date**:  The earlier of (i) **November 1, 2021**, and (ii) the date on which the unpaid principal balance of this Note becomes due and payable by acceleration or otherwise pursuant to the Loan Documents or the exercise by Lender of any right or remedy under any Loan Document.

**Maximum Interest Rate**:  The rate of interest that results in the maximum amount of interest allowed by applicable law.

**Mortgage**:  That certain Deed of Trust, Assignment of Rents, Security Agreement and Fixture Filing dated as of the date of this Note, executed by Borrower to or for the benefit of Lender and securing this Note, which Mortgage encumbers certain real property commonly known as **100 Los Altos Drive, Pasadena, CA 91105**.

**Payment Due Date**:  The First Payment Due Date and any subsequent date on which a monthly installment of interest or principal and interest is due and payable pursuant to Section 3.

**Prepayment Premium End Date: May 1, 2020.**

Prepared by LoanDocSolutions
California Promissory Note
Loan No.: 20190822000

**Prepayment Premium Period**:  The period during which, if a prepayment of principal occurs, a prepayment premium will be payable by Borrower to Lender.  The Prepayment Premium Period is the period from the Disbursement Date to and excluding the Prepayment Premium End Date.

**Property Jurisdiction**:  The jurisdiction in which the Land is located.

(b)     **"Event of Default"** and other capitalized terms used but not defined in this Note shall have the meanings given to such terms in the Mortgage or the Loan Agreement.

**2.       Address for Payment.** All payments due under this Note shall be payable at **18022 Cowan, Suite 245, Irvine, CA 92614**, or such other place as may be designated by written notice to Borrower from or on behalf of Lender.

**3.       Payments.**

(a)     Interest will accrue on the outstanding principal balance of this Note at the Fixed Interest Rate, subject to the provisions of Section 8.

(b)     Interest under this Note shall be computed, payable and allocated on the basis of an actual/365 interest calculation schedule (interest is payable for the actual number of days in each month, and each month's interest is calculated by multiplying the unpaid principal amount of this Note as of the first day of the  monthly period  for which interest is being calculated by the applicable Fixed Interest Rate, dividing the product by 365, and multiplying the quotient by the number of days in the  monthly period  for which interest is being calculated).  A balloon payment will be due upon full repayment of this Note even if this Note is not repaid until the Maturity Date.  Each monthly payment will first be applied to pay in full interest due, and the balance of the monthly payment paid by Borrower will be credited to principal.

(c)     Unless disbursement of principal is made by Lender to Borrower on the first day of a calendar month, interest for the period beginning on the Disbursement Date and ending on and including the last day of such calendar month shall be payable by Borrower on or before the Disbursement Date.  If the Disbursement Date is on the first day of a calendar month, then no payment will be due from Borrower until the First Payment Due Date.  The Payment Due Date for the first monthly installment payment under Section 3(d) of interest only or principal and interest, as applicable, will be the First Payment Due Date set forth in Section 1(a).  Except as provided in this Section 3(c) and in Section 10, accrued interest will be payable in arrears.

(d)     Beginning on the First Payment Due Date, and continuing until and including the monthly installment due on the Maturity Date, accrued interest only shall be payable by Borrower in consecutive monthly installments due and payable on the first day of each calendar month.  The amount of each monthly installment of interest only payable pursuant to this Section 3(d) on a Payment Due Date shall vary depending on the number of days in the month prior to the Payment Due Date.

(e)     All remaining Indebtedness, including all principal and interest, shall be due and payable by Borrower on the Maturity Date.  All payments under this Note shall be made in immediately available U.S. funds.  Any regularly scheduled monthly installment of interest that is received by Lender before the date it is due shall be deemed to have been received on the due date solely for the purpose of calculating interest due.  Any accrued interest remaining past due for **thirty (30) days** or more, at Lender's discretion, may be added to and become part of the unpaid principal balance of this Note and any reference to "accrued interest" shall refer to accrued interest which has not become part of the unpaid principal balance.  Any amount added to principal pursuant to the Loan Documents shall bear interest at the applicable rate or rates specified in this Note and shall be payable with such interest upon demand by Lender and absent such demand, as provided in this Note for the payment of interest or principal and interest.  In the event any check given by Borrower to Lender as a payment on this Note is dishonored, or in the event there are insufficient funds in Borrower's designated account to cover any preauthorized monthly debit from Borrower's checking account, then, without limiting any other charges or remedies, Borrower shall pay to Lender a processing fee of **$15.00** (but not more than the maximum amount allowed by law) for each such event.

(f)     *Balloon Payment*.  The interest-only payment schedule contained in this Loan requires that you make a balloon payment in the estimated amount of **TWO MILLION FIVE HUNDRED TWENTY-THREE THOUSAND THREE HUNDRED FIFTY-SIX AND 16/100 DOLLARS (US $2,523,356.16)** on the Maturity Date, which is comprised of the unpaid principal balance of this Note in the amount of **$2,500,000.00**, plus the unpaid interest-only payment for the period from **October 1, 2021** through **October 31, 2021**.  This balloon payment is more than double the amount of the regular payments.

4.    **Application of Payments.** If at any time Lender receives, from Borrower or otherwise, any amount applicable to the Indebtedness which is less than all amounts due and payable at such time, Lender may apply the amount received to amounts then due and payable in any manner and in any order determined by Lender, in Lender's discretion. Borrower agrees that neither Lender's acceptance of a payment from Borrower in an amount that is less than all amounts then due and payable nor Lender's application of such payment shall constitute or be deemed to constitute either a waiver of the unpaid amounts or an accord and satisfaction.

5.    **Security.** The Indebtedness is secured by, among other things, the Mortgage and reference is made to the Mortgage for other rights of Lender as to collateral for the Indebtedness. The Loan Agreement contains the following provision which provides for the acceleration of the Indebtedness upon certain Transfers:

"**ARTICLE V**    **TRANSFERS OF THE MORTGAGED PROPERTY OR INTERESTS IN BORROWER [NO RIGHT TO TRANSFER].**

**5.01    Prohibited and Permitted Transfers.**

(a)    "**Transfer**" means (A) a sale, assignment, transfer or other disposition (whether voluntary, involuntary or by operation of law); (B) the granting, creating or attachment of a lien, encumbrance or security interest (whether voluntary, involuntary or by operation of law); (C) the issuance or other creation of an ownership interest in a legal entity, including a partnership interest, interest in a limited liability company or corporate stock; (D) the withdrawal, retirement, removal or involuntary resignation of a partner in a partnership or a member or manager in a limited liability company; or (E) the merger, dissolution, liquidation, or consolidation of a legal entity or the reconstitution of one type of legal entity into another type of legal entity. For purposes of defining the term "Transfer," the term "partnership" shall mean a general partnership, a limited partnership, a joint venture and a limited liability partnership, and the term "partner" shall mean a general partner, a limited partner and a joint venturer.

(b)    "**Transfer**" does not include: (i) a conveyance of the Mortgaged Property at a judicial or non-judicial foreclosure sale under the Mortgage, (ii) the Mortgaged Property becoming part of a bankruptcy estate by operation of law under the Bankruptcy Code, or (iii) a lien against the Mortgaged Property for local taxes and/or assessments not then due and payable.

(c)    The occurrence of any of the following events shall not constitute an Event of Default, notwithstanding any provision of this Section 5.01 to the contrary:

(i)     a Transfer to which Lender has consented;

(ii)    a Transfer that occurs by devise, descent, or by operation of law upon the death of a natural person (unless such death itself is an Event of Default under Section 6.01(p));

(iii)   the grant of a leasehold interest in an individual dwelling unit, so long as such leasehold interest (A) is for a term of two years or less, (B) does not contain an option to purchase and (C) is otherwise in accordance with the terms of this Loan Agreement;

(iv)    a Transfer of obsolete or worn out Personalty or Fixtures that are contemporaneously replaced by items of equal or better function and quality, which are free of liens, encumbrances and security interests other than those created by the Loan Documents or consented to by Lender; and

(v)     the creation of a mechanic's, materialman's, or judgment lien against the Mortgaged Property which is released of record or otherwise remedied to Lender's satisfaction within 60 days of the date of creation.

(d)    The occurrence of any of the following Transfers shall not constitute an Event of Default under this Loan Agreement, provided that Borrower has notified Lender in writing within 30 days following the occurrence of any of the following, and such Transfer does not constitute an Event of Default under any other provision of this Loan Agreement:

(i)     a change of Borrower's name, provided that UCC financing statements and/or amendments sufficient to continue the perfection of Lender's security interest have been properly filed and copies have been delivered to Lender;

(ii)    a change of the form of Borrower not involving a transfer of Borrower's assets and not resulting in any change in liability of any Initial Owner, provided that: (A) UCC financing statements and/or amendments sufficient to continue the perfection of Lender's security

interest have been properly filed and copies have been delivered to Lender, (B) Lender has been provided, in advance, for Lender's review and approval, all proposed filings, amendments and other documents pertaining to such change in form, and (C) Borrower shall pay for attorneys' fees, and other out of pocket costs of Lender for the review of such documents and any filings, including any title endorsement costs if Lender in its discretion requires an endorsement or endorsements to Lender's title policy;

(iii)   the merger of Borrower with another entity when Borrower is the surviving entity;

(iv)   [intentionally omitted]; and

(v)   the grant of an easement, if before the grant Lender determines that the easement will not materially affect the operation or value of the Mortgaged Property or Lender's interest in the Mortgaged Property, and Borrower pays to Lender, upon demand, all costs and expenses, including Attorneys' Fees and Costs, incurred by Lender in connection with reviewing Borrower's request.

(e)   The occurrence of any of the following events shall constitute an Event of Default under this Loan Agreement:

(i)   a Transfer of all or any part of the Mortgaged Property or any interest in the Mortgaged Property, including the grant, creation or existence of any mortgage, deed of trust, deed to secure debt, security interest or other lien or encumbrance on the Mortgaged Property (other than the lien of the Mortgage and the liens and encumbrances reflected on the Schedule of Title Exceptions), whether voluntary, involuntary or by operation of law, and whether or not such lien has priority over the lien of the Mortgage;

(ii)   if Borrower is a limited partnership, a Transfer of (A) any general partnership interest, or (B) limited partnership interests in Borrower that would cause the Initial Owners of Borrower to own less than a Controlling Interest of all limited partnership interests in Borrower;

(iii)   if Borrower is a general partnership or a joint venture, a Transfer of any general partnership or joint venture interest in Borrower;

(iv)   if Borrower is a limited liability company, (A) a Transfer of any membership interest in Borrower which would cause the Initial Owners to own less than a Controlling Interest of all the membership interests in Borrower, (B) a Transfer of any membership or other interest of a manager in Borrower that results in a change of manager, or (C) a change of a nonmember manager;

(v)   if Borrower is a corporation, (A) the Transfer of any voting stock in Borrower which would cause the Initial Owners to own less than a Controlling Interest of any class of voting stock in Borrower or (B) if the outstanding voting stock in Borrower is held by 100 or more shareholders, one or more transfers by a single transferor within a 12-month period affecting an aggregate of 5% or more of that stock;

(vi)   if Borrower is a trust, (A) a Transfer of any beneficial interest in Borrower which would cause the Initial Owners to own less than a Controlling Interest of all the beneficial interests in Borrower, (B) the termination or revocation of the trust, or (C) the removal, appointment or substitution of a trustee of Borrower; and

(vii)   a Transfer of any interest in a Controlling Entity which, if such Controlling Entity were Borrower, would result in an Event of Default under any of <u>Sections 5.01(e)(i) through (vi)</u> above.

Lender shall not be required to demonstrate any actual impairment of its security or any increased risk of default in order to exercise any of its remedies with respect to an Event of Default under this <u>Section 5.01</u>."

6.   **Acceleration.**  If an Event of Default has occurred and is continuing, the entire unpaid principal balance, any accrued interest, the prepayment premium payable under Section 10, and all other amounts payable under this Note and any other Loan Document, shall at once become due and payable, at the option of Lender, without any prior notice to Borrower (except if notice is required by applicable law, then after such notice). Lender may exercise this option to accelerate regardless of any prior forbearance. For purposes of exercising such option, Lender shall calculate the prepayment premium as if prepayment occurred on the date of acceleration.

7.    **Late Charge.**

(a)    If any installment of interest or principal and interest or other amount payable under this Note, the Loan Agreement, the Mortgage or any other Loan Document is not received in full by Lender within **ten (10)** days after the installment or other amount is due (unless applicable law requires a longer period of time before a late charge may be imposed, in which event such longer period shall be substituted), Borrower shall pay to Lender, immediately and without demand by Lender, a late charge equal to **five percent (5%)** of such installment or other amount due (unless applicable law requires a lesser amount be charged, in which event such lesser amount shall be substituted).

(b)    Borrower acknowledges that its failure to make timely payments will cause Lender to incur additional expenses in servicing and processing the Loan and that it is extremely difficult and impractical to determine those additional expenses. Borrower agrees that the late charge payable pursuant to this Section 7 represents a fair and reasonable estimate, taking into account all circumstances existing on the date of this Note, of the additional expenses Lender will incur by reason of such late payment.  The late charge is payable in addition to, and not in lieu of, any interest payable at the Default Rate pursuant to Section 8.

8.    **Default Rate.**

(a)    So long as (i) any monthly installment under this Note remains past due for **thirty (30)** days or more or (ii) any other Event of Default has occurred and is continuing, then notwithstanding anything in Section 3 to the contrary, interest under this Note shall accrue on the unpaid principal balance from the Payment Due Date of the first such unpaid monthly installment or the occurrence of such other Event of Default, as applicable, at the Default Rate.

(b)    From and after the Maturity Date, the unpaid principal balance and all accrued interest shall continue to bear interest at the Default Rate until and including the date on which the entire principal balance is paid in full.

(c)    Borrower acknowledges that (i) its failure to make timely payments will cause Lender to incur additional expenses in servicing and processing the Loan, (ii) during the time that any monthly installment under this Note is delinquent for **thirty (30)** days or more, Lender will incur additional costs and expenses arising from its loss of the use of the money due and from the adverse impact on Lender's ability to meet its other obligations and to take advantage of other investment opportunities; and (iii)  it is extremely difficult and impractical to determine those additional costs and expenses.  Borrower also acknowledges that, during the time that any monthly installment under this Note is delinquent for **thirty (30)** days or more or any other Event of Default has occurred and is continuing, Lender's risk of nonpayment of this Note will be materially increased and Lender is entitled to be compensated for such increased risk.  Borrower agrees that the increase in the rate of interest payable under this Note to the Default Rate represents a fair and reasonable estimate, taking into account all circumstances existing on the date of this Note, of the additional costs and expenses Lender will incur by reason of Borrower's delinquent payment and the additional compensation Lender is entitled to receive for the increased risks of nonpayment associated with a delinquent loan.  During any period that the Default Rate is in effect the additional interest accruing over and above the Fixed Interest Rate shall be immediately due and payable in addition to the regularly scheduled interest or principal and interest payments.

9.    **Full Recourse Personal Liability.**  Borrower shall have full recourse personal liability under this Note, the Loan Agreement, the Mortgage and all other Loan Documents for the repayment of the Indebtedness and for the payment and performance of any and all other obligations of Borrower under this Note, the Loan Agreement, the Mortgage and all other Loan Documents.

10.    **Voluntary and Involuntary Prepayments.**

(a)    Any receipt by Lender of principal due under this Note prior to the Maturity Date, other than principal required to be paid in monthly installments pursuant to Section 3, constitutes a prepayment of principal under this Note.  Without limiting the foregoing, any application by Lender, prior to the Maturity Date, of any proceeds of collateral or other security to the repayment of any portion of the unpaid principal balance of this Note constitutes a prepayment under this Note.

(b)    Borrower may voluntarily prepay all of the unpaid principal balance of this Note on a Payment Due Date so long as Borrower designates the date for such prepayment in a notice from Borrower to Lender given at least **thirty (30)** days prior to the date of such prepayment.  If a Payment Due Date (as defined in Section 1(a)) falls on a day which is not a Business Day, then with respect to payments made under this Section 10 only, the term "Payment Due Date" shall mean the Business Day immediately preceding the scheduled Payment Due Date.

(c)       Notwithstanding Section 10(b), Borrower may voluntarily prepay all of the unpaid principal balance of this Note on a Business Day other than a Payment Due Date if Borrower provides Lender with the notice set forth in Section 10(b) and meets the other requirements set forth in this Section 10(c). Borrower acknowledges that Lender has agreed that Borrower may prepay principal on a Business Day other than a Payment Due Date only because Lender shall deem any prepayment received by Lender on any day other than a Payment Due Date to have been received on the Payment Due Date immediately following such prepayment and Borrower shall be responsible for all interest that would have been due if the prepayment had actually been made on the Payment Due Date immediately following such prepayment.

(d)       Borrower may voluntarily prepay less than all of the unpaid principal balance of this Note (a **"Partial Prepayment"**) at any time.  Upon delivery of the Partial Prepayment, a prepayment premium calculated pursuant to Section 10(e), based on the amount being prepaid, shall be due and payable to Lender upon demand.  In order to voluntarily prepay all or any part of the principal of this Note, Borrower must also pay to Lender, together with the amount of principal being prepaid, (i) all accrued and unpaid interest due under this Note, plus (ii) all other sums due to Lender at the time of such prepayment, plus (iii) any prepayment premium calculated pursuant to Section 10(e), to the extent such prepayment premium does not exceed the Maximum Interest Rate.

(e)       Except as provided in Section 10(f), a prepayment premium shall be due and payable by Borrower in connection with any prepayment of principal under this Note during the Prepayment Premium Period.  The prepayment premium shall be **five percent (5%)** of the amount of principal being prepaid for any prepayments occurring during the Prepayment Premium Period.

(f)       Notwithstanding any other provision of this Section 10, no prepayment premium shall be payable with respect to (i) any prepayment made after the expiration of the Prepayment Premium Period or (ii) any prepayment occurring as a result of the application of any insurance proceeds or condemnation award under the Loan Agreement.

(g)       Unless Lender agrees otherwise in writing, a permitted or required prepayment of less than the unpaid principal balance of this Note shall not extend or postpone the due date of any subsequent monthly installments.

(h)       Borrower recognizes that any prepayment of any of the unpaid principal balance of this Note, whether voluntary or involuntary or resulting from an Event of Default by Borrower, will result in Lender's incurring loss, including reinvestment loss, additional expense and frustration or impairment of Lender's ability to meet its commitments to third parties.  Borrower agrees to pay to Lender upon demand damages for the detriment caused by any prepayment, and agrees that it is extremely difficult and impractical to ascertain the extent of such damages.  Borrower therefore acknowledges and agrees that the formula for calculating prepayment premiums set forth in this Note represents a reasonable estimate of the damages Lender will incur because of a prepayment.  Borrower further acknowledges that any prepayment premium provisions of this Note are a material part of the consideration for the Loan, and that the terms of this Note are in other respects more favorable to Borrower as a result of Borrower's voluntary agreement to the prepayment premium provisions.

11.       **Costs and Expenses.**  To the fullest extent allowed by applicable law, Borrower shall pay: (a) all expenses and costs, including Attorneys' Fees and Costs incurred by Lender or any Loan Servicer as a result of any default under this Note or in connection with efforts to collect any amount due under this Note, or to enforce the provisions of any of the other Loan Documents (whether or not any lawsuit or other proceeding is instituted), including those incurred in post-judgment collection efforts and in any bankruptcy proceeding (including any action for relief from the automatic stay of any bankruptcy proceeding) or judicial or non-judicial foreclosure proceeding; and (b) all expenses and costs, including Attorneys' Fees and Costs, incurred by Lender or any Loan Servicer in connection with the servicing of the Loan, including without limitation responding to requests from Borrower, and expenses and costs incurred in connection with potential defaults or other legal questions regarding the Loan.

12.       **Forbearance.**  Any forbearance by Lender in exercising any right or remedy under this Note, the Loan Agreement, the Mortgage, or any other Loan Document or otherwise afforded by applicable law, shall not be a waiver of or preclude the exercise of that or any other right or remedy.  The acceptance by Lender of any payment after the due date of such payment, or in an amount which is less than the required payment, shall not be a waiver of Lender's right to require prompt payment when due of all other payments or to exercise any right or remedy with respect to any failure to make prompt payment.  Enforcement by Lender of any security for Borrower's obligations under this Note shall not constitute an election by Lender of remedies so as to preclude the exercise of any other right or remedy available to Lender.

13.    **Waivers.**  Borrower and all endorsers and guarantors of this Note and all other third party obligors waive presentment, demand, notice of dishonor, protest, notice of acceleration, notice of intent to demand or accelerate payment or maturity, presentment for payment, notice of nonpayment, grace, and diligence in collecting the Indebtedness and any other amount due under any of the Loan Documents.

14.    **Loan Charges.**  Neither this Note nor any of the other Loan Documents shall be construed to create a contract for the use, forbearance or detention of money requiring payment of interest at a rate greater than the Maximum Interest Rate.  If any applicable law limiting the amount of interest or other charges permitted to be collected from Borrower in connection with the Loan is interpreted so that any interest or other charge provided for in any Loan Document, whether considered separately or together with other charges provided for in any other Loan Document, violates that law, and Borrower is entitled to the benefit of that law, that interest or charge is hereby reduced to the extent necessary to eliminate that violation.  The amounts, if any, previously paid to Lender in excess of the permitted amounts shall be applied by Lender to reduce the unpaid principal balance of this Note.  For the purpose of determining whether any applicable law limiting the amount of interest or other charges permitted to be collected from Borrower has been violated, all Indebtedness that constitutes interest, as well as all other charges made in connection with the Indebtedness that constitute interest, shall be deemed to be allocated and spread ratably over the stated term of this Note.  Unless otherwise required by applicable law, such allocation and spreading shall be effected in such a manner that the rate of interest so computed is uniform throughout the stated term of this Note.

15.    **Purpose of Indebtedness.**  Borrower represents and warrants to Lender that the proceeds of this Note will be used solely for business, commercial investment, or similar purposes, and that no portion of it will be used for agricultural, personal, family, or household purposes.

16.    **Counting of Days.**  Except where otherwise specifically provided, any reference in this Note to a period of "days" means calendar days, not Business Days.

17.    **Governing Law.**  This Note shall be governed by the laws of the Property Jurisdiction.

18.    **Construction.**  The captions and headings of the Sections of this Note are for convenience only and shall be disregarded in construing this Note.  Any reference in this Note to an "Exhibit" or a "Section" shall, unless otherwise explicitly provided, be construed as referring, respectively, to an Exhibit attached to this Note or to a Section of this Note.  All Exhibits attached to or referred to in this Note are incorporated by reference in this Note.  Any reference in this Note to a statute or regulation shall be construed as referring to that statute or regulation as amended from time to time.  Use of the singular in this Note includes the plural and use of the plural includes the singular.  As used in this Note, the term "including" means "including, but not limited to" and the term "includes" means "includes without limitation."  The use of one gender includes the other gender, as the context may require.  Unless the context requires otherwise, (a) any definition of or reference to any agreement, instrument or other document in this Note shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth in this Note or any other Loan Document), and (b) any reference in this Note to any Person shall be construed to include such Person's successors and assigns.

19.    **Notices; Written Modifications.**

(a)    All notices, demands and other communications required or permitted to be given pursuant to this Note shall be given in accordance with Section 8.03 of the Loan Agreement.

(b)    Any modification or amendment to this Note shall be ineffective unless in writing signed by the party sought to be charged with such modification or amendment.

20.    **Consent to Jurisdiction and Venue.**  Borrower agrees that any controversy arising under or in relation to this Note may be litigated in the Property Jurisdiction.  The state and federal courts and authorities with jurisdiction in the Property Jurisdiction shall have non-exclusive jurisdiction over all controversies that shall arise under or in relation to this Note.  Borrower irrevocably consents to service, jurisdiction, and venue of such courts for any such litigation and waives any other venue or defense to venue to which it might be entitled by virtue of domicile, habitual residence, inconvenient forum or otherwise.  However, nothing in this Note is intended to limit any right that Lender may have to bring any suit, action or proceeding relating to matters arising under this Note in any court of any other jurisdiction.

**21.      Counterparts.**  This Note may be executed in any number of counterparts each of which shall be deemed an original, but all such counterparts together shall constitute but one Note.

**22.      California Law Provisions.**  If a guarantor is liable for only a portion of the Indebtedness, Borrower hereby waives its rights under California Civil Code Section 2822(a) to designate the portion of the Indebtedness that shall be satisfied by Borrower's partial payment.

**23.      Document Imaging.**  Lender shall be entitled, in its sole discretion, to image or make copies of all or any selection of the agreements, instruments, documents, items and records governing, arising from or relating to any of Borrower's loans, including, without limitation, this Note and the other Loan Documents, and Lender may destroy or archive the paper originals. Borrower waives (i) any right to insist or require that Lender produce paper originals, (ii) agrees that such images shall be accorded the same force and effect as the paper originals, (iii) agrees that Lender is entitled to use such images in lieu of destroyed or archived originals for any purpose, including as admissible evidence in any demand, presentment or other proceedings, and (iv) further agrees that any executed facsimile (faxed), scanned, or other imaged copy of this Note or any other Loan Document shall be deemed to be of the same force and effect as the original manually executed document.

**IN WITNESS WHEREOF,** and in consideration of Lender's agreement to lend Borrower the principal amount set forth above, Borrower has signed and delivered this Note under seal (where applicable) or has caused this Note to be signed and delivered by its duly authorized representative under seal (where applicable).  Where applicable law so provides or allows, Borrower intends that this Note shall be deemed to be signed and delivered as a sealed instrument.

**SIGNATURE(S) ON FOLLOWING PAGE(S)**

**BORROWER:**

_____

**THOMAS V. GIRARDI**

**Allonge to $2,500,000.00 Promissory Note dated October 7, 2019**
**executed by THOMAS V. GIRARDI, as Borrower,**
**in favor of ALT FINANCIAL NETWORK, INC., a California corporation, as Lender**

PAY TO THE ORDER OF _ALT Financial Network, Inc._, WITHOUT RECOURSE.

Dated as of _October 7_, 20_19_.

**ALT FINANCIAL NETWORK, INC.,**
**a California corporation**

By: _____
    ALBERT HANNA, President

Prepared by LoanDocSolutions
Allonge to California Promissory Note
Loan No.: 20190822000

Exhibit A

*RECORDING REQUESTED BY*
*AND WHEN RECORDED MAIL TO:*

ALT FINANCIAL NETWORK, INC.
18022 Cowan, Suite 245
Irvine, CA 92614

Tax Parcel Number(s): **5708-025-009, 5708-025-008**

Space Above for Recorder's Use

## DEED OF TRUST,
## ASSIGNMENT OF RENTS,
## SECURITY AGREEMENT AND FIXTURE FILING

### (CALIFORNIA)

ATTENTION COUNTY RECORDER:  THIS INSTRUMENT IS INTENDED TO BE EFFECTIVE AS A FINANCING STATEMENT FILED AS A FIXTURE FILING PURSUANT TO SECTION 9502 OF THE CALIFORNIA COMMERCIAL CODE.  PORTIONS OF THE GOODS COMPRISING A PART OF THE MORTGAGED PROPERTY ARE OR ARE TO BECOME FIXTURES RELATED TO THE LAND DESCRIBED IN EXHIBIT "A" HERETO.  THIS INSTRUMENT IS TO BE FILED FOR RECORD IN THE RECORDS OF THE COUNTY WHERE DEEDS OF TRUST ON REAL PROPERTY ARE RECORDED AND SHOULD BE INDEXED AS BOTH A DEED OF TRUST AND AS A FINANCING STATEMENT COVERING FIXTURES. THE MAILING ADDRESSES OF BORROWER (DEBTOR) AND LENDER (SECURED PARTY) ARE SPECIFIED IN PARAGRAPH A OF THIS INSTRUMENT.

A.       THIS DEED OF TRUST, ASSIGNMENT OF RENTS, SECURITY AGREEMENT AND FIXTURE FILING (this "**Instrument**") is dated as of **October 7, 2019**, and is given by **THOMAS V. GIRARDI**, whose address is **100 Los Altos Drive, Pasadena, CA 91105**, as trustor ("**Borrower**"), to FIDELITY NATIONAL TITLE INSURANCE COMPANY, **a Florida corporation**, as trustee ("**Trustee**"), for the benefit of **ALT FINANCIAL NETWORK, INC., a California corporation**, whose address is **18022 Cowan, Suite 245, Irvine, CA 92614**, as beneficiary ("**Lender**").

B.       Borrower in consideration of the Indebtedness and the trust created by this Instrument, irrevocably grants, conveys and assigns to Trustee, in trust, with power of sale, the Mortgaged Property, including the Land located in **Los Angeles** County, State of **California** and described in Exhibit "A" attached to this Instrument.

THIS DEED OF TRUST IS, AT THE TIME OF RECORDATION, A SECOND DEED OF TRUST, AND IS SUBJECT AND SUBORDINATE TO AN EXISTING $3,000,000.00 FIRST DEED OF TRUST DATED APRIL 8, 2014 (THE "APPROVED FIRST DEED OF TRUST"), WHICH APPROVED FIRST DEED OF TRUST WAS RECORDED ON MAY 5, 2014 AS INSTRUMENT NO. 2014-464309, OFFICIAL RECORDS OF LOS ANGELES COUNTY, STATE OF CALIFORNIA.

California Deed of Trust

C.        TO SECURE TO LENDER the repayment of the Indebtedness evidenced by Borrower's Promissory Note payable to Lender, dated as of the date of this Instrument, and maturing on the earlier of (i) **November 1, 2021**, or (ii) the date on which the unpaid principal balance of the Note becomes due and payable by acceleration or otherwise pursuant to the Loan Documents or the exercise by Lender of any right or remedy under any Loan Document (the "**Maturity Date**"), in the principal amount of **TWO MILLION FIVE HUNDRED THOUSAND AND 00/100 DOLLARS (US $2,500,000.00)**, and all renewals, extensions and modifications of the Indebtedness, the payment of all sums advanced by or on behalf of Lender to protect the security of this Instrument under Section 7, and the performance of the covenants and agreements of Borrower contained in the Loan Documents (other than the Environmental Indemnity and any guaranty).

D.        Borrower represents and warrants that Borrower is lawfully seized of the Mortgaged Property and has the right, power and authority to grant, convey and assign the Mortgaged Property, and that the Mortgaged Property is unencumbered, except as shown on the Schedule of Title Exceptions.  Borrower covenants that Borrower will warrant and defend generally the title to the Mortgaged Property against all claims and demands, subject to any easements and restrictions listed in the Schedule of Title Exceptions.

---

**Request for Notice of Default under California Civil Code Section 2924b**

In accordance with Section 2924b, Civil Code, request is hereby made that a copy of any notice of default and a copy of any notice of sale under the deed of trust recorded **May 5, 2014**, as Instrument No. **2014-464309**, of Official Records of **Los Angeles** County, State of **California**, executed by **THOMAS V. GIRARDI, a married man as his sole and separate property,** as trustor, in which **MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. (MERS), solely as nominee for Directors Financial Group** is named as beneficiary, and **TITLE 365**, as trustee, be mailed to **ALT FINANCIAL NETWORK, INC.** at 18022 Cowan, Suite 245, **Irvine, CA 92614**.

---

**Covenants.**  In consideration of the mutual promises set forth in this Instrument, Borrower and Lender covenant and agree as follows:

1.        **DEFINITIONS.** The following terms, when used in this Instrument (including when used in the above recitals), shall have the following meanings and any capitalized term not specifically defined in this Instrument shall have the meaning ascribed to that term in the Loan Agreement:

"**Assignment**" means, collectively, the provisions of Sections 3 and 4 of this Instrument relating to the assignment of rents and leases affecting the Mortgaged Property.

"**Attorneys' Fees and Costs**" means (i) fees and out-of-pocket costs of Lender's and Loan Servicer's attorneys, as applicable (whether or not any lawsuit or other proceeding is instituted), including costs of Lender's and Loan Servicer's allocable costs of in-house counsel, support staff costs, costs of preparing for litigation, computerized research, telephone and facsimile transmission expenses, mileage, deposition costs, postage, duplicating, deposition service, videotaping and similar costs and expenses; (ii) costs and fees of expert witnesses, including appraisers; and (iii) investigatory fees.  As used in this Instrument and in the Note, "Attorneys' Fees and Costs" shall include those awarded by an appellate court.

"**Borrower**" means all Persons identified as "Borrower" in paragraph A of this Instrument, together with their successors and assigns.

"**Collateral Agreement**" has the definition given such term in the Loan Agreement.

"**Environmental Indemnity**" means the provisions of Section 4.07 of the Loan Agreement.

"**Fixtures**" means all property owned by Borrower which is so attached to the Land or the Improvements as to constitute a fixture under applicable law, including: machinery, equipment, engines, boilers, incinerators, installed building materials; systems and equipment for the purpose of supplying or distributing heating, cooling, electricity, gas, water, air, or light; antennas, cable, wiring and conduits used in connection with radio, television, security, fire prevention, or fire detection or otherwise used to carry electronic signals; telephone systems and equipment; elevators and related machinery and equipment; fire detection, prevention and extinguishing systems and apparatus; security and access control systems and apparatus; plumbing systems; water heaters, ranges, stoves, microwave ovens, refrigerators, dishwashers, garbage disposers, washers, dryers and other appliances; light fixtures, awnings, storm windows and storm doors; pictures, screens, blinds, shades, curtains and curtain rods; mirrors; cabinets, paneling, rugs and floor and wall coverings; fences, trees and plants; swimming pools; and exercise equipment.

California Deed of Trust                                                                                            Page 2

"**Governmental Authority**" means any board, commission, department or body of any municipal, county, state or federal governmental unit, or any subdivision of any of them, that has or acquires jurisdiction over the Mortgaged Property or the use, operation or improvement of the Mortgaged Property or over Borrower.

"**Hazardous Materials**" means petroleum and petroleum products and compounds containing them, including gasoline, diesel fuel and oil; explosives; flammable materials; radioactive materials; polychlorinated biphenyls ("**PCBs**") and compounds containing them; lead and lead-based paint; asbestos or asbestos-containing materials in any form that is or could become friable; underground or above-ground storage tanks, whether empty or containing any substance; any substance the presence of which on the Mortgaged Property is prohibited by any federal, state or local authority; any substance that requires special handling; and any other material or substance now or in the future defined as a "hazardous substance," "hazardous material," "hazardous waste," "toxic substance," "toxic pollutant," "contaminant," or "pollutant" within the meaning of any Hazardous Materials Law.

"**Hazardous Materials Laws**" means all federal, state, and local laws, ordinances and regulations and standards, rules, policies and other governmental requirements, administrative rulings and court judgments and decrees in effect now or in the future and including all amendments, that relate to Hazardous Materials or the protection of human health or the environment and apply to Borrower or to the Mortgaged Property.  Hazardous Materials Laws include, but are not limited to, the Federal Water Pollution Control Act, 33 U.S.C. Section 1251 *et seq.*, the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. Section 9601, *et seq.*, as amended by the Superfund Amendments Reauthorization Act of 1986, the Materials Transportation Act, 49 U.S.C. Section 1801 *et seq.*, the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, *et seq.*, the Toxic Substance Control Act, 15 U.S.C. Section 2601, *et seq.*, the Clean Water Act, 33 U.S.C. Section 1251, *et seq.*, the Emergency Planning and Community Right-to-Know Act of 1986, as amended, the Solid Waste Disposal Act, as amended, the Clean Air Act, as amended, the Safe Drinking Water Act, as amended, the Occupational Safety and Health Act, as amended, and the Hazardous Materials Transportation Act, 49 U.S.C. Section 5101, and their state analogs.

"**Improvements**" means the buildings, structures, improvements, and alterations now constructed or at any time in the future constructed or placed upon the Land, including any future replacements and additions.

"**Indebtedness**" means the principal of, interest on, and all other amounts due at any time under, the Note, the Loan Agreement (other than the Environmental Indemnity), this Instrument or any other Loan Document (other than any guaranty), including prepayment premiums, late charges, default interest, and advances to protect the security of this Instrument under Section 7 of this Instrument or any other applicable provision of the Loan Agreement, this Instrument or any other Loan Document or as permitted by law.

"**Land**" means the land described in Exhibit "A".

"**Leases**" means all present and future leases, subleases, licenses, concessions or grants or other possessory interests now or hereafter in force, whether oral or written, covering or affecting the Mortgaged Property, or any portion of the Mortgaged Property, and all modifications, extensions or renewals.

"**Lender**" means the Person or Persons identified as "Lender" in paragraph A of this Instrument, or any subsequent holder of the Note.

"**Loan**" means the loan evidenced by the Note and secured by this Instrument.

"**Loan Agreement**" means the Loan Agreement executed by Borrower in favor of Lender and dated as of the date of this Instrument, as such agreement may be amended from time to time.

"**Loan Documents**" means the Note, this Instrument, the Assignment, the Loan Agreement, all guaranties, all indemnity agreements, all Collateral Agreements, O&M Plans, and any other documents now or in the future executed by Borrower, any Guarantor or any other Person in connection with the Loan, as such documents may be amended from time to time.

"**Loan Servicer**" means the Person or Persons that from time to time is designated by Lender to collect payments and deposits and receive notices under the Note, this Instrument and any other Loan Document, and otherwise to service the Loan for the benefit of Lender.  Unless otherwise specified in Section 2 of the Note, or unless Borrower receives notice to the contrary, the Loan Servicer means the Person or Persons identified as "Lender" in paragraph A of this Instrument.

**"Mortgaged Property"** means all of Borrower's present and future right, title and interest in and to all of the following: (1) the Land; (2) the Improvements; (3) the Fixtures; (4) the Personalty; (5) all current and future rights, including air rights, development rights, zoning rights and other similar rights or interests, easements, tenements, rights-of-way, strips and gores of land, streets, alleys, roads, sewer rights, waters, watercourses, and appurtenances related to or benefiting the Land or the Improvements, or both, and all rights-of-way, streets, alleys and roads which may have been or may in the future be vacated; (6) all proceeds paid or to be paid by any insurer of the Land, the Improvements, the Fixtures, the Personalty or any other part of the Mortgaged Property, whether or not Borrower obtained the insurance pursuant to Lender's requirement; (7) all awards, payments and other compensation made or to be made by any municipal, state or federal authority with respect to the Land, the Improvements, the Fixtures, the Personalty or any other part of the Mortgaged Property, including any awards or settlements resulting from condemnation proceedings or the total or partial taking of the Land, the Improvements, the Fixtures, the Personalty or any other part of the Mortgaged Property under the power of eminent domain or otherwise and including any conveyance in lieu thereof; (8) all contracts, options and other agreements for the sale of the Land, the Improvements, the Fixtures, the Personalty or any other part of the Mortgaged Property entered into by Borrower now or in the future, including cash or securities deposited to secure performance by parties of their obligations; (9) all proceeds from the conversion, voluntary or involuntary, of any of the above into cash or liquidated claims, and the right to collect such proceeds; (10) all Rents and Leases; (11) all earnings, royalties, accounts receivable, issues and profits from the Land, the Improvements or any other part of the Mortgaged Property, and all undisbursed proceeds of the Loan; (12) all funds on deposit pursuant to any separate agreement between Borrower and Lender (including, without limitation, all Imposition Deposits) for the purpose of establishing replacement reserves for the Mortgaged Property, to fund any water and sewer charges, premiums for fire or other hazard insurance, rent loss insurance or other insurance required by Lender, taxes, assessments, vault rentals, or other charges or expenses required by Lender to protect the Mortgaged Property, establishing a fund to assure the completion of repairs or improvements specified in that agreement, or assuring reduction of the outstanding principal balance of the Indebtedness if the occupancy of or income from the Mortgaged Property does not increase to a level specified in that agreement, or any other agreement or agreements between Borrower and Lender which provide for the establishment of any other fund, reserve or account; (13) all refunds or rebates of Impositions by any municipal, state or federal authority or insurance company (other than refunds applicable to periods before the real property tax year in which this Instrument is dated); (14) all tenant security deposits which have not been forfeited by any tenant under any Lease and any bond or other security in lieu of such deposits; and (15) all names under or by which any of the above Mortgaged Property may be operated or known, and all trademarks, trade names, and goodwill relating to any of the Mortgaged Property.

**"Mortgaged Property UCC Collateral"** means any of the Mortgaged Property which, under applicable law, may be subjected to a security interest under the Uniform Commercial Code, whether such Mortgaged Property is owned now or acquired in the future, and all products and cash and non-cash proceeds thereof.

**"Note"** means the Promissory Note described in paragraph C of this Instrument, including all schedules, riders, allonges and addenda, as such Promissory Note may be amended from time to time.

**"Person"** means any natural person, sole proprietorship, corporation, general partnership, limited partnership, limited liability company, limited liability partnership, limited liability limited partnership, joint venture, association, joint stock company, bank, trust, estate, unincorporated organization, any federal, state, county or municipal government (or any agency or political subdivision thereof), endowment fund or any other form of entity.

**"Personalty"** means all: (i) accounts (including deposit accounts); (ii) equipment and inventory owned by Borrower which are used now or in the future in connection with the ownership, management or operation of the Land or the Improvements or are located on the Land or in the Improvements, including furniture, furnishings, machinery, building materials, appliances, goods, supplies, tools, books, records (whether in written or electronic form), computer equipment (hardware and software); (iii) other tangible personal property (other than Fixtures) which are used now or in the future in connection with the ownership, management or operation of the Land or the Improvements or are located on the Land or in the Improvements; (iv) any operating agreements relating to the Land or the Improvements; (v) any surveys, plans and specifications and contracts for architectural, engineering and construction services relating to the Land or the Improvements; (vi) all other intangible property and rights relating to the operation of, or used in connection with, the Land or the Improvements, including all governmental permits relating to any activities on the Land or the Improvements and including subsidy or similar payments received from any sources, including a Governmental Authority; and (vii) any rights of Borrower in or under letters of credit.

**"Property Jurisdiction"** means the jurisdiction in which the Land is located.

**"Rents"** means all rents, revenues and other income of the Land or the Improvements, whether now due, past due, or to become due, and deposits forfeited by tenants.

**"Schedule of Title Exceptions"** means title exceptions approved by Lender and shown in the schedule of exceptions to coverage in the title policy issued to Lender contemporaneously with the recordation of this Instrument and insuring Lender's interest in the Mortgaged Property.

**"Taxes"** means all taxes, assessments, vault rentals and other charges, if any, general, special or otherwise, including all assessments for schools, public betterments and general or local improvements, which are levied, assessed or imposed by any public authority or quasi-public authority, and which, if not paid, will become a lien, on the Land or the Improvements.

**"Uniform Commercial Code"** or **"UCC"** means the Uniform Commercial Code as in effect in the Property Jurisdiction; *provided* that, to the extent perfection or the effect of perfection or non-perfection or the priority of any security interest in any collateral is governed by the Uniform Commercial Code as in effect in a jurisdiction other than the Property Jurisdiction, **"Uniform Commercial Code"** or **"UCC"** means the Uniform Commercial Code as in effect from time to time in such other jurisdiction for purposes of the provisions hereof relating to such perfection, effect of perfection or non-perfection or priority.

      2.      **UNIFORM COMMERCIAL CODE SECURITY AGREEMENT.**

      (a)      This Instrument is also a security agreement under the Uniform Commercial Code for the Mortgaged Property UCC Collateral, and Borrower, as debtor, hereby grants to Lender, as secured party, a security interest in the Mortgaged Property UCC Collateral. Borrower hereby authorizes Lender to prepare and file financing statements, continuation statements and financing statement amendments in such form as Lender may require to perfect or continue the perfection of this security interest and Borrower agrees, if Lender so requests, to execute and deliver to Lender such financing statements, continuation statements and amendments. Without limiting the generality of the foregoing, Borrower authorizes Lender to file any financing statement that describes the collateral as "all assets" of Borrower, or words to similar effect. Borrower shall pay all filing costs and all costs and expenses of any record searches for financing statements and/or amendments that Lender may require. Without the prior written consent of Lender, Borrower shall not create or permit to exist any other lien or security interest in any of the Mortgaged Property UCC Collateral. Unless Borrower gives notice to Lender within 30 days after the occurrence of any of the following, and executes and delivers to Lender modifications or supplements of this Instrument (and any financing statement which may be filed in connection with this Instrument) as Lender may require, Borrower shall not (i) change its name, identity, structure or jurisdiction of organization; (ii) change the location of its place of business (or chief executive office if more than one place of business); or (iii) add to or change any location at which any of the Mortgaged Property UCC Collateral is stored, held or located. If an Event of Default has occurred and is continuing, Lender shall have the remedies of a secured party under the Uniform Commercial Code, in addition to all remedies provided by this Instrument or existing under applicable law. In exercising any remedies, Lender may exercise its remedies against the Mortgaged Property UCC Collateral separately or together, and in any order, without in any way affecting the availability of Lender's other remedies. This Instrument constitutes a financing statement with respect to any part of the Mortgaged Property that is or may become a Fixture, if permitted by applicable law.

      3.      **ASSIGNMENT OF RENTS; APPOINTMENT OF RECEIVER; LENDER IN POSSESSION.**

      (a)      As part of the consideration for the Indebtedness, Borrower absolutely and unconditionally assigns and transfers to Lender all Rents. It is the intention of Borrower to establish a present, absolute and irrevocable transfer and assignment to Lender of all Rents and to authorize and empower Lender to collect and receive all Rents without the necessity of further action on the part of Borrower. Promptly upon request by Lender, Borrower agrees to execute and deliver such further assignments as Lender may from time to time require. Borrower and Lender intend this assignment of Rents to be immediately effective and to constitute an absolute present assignment and not an assignment for additional security only. For purposes of giving effect to this absolute assignment of Rents, and for no other purpose, Rents shall not be deemed to be a part of the "Mortgaged Property" as that term is defined in <u>Section 1</u>. However, if this present, absolute and unconditional assignment of Rents is not enforceable by its terms under the laws of the Property Jurisdiction, then the Rents shall be included as a part of the Mortgaged Property and it is the intention of Borrower that in this circumstance this Instrument create and perfect a lien on Rents in favor of Lender, which lien shall be effective as of the date of this Instrument.

      (b)      After the occurrence of an Event of Default, Borrower authorizes Lender to collect, sue for and compromise Rents and directs each tenant of the Mortgaged Property to pay all Rents to, or as directed by, Lender. However, until the

occurrence of an Event of Default, Lender hereby grants to Borrower a revocable license to collect and receive all Rents, to hold all Rents in trust for the benefit of Lender and to apply all Rents to pay the installments of interest and principal then due and payable under the Note and the other amounts then due and payable under the other Loan Documents, including Imposition Deposits, and to pay the current costs and expenses of managing, operating and maintaining the Mortgaged Property, including utilities, Taxes and insurance premiums (to the extent not included in Imposition Deposits), tenant improvements and other capital expenditures. So long as no Event of Default has occurred and is continuing, the Rents remaining after application pursuant to the preceding sentence may be retained by Borrower free and clear of, and released from, Lender's rights with respect to Rents under this Instrument. From and after the occurrence of an Event of Default, and without the necessity of Lender entering upon and taking and maintaining control of the Mortgaged Property directly, or by a receiver, Borrower's license to collect Rents shall automatically terminate and Lender shall without notice be entitled to all Rents as they become due and payable, including Rents then due and unpaid. Borrower shall pay to Lender upon demand all Rents to which Lender is entitled. At any time on or after the date of Lender's demand for Rents, Lender may give, and Borrower hereby irrevocably authorizes Lender to give, notice to all tenants of the Mortgaged Property instructing them to pay all Rents to Lender, no tenant shall be obligated to inquire further as to the occurrence or continuance of an Event of Default, and no tenant shall be obligated to pay to Borrower any amounts which are actually paid to Lender in response to such a notice. Any such notice by Lender shall be delivered to each tenant personally, by mail or by delivering such demand to each rental unit. Borrower shall not interfere with and shall cooperate with Lender's collection of such Rents.

(c)    Borrower represents and warrants to Lender that Borrower has not executed any prior assignment of Rents (other than (i) an assignment of Rents securing indebtedness that will be paid off and discharged with the proceeds of the Loan and (ii) an assignment of Rents established pursuant to the Approved First Deed of Trust), that Borrower has not performed, and Borrower covenants and agrees that it will not perform, any acts and has not executed, and shall not execute, any instrument which would prevent Lender from exercising its rights under this Section 3, and that at the time of execution of this Instrument there has been no anticipation or prepayment of any Rents for more than two (2) months prior to the due dates of such Rents. Borrower shall not collect or accept payment of any Rents more than two (2) months prior to the due dates of such Rents.

**4.    ASSIGNMENT OF LEASES; LEASES AFFECTING THE MORTGAGED PROPERTY.**

(a)    As part of the consideration for the Indebtedness, Borrower absolutely and unconditionally assigns and transfers to Lender all of Borrower's right, title and interest in, to and under the Leases, including Borrower's right, power and authority to modify the terms of any such Lease, or extend or terminate any such Lease. It is the intention of Borrower to establish a present, absolute and irrevocable transfer and assignment to Lender of all of Borrower's right, title and interest in, to and under the Leases. Borrower and Lender intend this assignment of the Leases to be immediately effective and to constitute an absolute present assignment and not an assignment for additional security only. For purposes of giving effect to this absolute assignment of the Leases, and for no other purpose, the Leases shall not be deemed to be a part of the "Mortgaged Property" as that term is defined in Section 1. However, if this present, absolute and unconditional assignment of the Leases is not enforceable by its terms under the laws of the Property Jurisdiction, then the Leases shall be included as a part of the Mortgaged Property and it is the intention of Borrower that in this circumstance this Instrument create and perfect a lien on the Leases in favor of Lender, which lien shall be effective as of the date of this Instrument.

(b)    Until Lender gives notice to Borrower of Lender's exercise of its rights under this Section 4, Borrower shall have all rights, power and authority granted to Borrower under any Lease (except as otherwise limited by this Section 4 or any other provision of this Instrument), including the right, power and authority to modify the terms of any Lease or extend or terminate any Lease. Upon the occurrence of an Event of Default, the permission given to Borrower pursuant to the preceding sentence to exercise all rights, power and authority under Leases shall automatically terminate. Borrower shall comply with and observe Borrower's obligations under all Leases, including Borrower's obligations pertaining to the maintenance and disposition of tenant security deposits.

(c)    Borrower acknowledges and agrees that the exercise by Lender, either directly or by a receiver, of any of the rights conferred under this Section 4 shall not be construed to make Lender a mortgagee-in-possession of the Mortgaged Property so long as Lender has not itself entered into actual possession of the Land and the Improvements. The acceptance by Lender of the assignment of the Leases pursuant to Section 4(a) shall not at any time or in any event obligate Lender to take any action under this Instrument or to expend any money or to incur any expenses. Lender shall not be liable in any way for any injury or damage to person or property sustained by any Person in or about the Mortgaged Property. Prior to Lender's actual entry into and taking possession of the Mortgaged Property, Lender shall not (i) be obligated to perform any of the terms, covenants and conditions contained in any Lease (or otherwise have any obligation with respect to any Lease); (ii) be obligated to appear in or

California Deed of Trust                                                                                      Page 6

defend any action or proceeding relating to the Lease or the Mortgaged Property; or (iii) be responsible for the operation, control, care, management or repair of the Mortgaged Property or any portion of the Mortgaged Property. The execution of this Instrument by Borrower shall constitute conclusive evidence that all responsibility for the operation, control, care, management and repair of the Mortgaged Property is and shall be that of Borrower, prior to such actual entry and taking of possession.

(d)    Upon delivery of notice by Lender to Borrower of Lender's exercise of Lender's rights under this Section 4 at any time after the occurrence of an Event of Default, and without the necessity of Lender entering upon and taking and maintaining control of the Mortgaged Property directly, by a receiver, or by any other manner or proceeding permitted by the laws of the Property Jurisdiction, Lender immediately shall have all rights, powers and authority granted to Borrower under any Lease, including the right, power and authority to modify the terms of any such Lease, or extend or terminate any such Lease.

(e)    Borrower shall, promptly upon Lender's request, deliver to Lender an executed copy of each Lease then in effect. All Leases shall be on forms approved by Lender, shall be for initial terms of at least six months and not more than two years, and shall not include options to purchase.

(f)    Borrower shall not receive or accept Rent under any Lease for more than two (2) months in advance.

**5.    PAYMENT OF INDEBTEDNESS; PERFORMANCE UNDER LOAN DOCUMENTS; PREPAYMENT PREMIUM.** Borrower shall pay the Indebtedness when due in accordance with the terms of the Note and the other Loan Documents and shall perform, observe and comply with all other provisions of the Note and the other Loan Documents. Borrower shall pay a prepayment premium in connection with certain prepayments of the Indebtedness, including a payment made after Lender's exercise of any right of acceleration of the Indebtedness, as provided in the Note.

**6.    APPLICATION OF PAYMENTS.** If at any time Lender receives, from Borrower or otherwise, any amount applicable to the Indebtedness which is less than all amounts due and payable at such time, then Lender may apply that payment to amounts then due and payable in any manner and in any order determined by Lender, in Lender's discretion. Neither Lender's acceptance of an amount which is less than all amounts then due and payable nor Lender's application of such payment in the manner authorized shall constitute or be deemed to constitute either a waiver of the unpaid amounts or an accord and satisfaction. Notwithstanding the application of any such amount to the Indebtedness, Borrower's obligations under this Instrument and the Note shall remain unchanged.

**7.    PROTECTION OF LENDER'S SECURITY.**

(a)    If Borrower fails to perform any of its obligations under this Instrument or any other Loan Document, or if any action or proceeding is commenced which purports to affect the Mortgaged Property, Lender's security or Lender's rights under this Instrument, including eminent domain, insolvency, code enforcement, civil or criminal forfeiture, enforcement of Hazardous Materials Laws, fraudulent conveyance or reorganizations or proceedings involving a bankrupt or decedent, then Lender at Lender's option may make such appearances, disburse such sums and take such actions as Lender reasonably deems necessary to perform such obligations of Borrower and to protect Lender's interest, including (1) payment of fees and out-of-pocket expenses of attorneys, accountants, inspectors and consultants, (2) entry upon the Mortgaged Property to make repairs or secure the Mortgaged Property, (3) procurement of the insurance required by Section 4.02 of the Loan Agreement, (4) payment of amounts which Borrower has failed to pay under Sections 4.01 and 4.06 of the Loan Agreement, and (5) advances made by Lender to pay, satisfy or discharge any obligation of Borrower for the payment of money that is secured by a pre-existing mortgage, deed of trust or other lien encumbering the Mortgaged Property (a "**Prior Lien**").

(b)    Any amounts disbursed by Lender under this Section 7, or under any other provision of this Instrument that treats such disbursement as being made under this Section 7, shall be added to, and become part of, the principal component of the Indebtedness, shall be immediately due and payable and shall bear interest from the date of disbursement until paid at the "**Default Rate**", as defined in the Note.

(c)    Nothing in this Section 7 shall require Lender to incur any expense or take any action.

**8.    EVENTS OF DEFAULT.** An Event of Default under the Loan Agreement shall constitute an Event of Default under this Instrument.

**9.    REMEDIES CUMULATIVE.** Each right and remedy provided in this Instrument is distinct from all other rights or remedies under this Instrument or any other Loan Document or afforded by applicable law, and each shall be cumulative and may be exercised concurrently, independently, or successively, in any order. Lender's exercise of any particular right or remedy will not in any way prevent Lender from exercising any other right or remedy available to Lender. Lender may exercise any such remedies from time to time and as often as Lender chooses.

**10.    WAIVER OF STATUTE OF LIMITATIONS, OFFSETS, AND COUNTERCLAIMS.** Borrower hereby waives the right to assert any statute of limitations as a bar to the enforcement of the lien of this Instrument or to any action brought to

California Deed of Trust                                                                                    Page 7

enforce any Loan Document. Borrower hereby waives the right to assert a counterclaim, other than a compulsory counterclaim, in any action or proceeding brought against it by Lender or otherwise to offset any obligations to make the payments required by the Loan Documents. No failure by Lender to perform any of its obligations under this Instrument will be a valid defense to, or result in any offset against, any payments that Borrower is obligated to make under any of the Loan Documents.

**11.    WAIVER OF MARSHALLING.** Notwithstanding the existence of any other security interests in the Mortgaged Property held by Lender or by any other party, Lender shall have the right to determine the order in which any or all of the Mortgaged Property shall be subjected to the remedies provided in this Instrument, the Note, any other Loan Document or applicable law. Lender shall have the right to determine the order in which any or all portions of the Indebtedness are satisfied from the proceeds realized upon the exercise of such remedies. Borrower and any party who now or in the future acquires a security interest in the Mortgaged Property and who has actual or constructive notice of this Instrument waives any and all right to require the marshalling of assets or to require that any of the Mortgaged Property be sold in the inverse order of alienation or that any of the Mortgaged Property be sold in parcels or as an entirety in connection with the exercise of any of the remedies permitted by applicable law or provided in this Instrument.

**12.    FURTHER ASSURANCES.** Borrower shall execute, acknowledge, and deliver, at its sole cost and expense, all further acts, deeds, conveyances, assignments, estoppel certificates, financing statements, transfers and assurances as Lender may require from time to time in order to better assure, grant, and convey to Lender the rights intended to be granted, now or in the future, to Lender under this Instrument and the Loan Documents.

**13.    GOVERNING LAW; CONSENT TO JURISDICTION AND VENUE.**

(a)    This Instrument, and any Loan Document which does not itself expressly identify the law that is to apply to it, shall be governed by the laws of the jurisdiction in which the Land is located (the "**Property Jurisdiction**").

(b)    Borrower agrees that any controversy arising under or in relation to the Note, this Instrument, or any other Loan Document may be litigated in the Property Jurisdiction. The state and federal courts and authorities with jurisdiction in the Property Jurisdiction shall have non-exclusive jurisdiction over all controversies which shall arise under or in relation to the Note, any security for the Indebtedness, or any other Loan Document. Borrower irrevocably consents to service, jurisdiction, and venue of such courts for any such litigation and waives any other venue, or defense to venue to which it might be entitled by virtue of domicile, habitual residence, inconvenient forum or otherwise.

**14.    NOTICE.** Except as otherwise specified by the laws of the Property Jurisdiction, all notices, demands and other communications required or permitted to be given pursuant to this Instrument shall be given in accordance with Section 8.03 of the Loan Agreement.

**15.    SUCCESSORS AND ASSIGNS BOUND.** This Instrument shall bind, and the rights granted by this Instrument shall inure to, the respective successors and assigns of Lender and Borrower. However, a Transfer not permitted by Section 5.01 of the Loan Agreement shall constitute an Event of Default.

**16.    JOINT AND SEVERAL LIABILITY.** If more than one Person signs this Instrument as Borrower, the obligations of such Persons under this Instrument, the Note and other Loan Documents shall be joint and several.

**17.    RELATIONSHIP OF PARTIES; NO THIRD PARTY BENEFICIARY.**

(a)    The relationship between Lender and Borrower shall be solely that of creditor and debtor, respectively, and nothing contained in this Instrument shall create any other relationship between Lender and Borrower.

(b)    No creditor of any party to this Instrument and no other Person shall be a third party beneficiary of this Instrument or any other Loan Document. Without limiting the generality of the preceding sentence, (1) any arrangement (a "**Servicing Arrangement**") between Lender and any Loan Servicer for loss sharing or interim advancement of funds shall constitute a contractual obligation of such Loan Servicer that is independent of the obligation of Borrower for the payment of the Indebtedness, (2) Borrower shall not be a third party beneficiary of any Servicing Arrangement, and (3) no payment by the Loan Servicer under any Servicing Arrangement will reduce the amount of the Indebtedness.

**18.    SEVERABILITY; ENTIRE AGREEMENT; AMENDMENTS.** The parties intend that the provisions of this Instrument and all other Loan Documents shall be legally severable. If any term or provision of this Instrument, or any other Loan Document, to any extent, be determined by a court of competent jurisdiction to be invalid or unenforceable, the remainder of this Instrument or of such other Loan Document shall not be affected thereby, and each term and provision shall be valid and be enforceable to the fullest extent permitted by law. This Instrument contains the entire agreement among the parties as to the rights granted and the obligations assumed in this Instrument. This Instrument may not be amended or modified except by a writing signed by the party against whom enforcement is sought.

California Deed of Trust                                                                                        Page 8

19.    **CONSTRUCTION.** The captions and headings of the Sections of this Instrument are for convenience only and shall be disregarded in construing this Instrument. Any reference in this Instrument to an "Exhibit" or a "Section" shall, unless otherwise explicitly provided, be construed as referring, respectively, to an Exhibit attached to this Instrument or to a Section of this Instrument. All Exhibits attached to or referred to in this Instrument are incorporated by reference into this Instrument. Any reference in this Instrument to a statute or regulation shall be construed as referring to that statute or regulation as amended from time to time. Use of the singular in this Instrument includes the plural and use of the plural includes the singular. As used in this Instrument, the term "including" means "including, but not limited to" and the term "includes" means "includes without limitation." The use of one gender includes the other gender, as the context may require. Unless the context requires otherwise, (a) any definition of or reference to any agreement, instrument or other document in this Instrument shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth in this Instrument or any other Loan Document), and (b) any reference in this Instrument to any Person shall be construed to include such Person's successors and assigns.

20.    **SUBROGATION.** If, and to the extent that, the proceeds of the Loan, or subsequent advances under <u>Section 7</u>, are used to pay, satisfy or discharge a Prior Lien, such Loan proceeds or advances shall be deemed to have been advanced by Lender at Borrower's request, and Lender shall automatically, and without further action on its part, be subrogated to the rights, including lien priority, of the owner or holder of the obligation secured by the Prior Lien, whether or not the Prior Lien is released.

21.    **BUSINESS PURPOSE.** Borrower acknowledges and agrees that the Loan is for business purposes and not for personal, family or household purposes.

22.    **ACCELERATION; REMEDIES.** If an Event of Default has occurred and is continuing, Lender, at Lender's option, may declare the Indebtedness to be immediately due and payable without further demand, and may invoke the power of sale and any other remedies permitted by California law or provided in this Instrument, the Loan Agreement or any other Loan Document. Borrower acknowledges that the power of sale granted in this Instrument may be exercised by Lender without prior judicial hearing. Lender shall be entitled to collect all costs and expenses incurred in pursuing such remedies, including Attorneys' Fees and Costs, and costs of documentary evidence, abstracts and title reports.

If the power of sale is invoked, Lender shall execute a written notice of the occurrence of an Event of Default and of Lender's election to cause the Mortgaged Property to be sold and shall cause the notice to be recorded in each county in which the Mortgaged Property or some part of the Mortgaged Property is located. Trustee shall give notice of default and notice of sale and shall sell the Mortgaged Property according to California law. Trustee may sell the Mortgaged Property at the time and place and under the terms designated in the notice of sale in one or more parcels and in such order as Trustee may determine. Trustee may postpone the sale of all or any part of the Mortgaged Property by public announcement at the time and place of any previously scheduled sale. Lender or Lender's designee may purchase the Mortgaged Property at any sale and Lender or such designee will have the right to credit bid all or any part of the Indebtedness toward the purchase price at such sale.

Within a reasonable time after the sale, Trustee shall deliver to the purchaser at the sale, a deed conveying the Mortgaged Property so sold without any express or implied covenant or warranty. The recitals in such deed of any matters or facts shall be conclusive proof of the truthfulness thereof. Trustee shall apply the proceeds of the sale in the following order: (a) to all costs and expenses of the sale, including Trustee's fees not to exceed the statutory maximum therefor, Attorneys' Fees and Costs, including the cost of any trustee's sale guarantee policy and any other evidence of title; (b) to the Indebtedness in such order as Lender, in Lender's discretion, directs; and (c) the excess, if any, to the Person or Persons legally entitled to the excess.

23.    **RECONVEYANCE.** Upon payment of the Indebtedness, Lender shall request Trustee to reconvey the Mortgaged Property and shall surrender this Instrument and the Note to Trustee. Trustee shall reconvey the Mortgaged Property without warranty to the Person or Persons legally entitled to the Mortgaged Property. Such Person or Persons shall pay Trustee's reasonable costs incurred in so reconveying the Mortgaged Property.

24.    **SUBSTITUTE TRUSTEE.** Lender, at Lender's option, may from time to time, by a written instrument, appoint a successor trustee, which instrument, when executed and acknowledged by Lender and recorded in the office of the Recorder of the county or counties where the Mortgaged Property is situated, shall be conclusive proof of proper substitution of the successor trustee. The successor trustee shall, without conveyance of the Mortgaged Property, succeed to all the title, power and duties conferred upon the Trustee in this Instrument and by California law. The instrument of substitution shall contain the name of the original Lender, Trustee and Borrower under this Instrument, the book and page where this Instrument is recorded, and the name and address of the successor trustee. The procedure provided for substitution of trustee in this Instrument shall govern to the exclusion of all other provisions for substitution, statutory or otherwise.

California Deed of Trust                                                                                                    Page 9

**25.**    **STATEMENT OF OBLIGATION.** Lender may collect a fee not to exceed the maximum allowed by applicable law for furnishing the statement of obligation as provided in Section 2943 of the California Civil Code.

**26.**    **SPOUSE'S SEPARATE PROPERTY.** Each Borrower who is a married person expressly agrees that recourse may be had against his or her separate property.

**27.**    **FIXTURE FILING.** This Instrument is also a fixture filing under the Uniform Commercial Code of California.

**28.**    **ADDITIONAL PROVISION REGARDING APPLICATION OF PAYMENTS.** In addition to the provisions of Section 6, Borrower further agrees that, if Lender accepts a guaranty of only a portion of the Indebtedness, Borrower waives its right under California Civil Code Section 2822(a), to designate the portion of the Indebtedness which shall be satisfied by a guarantor's partial payment.

**29.**    **WAIVER OF MARSHALLING; OTHER WAIVERS.** To the extent permitted by law, Borrower waives (i) the benefit of all present or future laws providing for any appraisement before sale of any portion of the Mortgaged Property, (ii) all rights of redemption, valuation, appraisement, stay of execution, notice of election to mature or declare due the whole of the Indebtedness and marshalling in the event of foreclosure of the lien created by this Instrument, (iii) all rights and remedies which Borrower may have or be able to assert by reason of the laws of the State of California pertaining to the rights and remedies of sureties, (iv) the right to assert any statute of limitations as a bar to the enforcement of the lien of this Instrument or to any action brought to enforce the Note or any other obligation secured by this Instrument, and (v) any rights, legal or equitable, to require marshalling of assets or to require upon foreclosure sales in a particular order, including any rights under California Civil Code Sections 2899 and 3433. Lender shall have the right to determine the order in which any or all of the Mortgaged Property shall be subjected to the remedies provided in this Instrument. Lender shall have the right to determine the order in which any or all portions of the Indebtedness are satisfied from the proceeds realized upon the exercise of the remedies provided by this Instrument. By signing this Instrument, Borrower does not waive its rights under Section 2924c of the California Civil Code.

**30.**    **INTERPRETATION.** It is the intention of Borrower and Lender that if any provision of this Instrument or any other Loan Document is capable of two (2) constructions, one of which would render the provision void, and the other of which would render the provision valid, then the provision shall have the meaning which renders it valid. Borrower acknowledges that Lender has attempted in good faith to assure that this Instrument, the Note and all other Loan Documents are in compliance with applicable laws of the Property Jurisdiction and federal laws. Nevertheless, in the event that any provision of this Instrument, the Note or any other Loan Document is not in compliance with any such laws, then the non-complying provision shall be deemed to be deleted or modified to the extent necessary to assure legal compliance. Similarly, in the event any language or disclosure required by applicable laws of the Property Jurisdiction is not contained in the Loan Documents, then the Loan Documents shall be deemed to have been supplemented to add such language or disclosure, or, at Lender's option, Lender may provide such additional language or disclosure. In either event, such legal requirement shall thereby be satisfied and such noncompliance shall be deemed to have been cured for all purposes. Within ten (10) days after written request by Lender, Borrower agrees to execute such documentation as Lender may require to cure any legal compliance issues or deficiencies in the Loan Documents.

**31.**    **FUTURE ADVANCES.** In addition to the Indebtedness, this Instrument shall (to the extent allowed by applicable law) also secure payment of the principal, interest and other charges due on all other future loans or advances made by Lender to Borrower (or any successor in interest to Borrower as the owner of all or any part of the Mortgaged Property) when the promissory note evidencing such loan or advance specifically states that it is secured by this Instrument (**"Future Advances"**), including all extensions, renewals and modifications of any such Future Advances.

**32.**    **EXECUTION IN COUNTERPARTS.** This Instrument may be executed in multiple counterparts, and the separate signature pages and notary acknowledgments may then be combined into a single original document for recordation.

**33.**    **CALIFORNIA LAW PROVISIONS RELATING TO INSURANCE COVERAGE.** Borrower acknowledges that Borrower is aware of the following provision of Subdivision (a) of Section 2955.5 of the California Civil Code, which provides as follows:

> "No lender shall require a borrower, as a condition of receiving or maintaining a loan secured by real property, to provide hazard insurance coverage against risks to the improvements on that real property in an amount exceeding the replacement value of the improvements on the property."

**34.**    **BALLOON PAYMENT NOTICE.** The Note secured hereby provides for a balloon payment of the entire Indebtedness upon the Maturity Date of the Note.

**35.**    **DOCUMENT IMAGING.** Lender shall be entitled, in its sole discretion, to image or make copies of all or any selection of the agreements, instruments, documents, items and records governing, arising from or relating to any of Borrower's loans, including, without limitation, this Instrument and the other Loan Documents, and Lender may destroy or archive the paper

California Deed of Trust                                                                                    Page 10

originals. Borrower waives (i) any right to insist or require that Lender produce paper originals, (ii) agrees that such images shall be accorded the same force and effect as the paper originals, (iii) agrees that Lender is entitled to use such images in lieu of destroyed or archived originals for any purpose, including as admissible evidence in any demand, presentment or other proceedings, and (iv) further agrees that any executed facsimile (faxed), scanned, or other imaged copy of this Instrument or any other Loan Document shall be deemed to be of the same force and effect as the original manually executed document.

36.     **SCOPE OF SECURED OBLIGATIONS.**  For the avoidance of doubt, this Instrument secures only the Indebtedness and **not** any amounts due under the Environmental Indemnity or any guaranty.

**ATTACHED EXHIBIT.**  The following Exhibit is attached to this Instrument:
Exhibit "A"         Description of the Land

THIS DEED OF TRUST SECURES A FIXED RATE PROMISSORY NOTE.  THIS DEED OF TRUST IS, AT THE TIME OF RECORDATION, A SECOND DEED OF TRUST.  EXCEPT FOR THE APPROVED FIRST DEED OF TRUST, NO FURTHER ENCUMBRANCES MAY BE RECORDED AGAINST THE MORTGAGED PROPERTY WITHOUT THE PRIOR WRITTEN CONSENT OF LENDER. FAILURE TO COMPLY WITH THIS PROVISION SHALL CONSTITUTE AN EVENT OF DEFAULT AND AT LENDER'S OPTION THE LOAN SHALL IMMEDIATELY BECOME DUE AND PAYABLE.  CONSENT TO ONE FURTHER ENCUMBRANCE SHALL NOT BE DEEMED TO BE A WAIVER OF THE RIGHT TO REQUIRE SUCH CONSENT TO FUTURE OR SUCCESSIVE ENCUMBRANCES.

**IN WITNESS WHEREOF**, Borrower has signed and delivered this Instrument under seal (where applicable) or has caused this Instrument to be signed and delivered by its duly authorized representative under seal (where applicable).  Where applicable law so provides or allows, Borrower intends that this Instrument shall be deemed to be signed and delivered as a sealed instrument.

**SIGNATURE(S) ON FOLLOWING PAGE(S)**

**BORROWER:**

_____

**THOMAS V. GIRARDI**

A notary public or other officer completing this certificate
verifies only the identity of the individual who signed the
document to which this certificate is attached, and not the
truthfulness, accuracy, or validity of that document.

State of California                    ) ss.

County of _Los Angeles_          )

On _October 8_, 2019, before me, _Maria L. Carlos_____, Notary Public, personally
appeared **THOMAS V. GIRARDI,**

who proved to me on the basis of satisfactory evidence to be the
person(s) whose name(s) is/are subscribed to the within instrument and
acknowledged to me that he/she/they executed the same in his/her/their
authorized capacity(ies), and that by his/her/their signature(s) on the
instrument the person(s), or the entity upon behalf of which the person(s)
acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of
California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

MARIA L. CARLOS
Notary Public – California
Los Angeles County
Commission # 2229856
My Comm. Expires Feb 26, 2022

Signature _Maria L. Carlos_____
                Signature of Notary Public

Place Notary Seal Above

# EXHIBIT "A"
### DESCRIPTION OF THE LAND

THE LAND REFERRED TO HEREIN BELOW IS SITUATED IN THE CITY OF PASADENA, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AND IS DESCRIBED AS FOLLOWS:

LOTS 21 AND 22 OF TRACT NO. 8702, IN THE CITY OF PASADENA, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 118, PAGES 1 AND 2 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY AND THAT PORTION OF LOT 23 IN SAID TRACT NO. 8702, DESCRIBED AS FOLLOWS:

BEGINNING AT THE MOST SOUTHERLY CORNER OF SAID LOT 23; THENCE NORTHERLY ALONG THE CURVED WESTERLY LINE OF SAID LOT 23, A DISTANCE OF 26.54 FEET; THENCE NORTH 72° 48' 10" EAST 74.50 FEET TO A POINT IN THE SOUTHEASTERLY LINE OF SAID LOT 23 DISTANT THEREON NORTH 54° 44' 10" EAST 84.15 FEET FROM THE POINT OF BEGINNING; THENCE ALONG SAID SOUTHEASTERLY LINE SOUTH 54° 44' 10" WEST 84.15 FEET TO THE POINT OF BEGINNING.

APN: 5708-025-009, 5708-025-008

PROPERTY ADDRESS: 100 LOS ALTOS DRIVE, PASADENA, CA 91105

# LOAN AGREEMENT

THIS LOAN AGREEMENT ("**Loan Agreement**") is dated for reference purposes only as of **October 7, 2019** and is made by and between **THOMAS V. GIRARDI** ("**Borrower**"), and **ALT FINANCIAL NETWORK, INC., a California corporation** ("**Lender**").

## RECITALS

Borrower has applied to Lender for a loan in the principal amount of **TWO MILLION FIVE HUNDRED THOUSAND AND 00/100 DOLLARS (US $2,500,000.00)** (the "**Loan**"). Lender is willing to make the Loan to Borrower upon the terms and subject to the conditions set forth in this Loan Agreement and in the other Loan Documents (as herein defined).

## AGREEMENT

NOW, THEREFORE, in consideration for the making of the Loan, the mutual covenants contained in this Loan Agreement and other good and valuable consideration, the receipt and sufficiency of which are acknowledged, the parties agree as follows:

**ARTICLE I    DEFINED TERMS.**

**1.01      Defined Terms.** Each defined term in this Loan Agreement shall have the following meanings unless otherwise defined in this Loan Agreement:

"**ADA**" is defined in Section 3.02(g).

"**Attorneys' Fees and Costs**" means (i) fees and out-of-pocket costs of Lender's and Loan Servicer's attorneys, as applicable (whether or not any lawsuit or other proceeding is instituted), including costs of Lender's and Loan Servicer's allocable costs of in-house counsel, support staff costs, costs of preparing for litigation, computerized research, telephone and facsimile transmission expenses, mileage, deposition costs, postage, duplicating, process service, videotaping and similar costs and expenses; (ii) costs and fees of expert witnesses, including appraisers; and (iii) investigatory fees. As used in this Loan Agreement and in the Note, "Attorneys' Fees and Costs" shall include those awarded by an appellate court.

"**Bankruptcy Code**" means the United States Bankruptcy Code, 11 U.S.C. Section 101 *et seq.*, as amended from time to time.

"**Borrower**" means all Persons identified as "Borrower" in the first paragraph of this Loan Agreement, together with their successors and assigns.

"**Business Day**" means any day other than a Saturday, a Sunday or any other day on which Lender or the national banking associations are not open for business.

"**Collateral Agreement**" means any separate agreement between Borrower and Lender for the purpose of establishing replacement reserves for the Mortgaged Property, establishing a fund to assure the completion of repairs or improvements specified in that agreement, or assuring reduction of the outstanding principal balance of the Indebtedness if the occupancy of or income from the Mortgaged Property does not increase to a level specified in that agreement, or any other agreement or agreements between Borrower and Lender which provide for the establishment of any other fund, reserve or account.

"**Controlling Entity**" means an entity which owns, directly or indirectly through one or more intermediaries, (A) a general partnership interest or a Controlling Interest of the limited partnership interests in Borrower (if Borrower is a partnership or joint venture), (B) a manager's interest in Borrower or a Controlling Interest of the ownership or membership interests in Borrower (if Borrower is a limited liability company), or (C) a Controlling Interest of any class of voting stock of Borrower (if Borrower is a corporation).

"**Controlling Interest**" means (i) 51 percent or more of the ownership interests in an entity, or (ii) a percentage ownership interest in an entity of less than 51 percent, if the owner(s) of that interest actually direct(s) the business and affairs of the entity without the requirement of consent of any other party.

"**Environmental Indemnity**" means the provisions of Section 4.07.

"**Environmental Permit**" means any permit, license, or other authorization issued under any Hazardous Materials Law with respect to any activities or businesses conducted on or in relation to the Mortgaged Property.

"**Event of Default**" means the occurrence of any event listed in Section 6.01.

**"Fixtures"** shall have the meaning set forth in Section 1 of the Mortgage.

**"Governmental Authority"** means any board, commission, department or body of any municipal, county, state or federal governmental unit, or any subdivision of any of them, that has or acquires jurisdiction over the Mortgaged Property or the use, operation or improvement of the Mortgaged Property or over Borrower.

**"Guarantor"** means any future guarantor of all or any portion of the Indebtedness.

**"Guaranty"** means each and every guaranty executed by any Guarantor in favor of Lender in connection with the Loan.

**"Impositions"** and **"Imposition Deposits"** are defined in Section 4.04(a).

**"Improvements"** shall have the meaning as set forth in Section 1 of the Mortgage.

**"Indebtedness"** means the principal of, interest on, and all other amounts due at any time under, the Note, this Loan Agreement (other than the Environmental Indemnity), the Mortgage or any other Loan Document (other than the Guaranty), including prepayment premiums, late charges, default interest, and advances to protect the security of the Mortgaged Property under Section 7 of the Mortgage or any other applicable provision of this Loan Agreement, the Mortgage or any other Loan Document or as permitted by law.

**"Initial Owners"** means, with respect to Borrower or any other entity, the Person(s) that (i) on the date of the Note, or (ii) on the date of a Transfer to which Lender has consented, own in the aggregate 100% of the ownership interests in Borrower or that entity.

**"Lender"** means the Person or Persons identified as "Lender" in the first paragraph of this Loan Agreement, or any subsequent holder(s) of the Note.

**"Loan Documents"** means the Note, this Loan Agreement, the Mortgage, the Environmental Indemnity, the Guaranty, all Collateral Agreements, O&M Plans, financing statements, and any other documents now or in the future executed by Borrower, any Guarantor or any other Person in connection with the Loan, as such documents may be amended from time to time.

**"Loan Servicer"** means the Person or Persons that from time to time is designated by Lender to collect payments and deposits and receive notices under the Note, this Loan Agreement and any other Loan Document, and otherwise to service the Loan for the benefit of Lender. Unless otherwise specified in Section 2 of the Note, or unless Borrower receives notice to the contrary, the Loan Servicer means the Person or Persons identified as "Lender" in the first paragraph of this Loan Agreement.

**"Mortgage"** means the Deed of Trust, Assignment of Rents, Security Agreement and Fixture Filing dated the same date as this Loan Agreement, executed by Borrower in favor of Lender, which Mortgage encumbers the Mortgaged Property including that certain real property located in **Los Angeles** County, State of **California** and described in Exhibit "A" attached to this Loan Agreement.

**"Mortgaged Property"** shall have the meaning as set forth in Section 1 of the Mortgage.

**"Note"** means the Promissory Note in the principal amount of **TWO MILLION FIVE HUNDRED THOUSAND AND 00/100 DOLLARS (US $2,500,000.00)** executed by Borrower in favor of Lender and dated as of the date of this Loan Agreement, including all schedules, riders, allonges and addenda, as such Promissory Note may be amended, modified and/or restated from time to time.

**"notice"** or **"notices"** is defined in Section 8.03.

**"O&M Plan"** shall have the meaning set forth in Section 4.07.

**"Person"** means any natural person, sole proprietorship, corporation, general partnership, limited partnership, limited liability company, limited liability partnership, limited liability limited partnership, joint venture, association, joint stock company, bank, trust, estate, unincorporated organization, any federal, state, county or municipal government (or any agency or political subdivision thereof), endowment fund or any other form of entity.

**"Personalty"** shall have the meaning set forth in Section 1 of the Mortgage.

**"Property Insurance"** is defined in Section 4.02(a).

**"Property Jurisdiction"** shall have the meaning as set forth in Section 1 of the Mortgage.

**"Schedule of Title Exceptions"** shall have the meaning set forth in Section 1 of the Mortgage.

"**Taxes**" means all taxes, assessments, vault rentals and other charges, if any, general, special or otherwise, including all assessments for schools, public betterments and general or local improvements, which are levied, assessed or imposed by any public authority or quasi-public authority, and which, if not paid, will become a lien, on the Land or the Improvements.

"**Transfer**" is defined in Section 5.01.

## ARTICLE II    THE LOAN.

**2.01    Loan Terms.**  The Loan shall be evidenced by the Note and shall bear interest and be paid in accordance with the payment terms set forth in the Note.

**2.02    Security.**  The Indebtedness shall be secured by the Mortgage.

**2.03    Prepayment Premium.**  Borrower will be required to pay a prepayment premium in connection with certain prepayments of the Indebtedness, including a payment made after Lender's exercise of any right of acceleration of the Indebtedness, as provided in the Note.

**2.04    Full Recourse Liability.**  Borrower shall have full recourse personal liability under the Note, this Loan Agreement, the Mortgage and all other Loan Documents for the repayment of the Indebtedness and for the payment and performance of any and all other obligations of Borrower under the Note, this Loan Agreement, the Mortgage and all other Loan Documents.

**2.05    Guaranty.**  Borrower shall cause each Guarantor to execute the Guaranty.

## ARTICLE III    REPRESENTATIONS AND WARRANTIES.

Borrower represents and warrants to Lender as follows as of the date of this Loan Agreement:

**3.01    General Representations and Warranties.**

(a)    Borrower is a United States citizen and resident with full legal capacity to enter into the Loan Documents for the Loan.  Borrower has all requisite power and authority to enter into all documents required in connection with the above described transaction, to carry out the obligations of Borrower contemplated by the Loan Documents and to own all of the Mortgaged Property.

(b)    Borrower has all necessary power and authority to execute and deliver the Loan Documents.

(c)    The execution and delivery by Borrower of the Loan Documents, the performance by Borrower of its obligations under the Loan Documents and the consummation of the transactions contemplated by the Loan Documents do not (i) violate any provision of any law or any governmental rule or regulations applicable to Borrower, any of Borrower's organizational documents or any order, judgment or decree of any court or other agency of government binding on Borrower, or (ii) conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under any contractual obligation of Borrower.

(d)    This Loan Agreement, the Note and all other Loan Documents represent valid and binding obligations of Borrower and any other Person executing any such document, enforceable in accordance with their terms.  There are no setoffs, defenses or counterclaims to the payment of the indebtedness evidenced by the Note, and Borrower hereby agrees that if any such defense to the payment of such indebtedness should hereafter exist against Lender, except to the extent such defense is permitted or provided by the usury laws of the State of **California**, the same will not be raised against Lender.

(e)    There is not pending against Borrower any petition in bankruptcy, whether voluntary or otherwise, any assignment for the benefit of creditors, any petition seeking reorganization, liquidation or arrangement under the bankruptcy laws of the United States or of any State thereof, or any other action brought under the aforesaid bankruptcy laws.  There are no lawsuits or legal proceedings pending or to the best of Borrower's knowledge threatened in any court or before any governmental agency involving Borrower or the Mortgaged Property, nor are there any judgments outstanding against Borrower.  The financial condition of Borrower as of the date hereof has not adversely changed from the financial condition as indicated by the financial statements furnished to Lender and said financial statements are substantially true and accurate as of the date hereof.

(f)    Borrower is acting in this Loan for its own account for commercial purposes and will receive and apply the Loan proceeds for its own account and not as an agent or trustee for others.

(g)    No material adverse change in the financial condition of Borrower, any general partner of Borrower (if Borrower is a partnership), any manager or managing member of Borrower (if Borrower is a limited liability company), any controlling shareholder of Borrower (if Borrower is a corporation), or any Guarantor has occurred between the respective dates of the financial statements which were furnished to Lender relating to such Persons and the date hereof.

(h)        The financial statements of Borrower, any general partner of Borrower (if Borrower is a partnership), any manager or managing member of Borrower (if Borrower is a limited liability company), any controlling shareholder of Borrower (if Borrower is a corporation), and any Guarantor furnished to Lender in connection with the Loan, reflect in each case a positive net worth as of the date thereof.

(i)        Borrower is not presently insolvent, and the proposed Loan will not render Borrower insolvent.  As used in this Loan Agreement, the term "insolvent" means that the sum total of all of an entity's liabilities (whether secured or unsecured, contingent or fixed, or liquidated or unliquidated) is in excess of the value of all such entity's non-exempt assets, i.e., all of the assets of the entity that are available to satisfy claims of creditors.

(j)        Borrower has not relied upon any advice or representations of any attorney, vendor or other service provider engaged by or on behalf of Lender to prepare or review the Loan Documents.  Borrower acknowledges that any such attorney, vendor or other service provider shall represent the interests of Lender only and shall have no duty or liability to Borrower.

(k)        After the Loan is made, Borrower will have sufficient working capital, including cash flow from the Mortgaged Property or other sources, to adequately maintain the Mortgaged Property and to pay all of Borrower's outstanding debts as they come due.

(l)        All information in the application for the loan submitted to Lender (the **"Loan Application"**) and in all financial statements, rent rolls, reports, certificates and other documents submitted in connection with the Loan Application are complete and accurate in all material respects.  There has been no material adverse change in any fact or circumstance that would make any such information incomplete or inaccurate.

**3.02     Representations and Warranties Regarding Mortgaged Property.**

(a)        Borrower owns (or will own, concurrently with the closing of the Loan) fee simple title to all of the Mortgaged Property; the Mortgage creates the lien and security it purports to create and is a valid and binding obligation of Borrower enforceable against Borrower and the Mortgaged Property in accordance with its terms.

(b)        Borrower is not engaged and has not been engaged at any time since Borrower's acquisition of the Mortgaged Property in a "pattern of racketeering activity" within the meaning of 18 U.S.C. Section 1961, as amended, nor has Borrower committed any other act or engaged in any other pattern of actions, the potential results of which might include forfeiture of Borrower's interest in the Mortgaged Property.

(c)        No part of the Mortgaged Property or the improvements located thereon have been (i) damaged and not, to Borrower's knowledge, repaired to Lender's satisfaction, or (ii) taken in any condemnation or other similar proceeding, and no such proceeding is pending or to the best of Borrower's knowledge threatened.

(d)        The Mortgaged Property is not subject to any leases other than the leases described in the rent roll provided to Lender, and such rent roll is true, accurate, complete and correct in all material respects, including the description of the rent, term, and pay through date.  All other information submitted by or on behalf of Borrower to Lender in connection with the Loan, including but not limited to financial statement(s), tax return(s), operating statement(s), bank statement(s), and management agreement(s) are true, accurate, complete and correct in all material respects.

(e)        To Borrower's knowledge, the improvements located on the Mortgaged Property have been completed in accordance with the plans and specifications and all recommendations of the soils engineer, including any grading, seeding, landscaping and all other on-site and off-site improvements relating to the operation of the Mortgaged Property.  Direct connection has been made from the Mortgaged Property to abutting public water, sewer, gas, electric, telephone and all other facilities necessary to serve the Mortgaged Property for its intended use; the improvements are ready for occupancy; and the original building permit, unconditional certificates of occupancy and all other consents and approvals of all governmental authorities having jurisdiction over the Mortgaged Property have been issued, evidencing compliance with all zoning, building and other laws and regulations applicable to the Mortgaged Property and the improvements located thereon.

(f)        Borrower acknowledges that Lender has made no representations or warranties whatsoever concerning the suitability of the Mortgaged Property for Borrower's purposes, or any other aspect of the Mortgaged Property.  Borrower agrees that Borrower shall have the sole responsibility to conduct its own due diligence regarding the suitability of the Mortgaged Property for Borrower's purposes, or any other aspect of the Mortgaged Property.

(g)        The improvements located on the Mortgaged Property are either exempt from the accessibility requirements of the Americans with Disabilities Act, 42 U.S.C.A. Section 12101 et. seq. (the **"ADA"**), or, if not exempt, said improvements are accessible to and usable by persons with disabilities and complies (and shall, at all times during the term of the Loan be maintained in compliance) with the ADA, and the regulations thereunder promulgated by the U.S. Architectural and Transportation Barriers

Compliance Board (36 C.F.R. Section 1191 et. seq.) and by the U.S. Department of Justice (28 C.F.R. Part 36), including without limitation the ADA Accessibility Guidelines for Buildings and Facilities attached as an Appendix to said regulations. The Mortgaged Property is in compliance with the Fair Housing Amendments Act of 1998, as amended, as well as any other state or local laws and ordinances related to handicapped access.

(h)      There has been no material change in the occupancy of the Mortgaged Property, or the business, financial condition or results of operations of Borrower, since the date of Borrower's application for the Loan or submittal of information to Lender in connection with the Loan.

(i)      In the event that Borrower is comprised of two or more entities and/or individuals who hold title as tenants in common, joint tenancy, community property, or other co-tenancy, each Borrower agrees, and shall be estopped to deny, that (i) each Borrower is jointly and severally liable for all obligations of Borrower under the Loan Documents and not merely for an allocated portion thereof, and (ii) the Mortgage is intended to grant to Lender a mortgage lien and security interest in and to the entire Mortgaged Property and the proceeds thereof, and not merely a lien and security interest in and to a tenant-in-common or other co-tenancy interest.

**3.03      Continued Accuracy of Representations and Warranties.**  Borrower shall use its best efforts to assure each and every representation and warranty contained in this Loan Agreement and any other Loan Document will remain true and correct at all times from the date hereof until the Loan is repaid in full in accordance with its terms.  In the event that any representation or warranty contained in this Loan Agreement or in any other Loan Document becomes untrue, in whole or in part, after the execution of this Loan Agreement (whether before or after the closing of the Loan), Borrower shall so advise Lender in writing immediately.

## ARTICLE IV   BORROWER COVENANTS.

**4.01      Taxes; Operating Expenses.**

(a)      Subject to the provisions of <u>Sections 4.01(c)</u> and <u>4.01(d)</u>, Borrower shall pay, or cause to be paid, all Taxes when due and before the addition of any interest, fine, penalty or cost for nonpayment.

(b)      Subject to the provisions of <u>Section 4.01(c)</u>, Borrower shall pay the expenses of operating, managing, maintaining and repairing the Mortgaged Property (including insurance premiums, utilities, repairs and replacements) when due and before the last date upon which each such payment may be made without any penalty or interest charge being added.

(c)      As long as no Event of Default exists and Borrower has timely delivered to Lender any bills or premium notices that it has received, Borrower shall not be obligated to pay Taxes, insurance premiums or any other individual Imposition to the extent that sufficient Imposition Deposits are held by Lender for the purpose of paying that specific Imposition.  If an Event of Default exists, Lender may exercise any rights Lender may have with respect to Imposition Deposits without regard to whether Impositions are then due and payable.  Lender shall have no liability to Borrower for failing to pay any Impositions to the extent that any Event of Default has occurred and is continuing, insufficient Imposition Deposits are held by Lender at the time an Imposition becomes due and payable or Borrower has failed to provide Lender with bills and premium notices as provided above.

(d)      Borrower, at its own expense, may contest by appropriate legal proceedings, conducted diligently and in good faith, the amount or validity of any Imposition other than insurance premiums, if (1) Borrower notifies Lender of the commencement or expected commencement of such proceedings, (2) the Mortgaged Property is not in danger of being sold or forfeited, (3) Borrower deposits with Lender reserves sufficient to pay the contested Imposition, if requested by Lender, and (4) Borrower furnishes whatever additional security is required in the proceedings or is reasonably requested by Lender, which may include the delivery to Lender of the reserves established by Borrower to pay the contested Imposition.

(e)      Borrower shall promptly deliver to Lender a copy of all notices of, and invoices for, Impositions, and if Borrower pays any Imposition directly, Borrower shall promptly furnish to Lender receipts evidencing such payments in accordance with <u>Section 4.04(f)</u>.

**4.02      Property and Liability Insurance.**

(a)      Borrower shall keep the Improvements insured at all times against such hazards as Lender may from time to time require, which insurance shall include but not be limited to coverage against loss by fire, windstorm and allied perils, general boiler and machinery coverage, and business income coverage.  Lender's insurance requirements may change from time to time throughout the term of the Indebtedness.  If Lender so requires, such insurance shall also include sinkhole insurance, mine subsidence insurance, earthquake insurance, and, if the Mortgaged Property does not conform to applicable zoning or land use laws, building ordinance or law coverage.  In the event any updated reports or other documentation are reasonably required by Lender in order to determine whether such additional insurance is necessary or prudent, Borrower shall pay for all such

documentation at its sole cost and expense. If any of the Improvements is located in an area that is either (i) identified by the Federal Emergency Management Agency (or any successor to that agency) ("**FEMA**") as an area having special flood hazards or (ii) designated by FEMA as Zone D, and if flood insurance is available in that area, Borrower shall insure such Improvements against loss by flood. If Lender so requires, such insurance shall also include business income/rental value insurance for all relevant perils to be covered in the amount required by Lender, but in no case less than the effective gross income attributable to the Mortgaged Property for the preceding 12 months, as determined by Lender in Lender's discretion. All insurance required pursuant to this Section 4.02 shall be referred to as "**Property Insurance**". All policies of Property Insurance must include a non-contributing, non-reporting mortgagee clause in favor of, and in a form approved by, Lender, and shall provide that the insurer will notify Lender in writing of cancelation of policies at least 10 days before the cancelation of the policy by the insurer for nonpayment of the premium or nonrenewal and at least 30 days before cancelation by the insurer for any other reason.

(b)      All premiums on insurance policies required under this Section 4.02 shall be paid in the manner provided in Section 4.04, unless Lender has designated in writing another method of payment. All such policies shall also be in a form approved by Lender. Borrower shall deliver to Lender a legible copy of each insurance policy (or duplicate original) and Borrower shall promptly deliver to Lender a copy of all renewal and other notices received by Borrower with respect to the policies and all receipts for paid premiums. At least 30 days prior to the expiration date of a policy, Borrower shall deliver to Lender a legible copy of each renewal policy (or a duplicate original) in a form satisfactory to Lender.

(c)      Borrower shall maintain at all times commercial general liability insurance, workers' compensation insurance and such other liability, errors and omissions and fidelity insurance coverages as Lender may from time to time require. All policies for general liability insurance must contain a standard additional insured provision, in favor of, and in a form approved by, Lender.

(d)      All insurance policies and renewals of insurance policies required by this Section 4.02 shall be in such amounts and for such periods as Lender may from time to time require, shall be in such form and contain such endorsements as Lender may from time to time require, and shall be issued by insurance companies satisfactory to Lender.

(e)      Borrower shall comply with all insurance requirements and shall not permit any condition to exist on the Mortgaged Property that would invalidate any part of any insurance coverage that this Loan Agreement requires Borrower to maintain.

(f)      In the event of loss, Borrower shall give immediate written notice to the insurance carrier and to Lender. Borrower hereby authorizes and appoints Lender as attorney-in-fact for Borrower to make proof of loss, to adjust and compromise any claims under policies of property damage insurance, to appear in and prosecute any action arising from such property damage insurance policies, to collect and receive the proceeds of property damage insurance, and to deduct from such proceeds Lender's expenses incurred in the collection of such proceeds. This power of attorney is coupled with an interest and therefore is irrevocable. However, nothing contained in this Section 4.02 shall require Lender to incur any expense or take any action. Lender may, at Lender's option, (1) hold the balance of such proceeds to be used to reimburse Borrower for the cost of restoring and repairing the Mortgaged Property to the equivalent of its original condition or to a condition approved by Lender (the "**Restoration**"), or (2) apply the balance of such proceeds to the payment of the Indebtedness, whether or not then due. To the extent Lender determines to apply insurance proceeds to Restoration, Lender shall do so in accordance with Lender's then-current policies relating to the restoration of casualty damage on similar properties.

(g)      Lender shall not exercise its option to apply insurance proceeds to the payment of the Indebtedness if all of the following conditions are met: (1) no Event of Default (or any event which, with the giving of notice or the passage of time, or both, would constitute an Event of Default) has occurred and is continuing; (2) Lender determines, in its discretion, that Borrower has sufficient funds to complete the Restoration; (3) Lender determines, in its discretion, that the rental income from the Mortgaged Property after completion of the Restoration will be sufficient to meet all operating costs and other expenses, Imposition Deposits, deposits to reserves and loan repayment obligations relating to the Mortgaged Property; and (4) Lender determines, in its discretion, that the Restoration will be completed before the earlier of (A) one year before the maturity date of the Note or (B) one year after the date of the loss or casualty.

(h)      If the Mortgaged Property is sold at a foreclosure sale or Lender acquires title to the Mortgaged Property, Lender shall automatically succeed to all rights of Borrower in and to any insurance policies and unearned insurance premiums and in and to the proceeds resulting from any damage to the Mortgaged Property prior to such sale or acquisition.

**4.03    Condemnation.**

(a)      Borrower shall promptly notify Lender of any action or proceeding relating to any condemnation or other taking, or conveyance in lieu thereof, of all or any part of the Mortgaged Property, whether direct or indirect (a "**Condemnation**"). Borrower shall appear in and prosecute or defend any action or proceeding relating to any Condemnation unless otherwise directed by

Lender in writing. Borrower authorizes and appoints Lender as attorney in fact for Borrower to commence, appear in and prosecute, in Lender's or Borrower's name, any action or proceeding relating to any Condemnation and to settle or compromise any claim in connection with any Condemnation. This power of attorney is coupled with an interest and therefore is irrevocable. However, nothing contained in this Section 4.03 shall require Lender to incur any expense or take any action. Borrower hereby transfers and assigns to Lender all right, title and interest of Borrower in and to any award or payment with respect to (i) any Condemnation, or any conveyance in lieu of Condemnation, and (ii) any damage to the Mortgaged Property caused by governmental action that does not result in a Condemnation.

(b)      Lender may apply such awards or proceeds, after the deduction of Lender's expenses incurred in the collection of such amounts, at Lender's option, to the restoration or repair of the Mortgaged Property or to the payment of the Indebtedness, with the balance, if any, to Borrower. Unless Lender otherwise agrees in writing, any application of any awards or proceeds to the Indebtedness shall not extend or postpone the due date of any monthly installments referred to in the Note, Section 4.04 or any Collateral Agreement, or change the amount of such installments. Borrower agrees to execute such further evidence of assignment of any awards or proceeds as Lender may require.

**4.04      Deposits for Taxes, Insurance and Other Charges.**

(a)      Unless this requirement is waived in writing by Lender, or as otherwise provided in this Section 4.04, Borrower shall deposit with Lender on the day monthly installments of principal or interest, or both, are due under the Note (or on another day designated in writing by Lender), until the Indebtedness is paid in full, an additional amount estimated by Lender to be sufficient to accumulate with Lender the entire sum required to pay, when due, the items marked "COLLECT" below, plus, at Lender's discretion, a contingency reserve of up to one-sixth of such estimate. Lender will not initially require Borrower to make Imposition Deposits with respect to any items marked "DEFERRED" or "NOT APPLICABLE" below.

| [DEFERRED] | Property Insurance premiums or other insurance premiums required by Lender under Section 4.02 |
| [DEFERRED] | Taxes |
| [DEFERRED] | water and sewer charges (that could become a lien on the Mortgaged Property) |
| [DEFERRED] | assessments or other charges (that could become a lien on the Mortgaged Property) |

The amounts deposited under the preceding sentence are collectively referred to in this Loan Agreement as the "**Imposition Deposits**". The obligations of Borrower for which the Imposition Deposits are required are collectively referred to in this Loan Agreement as "**Impositions**". The amount of the Imposition Deposits shall be sufficient to enable Lender to pay each Imposition before the last date upon which such payment may be made without any penalty or interest charge being added. Lender shall maintain records indicating how much of the monthly Imposition Deposits and how much of the aggregate Imposition Deposits held by Lender are held for the purpose of paying Taxes, insurance premiums and each other Imposition.

(b)      Imposition Deposits shall be held by Lender or in a bank, credit union or other financial institution designated by Lender. Lender shall apply the Imposition Deposits to pay Impositions so long as no Event of Default has occurred and is continuing. Unless applicable law requires, Lender shall not be required to pay Borrower any interest, earnings or profits on the Imposition Deposits. As additional security for all of Borrower's obligations under this Loan Agreement (other than the Environmental Indemnity) and the other Loan Documents (other than any guaranty), Borrower hereby pledges and grants to Lender a security interest in the Imposition Deposits and all proceeds of, and all interest and dividends on, the Imposition Deposits. Any amounts deposited with Lender under this Section 4.04 shall not be trust funds, nor shall they operate to reduce the Indebtedness, unless applied by Lender for that purpose under Section 4.04(e).

(c)      Borrower shall promptly deliver to Lender a copy of all notices of, and invoices for, Impositions. If Lender receives a bill or invoice for an Imposition, Lender shall pay the Imposition from the Imposition Deposits held by Lender. Lender shall have no obligation to pay any Imposition to the extent it exceeds Imposition Deposits then held by Lender. Lender may pay an Imposition according to any bill, statement or estimate from the appropriate public office or insurance company without inquiring into the accuracy of the bill, statement or estimate or into the validity of the Imposition.

(d)      If at any time the amount of the Imposition Deposits held by Lender for payment of a specific Imposition exceeds the amount reasonably deemed necessary by Lender, plus at Lender's discretion, a contingency reserve of up to one-sixth of such estimate, the excess shall be credited against future installments of Imposition Deposits. If at any time the amount of the Imposition Deposits held by Lender for payment of a specific Imposition is less than the amount reasonably estimated by

Lender to be necessary, plus, at Lender's discretion, a contingency reserve of up to one-sixth of such estimate, Borrower shall pay to Lender the amount of the deficiency within 15 days after notice from Lender.

(e)      If an Event of Default has occurred and is continuing, Lender may apply any Imposition Deposits, in any amounts and in any order as Lender determines, in Lender's discretion, to pay any Impositions or as a credit against the Indebtedness. Upon payment in full of the Indebtedness, Lender shall refund to Borrower any Imposition Deposits held by Lender.

(f)      If Lender does not collect an Imposition Deposit with respect to an Imposition either marked "DEFERRED" in Section 4.04(a) or pursuant to a separate written waiver by Lender, then at least 30 days before the date each such Imposition is due, or on the date this Loan Agreement requires each such Imposition to be paid, Borrower must provide Lender with a receipt or other proof of payment of each such Imposition for which Lender does not require collection of Imposition Deposits. Lender may revoke its deferral or waiver and require Borrower to deposit with Lender any or all of the Imposition Deposits listed in Section 4.04(a), regardless of whether any such item is marked "DEFERRED" in such section, upon notice to Borrower, (i) if Borrower does not timely pay any of the Impositions as required by this Loan Agreement, (ii) if Borrower fails to provide timely proof to Lender of such payment as required by this Loan Agreement, or (iii) at any time from and after the occurrence of an Event of Default or any event which, with the giving of notice or the passage of time, or both, would constitute an Event of Default. In the event of a Transfer prohibited by or requiring Lender's approval under Article V, Lender's waiver or deferral of the collection of any Imposition Deposit in this Section 4.04 may be modified or rendered void by Lender at Lender's sole option and discretion by notice to Borrower and the transferee(s) as a condition of Lender's approval of such Transfer.

**4.05      Books and Records; Financial Reporting.**

(a)      Borrower shall keep and maintain at all times at the Mortgaged Property or the management agent's offices, and upon Lender's request shall make available at the Mortgaged Property, complete and accurate books of account and records (including copies of supporting bills and invoices) adequate to reflect correctly the operation of the Mortgaged Property, and copies of all written contracts, Leases, and other instruments which affect the Mortgaged Property. The books, records, contracts, Leases and other instruments shall be subject to examination and inspection at any reasonable time by Lender.

(b)      Borrower and Guarantor shall furnish to Lender all of the following:

(1)      within one hundred twenty (120) days after the end of each fiscal year of Borrower, a statement of income and expenses for Borrower and any Guarantor for that fiscal year, a statement of changes in financial position of Borrower and any Guarantor for that fiscal year and, a balance sheet showing all assets and liabilities of Borrower and any Guarantor as of the end of that fiscal year;

(2)      within one hundred twenty (120) days after the end of each fiscal year of Borrower, and at any other time upon Lender's request, a statement that identifies all owners of any interest in Borrower and any Controlling Entity and the interest held by each, if Borrower or a Controlling Entity is a corporation, all officers and directors of Borrower and the Controlling Entity, and if Borrower or a Controlling Entity is a limited liability company, all managers who are not members; and

(3)      within thirty (30) days after filing, copies of all federal and state income tax returns filed by Borrower and any Guarantor (or, if Borrower or any Guarantor is a "disregarded entity" for federal tax purposes, the federal and state returns filed by the owner of Borrower or such Guarantor) including all schedules, forms, attachments, W-2s and K-1s.

(c)      Each of the statements, schedules, documents, items and reports required by Section 4.05(b) shall be certified to be complete and accurate by each individual Borrower, an individual (or individuals) having authority to bind each entity Borrower and (for guarantor information and documents) each Guarantor, and shall be in such form and contain such detail as Lender may reasonably require. Lender may, at Lender's discretion, require that any statements, schedules or reports be audited at Borrower's expense by independent certified public accountants acceptable to Lender.

(d)      In the event Borrower or any Guarantor fails to deliver such statements, schedules, documents, items and reports within the time frames provided in Section 4.05(b) above, then such failure shall constitute an Event of Default and, in addition to any other remedies which may be available to Lender as a result of such Event of Default, Borrower shall pay a late charge equal to two percent (2%) of the monthly payment amount for each late submission of financial reports to compensate Lender or its servicer for the additional administrative expense caused by such failure or delay whether or not Borrower is entitled to any notice and opportunity to cure such failure prior to the exercise of any of the remedies. Such late charge shall be charged each month that any financial statements remain delinquent. The late charge shall be immediately payable from Borrower upon demand by Lender and, until paid, shall be added to and constitute a part of the Indebtedness as provided in Section 7 of the Mortgage. In no event shall the financial statement late charge constitute a cure of Borrower's or any Guarantor's default in failing to provide financial statements, nor limit Lender's remedies as a result of such default. In addition to such financial statement late

charge and any other remedies which may be available to Lender as a result of such Event of Default, Lender shall have the right: (1) to increase the interest rate under the Note to the Default Rate provided for in the Note as long as such financial statements remain delinquent, and (2) to have Borrower's or any Guarantor's books and records audited, at Borrower's expense, by independent certified public accountants selected by Lender in order to obtain such statements, schedules and reports, and all related costs and expenses of Lender shall become immediately due and payable and shall become an additional part of the Indebtedness as provided in Section 7 of the Mortgage.

(e)    If an Event of Default has occurred and is continuing, Borrower shall deliver to Lender upon written demand all books and records relating to the Mortgaged Property or its operation.

(f)    Borrower authorizes Lender to obtain a credit report on Borrower at any time.

**4.06    Preservation, Management and Maintenance of Mortgaged Property.** Borrower (a) shall not commit waste or permit impairment or deterioration of the Mortgaged Property, (b) shall not abandon the Mortgaged Property, (c) shall restore or repair promptly, in a good and workmanlike manner, any damaged part of the Mortgaged Property to the equivalent of its original condition, or such other condition as Lender may approve in writing, whether or not insurance proceeds or condemnation awards are available to cover any costs of such restoration or repair, (d) shall keep the Mortgaged Property in good repair, including the replacement of Personalty and Fixtures with items of equal or better function and quality, (e) shall provide for professional management of the Mortgaged Property by a residential rental property manager satisfactory to Lender under a contract approved by Lender in writing, and (f) shall give notice to Lender of and, unless otherwise directed in writing by Lender, shall appear in and defend any action or proceeding purporting to affect the Mortgaged Property, Lender's security or Lender's rights under this Loan Agreement.  Borrower shall not (and shall not permit any tenant or other Person to) remove, demolish or alter the Mortgaged Property or any part of the Mortgaged Property except in connection with the replacement of tangible Personalty.

**4.07    Environmental Hazards.**

(a)    Except for matters covered by a written plan of operations and maintenance approved in writing by Lender (an "**O&M Plan**") or matters described in Section 4.07(b), Borrower shall not cause or permit any of the following:

(1)    the presence, use, generation, release, treatment, processing, storage (including storage in above ground and underground storage tanks), handling, or disposal of any Hazardous Materials on or under the Mortgaged Property or any other property of Borrower that is adjacent to the Mortgaged Property;

(2)    the transportation of any Hazardous Materials to, from, or across the Mortgaged Property;

(3)    any occurrence or condition (including soil and groundwater conditions) on the Mortgaged Property or any other property of Borrower that is adjacent to the Mortgaged Property, which occurrence or condition is or may be in violation of Hazardous Materials Laws; or

(4)    any violation of or noncompliance with the terms of any Environmental Permit with respect to the Mortgaged Property or any property of Borrower that is adjacent to the Mortgaged Property.

The matters described in clauses (1) through (4) above are referred to collectively in this Section 4.07 as "**Prohibited Activities or Conditions**".

(b)    Prohibited Activities and Conditions shall not include the safe and lawful use and storage of quantities of (1) pre-packaged supplies, cleaning materials and petroleum products customarily used in the operation and maintenance of comparable properties, (2) cleaning materials, personal grooming items and other items sold in pre-packaged containers for consumer use and used by tenants and occupants of residential dwelling units in the Mortgaged Property; and (3) petroleum products used in the operation and maintenance of motor vehicles from time to time located on the Mortgaged Property's parking areas, so long as all of the foregoing are used, stored, handled, transported and disposed of in compliance with Hazardous Materials Laws.

(c)    Borrower shall take all commercially reasonable actions (including the inclusion of appropriate provisions in any Leases executed after the date of this Loan Agreement) to prevent its employees, agents, and contractors, and all tenants and other occupants from causing or permitting any Prohibited Activities or Conditions.  Borrower shall not lease or allow the sublease or use of all or any portion of the Mortgaged Property to any tenant or subtenant for nonresidential use by any user that, in the ordinary course of its business, would cause or permit any Prohibited Activity or Condition.

(d)    If an O&M Plan has been established with respect to Hazardous Materials, Borrower shall comply in a timely manner with, and cause all employees, agents, and contractors of Borrower and any other Persons present on the Mortgaged Property to comply with the O&M Plan.  All costs of performance of Borrower's obligations under any O&M Plan shall be paid by Borrower, and Lender's out-of-pocket costs incurred in connection with the monitoring and review of the O&M Plan and Borrower's

performance shall be paid by Borrower upon demand by Lender.  Any such out-of-pocket costs of Lender which Borrower fails to pay promptly shall become an additional part of the Indebtedness as provided in Section 7 of the Mortgage.

   (e)  Borrower represents and warrants to Lender that, except as previously disclosed by Borrower to Lender in writing:

     (1) Borrower has not at any time engaged in, caused or permitted any Prohibited Activities or Conditions;

     (2) to the best of Borrower's knowledge after reasonable and diligent inquiry, no Prohibited Activities or Conditions exist or have existed;

     (3) except to the extent previously disclosed by Borrower to Lender in writing, the Mortgaged Property does not now contain any underground storage tanks, and, to the best of Borrower's knowledge after reasonable and diligent inquiry, the Mortgaged Property has not contained any underground storage tanks in the past.  If there is an underground storage tank located on the Mortgaged Property which has been previously disclosed by Borrower to Lender in writing, that tank complies with all requirements of Hazardous Materials Laws;

     (4) Borrower has complied with all Hazardous Materials Laws, including all requirements for notification regarding releases of Hazardous Materials.  Without limiting the generality of the foregoing, Borrower has obtained all Environmental Permits required for the operation of the Mortgaged Property in accordance with Hazardous Materials Laws now in effect and all such Environmental Permits are in full force and effect;

     (5) no event has occurred with respect to the Mortgaged Property that constitutes, or with the passing of time or the giving of notice would constitute, noncompliance with the terms of any Environmental Permit;

     (6) there are no actions, suits, claims or proceedings pending or, to the best of Borrower's knowledge after reasonable and diligent inquiry, threatened that involve the Mortgaged Property and allege, arise out of, or relate to any Prohibited Activity or Condition;

     (7) Borrower has not received any complaint, order, notice of violation or other communication from any Governmental Authority with regard to air emissions, water discharges, noise emissions or Hazardous Materials, or any other environmental, health or safety matters affecting the Mortgaged Property or any other property of Borrower that is adjacent to the Mortgaged Property;

     (8) there are no liens arising under or pursuant to any Hazardous Materials Laws affecting the Mortgaged Property and there are no facts, circumstances, or conditions that could reasonably be expected to restrict, encumber, or result in the imposition of special conditions under any Hazardous Materials Law with respect to the ownership, occupancy development, use, or transferability of the Mortgaged Property;

     (9) there has been no written environmental audit, investigation, assessment, review, sampling or analysis conducted by Borrower of the Mortgaged Property which in any such case has not been delivered to Lender prior to the date hereof; and

     (10) at the time of acquiring the Mortgaged Property, Borrower undertook all appropriate inquiry into the previous ownership and uses of the Mortgaged Property consistent with good commercial or customary practice and no evidence or indication came to light which would suggest that the Mortgaged Property has been or is now being used for any Prohibited Activities or Conditions.

The representations and warranties in this <u>Section 4.07</u> shall be continuing representations and warranties that shall be deemed to be made by Borrower throughout the term of the Loan, until the Indebtedness and all obligations under this <u>Section 4.07</u> have been paid in full.

   (f)  Borrower shall promptly notify Lender in writing upon the occurrence of any of the following events:

     (1) Borrower's discovery of any Prohibited Activity or Condition;

     (2) Borrower's receipt of or knowledge of any complaint, order, notice of violation or other communication from any Governmental Authority or other Person with regard to present or future alleged Prohibited Activities or Conditions or any other environmental, health or safety matters affecting the Mortgaged Property or any other property of Borrower that is adjacent to the Mortgaged Property; and

     (3) any representation or warranty in this <u>Section 4.07</u> becomes untrue after the date of this Agreement.

Any such notice given by Borrower shall not relieve Borrower of, or result in a waiver of, any obligation under this Loan Agreement, the Note, or any other Loan Document.

Prepared by LoanDocSolutions
Loan Agreement                     Page 10

Exhibit A          Page 34 of 60

(g)    Borrower shall pay promptly the costs of any environmental inspections, tests or audits ("**Environmental Inspections**") required by Lender in connection with any foreclosure or deed in lieu of foreclosure, or as a condition of Lender's consent to any Transfer under Section 5.01, or required by Lender following a reasonable determination by Lender that Prohibited Activities or Conditions may exist.  Any such costs incurred by Lender (including the fees and out-of-pocket costs of attorneys and technical consultants whether incurred in connection with any judicial or administrative process or otherwise) which Borrower fails to pay promptly shall become an additional part of the Indebtedness as provided in Section 7 of the Mortgage. The results of all Environmental Inspections made by Lender shall at all times remain the property of Lender and Lender shall have no obligation to disclose or otherwise make available to Borrower or any other party such results or any other information obtained by Lender in connection with its Environmental Inspections.  Lender hereby reserves the right, and Borrower hereby expressly authorizes Lender, to make available to any party, including any prospective bidder at a foreclosure sale of the Mortgaged Property, the results of any Environmental Inspections made by Lender with respect to the Mortgaged Property.  Borrower consents to Lender notifying any party (either as part of a notice of sale or otherwise) of the results of any of Lender's Environmental Inspections.  Borrower acknowledges that Lender cannot control or otherwise assure the truthfulness or accuracy of the results of any of its Environmental Inspections and that the release of such results to prospective bidders at a foreclosure sale of the Mortgaged Property may have a material and adverse effect upon the amount which a party may bid at such sale.  Borrower agrees that Lender shall have no liability whatsoever as a result of delivering the results of any of its Environmental Inspections to any third party, and Borrower hereby releases and forever discharges Lender from any and all claims, damages, or causes of action, arising out of, connected with or incidental to the results of, the delivery of any of Lender's Environmental Inspections.

(h)    If any investigation, site monitoring, containment, clean-up, restoration or other remedial work ("**Remedial Work**") is necessary to comply with any Hazardous Materials Law or order of any Governmental Authority that has or acquires jurisdiction over the Mortgaged Property or the use, operation or improvement of the Mortgaged Property under any Hazardous Materials Law, Borrower shall, by the earlier of (1) the applicable deadline required by Hazardous Materials Law or (2) 30 days after notice from Lender demanding such action, begin performing the Remedial Work, and thereafter diligently prosecute it to completion, and shall in any event complete the work by the time required by applicable Hazardous Materials Law.  If Borrower fails to begin on a timely basis or diligently prosecute any required Remedial Work, Lender may, at its option, cause the Remedial Work to be completed, in which case Borrower shall reimburse Lender on demand for the cost of doing so.  Any reimbursement due from Borrower to Lender shall become part of the Indebtedness as provided in Section 7 of the Mortgage.

(i)    Borrower shall cooperate with any inquiry by any Governmental Authority and shall comply with any governmental or judicial order which arises from any alleged Prohibited Activity or Condition.

(j)    Borrower shall indemnify, hold harmless and defend (i) Lender, (ii) any prior owner or holder of the Note, (iii) the Loan Servicer, (iv) any prior Loan Servicer, (v) the officers, directors, shareholders, partners, employees and trustees of any of the foregoing, and (vi) the heirs, legal representatives, successors and assigns of each of the foregoing (collectively, the "**Indemnitees**") from and against all proceedings, claims, damages, liabilities, obligations, demands, causes of action, losses, fines, penalties and costs (whether initiated or sought by Governmental Authorities or private parties), including fees and out of pocket expenses of attorneys and expert witnesses, investigatory fees, and remediation costs, whether incurred in connection with any judicial or administrative process or otherwise, arising directly or indirectly from any of the following:

(1)    any breach of any representation or warranty of Borrower in this Section 4.07;
(2)    any failure by Borrower to perform any of its obligations under this Section 4.07;
(3)    the existence or alleged existence of any Prohibited Activity or Condition;
(4)    the presence or alleged presence of Hazardous Materials on or under the Mortgaged Property or any property of Borrower that is adjacent to the Mortgaged Property;
(5)    the actual or alleged violation of any Hazardous Materials Law; and
(6)    any personal injury (including wrongful death) or property damage (real or personal) arising out of or related to any Hazardous Materials.

(k)    Counsel selected by Borrower to defend Indemnitees shall be subject to the approval of those Indemnitees. However, any Indemnitee may elect to defend any claim or legal or administrative proceeding at Borrower's expense.

(l)    Borrower shall not, without the prior written consent of those Indemnitees who are named as parties to a claim or legal or administrative proceeding (a "**Claim**"), settle or compromise the Claim if the settlement (1) results in the entry of any judgment that does not include as an unconditional term the delivery by the claimant or plaintiff to Lender of a written release of those Indemnitees, satisfactory in form and substance to Lender; or (2) may materially and adversely affect Lender, as determined by Lender in its discretion.

(m)    Borrower's obligation to indemnify the Indemnitees shall not be limited or impaired by any of the following, or by any failure of Borrower or any Guarantor to receive notice of or consideration for any of the following:

(1)    any amendment or modification of any Loan Document;

(2)    any extensions of time for performance required by any Loan Document;

(3)    any provision in any of the Loan Documents limiting Lender's recourse to property securing the Indebtedness, or limiting the personal liability of Borrower or any other party for payment of all or any part of the Indebtedness;

(4)    the accuracy or inaccuracy of any representations and warranties made by Borrower under this Loan Agreement or any other Loan Document;

(5)    the release of Borrower or any other Person, by Lender or by operation of law, from performance of any obligation under any Loan Document;

(6)    the release or substitution in whole or in part of any security for the Indebtedness; and

(7)    Lender's failure to properly perfect any lien or security interest given as security for the Indebtedness.

(n)    Borrower shall, at its own cost and expense, do all of the following:

(1)    pay or satisfy any judgment or decree that may be entered against any Indemnitee or Indemnitees in any legal or administrative proceeding incident to any matters against which Indemnitees are entitled to be indemnified under this Section 4.07;

(2)    reimburse Indemnitees for any expenses paid or incurred in connection with any matters against which Indemnitees are entitled to be indemnified under this Section 4.07; and

(3)    reimburse Indemnitees for any and all expenses, including fees and out of pocket expenses of attorneys and expert witnesses, paid or incurred in connection with the enforcement by Indemnitees of their rights under this Section 4.07, or in monitoring and participating in any legal or administrative proceeding.

(o)    In any circumstances in which the indemnity under this Section 4.07 applies, Lender may employ its own legal counsel and consultants to prosecute, defend or negotiate any claim or legal or administrative proceeding and Lender, with the prior written consent of Borrower (which shall not be unreasonably withheld, delayed or conditioned) may settle or compromise any action or legal or administrative proceeding.  Borrower shall reimburse Lender upon demand for all costs and expenses incurred by Lender, including all costs of settlements entered into in good faith, and the fees and out of pocket expenses of such attorneys and consultants.

(p)    The provisions of this Section 4.07 shall be in addition to any and all other obligations and liabilities that Borrower may have under applicable law or under other Loan Documents, and each Indemnitee shall be entitled to indemnification under this Section 4.07 without regard to whether Lender or that Indemnitee has exercised any rights against the Mortgaged Property or any other security, pursued any rights against any Guarantor, or pursued any other rights available under the Loan Documents or applicable law.  If Borrower consists of more than one Person, the obligation of those Persons to indemnify the Indemnitees under this Section 4.07 shall be joint and several.  The obligation of Borrower to indemnify the Indemnitees under this Section 4.07 shall survive any repayment or discharge of the Indebtedness, any foreclosure proceeding, any foreclosure sale, any delivery of any deed in lieu of foreclosure, and any release of record of the lien of the Mortgage.

(q)    Except for matters covered by an O&M Plan or lawful conditions expressly excluded from the definition of Prohibited Activity or Condition in Section 4.07(b), Borrower shall not cause or permit any lien (whether or not such lien has priority over the lien created by the Mortgage) upon the Mortgaged Property imposed pursuant to any Hazardous Materials Laws.  Any such lien shall be considered a Prohibited Activity or Condition.

(r)    Borrower represents and warrants to Lender that, except as previously disclosed by Borrower to Lender in writing, each of the following are true:

(1)    at the time of acquiring the Mortgaged Property, Borrower undertook all appropriate inquiry into the previous ownership and uses of the Mortgaged Property consistent with good commercial or customary practice and no evidence or indication came to light which would suggest that the Mortgaged Property has been or is now being used for any Prohibited Activities or Conditions; and

(2)    the Mortgaged Property has not been designated as "hazardous waste property" or "border zone property" pursuant to former (now repealed) Article 11 (Sections 25220, et seq.) of Chapter 6.5 of Division 20 of the California Health and Safety Code.

The representations and warranties in this Section 4.07 shall be continuing representations and warranties that shall be deemed to be made by Borrower throughout the term of the Loan, until the Indebtedness and all obligations under this Section 4.07 have been paid in full.

(s)    Without limiting any of the remedies provided in this Loan Agreement, Borrower acknowledges and agrees that each of the provisions in this Section 4.07 is an environmental provision (as defined in Section 736(f)(2) of the California Code of Civil Procedure) made by Borrower relating to the real property security (the **"Environmental Provisions"**), and that Borrower's failure to comply with any of the Environmental Provisions will be a breach of contract that will entitle Lender to pursue the remedies provided by Section 736 of the California Code of Civil Procedure (**"Section 736"**) for the recovery of damages and for the enforcement of the Environmental Provisions. Pursuant to Section 736, Lender's action for recovery of damages or enforcement of the Environmental Provisions shall not constitute an action within the meaning of Section 726(a) of the California Code of Civil Procedure or constitute a money judgment for a deficiency or a deficiency judgment within the meaning of Sections 580a, 580b, 580d, or 726(b) of the California Code of Civil Procedure.

(t)    The obligations of Borrower under this Section 4.07 (i) are separate and distinct from the Indebtedness and (ii) are **not** secured by the Mortgage or any other Loan Document pursuant to which Lender has been granted a security interest in any property as collateral for the repayment of the Indebtedness.

**4.08    Application of Payments.** If at any time Lender receives, from Borrower or otherwise, any amount applicable to the Indebtedness which is less than all amounts due and payable at such time, then Lender may apply that payment to amounts then due and payable in any manner and in any order determined by Lender (unless otherwise required by applicable law), in Lender's sole and absolute discretion. Neither Lender's acceptance of an amount that is less than all amounts then due and payable, nor Lender's application of such payment in the manner authorized, will constitute or be deemed to constitute either a waiver of the unpaid amounts or an accord and satisfaction. Notwithstanding the application of any such amount to the Indebtedness, Borrower's obligations under this Loan Agreement, the Note and all other Loan Documents will remain unchanged.

**4.09    Collateral Agreements.** Borrower shall deposit with Lender such amounts as may be required by any Collateral Agreement and shall perform all other obligations of Borrower under each Collateral Agreement.

**4.10    Use of Mortgaged Property.** Unless required by applicable law, Borrower shall not (a) except for any change in use approved by Lender, allow changes in the use for which all or any part of the Mortgaged Property was being used at the time this Loan Agreement was executed, (b) convert any individual dwelling unit or common area to commercial use, (c) convert, in whole or in part, any non-residential income producing units to non-income producing units, (d) initiate or acquiesce in a change in the zoning classification of the Mortgaged Property, or (e) establish any condominium or cooperative regime with respect to the Mortgaged Property. Borrower acknowledges that Lender has not agreed to grant any partial releases or reconveyances of any portion of the Mortgaged Property, and that the release and reconveyance of the lien of the Mortgage shall only be granted by Lender upon full repayment of the Indebtedness.

**4.11    Inspection.** Borrower shall permit Lender and the agents, representatives and designees of Lender to make or cause to be made entries upon and inspections of the Mortgaged Property (including environmental inspections and tests) during normal business hours, or at any other reasonable time. Borrower shall within five (5) days after written request by Lender provide the name, phone number, address and email address of a contact person for Borrower or for a property management company managing the Mortgaged Property to arrange such inspection. Such contact person shall meet Lender's inspector(s) at the Mortgaged Property at the time specified by Lender and shall provide Lender's inspector(s) with access to all areas of the Mortgaged Property as Lender's inspector's may require to complete such inspection. At any time when an Event of Default has occurred and is continuing, the cost of such inspections shall be paid by Borrower upon written demand by Lender and if not paid within thirty (30) days after such written demand, and, until paid, shall be added to and constitute a part of the Indebtedness as provided in Section 7 of the Mortgage.

**4.12    [Intentionally Omitted]**

**4.13    Compliance with Laws, Loan Documents and Organizational Documents.**

(a)    Borrower shall comply with all laws, ordinances, regulations and requirements of any Governmental Authority and all recorded lawful covenants and agreements relating to or affecting the Mortgaged Property, including all laws, ordinances, regulations, requirements and covenants pertaining to health and safety, construction of improvements on the Mortgaged Property, fair housing, zoning and land use, and Leases. Borrower also shall comply with all applicable laws that pertain to the maintenance and disposition of tenant security deposits.

(b)      Borrower shall at all times maintain records sufficient to demonstrate compliance with the provisions of this Article IV and other covenants contained in this Loan Agreement or any other Loan Document, and shall provide such records to Lender upon written demand by Lender.

(c)      Borrower shall take appropriate measures to prevent, and shall not engage in or knowingly permit, any illegal activities at the Mortgaged Property that could endanger tenants or visitors, result in damage to the Mortgaged Property, result in forfeiture of the Mortgaged Property, or otherwise materially impair the lien created by the Mortgage or Lender's interest in the Mortgaged Property.  Borrower represents and warrants to Lender that no portion of the Mortgaged Property has been or will be purchased with the proceeds of any illegal activity.

(d)      If Borrower is not a natural person: (A) Borrower, and any Sub-Entity, shall maintain its existence as long as any portion of the Indebtedness remains unpaid; and (B) Borrower shall give written notice to Lender within ten (10) days after any dissolution or event triggering dissolution of Borrower or any Sub-Entity (which shall constitute an Event of Default under clause (A) of this sentence).  As used herein, "Sub-Entity" shall include any managing or controlling entities, including any of the following that is not a natural person: (i) any manager or member of a limited liability company and any Sub-Entity thereof, (ii) any general partner of a general or limited partnership or limited liability partnership and any Sub-Entity thereof.  To the extent not in conflict with the provisions of this Loan Agreement and the other Loan Documents, Borrower shall at all times comply with its organizational documents, including but not limited to its partnership agreement (if Borrower is a partnership), its by-laws (if Borrower is a corporation or association) or its operating agreement (if Borrower is a limited liability company, joint venture or tenancy-in-common).  If Borrower is not a natural person, then: (A) Borrower shall at all times comply with all laws, regulations and requirements of any Governmental Authority relating to Borrower's formation, continued existence and good standing in the state or commonwealth of Borrower's formation; (B) if the state or commonwealth of Borrower's formation is not the Property Jurisdiction, Borrower shall register or qualify as a foreign entity in the Property Jurisdiction and maintain such registration or qualification in good standing; (C) Borrower shall promptly provide Lender with copies of any amendments or supplements to Borrower's and any Sub-Entity's organizational documents; and (D) within ten (10) days after request by Lender Borrower shall furnish evidence satisfactory to Lender that Borrower and any Sub-Entity is/are in good standing in its/their state(s) or commonwealth(s) of organization, and, if different, the Property Jurisdiction.

**4.14      Estoppel Certificate.**  Within ten (10) days after a request from Lender, Borrower shall deliver to Lender a written statement, signed and acknowledged by Borrower, certifying to Lender or any Person designated by Lender, as of the date of such statement, (i) that the Loan Documents are unmodified and in full force and effect (or, if there have been modifications, that the Loan Documents are in full force and effect as modified and setting forth such modifications); (ii) the unpaid principal balance of the Note; (iii) the date to which interest under the Note has been paid; (iv) that Borrower is not in default in paying the Indebtedness or in performing or observing any of the covenants or agreements contained in this Loan Agreement or any of the other Loan Documents (or, if Borrower is in default, describing such default in reasonable detail); (v) whether or not there are then existing any setoffs or defenses known to Borrower against the enforcement of any right or remedy of Lender under the Loan Documents; and (vi) any additional facts requested by Lender.

**4.15      Agreement to Provide Additional Documents.**  Borrower agrees to execute and acknowledge such additional documents as may be necessary or desirable in order to carry out the intent and purpose of this Loan Agreement and the other Loan Documents, to confirm or establish the lien of the Mortgage, or to correct any clerical errors or legal deficiencies.  Without limiting the foregoing, Borrower agrees to execute a replacement Note in the event the Note is lost or destroyed and to execute an amended or corrected and restated substitute Note to correct any clerical or other errors which may be discovered in the original Note.  Failure of Borrower to comply with any request by Lender pursuant to this Section 4.15 or under Section 12 of the Mortgage within ten (10) days after written request by Lender shall constitute a material Event of Default hereunder.

**ARTICLE V    TRANSFERS OF THE MORTGAGED PROPERTY OR INTERESTS IN BORROWER [NO RIGHT TO TRANSFER].**

**5.01      Prohibited and Permitted Transfers.**

(a)      "**Transfer**" means (A) a sale, assignment, transfer or other disposition (whether voluntary, involuntary or by operation of law); (B) the granting, creating or attachment of a lien, encumbrance or security interest (whether voluntary, involuntary or by operation of law); (C) the issuance or other creation of an ownership interest in a legal entity, including a partnership interest, interest in a limited liability company or corporate stock; (D) the withdrawal, retirement, removal or involuntary resignation of a partner in a partnership or a member or manager in a limited liability company; or (E) the merger, dissolution, liquidation, or consolidation of a legal entity or the reconstitution of one type of legal entity into another type of legal entity.  For purposes of defining the term "Transfer," the term "partnership" shall mean a general partnership, a limited partnership, a joint venture and a limited liability partnership, and the term "partner" shall mean a general partner, a limited partner and a joint venturer.

(b)     "Transfer" does not include: (i) a conveyance of the Mortgaged Property at a judicial or non-judicial foreclosure sale under the Mortgage, (ii) the Mortgaged Property becoming part of a bankruptcy estate by operation of law under the Bankruptcy Code, or (iii) a lien against the Mortgaged Property for local taxes and/or assessments not then due and payable.

(c)     The occurrence of any of the following events shall not constitute an Event of Default, notwithstanding any provision of this Section 5.01 to the contrary:

(i)     a Transfer to which Lender has consented;

(ii)    a Transfer that occurs by devise, descent, or by operation of law upon the death of a natural person (unless such death itself is an Event of Default under Section 6.01(p));

(iii)   the grant of a leasehold interest in an individual dwelling unit, so long as such leasehold interest (A) is for a term of two years or less, (B) does not contain an option to purchase and (C) is otherwise in accordance with the terms of this Loan Agreement;

(iv)    a Transfer of obsolete or worn out Personalty or Fixtures that are contemporaneously replaced by items of equal or better function and quality, which are free of liens, encumbrances and security interests other than those created by the Loan Documents or consented to by Lender; and

(v)     the creation of a mechanic's, materialman's, or judgment lien against the Mortgaged Property which is released of record or otherwise remedied to Lender's satisfaction within 60 days of the date of creation.

(d)     The occurrence of any of the following Transfers shall not constitute an Event of Default under this Loan Agreement, provided that Borrower has notified Lender in writing within 30 days following the occurrence of any of the following, and such Transfer does not constitute an Event of Default under any other provision of this Loan Agreement:

(i)     a change of Borrower's name, provided that UCC financing statements and/or amendments sufficient to continue the perfection of Lender's security interest have been properly filed and copies have been delivered to Lender;

(ii)    a change of the form of Borrower not involving a transfer of Borrower's assets and not resulting in any change in liability of any Initial Owner, provided that: (A) UCC financing statements and/or amendments sufficient to continue the perfection of Lender's security interest have been properly filed and copies have been delivered to Lender, (B) Lender has been provided, in advance, for Lender's review and approval, all proposed filings, amendments and other documents pertaining to such change in form, and (C) Borrower shall pay for attorneys' fees, and other out of pocket costs of Lender for the review of such documents and any filings, including any title endorsement costs if Lender in its discretion requires an endorsement or endorsements to Lender's title policy;

(iii)   the merger of Borrower with another entity when Borrower is the surviving entity;

(iv)    [intentionally omitted]; and

(v)     the grant of an easement, if before the grant Lender determines that the easement will not materially affect the operation or value of the Mortgaged Property or Lender's interest in the Mortgaged Property, and Borrower pays to Lender, upon demand, all costs and expenses, including Attorneys' Fees and Costs, incurred by Lender in connection with reviewing Borrower's request.

(e)     The occurrence of any of the following events shall constitute an Event of Default under this Loan Agreement:

(i)     a Transfer of all or any part of the Mortgaged Property or any interest in the Mortgaged Property, including the grant, creation or existence of any mortgage, deed of trust, deed to secure debt, security interest or other lien or encumbrance on the Mortgaged Property (other than the lien of the Mortgage and the liens and encumbrances reflected on the Schedule of Title Exceptions), whether voluntary, involuntary or by operation of law, and whether or not such lien has priority over the lien of the Mortgage;

(ii)    if Borrower is a limited partnership, a Transfer of (A) any general partnership interest, or (B) limited partnership interests in Borrower that would cause the Initial Owners of Borrower to own less than a Controlling Interest of all limited partnership interests in Borrower;

(iii)   if Borrower is a general partnership or a joint venture, a Transfer of any general partnership or joint venture interest in Borrower;

(iv)    if Borrower is a limited liability company, (A) a Transfer of any membership interest in Borrower which would cause the Initial Owners to own less than a Controlling Interest of all the membership interests in Borrower, (B) a Transfer of any membership or other interest of a manager in Borrower that results in a change of manager, or (C) a change of a nonmember manager;

(v)    if Borrower is a corporation, (A) the Transfer of any voting stock in Borrower which would cause the Initial Owners to own less than a Controlling Interest of any class of voting stock in Borrower or (B) if the outstanding voting stock in Borrower is held by 100 or more shareholders, one or more transfers by a single transferor within a 12-month period affecting an aggregate of 5% or more of that stock;

(vi)    if Borrower is a trust, (A) a Transfer of any beneficial interest in Borrower which would cause the Initial Owners to own less than a Controlling Interest of all the beneficial interests in Borrower, (B) the termination or revocation of the trust, or (C) the removal, appointment or substitution of a trustee of Borrower; and

(vii)    a Transfer of any interest in a Controlling Entity which, if such Controlling Entity were Borrower, would result in an Event of Default under any of <u>Sections 5.01(e)(i) through (vi)</u> above.

Lender shall not be required to demonstrate any actual impairment of its security or any increased risk of default in order to exercise any of its remedies with respect to an Event of Default under this <u>Section 5.01</u>.

## ARTICLE VI   EVENTS OF DEFAULT AND REMEDIES.

**6.01**    **Events of Default.**  The occurrence of any one or more of the following shall constitute an Event of Default under this Loan Agreement:

(a)    any failure by Borrower to pay or deposit when due any amount required by the Note, the Mortgage, this Loan Agreement or any other Loan Document;

(b)    any failure by Borrower to maintain the insurance coverage required by <u>Section 4.02</u> or to provide any financial information or documents required by <u>Section 4.05</u>;

(c)    [Intentionally Omitted];

(d)    fraud or material misrepresentation or material omission by Borrower, any of its officers, directors, trustees, general partners or managers or any Guarantor in connection with (A) the application for or creation of the Indebtedness, (B) any financial statement, rent roll, or other report or information provided to Lender during the term of the Indebtedness, or (C) any request for Lender's consent to any proposed action, including a request for disbursement of funds under any Collateral Agreement;

(e)    any event or condition that under the terms of this Loan Agreement is specified as constituting an Event of Default, including, without limitation, any Event of Default under <u>Article V</u>;

(f)    the commencement of a forfeiture action or proceeding, whether civil or criminal, which, in Lender's reasonable judgment, could result in a forfeiture of the Mortgaged Property or otherwise materially impair the lien created by the Mortgage or Lender's interest in the Mortgaged Property;

(g)    any event or condition occurs that results in any indebtedness secured by a mortgage, deed of trust or deed to secure debt on the Mortgaged Property (including the indebtedness secured by the Approved First Deed of Trust) becoming due prior to its scheduled maturity or that enables or permits (after the lapse of any applicable cure period) the holder of such indebtedness or any trustee or agent on its behalf to cause such indebtedness to become due prior to its scheduled maturity;

(h)    any failure by Borrower to perform any of its obligations under this Loan Agreement (other than those specified in <u>Sections 6.01(a)</u> through <u>(g)</u>) as and when required, which continues for a period of 30 days after notice of such failure by Lender to Borrower.  However, no such notice or grace period shall apply in the case of any such failure which could, in Lender's judgment, absent immediate exercise by Lender of a right or remedy under the Mortgage or this Loan Agreement, result in harm to Lender, impairment of the Note, the Mortgage or this Loan Agreement or any other security given under any other Loan Document;

(i)    any failure by Borrower or any Guarantor to perform any of its obligations as and when required under any Loan Document other than this Loan Agreement which continues beyond the applicable cure period, if any, specified in that Loan Document;

(j)    any event or condition occurs that results in any other indebtedness (i.e. indebtedness other than the Indebtedness secured by the Mortgage) owing by Borrower or any Borrower Affiliate (as defined below) to Lender becoming due prior to its scheduled maturity or that enables or permits (after the lapse of any applicable cure period) Lender or any trustee or agent on its behalf to cause such indebtedness to become due prior to its scheduled maturity (**"Borrower Affiliate"** means (i) any entity owned or controlled by Borrower, (ii) any entity commonly owned or controlled by the members or owners of Borrower, (iii) any Guarantor and (iv) any entity owned or controlled by one or more Guarantors);

(k)    [Intentionally Omitted];

(l)    should any representation or warranty contained in this Loan Agreement, any other Loan Document, or any other document submitted by Borrower to Lender be or become false or misleading in any material respect;

(m)    if the Mortgaged Property is subject to any covenants, conditions and/or restrictions, land use restriction agreements or similar agreements, Borrower fails to perform any of its obligations under any such agreement as and when required, and such failure continues beyond any applicable cure period;

(n)    Borrower or any Guarantor makes a general assignment for the benefit of creditors, voluntarily files for bankruptcy protection under the Bankruptcy Code or voluntarily becomes subject to any reorganization, receivership, insolvency proceeding or other similar proceeding pursuant to any other federal or state law affecting debtor and creditor rights, or an involuntary case is commenced against Borrower or any Guarantor by any creditor (other than Lender) of Borrower or any Guarantor pursuant to the Bankruptcy Code or other federal or state law affecting debtor and creditor rights to which Borrower or any Guarantor voluntarily becomes subject, and is not dismissed or discharged within 60 days after filing;

(o)    Borrower, any member, manager, officer, shareholder, general partner or trustee of Borrower, any Guarantor or any member, manager, officer, shareholder, general partner or trustee of any Guarantor, purports to revoke or dispute the validity of, or Borrower's or any Guarantor's liability under, any of the Loan Documents or any Guaranty; and

(p)    Borrower (if Borrower is a natural person) or any member, shareholder, partner or trustee of Borrower (if such member, shareholder, partner or trustee is a natural person), or any Guarantor who is a natural person, dies or becomes incompetent (unless, in the case of the death or incapacity of any member, shareholder or partner of Borrower, the Transfer of such member's, shareholder's or partner's interest in Borrower would not have been an Event of Default under Section 5.01); provided, however, that in the event of the death of any such person, Borrower (or such deceased person's executor, administrator or successor trustee) may within thirty (30) days after such death, present to Lender credit application(s) for proposed substitute borrower(s), member(s), shareholder(s), partner(s), trustee(s) or guarantor(s) on Lender's required forms, together with such supporting financial information as Lender may require, and in such event Lender, in its sole, absolute and unfettered discretion after review of such application(s) and supporting information, may waive such Event of Default, and provided further that such waiver may, in the case of the death or incompetence of Borrower or any Guarantor, require, as a condition of such waiver, that one or more substitute borrowers or guarantors assume unconditionally the obligations of such deceased person under the Loan Documents and/or guaranty, in a manner satisfactory to Lender.  In such event Borrower or the successor Borrower (s) shall execute such documentation as Lender may require and shall pay all of Lender's Attorneys' Fees and Costs and other out of pocket costs in connection with such assumption.

**6.02    Remedies.**

(a)    Upon an Event of Default, Lender may exercise any or all of its rights and remedies provided under the Loan Documents and Borrower shall pay all costs associated therewith, including Attorneys' Fees and Costs.

(b)    Each right and remedy provided in this Loan Agreement is distinct from all other rights or remedies under this Loan Agreement or any other Loan Document or afforded by applicable law or equity, and each will be cumulative and may be exercised concurrently, independently or successively, in any order.  Lender's exercise of any particular right or remedy will not in any way prevent Lender from exercising any other right or remedy available to Lender.  Lender may exercise any such remedies from time to time and as often as Lender chooses.

(c)    Lender will have all remedies available to Lender under Revised Article 9 of the Uniform Commercial Code of the Property Jurisdiction, the Loan Documents and under applicable law.

(d)    Lender may also retain (i) all money held pursuant to any Collateral Agreement, including interest, and (ii) any Imposition Deposits and any money held in any reserve fund or holdback fund, if applicable, and in Lender's sole and absolute discretion, may apply such amounts, without restriction and without any specific order of priority, to the payment of any and all Indebtedness.

(e)    If a claim or adjudication is made that Lender has acted unreasonably or unreasonably delayed acting in any case where, by law or under this Loan Agreement or the other Loan Documents, Lender has an obligation to act reasonably or promptly, then Lender shall not be liable for any monetary damages, and Borrower's sole remedy shall be limited to commencing an action seeking injunctive relief or declaratory judgment.  Any action or proceeding to determine whether Lender has acted reasonably shall be determined by an action seeking declaratory judgment.

**6.03    Forbearance.**

(a)    Lender may (but shall not be obligated to) agree with Borrower, from time to time, and without giving notice to, or obtaining the consent of, or having any effect upon the obligations of, any Guarantor or any other third party obligor, to take any

of the following actions: extend the time for payment of all or any part of the Indebtedness; reduce the payments due under this Loan Agreement, the Mortgage, the Note, or any other Loan Document; release anyone liable for the payment of any amounts under this Loan Agreement, the Mortgage, the Note, or any other Loan Document; accept a renewal of the Note; modify the terms and time of payment of the Indebtedness; join in any extension or subordination agreement; release any Mortgaged Property; take or release other or additional security; modify the rate of interest or period of amortization of the Note or change the amount of the monthly installments payable under the Note; and otherwise modify this Loan Agreement, the Mortgage, the Note, or any other Loan Document.

(b)      Any forbearance by Lender in exercising any right or remedy under this Loan Agreement, the Mortgage, the Note or any other Loan Document or otherwise afforded by applicable law, shall not be a waiver of or preclude the exercise of any right or remedy. The acceptance by Lender of payment of all or any part of the Indebtedness after the due date of such payment, or in an amount which is less than the required payment, shall not be a waiver of Lender's right to require prompt payment when due of all other payments on account of the Indebtedness or under the Environmental Indemnity or to exercise any remedies for any failure to make prompt payment. Enforcement by Lender of any security for the Indebtedness shall not constitute an election by Lender of remedies so as to preclude the exercise of any other right available to Lender. Lender's receipt of any awards or proceeds under Sections 4.02 and 4.03 shall not operate to cure or waive any Event of Default.

## ARTICLE VII  RELEASE; INDEMNITY.

**7.01      Release.** Borrower covenants and agrees that, in performing any of its duties under this Loan Agreement, none of Lender, Loan Servicer or any of their respective agents or employees will be liable for any losses, claims, damages, liabilities and expenses that may be incurred by any of them as a result of such performance, except that no party will be released from liability for any losses, claims, damages, liabilities or expenses arising out of the willful misconduct or gross negligence of such party.

**7.02      Indemnity.** Borrower agrees to indemnify, hold harmless and defend Lender, any prior owner or holder of the Note, the Loan Servicer, any prior Loan Servicer, the officers, directors, shareholders, partners, employees and trustees of each of the foregoing, and the heirs, legal representatives, successors and assigns of each of the foregoing (collectively, "**Indemnitees**") against any and all losses, claims, damages, liabilities and expenses including Attorneys' Fees and Costs, which may be imposed or incurred by any of them directly or indirectly arising out of, or in any way relating to, or as a result of (i) any failure of the Mortgaged Property to comply with the laws, regulations, ordinance, code or decree of any Governmental Authority, including those pertaining to the ADA, zoning, occupancy and subdivision of real property, (ii) any obligation of Borrower under any Lease, and (iii) any accident, injury or death to any natural person on the Mortgaged Property or any damage to personal property located on the Mortgaged Property, except that no such party will be indemnified from liability for any losses, claims, damages, liabilities or expenses arising out of the willful misconduct or gross negligence of such party.

## ARTICLE VIII  MISCELLANEOUS PROVISIONS.

**8.01      Waiver of Statute of Limitations, Offsets and Counterclaims.** Borrower waives the right to assert any statute of limitations as a bar to the enforcement of this Loan Agreement or the lien of the Mortgage or to any action brought to enforce any Loan Document. Borrower waives the right to assert a counterclaim, other than a compulsory counterclaim, in any action or proceeding brought against it by Lender or otherwise to offset any obligations to make the payments required by the Loan Documents. No failure by Lender to perform any of its obligations under the Loan Documents will be a valid defense to, or result in any offset against, any payments that Borrower is obligated to make under any of the Loan Documents.

**8.02      Governing Law; Consent to Jurisdiction and Venue.**

(a)      This Loan Agreement, and any Loan Document which does not itself expressly identify the law which is to apply to it, shall be governed by the laws of the Property Jurisdiction.

(b)      Borrower agrees that any controversy arising under or in relation to the Note, the Mortgage, this Loan Agreement or any other Loan Document may be litigated in the Property Jurisdiction. The state and federal courts and authorities with jurisdiction in the Property Jurisdiction will have jurisdiction over all controversies that may arise under or in relation to the Note, any security for the Indebtedness or any other Loan Document. Borrower irrevocably consents to service, jurisdiction and venue of such courts for any such litigation and waives any other venue to which it might be entitled by virtue of domicile, habitual residence or otherwise. However, nothing in this Section 8.02 is intended to limit Lender's right to bring any suit, action or proceeding relating to matters under this Loan Agreement in any court of any other jurisdiction.

**8.03    Notice.**

(a)    All notices, demands and other communications under or concerning this Loan Agreement or any other Loan Document shall be in writing.  Each notice shall be addressed to the intended recipient at the following address:

If to Borrower:

> THOMAS V. GIRARDI
> 100 Los Altos Drive
> Pasadena, CA 91105

If to Lender:

> ALT FINANCIAL NETWORK, INC.
> 18022 Cowan, Suite 245
> Irvine, CA 92614

Each notice shall be deemed given on the earliest to occur of (1) the date when the notice is received by the addressee; (2) the first Business Day after the notice is delivered to a recognized overnight courier service, with arrangements made for payment of charges for next Business Day delivery; or (3) the third Business Day after the notice is deposited in the United States mail with postage prepaid, certified mail, return receipt requested.

(b)    Any party to this Loan Agreement may change the address to which notices intended for it are to be directed by means of notice given to the other party in accordance with this Section 8.03.  Each party agrees that it will not refuse or reject delivery of any notice given in accordance with this Section 8.03, that it will acknowledge, in writing, the receipt of any notice upon request by the other party and that any notice rejected or refused by it shall be deemed for purposes of this Section 8.03 to have been received by the rejecting party on the date so refused or rejected, as conclusively established by the records of the U.S. Postal Service or the courier service.

(c)    Any notice under the Note and any other Loan Document which does not specify how notices are to be given shall be given in accordance with this Section 8.03.

**8.04    Successors and Assigns Bound.**  This Loan Agreement will bind the respective successors and assigns of Borrower and Lender, and the rights granted by this Loan Agreement will inure to Lender's successors and assigns.

**8.05    Joint and Several Liability.**  If more than one Person signs this Loan Agreement as Borrower, the obligations of such Persons shall be joint and several.

**8.06    Relationship of Parties; No Third Party Beneficiary.**

(a)    The relationship between Lender and Borrower shall be solely that of creditor and debtor, respectively, and nothing contained in this Loan Agreement will create any other relationship between Lender and Borrower.  Nothing contained in this Loan Agreement will constitute Lender as a joint venturer, partner or agent of Borrower, or render Lender liable for any debts, obligations, acts, omissions, representations or contracts of Borrower.

(b)    No creditor of any party to this Loan Agreement and no other Person shall be a third party beneficiary of this Loan Agreement or any other Loan Document.  Without limiting the generality of the preceding sentence, (i) any arrangement (**"Servicing Arrangement"**) between Lender and any Loan Servicer for loss sharing or interim advancement of funds will constitute a contractual obligation of such Loan Servicer that is independent of the obligation of Borrower for the payment of the Indebtedness, (ii) Borrower will not be a third party beneficiary of any Servicing Arrangement, and (iii) no payment by the Loan Servicer under any Servicing Arrangement will reduce the amount of the Indebtedness.

**8.07    Severability; Amendments.**

(a)    The invalidity or unenforceability of any provision of this Loan Agreement will not affect the validity or enforceability of any other provision, and all other provisions will remain in full force and effect.  This Loan Agreement contains the entire agreement among the parties as to the rights granted and the obligations assumed in this Loan Agreement.

(b)    This Loan Agreement may not be amended or modified except by a writing signed by the party against whom enforcement is sought.

**8.08    Disclosure of Information.**  Borrower acknowledges that Lender may furnish information regarding Borrower or the Mortgaged Property to third parties with an existing or prospective interest in the servicing, enforcement, evaluation, performance, purchase or securitization of the Indebtedness, including trustees, master servicers, sub-servicers, special servicers, rating

agencies and organizations maintaining databases on the underwriting and performance of commercial mortgage loans, as well as governmental regulatory agencies having regulatory authority over Lender, designated Persons pursuant to an order or legal process of any court or governmental agency, and independent auditors, accountants, attorneys or other professionals acting on behalf of any of the foregoing. To the fullest extent permitted under applicable law, Borrower irrevocably waives all rights, if any, to prohibit such disclosure, including any right of privacy.

**8.09     Determinations by Lender.** Unless otherwise provided in this Loan Agreement, in any instance where the consent or approval of Lender may be given or is required, or where any determination, judgment or decision is to be rendered by Lender under this Loan Agreement, the granting, withholding or denial of such consent or approval and the rendering of such determination, judgment or decision will be made or exercised by Lender (or its designated representative) at its sole and exclusive option and in its sole and absolute discretion.

**8.10     Sale of Note; Change in Servicer; Loan Servicing.** The Note or a partial interest in the Note (together with this Loan Agreement and the other Loan Documents) may be sold one or more times without prior notice to Borrower. A sale may result in a change of the Loan Servicer. There also may be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given notice of the change. All actions regarding the servicing of the Loan, including the collection of payments, the giving and receipt of notice, inspections of the Mortgaged Property, inspections of books and records, and the granting of consents and approvals, may be taken by the Loan Servicer unless Borrower receives notice to the contrary. If Borrower receives conflicting notices regarding the identity of the Loan Servicer or any other subject, any such notice from Lender shall govern.

**8.11     Construction.** The captions and headings of the Articles and Sections of this Loan Agreement are for convenience only and shall be disregarded in construing this Loan Agreement. Any reference in this Loan Agreement to a "Schedule", an "Exhibit," an "Article" or a "Section" shall, unless otherwise explicitly provided, be construed as referring, respectively, to a Schedule or Exhibit attached to this Loan Agreement or to an Article or Section of this Loan Agreement. All Schedules, Exhibits and Riders attached to or referred to in this Loan Agreement are incorporated by reference in this Loan Agreement. Any reference in this Loan Agreement to a statute or regulation shall be construed as referring to that statute or regulation as amended from time to time. Use of the singular in this Loan Agreement includes the plural and use of the plural includes the singular. As used in this Loan Agreement, the term "including" means "including, but not limited to" and the term "includes" means "includes without limitation." The use of one gender includes the other gender, as the context may require. Unless the context requires otherwise, (a) any definition of or reference to any agreement, instrument or other document in this Loan Agreement shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth in this Loan Agreement or any other Loan Document), and (b) any reference in this Loan Agreement to any Person shall be construed to include such Person's successors and assigns.

**8.12     Loan Charges.** If any applicable law limiting the amount of interest or other charges permitted to be collected from Borrower is interpreted so that any charge provided for in any Loan Document, whether considered separately or together with other charges levied in connection with any other Loan Document, violates that law, and Borrower is entitled to the benefit of that law, that charge is hereby reduced to the extent necessary to eliminate that violation. The amounts, if any, previously paid to Lender in excess of the permitted amounts shall be applied by Lender to reduce the principal of the Indebtedness. For the purpose of determining whether any applicable law limiting the amount of interest or other charges permitted to be collected from Borrower has been violated, all Indebtedness which constitutes interest, as well as all other charges levied in connection with the Indebtedness which constitute interest, shall be deemed to be allocated and spread over the stated term of the Note. Unless otherwise required by applicable law, such allocation and spreading shall be effected in such a manner that the rate of interest so computed is uniform throughout the stated term of the Note.

**8.13     Payment of Closing Costs.** If for any reason the escrow or closing agent fails to reserve and pay for all of Lender's fees, legal, documentation, appraisal, title, recording and other closing costs incurred in connection with the closing and funding of the Loan, then Borrower shall pay or reimburse Lender for any such unpaid fees or costs within ten (10) days after written demand by Lender itemizing the unpaid fees and costs. Failure of Borrower to so pay or reimburse Lender for any such unpaid fees and costs within ten (10) days after written demand by Lender shall constitute an Event of Default and, without limiting any other remedies of Lender, Lender may immediately instate the Default Rate under the Note until such amounts are received by Lender.

**8.14     Time is of the Essence.** Time is of the essence with respect to each covenant of this Loan Agreement.

**8.15     Document Imaging.** Lender shall be entitled, in its sole discretion, to image or make copies of all or any selection of the agreements, instruments, documents, items and records governing, arising from or relating to any of Borrower's loans, including, without limitation, this Loan Agreement and the other Loan Documents, and Lender may destroy or archive the paper

originals.  Borrower (i) waives any right to insist or require that Lender produce paper originals, (ii) agrees that such images shall be accorded the same force and effect as the paper originals, (iii) agrees that Lender is entitled to use such images in lieu of destroyed or archived originals for any purpose, including as admissible evidence in any demand, presentment or other proceedings, and (iv) further agrees that any executed facsimile (faxed), scanned, or other imaged copy of this Loan Agreement or any other Loan Document shall be deemed to be of the same force and effect as the original manually executed document.

**ATTACHED EXHIBIT.**  The following Exhibit is attached to this Loan Agreement:

Exhibit "A"          Description of the Land

**IN WITNESS WHEREOF**, each party hereto has signed and delivered this Loan Agreement under seal (where applicable) or has caused this Loan Agreement to be signed and delivered by its duly authorized representative under seal (where applicable).  Where applicable law so provides or allows, each party hereto intends that this Loan Agreement shall be deemed to be signed and delivered as a sealed instrument.

**SIGNATURE(S) ON FOLLOWING PAGE(S)**

**BORROWER:**

_____

THOMAS V. GIRARDI

**SIGNATURE(S) CONTINUED ON FOLLOWING PAGE(S)**

**LENDER:**

**ALT FINANCIAL NETWORK, INC.,**
a California corporation

By: _____
    ALBERT HANNA, President

## EXHIBIT "A"
### DESCRIPTION OF THE LAND

THE LAND REFERRED TO HEREIN BELOW IS SITUATED IN THE CITY OF PASADENA, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AND IS DESCRIBED AS FOLLOWS:

LOTS 21 AND 22 OF TRACT NO. 8702, IN THE CITY OF PASADENA, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 118, PAGES 1 AND 2 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY AND THAT PORTION OF LOT 23 IN SAID TRACT NO. 8702, DESCRIBED AS FOLLOWS:

BEGINNING AT THE MOST SOUTHERLY CORNER OF SAID LOT 23; THENCE NORTHERLY ALONG THE CURVED WESTERLY LINE OF SAID LOT 23, A DISTANCE OF 26.54 FEET; THENCE NORTH 72° 48' 10" EAST 74.50 FEET TO A POINT IN THE SOUTHEASTERLY LINE OF SAID LOT 23 DISTANT THEREON NORTH 54° 44' 10" EAST 84.15 FEET FROM THE POINT OF BEGINNING; THENCE ALONG SAID SOUTHEASTERLY LINE SOUTH 54° 44' 10" WEST 84.15 FEET TO THE POINT OF BEGINNING.

APN: 5708-025-009, 5708-025-008

PROPERTY ADDRESS: 100 LOS ALTOS DRIVE, PASADENA, CA 91105

## CALIFORNIA PREPAYMENT PREMIUM WAIVER
### (Waiver of California Civil Code Section 2954.10)

This CALIFORNIA PREPAYMENT PREMIUM WAIVER ("**Agreement**") is made as of **October 7, 2019**, in connection with a real estate loan to be made by **ALT FINANCIAL NETWORK, INC., a California corporation**, its successors and/or assigns ("**Lender**") to **THOMAS V. GIRARDI** ("**Borrower**"), which loan shall be evidenced by a Promissory Note of even date herewith in the amount of **TWO MILLION FIVE HUNDRED THOUSAND AND 00/100 DOLLARS (US $2,500,000.00)** (the "**Note**") and secured by a Deed of Trust, Assignment of Rents, Security Agreement and Fixture Filing of even date herewith (the "**Mortgage**") upon the real property located at **100 Los Altos Drive, Pasadena, CA 91105**. All capitalized terms used herein and not otherwise defined herein shall have the meaning set forth in the Mortgage.

1.      Borrower is aware of and understands California Civil Code Section 2954.10, which provides as follows:
**"2954.10.  Acceleration of maturity date; penalty for prepayment.** An obligee which accelerates the maturity date of the principal and accrued interest, pursuant to contract, on any loan secured by a mortgage or deed of trust on real property or an estate for years therein, upon the conveyance of any right, title, or interest in that property, may not claim, exact, or collect any charge, fee, or penalty for any prepayment resulting from that acceleration.

The provisions of this section shall not apply to a loan other than a loan secured by residential real property or any interest therein containing four units or less, in which the obligor has expressly waived, in writing, the right to repay in whole or part without penalty, or has expressly agreed, in writing, to the payment of a penalty for prepayment upon acceleration. For any loan executed on or after January 1, 1984, any such waiver or agreement shall be separately signed or initialed by the obligor and its enforcement shall be supported by evidence of a course of conduct by the obligee of individual weight to the consideration in that transaction for the waiver or agreement."

2.      Borrower has read and understands the provisions of the Note and Mortgage, including the provisions which provide, in general, that if the Note is accelerated because of the occurrence of any Event of Default (including without limitation any transfer or encumbrance of the Mortgaged Property without Lender's consent), the prepayment premium described in the Note will be imposed and collected upon prepayment of the loan. Borrower acknowledges that it understands and is familiar with the nature and effect of the Note and other Loan Documents, including the above-described provisions. Borrower further acknowledges that if any such Event of Default occurs, the resulting actual damages to Lender would be difficult to measure and that the payment of the prepayment premium described in the Note is a reasonable estimate of such damages. Borrower hereby initials below to indicate its understanding of these provisions, and specifically its waiver of the provisions of Section 2954.10 of the California Civil Code.

**BORROWER'S INITIALS:**

3.      Borrower agrees that Lender will grant the subject loan to Borrower only if Borrower agrees to the loan acceleration and prepayment premium provisions set forth in the Note and to the waivers contained in this Agreement. Borrower further agrees and recites conclusively that Borrower and Lender each have given individual weight to the consideration given by Lender for this Agreement on the part of Borrower, which consideration is the granting of the subject loan described above.

4.      Furthermore, Borrower conclusively recites and agrees that with respect to the subject loan, the prepayment provisions described in the Note are reasonable, valid and also binding on Borrower, its successors and assigns, and this recitation and agreement may be conclusively relied upon by Lender and the successors and assigns of Lender.

5.      This Agreement may be executed in any number of counterparts each of which shall be deemed an original, but all such counterparts together shall constitute but one Agreement.

**BORROWER:**

THOMAS V. GIRARDI

Prepared by LoanDocSolutions
California Prepayment Premium Waiver
Loan No.: 20190822000

## BUSINESS PURPOSE OF LOAN CERTIFICATION

| Lender: | **ALT FINANCIAL NETWORK, INC.** | Borrower: | **THOMAS V. GIRARDI** |
|---|---|---|---|
| Date: | **October 7, 2019** | Loan Number: | **20190822000** |

Borrower certifies to Lender, its agents, employees, successors and assigns the following:

1.      Borrower has applied for and has obtained or may obtain a loan in the principal amount of **$2,500,000.00** (the "**Loan**").  The Loan will be secured by a Deed of Trust, Assignment of Rents, Security Agreement and Fixture Filing on the real property commonly known as **100 Los Altos Drive, Pasadena, CA 91105**.

2.      Lender has stressed the importance of knowing the primary purpose of the Loan.  Borrower understands that the legal responsibilities of Lender vary considerably depending upon whether a loan is a consumer loan, which is for personal, household or family purposes, or a business loan, which is for every other purpose.

3.      Borrower has previously represented to Lender, and hereby represents again in this certification to Lender, its successors and assigns, that ALL of the purposes of the Loan are for business purposes.

4.      No part of the Loan proceeds is intended to be used for a non-business (i.e., consumer) purpose.

Borrower declares under penalty of perjury under the laws of the State of **California** that the foregoing is true and correct.

**Dated: October 7, 2019**

**BORROWER:**

_____
**THOMAS V. GIRARDI**

**Prepared by LoanDocSolutions**
**Business Purpose of Loan Certification**
**Loan No.: 20190822000**

Exhibit A                                                      Page 50 of 60

# THE HOUSING FINANCIAL DISCRIMINATION ACT OF 1977
## FAIR LENDING NOTICE

It is illegal to discriminate in the provision of or in the availability of financial assistance because of the consideration of:

1. Trends, characteristics or conditions in the neighborhood or geographic area surrounding a housing accommodation, unless the financial institution can demonstrate in the particular case that such consideration is required to avoid an unsafe and unsound business practice: or

2. Race, color, religion, sex, marital status, domestic partnership, national origin or ancestry.

It is illegal to consider the racial, ethnic, religious or national origin composition of a neighborhood or geographic area surrounding a housing accommodation or whether or not such composition is undergoing change, or is expected to undergo change, in appraising a housing accommodation or in determining whether or not, or under what terms and conditions, to provide financial assistance.

These provisions govern financial assistance for the purpose of the purchase, construction, rehabilitation or refinancing of one- to four-unit family residences occupied by the owner and for the purpose of the home improvement of any one- to four-unit family residence.

*If you have any questions about your rights, or if you wish to file a complaint, contact the management of this financial institution or the Department of Business Oversight at one of the following locations:*

| | |
|---|---|
| 1515 K Street, Suite 200<br>Sacramento, CA 95814-4052<br>Tel: 916-445-7205<br>(866) 275-2677 | 320 West 4th Street, Suite 750<br>Los Angeles, CA 90013-2344<br>Tel: (213) 576-7500<br>(866) 275-2677 |
| One Sansome Street, Suite 600<br>San Francisco, CA 94104-4428<br>Tel: (415) 972-8565<br>(866) 275-2677 | 1350 Front St. #2034<br>San Diego, CA 92101-3697<br>Tel: (619) 525-4233<br>(866) 275-2677 |
| 45 Fremont Street, Suite 1700<br>San Francisco, CA 94105-2219<br>Tel: (415) 263-8500<br>Fax: (415) 288-8830 | 7575 Metropolitan Drive, Suite 108<br>San Diego, CA 92108-4421<br>Tel: (619) 682-7227<br>Fax: (619) 682-7217 |
| 300 S. Spring Street, Suite 15513,<br>Los Angeles, CA 90013-1259<br>Tel: (213) 897-2085<br>Fax: (213) 897-8860 | |

## ACKNOWLEDGMENT OF RECEIPT

Borrower has received a copy of this notice.

BORROWER:

_____

THOMAS V. GIRARDI

Prepared by LoanDocSolutions
Fair Lending Notice
Loan No.: 20190822000

## FEDERAL EQUAL CREDIT OPPORTUNITY ACT NOTICE

| Lender: | Borrower: |
|---|---|
| **ALT FINANCIAL NETWORK, INC.** | **THOMAS V. GIRARDI** |
| Date: | Loan Number: |
| **October 7, 2019** | **20190822000** |

The Federal Equal Credit Opportunity Act prohibits creditors from discriminating against credit applicants on the basis of race, color, religion, national origin, sex, marital status, age (provided the applicant has the capacity to enter into a binding contract); because all or part of the applicant's income derives from any public assistance program; or because the applicant has in good faith exercised any right under the Consumer Credit Protection Act.

The Federal Agency that administers compliance with this law concerning this creditor is:

<div align="center">

COMPTROLLER OF THE CURRENCY,
CUSTOMER ASSISTANCE GROUP
1301 MCKINNEY STREET, SUITE 3450
HOUSTON, TX 77010-9050

</div>

By signing below, Borrower acknowledges that Borrower has read and received a copy of this document.

**BORROWER:**

**THOMAS V. GIRARDI**

# NOTICE OF RIGHT TO RECEIVE
# COPY OF REAL ESTATE APPRAISAL REPORT
## (E.C.O.A.)

| Lender: | Applicant/Borrower: |
|---|---|
| **ALT FINANCIAL NETWORK, INC.** | **THOMAS V. GIRARDI** |
| Date: | Property Address: |
| **October 7, 2019** | **100 Los Altos Drive, Pasadena, CA 91105** |

We may order an appraisal to determine the property's value and charge you for this appraisal.  We will promptly give you a copy of any appraisal, even if your loan does not close.

You can pay for an additional appraisal for your own use at your own cost.

If you have any questions regarding the above, please contact:

> ALT FINANCIAL NETWORK, INC.
> 18022 Cowan, Suite 245
> Irvine, CA 92614

**APPLICANT/BORROWER:**

**THOMAS V. GIRARDI**

Prepared by LoanDocSolutions
Notice of Right to Receive Copy of Real Estate Appraisal Report (Appraisal Disclosure)
Loan No.: 20190822000

# ACKNOWLEDGEMENT OF RECEIPT OF
# COPY OF REAL ESTATE APPRAISAL REPORT
## (E.C.O.A.)

| Lender:                        | Borrower:                               |
|--------------------------------|-----------------------------------------|
| **ALT FINANCIAL NETWORK, INC.** | **THOMAS V. GIRARDI**                  |
| Date:                          | Property Address:                       |
| **October 7, 2019**            | **100 Los Altos Drive, Pasadena, CA 91105** |

Borrower understands that Borrower is entitled to a copy of any written report regarding the valuation of the property securing this loan (the **"Property"**) promptly upon completion at no additional cost to Borrower, and, in any event, no later than 3 days prior to the closing of the loan.

Borrower hereby acknowledges receipt of the written report setting forth the value of the Property.

**BORROWER:**

**THOMAS V. GIRARDI**

Prepared by LoanDocSolutions
Acknowledgement of Receipt of Copy of Real Estate Appraisal Report (Receipt)
Loan No.: 20190822000

Exhibit A                                                    Page 54 of 60

# BALLOON PAYMENT DISCLOSURE

| | |
|---|---|
| **BORROWER:** | **THOMAS V. GIRARDI** |
| **PROPERTY:** | **100 Los Altos Drive, Pasadena, CA 91105** |
| **LOAN NO:** | **20190822000** |
| **DATE:** | **October 7, 2019** |
| **LOAN MATURITY DATE:** | **November 1, 2021** |

THE NOTE YOU ARE SIGNING WITH RESPECT TO THE LOAN YOU ARE OBTAINING FROM **ALT FINANCIAL NETWORK, INC., A CALIFORNIA CORPORATION**, REQUIRES THE ENTIRE AMOUNT OF OUTSTANDING PRINCIPAL AND ACCRUED INTEREST TO BE PAYABLE IN FULL ON THE "BALLOON PAYMENT / MATURITY DATE" INDICATED BELOW.

NOTICE TO BORROWER: IF YOU DO NOT HAVE THE FUNDS TO PAY THE BALLOON PAYMENT WHEN IT COMES DUE, YOU MAY HAVE TO OBTAIN A NEW LOAN AGAINST THE PROPERTY TO MAKE THE BALLOON PAYMENT. IN THAT CASE, YOU MAY AGAIN HAVE TO PAY COMMISSIONS, FEES, AND EXPENSES FOR THE ARRANGING OF THE NEW LOAN. IN ADDITION, IF YOU ARE UNABLE TO MAKE THE MONTHLY PAYMENTS OR THE BALLOON PAYMENT, YOU MAY LOSE THE PROPERTY AND ALL OF YOUR EQUITY THROUGH FORECLOSURE. KEEP THIS IN MIND IN DECIDING UPON THE AMOUNT AND TERMS OF THIS LOAN.

| | |
|---|---|
| **BALLOON PAYMENT / MATURITY DATE:** | **November 1, 2021** |
| **BALLOON PAYMENT AMOUNT:** | **$2,523,356.16** |

(Plus any unpaid late charges or other unpaid amounts due under the Loan Agreement, Note or Deed of Trust.)

PLEASE BE SURE YOU FULLY UNDERSTAND THE ABOVE BEFORE SIGNING THE NOTE AND OTHER RELATED LOAN DOCUMENTS.

BORROWER ACKNOWLEDGES RECEIPT OF THE ABOVE AND CERTIFIES FULL UNDERSTANDING OF ALL OF THE TERMS AND CONDITIONS OF THE NOTE, INCLUDING THE BALLOON PAYMENT REQUIREMENT.

**BORROWER:**

THOMAS V. GIRARDI

Prepared by LoanDocSolutions
Balloon Payment Disclosure
Loan No.: 20190822000

# PATRIOT ACT INFORMATION DISCLOSURE

## CUSTOMER IDENTIFICATION PROGRAM

## IMPORTANT INFORMATION ABOUT APPLICATION PROCEDURES

To help the U. S. government fight the funding of terrorism and money laundering activities, Federal law requires all financial institutions to obtain, verify, and record information that identifies every person who opens an account.

What this means for you: When you apply for a loan, we will ask for your name, address, date of birth, and other information that will allow us to identify you.  We may also ask to see your driver's license or other identifying documents.

## ACKNOWLEDGMENT OF RECEIPT

*Borrower has received a copy of this notice.*

**BORROWER:**

_____   Date _10 ' 8 - 19_
THOMAS V. GIRARDI

Prepared by LoanDocSolutions
Patriot Act Information Disclosure
Loan No.: 20190822000

## HAZARD INSURANCE DISCLOSURE

**(California Civil Code Section 2955.5)**

Re:    **$2,500,000.00** loan from **ALT FINANCIAL NETWORK, INC.** to **THOMAS V. GIRARDI** ("Borrower"), secured by real property located at **100 Los Altos Drive, Pasadena, CA 91105**; Loan No. 20190822000.

**CALIFORNIA LAW PROVISIONS RELATING TO INSURANCE COVERAGE.** Borrower acknowledges that Borrower is aware of the following provision of Subdivision (a) of Section 2955.5 of the California Civil Code, which provides as follows:

"No lender shall require a borrower, as a condition of receiving or maintaining a loan secured by real property, to provide hazard insurance coverage against risks to the improvements on that real property in an amount exceeding the replacement value of the improvements on the property."

Dated:  **October 7, 2019**

**BORROWER:**

**THOMAS V. GIRARDI**

**Prepared by LoanDocSolutions**
**Hazard Insurance Disclosure (California)**
**Loan No.: 20190822000**

## LIMITED POWER OF ATTORNEY
## TO CORRECT DOCUMENTS

THOMAS V. GIRARDI ("Borrower"), for and in consideration of the approval, closing and funding of the loan represented by that certain Promissory Note of even date herewith executed by Borrower in the amount of **TWO MILLION FIVE HUNDRED THOUSAND AND 00/100 DOLLARS (US $2,500,000.00)** (the "**Loan**"), hereby grants any authorized representative of **ALT FINANCIAL NETWORK, INC., a California corporation**, its successors and/or assigns ("**Lender**") a limited power of attorney ("**Limited Power of Attorney**") to correct and/or execute and/or initial all typographical or clerical errors discovered in any or all of the loan documentation required to be executed by Borrower in connection with the Loan. In the event this Limited Power of Attorney is exercised, Borrower will be notified and will receive a copy of any document executed or initialed on Borrower's behalf.

Any of the required corrections must be executed directly by Borrower within ten days after written request by Lender, as required by that certain Loan Agreement of even date herewith entered into between Borrower and Lender in connection with the Loan. Any delay or failure of Borrower to execute any required correction documents shall not affect the validity of corrections made by Lender pursuant to the Limited Power of Attorney granted herein.

This Limited Power of Attorney shall automatically terminate upon full repayment of the Loan. This Limited Power of Attorney is in addition to, and does not limit in any way, any rights or powers granted to Lender under the terms of any agreement or other document executed in connection with the Loan. This Limited Power of Attorney may be executed in any number of counterparts each of which shall be deemed an original, but all such counterparts together shall constitute but one Limited Power of Attorney.

IN WITNESS WHEREOF, this Limited Power of Attorney has been executed by the undersigned as of **October 7, 2019**.

BORROWER:

THOMAS V. GIRARDI

*RECORDING REQUESTED BY*
*AND WHEN RECORDED MAILED TO:*

ALT FINANCIAL NETWORK, INC.
18022 Cowan, Suite 245
Irvine, CA 92614

Tax Parcel Number(s):  **5708-025-009, 5708-025-008**

Space Above for Recorder's Use

## REQUEST FOR COPY OF NOTICE OF DEFAULT

In accordance with Section 2924b, Civil Code, request is hereby made that a copy of any notice of default and a copy of any notice of sale under the deed of trust recorded **May 5, 2014**, as Instrument No. **2014-464309**, of Official Records of **Los Angeles** County, State of **California** and encumbering land described in Exhibit "A", executed by **THOMAS V. GIRARDI, a married man as his sole and separate property**, as trustor, in which **MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. (MERS), solely as nominee for Directors Financial Group** is named as beneficiary, and **TITLE 365**, as trustee, be mailed to **ALT FINANCIAL NETWORK, INC.** at **18022 Cowan, Suite 245, Irvine, CA 92614.**

NOTICE:  A copy of any notice of default and of any notice of sale will be sent only to the address contained in this recorded request.  If your address changes, a new request must be recorded.

**ALT FINANCIAL NETWORK, INC.,**
**a California corporation**

By: _____
   **ALBERT HANNA, President**

CA Request for Copy of Notice of Default

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California                    ) ss.

County of **los Angeles**     )

On **October 8**, 2019, before me, **Brittany Welch** _____, Notary Public, personally appeared **ALBERT HANNA,**

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.



**BRITTANY WELCH**
COMM. # 2142540
NOTARY PUBLIC CALIFORNIA
ORANGE COUNTY
My comm. expires Feb. 12, 2020

Signature _____

Signature of Notary Public

Place Notary Seal Above

# EXHIBIT B

 **This page is part of your document - DO NOT DISCARD**

# 20191149333

**Pages: 0015**

**Recorded/Filed in Official Records**
**Recorder's Office, Los Angeles County,**
**California**

**10/25/19 AT 08:00AM**

| | |
|---|---|
| FEES: | 126.00 |
| TAXES: | 0.00 |
| OTHER: | 0.00 |
| PAID: | 126.00 |

LEADSHEET

201910250260053

**00017352367**

010234191

**SEQ:**
**03**

SECURE - 8:00AM

**THIS FORM IS NOT TO BE DUPLICATED**

E248971

**20_4760383_1_2**

FIDELITY NATIONAL TITLE
ORANGE COUNTY

*RECORDING REQUESTED BY
AND WHEN RECORDED MAIL TO:*

ALT FINANCIAL NETWORK, INC.
18022 Cowan, Suite 245
Irvine, CA 92614

Tax Parcel Number(s): 5708-025-009, 5708-025-008

266500

Space Above for Recorder's Use

**DEED OF TRUST,
ASSIGNMENT OF RENTS,
SECURITY AGREEMENT AND FIXTURE FILING**

**(CALIFORNIA)**

**Exempt from fee per GC
27388.1 (a) (1); fee cap of
$225 reached**

ATTENTION COUNTY RECORDER:  THIS INSTRUMENT IS INTENDED TO BE EFFECTIVE AS A FINANCING STATEMENT FILED AS A FIXTURE FILING PURSUANT TO SECTION 9502 OF THE CALIFORNIA COMMERCIAL CODE.  PORTIONS OF THE GOODS COMPRISING A PART OF THE MORTGAGED PROPERTY ARE OR ARE TO BECOME FIXTURES RELATED TO THE LAND DESCRIBED IN EXHIBIT "A" HERETO. THIS INSTRUMENT IS TO BE FILED FOR RECORD IN THE RECORDS OF THE COUNTY WHERE DEEDS OF TRUST ON REAL PROPERTY ARE RECORDED AND SHOULD BE INDEXED AS BOTH A DEED OF TRUST AND AS A FINANCING STATEMENT COVERING FIXTURES. THE MAILING ADDRESSES OF BORROWER (DEBTOR) AND LENDER (SECURED PARTY) ARE SPECIFIED IN PARAGRAPH A OF THIS INSTRUMENT.

  **A.**  THIS DEED OF TRUST, ASSIGNMENT OF RENTS, SECURITY AGREEMENT AND FIXTURE FILING (this "Instrument") is dated as of **October 7, 2019**, and is given by **THOMAS V. GIRARDI**, whose address is **100 Los Altos Drive, Pasadena, CA 91105**, as trustor ("Borrower"), to FIDELITY NATIONAL TITLE INSURANCE COMPANY, a Florida corporation, as trustee ("Trustee"), for the benefit of ALT FINANCIAL NETWORK, INC., a California corporation, whose address is **18022 Cowan, Suite 245, Irvine, CA 92614**, as beneficiary ("Lender").

  **B.**  Borrower in consideration of the Indebtedness and the trust created by this Instrument, irrevocably grants, conveys and assigns to Trustee, in trust, with power of sale, the Mortgaged Property, including the Land located in **Los Angeles** County, State of California and described in Exhibit "A" attached to this Instrument.

THIS DEED OF TRUST IS, AT THE TIME OF RECORDATION, A SECOND DEED OF TRUST, AND IS SUBJECT AND SUBORDINATE TO AN EXISTING $3,000,000.00 FIRST DEED OF TRUST DATED APRIL 8, 2014 (THE "APPROVED FIRST DEED OF TRUST"), WHICH APPROVED FIRST DEED OF TRUST WAS RECORDED ON MAY 5, 2014 AS INSTRUMENT NO. 2014-464309, OFFICIAL RECORDS OF LOS ANGELES COUNTY, STATE OF CALIFORNIA.

*California Deed of Trust*

**C.** TO SECURE TO LENDER the repayment of the Indebtedness evidenced by Borrower's Promissory Note payable to Lender, dated as of the date of this Instrument, and maturing on the earlier of (i) November 1, 2021, and (ii) the date on which the unpaid principal balance of the Note becomes due and payable by acceleration or otherwise pursuant to the Loan Documents or the exercise by Lender of any right or remedy under any Loan Document (the "**Maturity Date**"), in the principal amount of **TWO MILLION FIVE HUNDRED THOUSAND AND 00/100 DOLLARS (US $2,500,000.00)**, and all renewals, extensions and modifications of the Indebtedness, the payment of all sums advanced by or on behalf of Lender to protect the security of this Instrument under Section 7, and the performance of the covenants and agreements of Borrower contained in the Loan Documents (other than the Environmental Indemnity and any guaranty).

**D.** Borrower represents and warrants that Borrower is lawfully seized of the Mortgaged Property and has the right, power and authority to grant, convey and assign the Mortgaged Property, and that the Mortgaged Property is unencumbered, except as shown on the Schedule of Title Exceptions. Borrower covenants that Borrower will warrant and defend generally the title to the Mortgaged Property against all claims and demands, subject to any easements and restrictions listed in the Schedule of Title Exceptions.

---

**Request for Notice of Default under California Civil Code Section 2924b**

In accordance with Section 2924b, Civil Code, request is hereby made that a copy of any notice of default and a copy of any notice of sale under the deed of trust recorded May 5, 2014, as Instrument No. 2014-464309, of Official Records of Los Angeles County, State of California, executed by THOMAS V. GIRARDI, a married man as his sole and separate property, as trustor, in which MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. (MERS), solely as nominee for Directors Financial Group is named as beneficiary, and TITLE 365, as trustee, be mailed to ALT FINANCIAL NETWORK, INC. at 18022 Cowan, Suite 245, Irvine, CA 92614.

---

**Covenants.** In consideration of the mutual promises set forth in this Instrument, Borrower and Lender covenant and agree as follows:

**1.** **DEFINITIONS.** The following terms, when used in this Instrument (including when used in the above recitals), shall have the following meanings and any capitalized term not specifically defined in this Instrument shall have the meaning ascribed to that term in the Loan Agreement:

"**Assignment**" means, collectively, the provisions of Sections 3 and 4 of this Instrument relating to the assignment of rents and leases affecting the Mortgaged Property.

"**Attorneys' Fees and Costs**" means (i) fees and out-of-pocket costs of Lender's and Loan Servicer's attorneys, as applicable (whether or not any lawsuit or other proceeding is instituted), including costs of Lender's and Loan Servicer's allocable costs of in-house counsel, support staff costs, costs of preparing for litigation, computerized research, telephone and facsimile transmission expenses, mileage, deposition costs, postage, duplicating, process service, videotaping and similar costs and expenses; (ii) costs and fees of expert witnesses, including appraisers; and (iii) investigatory fees. As used in this Instrument and in the Note, "Attorneys' Fees and Costs" shall include those awarded by an appellate court.

"**Borrower**" means all Persons identified as "Borrower" in paragraph A of this Instrument, together with their successors and assigns.

"**Collateral Agreement**" has the definition given such term in the Loan Agreement.

"**Environmental Indemnity**" means the provisions of Section 4.07 of the Loan Agreement.

"**Fixtures**" means all property owned by Borrower which is so attached to the Land or the Improvements as to constitute a fixture under applicable law, including: machinery, equipment, engines, boilers, incinerators, installed building materials; systems and equipment for the purpose of supplying or distributing heating, cooling, electricity, gas, water, air, or light; antennas, cable, wiring and conduits used in connection with radio, television, security, fire prevention, or fire detection or otherwise used to carry electronic signals; telephone systems and equipment; elevators and related machinery and equipment; fire detection, prevention and extinguishing systems and apparatus; security and access control systems and apparatus; plumbing systems; water heaters, ranges, stoves, microwave ovens, refrigerators, dishwashers, garbage disposers, washers, dryers and other appliances; light fixtures, awnings, storm windows and storm doors; pictures, screens, blinds, shades, curtains and curtain rods; mirrors; cabinets, paneling, rugs and floor and wall coverings; fences, trees and plants; swimming pools; and exercise equipment.

California Deed of Trust                                                                                     Page 2

"**Governmental Authority**" means any board, commission, department or body of any municipal, county, state or federal governmental unit, or any subdivision of any of them, that has or acquires jurisdiction over the Mortgaged Property or the use, operation or improvement of the Mortgaged Property or over Borrower.

"**Hazardous Materials**" means petroleum and petroleum products and compounds containing them, including gasoline, diesel fuel and oil; explosives; flammable materials; radioactive materials; polychlorinated biphenyls ("**PCBs**") and compounds containing them; lead and lead-based paint; asbestos or asbestos-containing materials in any form that is or could become friable; underground or above-ground storage tanks, whether empty or containing any substance; any substance the presence of which on the Mortgaged Property is prohibited by any federal, state or local authority; any substance that requires special handling; and any other material or substance now or in the future defined as a "hazardous substance," "hazardous material," "hazardous waste," "toxic substance," "toxic pollutant," "contaminant," or "pollutant" within the meaning of any Hazardous Materials Law.

"**Hazardous Materials Laws**" means all federal, state, and local laws, ordinances and regulations and standards, rules, policies and other governmental requirements, administrative rulings and court judgments and decrees in effect now or in the future and including all amendments, that relate to Hazardous Materials or the protection of human health or the environment and apply to Borrower or to the Mortgaged Property. Hazardous Materials Laws include, but are not limited to, the Federal Water Pollution Control Act, 33 U.S.C. Section 1251 *et seq.*, the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. Section 9601, *et seq.*, as amended by the Superfund Amendments Reauthorization Act of 1986, the Materials Transportation Act, 49 U.S.C. Section 1801 *et seq.*, the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, *et seq.*, the Toxic Substance Control Act, 15 U.S.C. Section 2601, *et seq.*, the Clean Water Act, 33 U.S.C. Section 1251, *et seq.*, the Emergency Planning and Community Right-to-Know Act of 1986, as amended, the Solid Waste Disposal Act, as amended, the Clean Air Act, as amended, the Safe Drinking Water Act, as amended, the Occupational Safety and Health Act, as amended, and the Hazardous Materials Transportation Act, 49 U.S.C. Section 5101, and their state analogs.

"**Improvements**" means the buildings, structures, improvements, and alterations now constructed or at any time in the future constructed or placed upon the Land, including any future replacements and additions.

"**Indebtedness**" means the principal of, interest on, and all other amounts due at any time under, the Note, the Loan Agreement (other than the Environmental Indemnity), this Instrument or any other Loan Document (other than any guaranty), including prepayment premiums, late charges, default interest, and advances to protect the security of this Instrument under Section 7 of this Instrument or any other applicable provision of the Loan Agreement, this Instrument or any other Loan Document or as permitted by law.

"**Land**" means the land described in Exhibit "A".

"**Leases**" means all present and future leases, subleases, licenses, concessions or grants or other possessory interests now or hereafter in force, whether oral or written, covering or affecting the Mortgaged Property, or any portion of the Mortgaged Property, and all modifications, extensions or renewals.

"**Lender**" means the Person or Persons identified as "Lender" in paragraph A of this Instrument, or any subsequent holder of the Note.

"**Loan**" means the loan evidenced by the Note and secured by this Instrument.

"**Loan Agreement**" means the Loan Agreement executed by Borrower in favor of Lender and dated as of the date of this Instrument, as such agreement may be amended from time to time.

"**Loan Documents**" means the Note, this Instrument, the Assignment, the Loan Agreement, all guaranties, all indemnity agreements, all Collateral Agreements, O&M Plans, and any other documents now or in the future executed by Borrower, any Guarantor or any other Person in connection with the Loan, as such documents may be amended from time to time.

"**Loan Servicer**" means the Person or Persons that from time to time is designated by Lender to collect payments and deposits and receive notices under the Note, this Instrument and any other Loan Document, and otherwise to service the Loan for the benefit of Lender. Unless otherwise specified in Section 2 of the Note, or unless Borrower receives notice to the contrary, the Loan Servicer means the Person or Persons identified as "Lender" in paragraph A of this Instrument.

California Deed of Trust                                                                                                     Page 3

"**Mortgaged Property**" means all of Borrower's present and future right, title and interest in and to all of the following: (1) the Land; (2) the Improvements; (3) the Fixtures; (4) the Personalty; (5) all current and future rights, including air rights, development rights, zoning rights and other similar rights or interests, easements, tenements, rights-of-way, strips and gores of land, streets, alleys, roads, sewer rights, waters, watercourses, and appurtenances related to or benefiting the Land or the Improvements, or both, and all rights-of-way, streets, alleys and roads which may have been or may in the future be vacated; (6) all proceeds paid or to be paid by any insurer of the Land, the Improvements, the Fixtures, the Personalty or any other part of the Mortgaged Property, whether or not Borrower obtained the insurance pursuant to Lender's requirement; (7) all awards, payments and other compensation made or to be made by any municipal, state or federal authority with respect to the Land, the Improvements, the Fixtures, the Personalty or any other part of the Mortgaged Property, including any awards or settlements resulting from condemnation proceedings or the total or partial taking of the Land, the Improvements, the Fixtures, the Personalty or any other part of the Mortgaged Property under the power of eminent domain or otherwise and including any conveyance in lieu thereof; (8) all contracts, options and other agreements for the sale of the Land, the Improvements, the Fixtures, the Personalty or any other part of the Mortgaged Property entered into by Borrower now or in the future, including cash or securities deposited to secure performance by parties of their obligations; (9) all proceeds from the conversion, voluntary or involuntary, of any of the above into cash or liquidated claims, and the right to collect such proceeds; (10) all Rents and Leases; (11) all earnings, royalties, accounts receivable, issues and profits from the Land, the Improvements or any other part of the Mortgaged Property, and all undisbursed proceeds of the Loan; (12) all funds on deposit pursuant to any separate agreement between Borrower and Lender (including, without limitation, all Imposition Deposits) for the purpose of establishing replacement reserves for the Mortgaged Property, to fund any water and sewer charges, premiums for fire or other hazard insurance, rent loss insurance or other insurance required by Lender, taxes, assessments, vault rentals, or other charges or expenses required by Lender to protect the Mortgaged Property, establishing a fund to assure the completion of repairs or improvements specified in that agreement, or assuring reduction of the outstanding principal balance of the Indebtedness if the occupancy of or income from the Mortgaged Property does not increase to a level specified in that agreement, or any other agreement or agreements between Borrower and Lender which provide for the establishment of any other fund, reserve or account; (13) all refunds or rebates of Impositions by any municipal, state or federal authority or insurance company (other than refunds applicable to periods before the real property tax year in which this Instrument is dated); (14) all tenant security deposits which have not been forfeited by any tenant under any Lease and any bond or other security in lieu of such deposits; and (15) all names under or by which any of the above Mortgaged Property may be operated or known, and all trademarks, trade names, and goodwill relating to any of the Mortgaged Property.

"**Mortgaged Property UCC Collateral**" means any of the Mortgaged Property which, under applicable law, may be subjected to a security interest under the Uniform Commercial Code, whether such Mortgaged Property is owned now or acquired in the future, and all products and cash and non-cash proceeds thereof.

"**Note**" means the Promissory Note described in paragraph C of this Instrument, including all schedules, riders, allonges and addenda, as such Promissory Note may be amended from time to time.

"**Person**" means any natural person, sole proprietorship, corporation, general partnership, limited partnership, limited liability company, limited liability partnership, limited liability limited partnership, joint venture, association, joint stock company, bank, trust, estate, unincorporated organization, any federal, state, county or municipal government (or any agency or political subdivision thereof), endowment fund or any other form of entity.

"**Personalty**" means all: (i) accounts (including deposit accounts); (ii) equipment and inventory owned by Borrower which are used now or in the future in connection with the ownership, management or operation of the Land or the Improvements or are located on the Land or in the Improvements, including furniture, furnishings, machinery, building materials, appliances, goods, supplies, tools, books, records (whether in written or electronic form), computer equipment (hardware and software); (iii) other tangible personal property (other than Fixtures) which are used now or in the future in connection with the ownership, management or operation of the Land or the Improvements or are located on the Land or in the Improvements; (iv) any operating agreements relating to the Land or the Improvements; (v) any surveys, plans and specifications and contracts for architectural, engineering and construction services relating to the Land or the Improvements; (vi) all other intangible property and rights relating to the operation of, or used in connection with, the Land or the Improvements, including all governmental permits relating to any activities on the Land or the Improvements and including subsidy or similar payments received from any sources, including a Governmental Authority; and (vii) any rights of Borrower in or under letters of credit.

California Deed of Trust                                                           Page 4

"**Property Jurisdiction**" means the jurisdiction in which the Land is located.

"**Rents**" means all rents, revenues and other income of the Land or the Improvements, whether now due, past due, or to become due, and deposits forfeited by tenants.

"**Schedule of Title Exceptions**" means title exceptions approved by Lender and shown in the schedule of exceptions to coverage in the title policy issued to Lender contemporaneously with the recordation of this Instrument and insuring Lender's interest in the Mortgaged Property.

"**Taxes**" means all taxes, assessments, vault rentals and other charges, if any, general, special or otherwise, including all assessments for schools, public betterments and general or local improvements, which are levied, assessed or imposed by any public authority or quasi-public authority, and which, if not paid, will become a lien, on the Land or the Improvements.

"**Uniform Commercial Code**" or "**UCC**" means the Uniform Commercial Code as in effect in the Property Jurisdiction; *provided* that, to the extent perfection or the effect of perfection or non-perfection or the priority of any security interest in any collateral is governed by the Uniform Commercial Code as in effect in a jurisdiction other than the Property Jurisdiction, "**Uniform Commercial Code**" or "**UCC**" means the Uniform Commercial Code as in effect from time to time in such other jurisdiction for purposes of the provisions hereof relating to such perfection, effect of perfection or non-perfection or priority.

     2.     **UNIFORM COMMERCIAL CODE SECURITY AGREEMENT.**

     (a)     This Instrument is also a security agreement under the Uniform Commercial Code for the Mortgaged Property UCC Collateral, and Borrower, as debtor, hereby grants to Lender, as secured party, a security interest in the Mortgaged Property UCC Collateral. Borrower hereby authorizes Lender to prepare and file financing statements, continuation statements and financing statement amendments in such form as Lender may require to perfect or continue the perfection of this security interest and Borrower agrees, if Lender so requests, to execute and deliver to Lender such financing statements, continuation statements and amendments. Without limiting the generality of the foregoing, Borrower authorizes Lender to file any financing statement that describes the collateral as "all assets" of Borrower, or words to similar effect. Borrower shall pay all filing costs and all costs and expenses of any record searches for financing statements and/or amendments that Lender may require. Without the prior written consent of Lender, Borrower shall not create or permit to exist any other lien or security interest in any of the Mortgaged Property UCC Collateral. Unless Borrower gives notice to Lender within 30 days after the occurrence of any of the following, and executes and delivers to Lender modifications or supplements of this Instrument (and any financing statement which may be filed in connection with this Instrument) as Lender may require, Borrower shall not (i) change its name, identity, structure or jurisdiction of organization; (ii) change the location of its place of business (or chief executive office if more than one place of business); or (iii) add to or change any location at which any of the Mortgaged Property UCC Collateral is stored, held or located. If an Event of Default has occurred and is continuing, Lender shall have the remedies of a secured party under the Uniform Commercial Code, in addition to all remedies provided by this Instrument or existing under applicable law. In exercising any remedies, Lender may exercise its remedies against the Mortgaged Property UCC Collateral separately or together, and in any order, without in any way affecting the availability of Lender's other remedies. This Instrument constitutes a financing statement with respect to any part of the Mortgaged Property that is or may become a Fixture, if permitted by applicable law.

     3.     **ASSIGNMENT OF RENTS; APPOINTMENT OF RECEIVER; LENDER IN POSSESSION.**

     (a)     As part of the consideration for the Indebtedness, Borrower absolutely and unconditionally assigns and transfers to Lender all Rents. It is the intention of Borrower to establish a present, absolute and irrevocable transfer and assignment to Lender of all Rents and to authorize and empower Lender to collect and receive all Rents without the necessity of further action on the part of Borrower. Promptly upon request by Lender, Borrower agrees to execute and deliver such further assignments as Lender may from time to time require. Borrower and Lender intend this assignment of Rents to be immediately effective and to constitute an absolute present assignment and not an assignment for additional security only. For purposes of giving effect to this absolute assignment of Rents, and for no other purpose, Rents shall not be deemed to be a part of the "Mortgaged Property" as that term is defined in Section 1. However, if this present, absolute and unconditional assignment of Rents is not enforceable by its terms under the laws of the Property Jurisdiction, then the Rents shall be included as a part of the Mortgaged Property and it is the intention of Borrower that in this circumstance this Instrument create and perfect a lien on Rents in favor of Lender, which lien shall be effective as of the date of this Instrument.

     (b)     After the occurrence of an Event of Default, Borrower authorizes Lender to collect, sue for and compromise Rents and directs each tenant of the Mortgaged Property to pay all Rents to, or as directed by, Lender. However, until the

occurrence of an Event of Default, Lender hereby grants to Borrower a revocable license to collect and receive all Rents, to hold all Rents in trust for the benefit of Lender and to apply all Rents to pay the installments of interest and principal then due and payable under the Note and the other amounts then due and payable under the other Loan Documents, including Imposition Deposits, and to pay the current costs and expenses of managing, operating and maintaining the Mortgaged Property, including utilities, Taxes and insurance premiums (to the extent not included in Imposition Deposits), tenant improvements and other capital expenditures. So long as no Event of Default has occurred and is continuing, the Rents remaining after application pursuant to the preceding sentence may be retained by Borrower free and clear of, and released from, Lender's rights with respect to Rents under this Instrument. From and after the occurrence of an Event of Default, and without the necessity of Lender entering upon and taking and maintaining control of the Mortgaged Property directly, or by a receiver, Borrower's license to collect Rents shall automatically terminate and Lender shall without notice be entitled to all Rents as they become due and payable, including Rents then due and unpaid. Borrower shall pay to Lender upon demand all Rents to which Lender is entitled. At any time on or after the date of Lender's demand for Rents, Lender may give, and Borrower hereby irrevocably authorizes Lender to give, notice to all tenants of the Mortgaged Property instructing them to pay all Rents to Lender, no tenant shall be obligated to inquire further as to the occurrence or continuance of an Event of Default, and no tenant shall be obligated to pay to Borrower any amounts which are actually paid to Lender in response to such a notice. Any such notice by Lender shall be delivered to each tenant personally, by mail or by delivering such demand to each rental unit. Borrower shall not interfere with and shall cooperate with Lender's collection of such Rents.

(c)    Borrower represents and warrants to Lender that Borrower has not executed any prior assignment of Rents (other than (i) an assignment of Rents securing indebtedness that will be paid off and discharged with the proceeds of the Loan and (ii) an assignment of Rents established pursuant to the Approved First Deed of Trust), that Borrower has not performed, and Borrower covenants and agrees that it will not perform, any acts and has not executed, and shall not execute, any instrument which would prevent Lender from exercising its rights under this Section 3, and that at the time of execution of this Instrument there has been no anticipation or prepayment of any Rents for more than two (2) months prior to the due dates of such Rents. Borrower shall not collect or accept payment of any Rents more than two (2) months prior to the due dates of such Rents.

4.    ASSIGNMENT OF LEASES; LEASES AFFECTING THE MORTGAGED PROPERTY.

(a)    As part of the consideration for the Indebtedness, Borrower absolutely and unconditionally assigns and transfers to Lender all of Borrower's right, title and interest in, to and under the Leases, including Borrower's right, power and authority to modify the terms of any such Lease, or extend or terminate any such Lease. It is the intention of Borrower to establish a present, absolute and irrevocable transfer and assignment to Lender of all of Borrower's right, title and interest in, to and under the Leases. Borrower and Lender intend this assignment of the Leases to be immediately effective and to constitute an absolute present assignment and not an assignment for additional security only. For purposes of giving effect to this absolute assignment of the Leases, and for no other purpose, the Leases shall not be deemed to be a part of the "Mortgaged Property" as that term is defined in Section 1. However, if this present, absolute and unconditional assignment of the Leases is not enforceable by its terms under the laws of the Property Jurisdiction, then the Leases shall be included as a part of the Mortgaged Property and it is the intention of Borrower that in this circumstance this Instrument create and perfect a lien on the Leases in favor of Lender, which lien shall be effective as of the date of this Instrument.

(b)    Until Lender gives notice to Borrower of Lender's exercise of its rights under this Section 4, Borrower shall have all rights, power and authority granted to Borrower under any Lease (except as otherwise limited by this Section 4 or any other provision of this Instrument), including the right, power and authority to modify the terms of any Lease or extend or terminate any Lease. Upon the occurrence of an Event of Default, the permission given to Borrower pursuant to the preceding sentence to exercise all rights, power and authority under Leases shall automatically terminate. Borrower shall comply with and observe Borrower's obligations under all Leases, including Borrower's obligations pertaining to the maintenance and disposition of tenant security deposits.

(c)    Borrower acknowledges and agrees that the exercise by Lender, either directly or by a receiver, of any of the rights conferred under this Section 4 shall not be construed to make Lender a mortgagee-in-possession of the Mortgaged Property so long as Lender has not itself entered into actual possession of the Land and the Improvements. The acceptance by Lender of the assignment of the Leases pursuant to Section 4(a) shall not at any time or in any event obligate Lender to take any action under this Instrument or to expend any money or to incur any expenses. Lender shall not be liable in any way for any injury or damage to person or property sustained by any Person in or about the Mortgaged Property. Prior to Lender's actual entry into and taking possession of the Mortgaged Property, Lender shall not (i) be obligated to perform any of the terms, covenants and conditions contained in any Lease (or otherwise have any obligation with respect to any Lease); (ii) be obligated to appear in or

California Deed of Trust                                                                                                Page 6

defend any action or proceeding relating to the Lease or the Mortgaged Property; or (iii) be responsible for the operation, control, care, management or repair of the Mortgaged Property or any portion of the Mortgaged Property. The execution of this Instrument by Borrower shall constitute conclusive evidence that all responsibility for the operation, control, care, management and repair of the Mortgaged Property is and shall be that of Borrower, prior to such actual entry and taking of possession.

(d)    Upon delivery of notice by Lender to Borrower of Lender's exercise of Lender's rights under this Section 4 at any time after the occurrence of an Event of Default, and without the necessity of Lender entering upon and taking and maintaining control of the Mortgaged Property directly, by a receiver, or by any other manner or proceeding permitted by the laws of the Property Jurisdiction, Lender immediately shall have all rights, powers and authority granted to Borrower under any Lease, including the right, power and authority to modify the terms of any such Lease, or extend or terminate any such Lease.

(e)    Borrower shall, promptly upon Lender's request, deliver to Lender an executed copy of each Lease then in effect. All Leases shall be on forms approved by Lender, shall be for initial terms of at least six months and not more than two years, and shall not include options to purchase.

(f)    Borrower shall not receive or accept Rent under any Lease for more than two (2) months in advance.

**5.    PAYMENT OF INDEBTEDNESS; PERFORMANCE UNDER LOAN DOCUMENTS; PREPAYMENT PREMIUM.** Borrower shall pay the Indebtedness when due in accordance with the terms of the Note and the other Loan Documents and shall perform, observe and comply with all other provisions of the Note and the other Loan Documents. Borrower shall pay a prepayment premium in connection with certain prepayments of the Indebtedness, including a payment made after Lender's exercise of any right of acceleration of the Indebtedness, as provided in the Note.

**6.    APPLICATION OF PAYMENTS.** If at any time Lender receives, from Borrower or otherwise, any amount applicable to the Indebtedness which is less than all amounts due and payable at such time, then Lender may apply that payment to amounts then due and payable in any manner and in any order determined by Lender, in Lender's discretion. Neither Lender's acceptance of an amount which is less than all amounts then due and payable nor Lender's application of such payment in the manner authorized shall constitute or be deemed to constitute either a waiver of the unpaid amounts or an accord and satisfaction. Notwithstanding the application of any such amount to the Indebtedness, Borrower's obligations under this Instrument and the Note shall remain unchanged.

**7.    PROTECTION OF LENDER'S SECURITY.**

(a)    If Borrower fails to perform any of its obligations under this Instrument or any other Loan Document, or if any action or proceeding is commenced which purports to affect the Mortgaged Property, Lender's security or Lender's rights under this Instrument, including eminent domain, insolvency, code enforcement, civil or criminal forfeiture, enforcement of Hazardous Materials Laws, fraudulent conveyance or reorganizations or proceedings involving a bankrupt or decedent, then Lender at Lender's option may make such appearances, disburse such sums and take such actions as Lender reasonably deems necessary to perform such obligations of Borrower and to protect Lender's interest, including (1) payment of fees and out-of-pocket expenses of attorneys, accountants, inspectors and consultants, (2) entry upon the Mortgaged Property to make repairs or secure the Mortgaged Property, (3) procurement of the insurance required by Section 4.02 of the Loan Agreement, (4) payment of amounts which Borrower has failed to pay under Sections 4.01 and 4.06 of the Loan Agreement, and (5) advances made by Lender to pay, satisfy or discharge any obligation of Borrower for the payment of money that is secured by a pre-existing mortgage, deed of trust or other lien encumbering the Mortgaged Property (a "**Prior Lien**").

(b)    Any amounts disbursed by Lender under this Section 7, or under any other provision of this Instrument that treats such disbursement as being made under this Section 7, shall be added to, and become part of, the principal component of the Indebtedness, shall be immediately due and payable and shall bear interest from the date of disbursement until paid at the "**Default Rate**", as defined in the Note.

(c)    Nothing in this Section 7 shall require Lender to incur any expense or take any action.

**8.    EVENTS OF DEFAULT.** An Event of Default under the Loan Agreement shall constitute an Event of Default under this Instrument.

**9.    REMEDIES CUMULATIVE.** Each right and remedy provided in this Instrument is distinct from all other rights or remedies under this Instrument or any other Loan Document or afforded by applicable law, and each shall be cumulative and may be exercised concurrently, independently, or successively, in any order. Lender's exercise of any particular right or remedy will not in any way prevent Lender from exercising any other right or remedy available to Lender. Lender may exercise any such remedies from time to time and as often as Lender chooses.

**10.    WAIVER OF STATUTE OF LIMITATIONS, OFFSETS, AND COUNTERCLAIMS.** Borrower hereby waives the right to assert any statute of limitations as a bar to the enforcement of the lien of this Instrument or to any action brought to

California Deed of Trust                                                                                                          Page 7

enforce any Loan Document. Borrower hereby waives the right to assert a counterclaim, other than a compulsory counterclaim, in any action or proceeding brought against it by Lender or otherwise to offset any obligations to make the payments required by the Loan Documents. No failure by Lender to perform any of its obligations under this Instrument will be a valid defense to, or result in any offset against, any payments that Borrower is obligated to make under any of the Loan Documents.

**11.**      **WAIVER OF MARSHALLING.** Notwithstanding the existence of any other security interests in the Mortgaged Property held by Lender or by any other party, Lender shall have the right to determine the order in which any or all of the Mortgaged Property shall be subjected to the remedies provided in this Instrument, the Note, any other Loan Document or applicable law. Lender shall have the right to determine the order in which any or all portions of the Indebtedness are satisfied from the proceeds realized upon the exercise of such remedies. Borrower and any party who now or in the future acquires a security interest in the Mortgaged Property and who has actual or constructive notice of this Instrument waives any and all right to require the marshalling of assets or to require that any of the Mortgaged Property be sold in the inverse order of alienation or that any of the Mortgaged Property be sold in parcels or as an entirety in connection with the exercise of any of the remedies permitted by applicable law or provided in this Instrument.

**12.**      **FURTHER ASSURANCES.** Borrower shall execute, acknowledge, and deliver, at its sole cost and expense, all further acts, deeds, conveyances, assignments, estoppel certificates, financing statements, transfers and assurances as Lender may require from time to time in order to better assure, grant, and convey to Lender the rights intended to be granted, now or in the future, to Lender under this Instrument and the Loan Documents.

**13.**      **GOVERNING LAW; CONSENT TO JURISDICTION AND VENUE.**

(a)      This Instrument, and any Loan Document which does not itself expressly identify the law that is to apply to it, shall be governed by the laws of the jurisdiction in which the Land is located (the **"Property Jurisdiction"**).

(b)      Borrower agrees that any controversy arising under or in relation to the Note, this Instrument, or any other Loan Document may be litigated in the Property Jurisdiction. The state and federal courts and authorities with jurisdiction in the Property Jurisdiction shall have non-exclusive jurisdiction over all controversies which shall arise under or in relation to the Note, any security for the Indebtedness, or any other Loan Document. Borrower irrevocably consents to service, jurisdiction, and venue of such courts for any such litigation and waives any other venue, or defense to venue to which it might be entitled by virtue of domicile, habitual residence, inconvenient forum or otherwise.

**14.**      **NOTICE.** Except as otherwise specified by the laws of the Property Jurisdiction, all notices, demands and other communications required or permitted to be given pursuant to this Instrument shall be given in accordance with Section 8.03 of the Loan Agreement.

**15.**      **SUCCESSORS AND ASSIGNS BOUND.** This Instrument shall bind, and the rights granted by this Instrument shall inure to, the respective successors and assigns of Lender and Borrower. However, a Transfer not permitted by Section 5.01 of the Loan Agreement shall constitute an Event of Default.

**16.**      **JOINT AND SEVERAL LIABILITY.** If more than one Person signs this Instrument as Borrower, the obligations of such Persons under this Instrument, the Note and other Loan Documents shall be joint and several.

**17.**      **RELATIONSHIP OF PARTIES; NO THIRD PARTY BENEFICIARY.**

(a)      The relationship between Lender and Borrower shall be solely that of creditor and debtor, respectively, and nothing contained in this Instrument shall create any other relationship between Lender and Borrower.

(b)      No creditor of any party to this Instrument and no other Person shall be a third party beneficiary of this Instrument or any other Loan Document. Without limiting the generality of the preceding sentence, (1) any arrangement (a **"Servicing Arrangement"**) between Lender and any Loan Servicer for loss sharing or interim advancement of funds shall constitute a contractual obligation of such Loan Servicer that is independent of the obligation of Borrower for the payment of the Indebtedness, (2) Borrower shall not be a third party beneficiary of any Servicing Arrangement, and (3) no payment by the Loan Servicer under any Servicing Arrangement will reduce the amount of the Indebtedness.

**18.**      **SEVERABILITY; ENTIRE AGREEMENT; AMENDMENTS.** The parties intend that the provisions of this Instrument and all other Loan Documents shall be legally severable. If any term or provision of this Instrument, or any other Loan Document, to any extent, be determined by a court of competent jurisdiction to be invalid or unenforceable, the remainder of this Instrument or of such other Loan Document shall not be affected thereby, and each term and provision shall be valid and be enforceable to the fullest extent permitted by law. This Instrument contains the entire agreement among the parties as to the rights granted and the obligations assumed in this Instrument. This Instrument may not be amended or modified except by a writing signed by the party against whom enforcement is sought.

California Deed of Trust                                                                                                          Page 8

**19.**     **CONSTRUCTION.** The captions and headings of the Sections of this Instrument are for convenience only and shall be disregarded in construing this Instrument. Any reference in this Instrument to an "Exhibit" or a "Section" shall, unless otherwise explicitly provided, be construed as referring, respectively, to an Exhibit attached to this Instrument or to a Section of this Instrument. All Exhibits attached to or referred to in this Instrument are incorporated by reference into this Instrument. Any reference in this Instrument to a statute or regulation shall be construed as referring to that statute or regulation as amended from time to time. Use of the singular in this Instrument includes the plural and use of the plural includes the singular. As used in this Instrument, the term "including" means "including, but not limited to" and the term "includes" means "includes without limitation." The use of one gender includes the other gender, as the context may require. Unless the context requires otherwise, (a) any definition of or reference to any agreement, instrument or other document in this Instrument shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth in this Instrument or any other Loan Document), and (b) any reference in this Instrument to any Person shall be construed to include such Person's successors and assigns.

**20.**     **SUBROGATION.** If, and to the extent that, the proceeds of the Loan, or subsequent advances under Section 7, are used to pay, satisfy or discharge a Prior Lien, such Loan proceeds or advances shall be deemed to have been advanced by Lender at Borrower's request, and Lender shall automatically, and without further action on its part, be subrogated to the rights, including lien priority, of the owner or holder of the obligation secured by the Prior Lien, whether or not the Prior Lien is released.

**21.**     **BUSINESS PURPOSE.** Borrower acknowledges and agrees that the Loan is for business purposes and not for personal, family or household purposes.

**22.**     **ACCELERATION; REMEDIES.** If an Event of Default has occurred and is continuing, Lender, at Lender's option, may declare the Indebtedness to be immediately due and payable without further demand, and may invoke the power of sale and any other remedies permitted by California law or provided in this Instrument, the Loan Agreement or any other Loan Document. Borrower acknowledges that the power of sale granted in this Instrument may be exercised by Lender without prior judicial hearing. Lender shall be entitled to collect all costs and expenses incurred in pursuing such remedies, including Attorneys' Fees and Costs, and costs of documentary evidence, abstracts and title reports.

If the power of sale is invoked, Lender shall execute a written notice of the occurrence of an Event of Default and of Lender's election to cause the Mortgaged Property to be sold and shall cause the notice to be recorded in each county in which the Mortgaged Property or some part of the Mortgaged Property is located. Trustee shall give notice of default and notice of sale and shall sell the Mortgaged Property according to California law. Trustee may sell the Mortgaged Property at the time and place and under the terms designated in the notice of sale in one or more parcels and in such order as Trustee may determine. Trustee may postpone the sale of all or any part of the Mortgaged Property by public announcement at the time and place of any previously scheduled sale. Lender or Lender's designee may purchase the Mortgaged Property at any sale and Lender or such designee will have the right to credit bid all or any part of the Indebtedness toward the purchase price at such sale.

Within a reasonable time after the sale, Trustee shall deliver to the purchaser at the sale, a deed conveying the Mortgaged Property so sold without any express or implied covenant or warranty. The recitals in such deed of any matters or facts shall be conclusive proof of the truthfulness thereof. Trustee shall apply the proceeds of the sale in the following order: (a) to all costs and expenses of the sale, including Trustee's fees not to exceed the statutory maximum therefor, Attorneys' Fees and Costs, including the cost of any trustee's sale guarantee policy and any other evidence of title; (b) to the Indebtedness in such order as Lender, in Lender's discretion, directs; and (c) the excess, if any, to the Person or Persons legally entitled to the excess.

**23.**     **RECONVEYANCE.** Upon payment of the Indebtedness, Lender shall request Trustee to reconvey the Mortgaged Property and shall surrender this Instrument and the Note to Trustee. Trustee shall reconvey the Mortgaged Property without warranty to the Person or Persons legally entitled to the Mortgaged Property. Such Person or Persons shall pay Trustee's reasonable costs incurred in so reconveying the Mortgaged Property.

**24.**     **SUBSTITUTE TRUSTEE.** Lender, at Lender's option, may from time to time, by a written instrument, appoint a successor trustee, which instrument, when executed and acknowledged by Lender and recorded in the office of the Recorder of the county or counties where the Mortgaged Property is situated, shall be conclusive proof of proper substitution of the successor trustee. The successor trustee shall, without conveyance of the Mortgaged Property, succeed to all the title, power and duties conferred upon the Trustee in this Instrument and by California law. The instrument of substitution shall contain the name of the original Lender, Trustee and Borrower under this Instrument, the book and page where this Instrument is recorded, and the name and address of the successor trustee. The procedure provided for substitution of trustee in this Instrument shall govern to the exclusion of all other provisions for substitution, statutory or otherwise.

California Deed of Trust                                                                                                                    Page 9

**25.    STATEMENT OF OBLIGATION.** Lender may collect a fee not to exceed the maximum allowed by applicable law for furnishing the statement of obligation as provided in Section 2943 of the California Civil Code.

**26.    SPOUSE'S SEPARATE PROPERTY.** Each Borrower who is a married person expressly agrees that recourse may be had against his or her separate property.

**27.    FIXTURE FILING.** This Instrument is also a fixture filing under the Uniform Commercial Code of California.

**28.    ADDITIONAL PROVISION REGARDING APPLICATION OF PAYMENTS.** In addition to the provisions of Section 6, Borrower further agrees that, if Lender accepts a guaranty of only a portion of the Indebtedness, Borrower waives its right under California Civil Code Section 2822(a), to designate the portion of the Indebtedness which shall be satisfied by a guarantor's partial payment.

**29.    WAIVER OF MARSHALLING; OTHER WAIVERS.** To the extent permitted by law, Borrower waives (i) the benefit of all present or future laws providing for any appraisement before sale of any portion of the Mortgaged Property, (ii) all rights of redemption, valuation, appraisement, stay of execution, notice of election to mature or declare due the whole of the Indebtedness and marshalling in the event of foreclosure of the lien created by this Instrument, (iii) all rights and remedies which Borrower may have or be able to assert by reason of the laws of the State of California pertaining to the rights and remedies of sureties, (iv) the right to assert any statute of limitations as a bar to the enforcement of the lien of this Instrument or to any action brought to enforce the Note or any other obligation secured by this Instrument, and (v) any rights, legal or equitable, to require marshalling of assets or to require upon foreclosure sales in a particular order, including any rights under California Civil Code Sections 2899 and 3433. Lender shall have the right to determine the order in which any or all of the Mortgaged Property shall be subjected to the remedies provided by this Instrument. Lender shall have the right to determine the order in which any or all portions of the Indebtedness are satisfied from the proceeds realized upon the exercise of the remedies provided by this Instrument. By signing this Instrument, Borrower does not waive its rights under Section 2924c of the California Civil Code.

**30.    INTERPRETATION.** It is the intention of Borrower and Lender that if any provision of this Instrument or any other Loan Document is capable of two (2) constructions, one of which would render the provision void, and the other of which would render the provision valid, then the provision shall have the meaning which renders it valid. Borrower acknowledges that Lender has attempted in good faith to assure that this Instrument, the Note and all other Loan Documents are in compliance with applicable laws of the Property Jurisdiction and federal laws. Nevertheless, in the event that any provision of this Instrument, the Note or any other Loan Document is not in compliance with any such laws, then the non-complying provision shall be deemed to be deleted or modified to the extent necessary to assure legal compliance. Similarly, in the event any language or disclosure required by applicable laws of the Property Jurisdiction is not contained in the Loan Documents, then the Loan Documents shall be deemed to have been supplemented to add such language or disclosure, or, at Lender's option, Lender may provide such additional language or disclosure. In either event, such legal requirement shall thereby be satisfied and such noncompliance shall be deemed to have been cured for all purposes. Within ten (10) days after written request by Lender, Borrower agrees to execute such documentation as Lender may require to cure any legal compliance issues or deficiencies in the Loan Documents.

**31.    FUTURE ADVANCES.** In addition to the Indebtedness, this Instrument shall (to the extent allowed by applicable law) also secure payment of the principal, interest and other charges due on all other future loans or advances made by Lender to Borrower (or any successor in interest to Borrower as the owner of all or any part of the Mortgaged Property) when the promissory note evidencing such loan or advance specifically states that it is secured by this Instrument ("**Future Advances**"), including all extensions, renewals and modifications of any such Future Advances.

**32.    EXECUTION IN COUNTERPARTS.** This Instrument may be executed in multiple counterparts, and the separate signature pages and notary acknowledgments may then be combined into a single original document for recordation.

**33.    CALIFORNIA LAW PROVISIONS RELATING TO INSURANCE COVERAGE.** Borrower acknowledges that Borrower is aware of the following provision of Subdivision (a) of Section 2955.5 of the California Civil Code, which provides as follows:

"No lender shall require a borrower, as a condition of receiving or maintaining a loan secured by real property, to provide hazard insurance coverage against risks to the improvements on that real property in an amount exceeding the replacement value of the improvements on the property."

**34.    BALLOON PAYMENT NOTICE.** The Note secured hereby provides for a balloon payment of the entire Indebtedness upon the Maturity Date of the Note.

**35.    DOCUMENT IMAGING.** Lender shall be entitled, in its sole discretion, to image or make copies of all or any selection of the agreements, instruments, documents, items and records governing, arising from or relating to any of Borrower's loans, including, without limitation, this Instrument and the other Loan Documents, and Lender may destroy or archive the paper

California Deed of Trust                                                                                                                                          Page 10

originals. Borrower waives (i) any right to insist or require that Lender produce paper originals, (ii) agrees that such images shall be accorded the same force and effect as the paper originals, (iii) agrees that Lender is entitled to use such images in lieu of destroyed or archived originals for any purpose, including as admissible evidence in any demand, presentment or other proceedings, and (iv) further agrees that any executed facsimile (faxed), scanned, or other imaged copy of this Instrument or any other Loan Document shall be deemed to be of the same force and effect as the original manually executed document.

**36.    SCOPE OF SECURED OBLIGATIONS.** For the avoidance of doubt, this Instrument secures only the Indebtedness and <u>not</u> any amounts due under the Environmental Indemnity or any guaranty.

ATTACHED EXHIBIT. The following Exhibit is attached to this Instrument:
Exhibit "A"          Description of the Land

THIS DEED OF TRUST SECURES A FIXED RATE PROMISSORY NOTE.  THIS DEED OF TRUST IS, AT THE TIME OF RECORDATION, A SECOND DEED OF TRUST.  EXCEPT FOR THE APPROVED FIRST DEED OF TRUST, NO FURTHER ENCUMBRANCES MAY BE RECORDED AGAINST THE MORTGAGED PROPERTY WITHOUT THE PRIOR WRITTEN CONSENT OF LENDER. FAILURE TO COMPLY WITH THIS PROVISION SHALL CONSTITUTE AN EVENT OF DEFAULT AND AT LENDER'S OPTION THE LOAN SHALL IMMEDIATELY BECOME DUE AND PAYABLE.  CONSENT TO ONE FURTHER ENCUMBRANCE SHALL NOT BE DEEMED TO BE A WAIVER OF THE RIGHT TO REQUIRE SUCH CONSENT TO FUTURE OR SUCCESSIVE ENCUMBRANCES.

**IN WITNESS WHEREOF,** Borrower has signed and delivered this Instrument under seal (where applicable) or has caused this Instrument to be signed and delivered by its duly authorized representative under seal (where applicable).  Where applicable law so provides or allows, Borrower intends that this Instrument shall be deemed to be signed and delivered as a sealed Instrument.

**SIGNATURE(S) ON FOLLOWING PAGE(S)**

California Deed of Trust                                                                                              Page 11

BORROWER:

_____
THOMAS V. GIRARDI

California Deed of Trust                                                                                    Page 12

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California                              ) ss.

County of _Los Angeles_              )

On _October 8_____, 2019, before me, _Maria L. Carlos_____, Notary Public, personally appeared **THOMAS V. GIRARDI,**

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

MARIA L. CARLOS
Notary Public – California
Los Angeles County
Commission # 2229856
My Comm. Expires Feb 26, 2022

Place Notary Seal Above

Signature _Maria L. Carlos_____
                    Signature of Notary Public

Exhibit B                                              Page 14 of 15

**EXHIBIT "A"**
**DESCRIPTION OF THE LAND**

THE LAND REFERRED TO HEREIN BELOW IS SITUATED IN THE CITY OF PASADENA, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AND IS DESCRIBED AS FOLLOWS:

LOTS 21 AND 22 OF TRACT NO. 8702, IN THE CITY OF PASADENA, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 118, PAGES 1 AND 2 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY AND THAT PORTION OF LOT 23 IN SAID TRACT NO. 8702, DESCRIBED AS FOLLOWS:

BEGINNING AT THE MOST SOUTHERLY CORNER OF SAID LOT 23; THENCE NORTHERLY ALONG THE CURVED WESTERLY LINE OF SAID LOT 23, A DISTANCE OF 26.54 FEET; THENCE NORTH 72° 48' 10" EAST 74.50 FEET TO A POINT IN THE SOUTHEASTERLY LINE OF SAID LOT 23 DISTANT THEREON NORTH 54° 44' 10" EAST 84.15 FEET FROM THE POINT OF BEGINNING; THENCE ALONG SAID SOUTHEASTERLY LINE SOUTH 54° 44' 10" WEST 84.15 FEET TO THE POINT OF BEGINNING.

APN: 5708-025-009, 5708-025-008

PROPERTY ADDRESS: 100 LOS ALTOS DRIVE, PASADENA, CA 91105

California Deed of Trust
Exhibit "A" – Legal Description

Page A-1

# EXHIBIT C



**This page is part of your document - DO NOT DISCARD**



## 20191149334



**Pages:**
**0004**

Recorded/Filed in Official Records
Recorder's Office, Los Angeles County,
California

**10/25/19 AT 08:00AM**

| | |
|---|---|
| FEES: | 66.00 |
| TAXES: | 0.00 |
| OTHER: | 0.00 |
| PAID: | 66.00 |



**L E A D S H E E T**



201910250260053

**00017352368**



010234191

**SEQ:**
**04**

**SECURE - 8:00AM**



**THIS FORM IS NOT TO BE DUPLICATED**

20_4760383_1

Order: 121070309
Doc: CALOSA:2019 01149334

Page 1 of 4

Exhibit C

Requested By: Dexter.Batanga, Printed: 1/19/2021 12:10 PM

Page 1 of 4

FIDELITY NATIONAL TITLE
ORANGE COUNTY

RECORDING REQUESTED BY
AND WHEN RECORDED MAIL TO:

ALT FINANCIAL NETWORK, INC.
18022 Cowan, Suite 245
Irvine, CA 92614
    266500
Tax Parcel Number(s):  5708-025-009, 5708-025-008

Exempt from fee per GC
27388.1 (a) (1); fee cap of
$225 reached

Space Above for Recorder's Use

## ASSIGNMENT OF DEED OF TRUST

FOR VALUE RECEIVED, the undersigned hereby grants, assigns and transfers to _Arsani Sidarous_, whose address is _37000 Newton St, Torrance, CA 90505_ all beneficial interest under that certain Deed of Trust, Assignment of Rents, Security Agreement and Fixture Filing dated **October 7, 2019**, executed by THOMAS V. GIRARDI, whose address is **100 Los Altos Drive, Pasadena, CA 91105**, as trustor, to **FIDELITY NATIONAL TITLE INSURANCE COMPANY, a Florida corporation**, as trustee, and recorded on _Concurrent herewith_, 2019, as Instrument No. _____, of Official Records of the Office of the County Recorder of Los Angeles County, State of California, describing land in said county as:

Legal description per Exhibit "A" attached hereto.

Together with the note or notes therein described or referred to in the original amount of **TWO MILLION FIVE HUNDRED THOUSAND AND 00/100 DOLLARS (US $2,500,000.00)**, the money due and to become due thereon with interest, and all rights accrued or to accrue under said Deed of Trust.

Dated as of _October 8_, 20 _19_

ASSIGNOR:

ALT FINANCIAL NETWORK, INC.,
a California corporation

By: _____
    ALBERT HANNA, President

Assignment of Deed of Trust

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California            ) ss.

County of Los Angeles.         )

On October 8        , 2019, before me, Brittany Welch        , Notary Public, personally appeared ALBERT HANNA,

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____

Signature of Notary Public

BRITTANY WELCH
COMM. # 2142540
NOTARY PUBLIC CALIFORNIA
ORANGE COUNTY
My comm. expires Feb. 12, 2020

Place Notary Seal Above

## EXHIBIT "A"
### DESCRIPTION OF THE LAND

THE LAND REFERRED TO HEREIN BELOW IS SITUATED IN THE CITY OF PASADENA, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AND IS DESCRIBED AS FOLLOWS:

LOTS 21 AND 22 OF TRACT NO. 8702, IN THE CITY OF PASADENA, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 118, PAGES 1, AND 2 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY AND THAT PORTION OF LOT 23 IN SAID TRACT NO. 8702, DESCRIBED AS FOLLOWS:

BEGINNING AT THE MOST SOUTHERLY CORNER OF SAID LOT 23; THENCE NORTHERLY ALONG THE CURVED WESTERLY LINE OF SAID LOT 23, A DISTANCE OF 26.54 FEET; THENCE NORTH 72° 48' 10" EAST 74.50 FEET TO A POINT IN THE SOUTHEASTERLY LINE OF SAID LOT 23 DISTANT THEREON NORTH 54° 44' 10" EAST 84.15 FEET FROM THE POINT OF BEGINNING; THENCE ALONG SAID SOUTHEASTERLY LINE SOUTH 54° 44' 10" WEST 84.15 FEET TO THE POINT OF BEGINNING.

APN: 5708-025-009, 5708-025-008

PROPERTY ADDRESS:  100 LOS ALTOS DRIVE, PASADENA, CA 91105

# EXHIBIT D




**This page is part of your document - DO NOT DISCARD**

## 20191149335





**Pages:**
**0005**

**Recorded/Filed in Official Records**
**Recorder's Office, Los Angeles County,**
**California**

**10/25/19 AT 08:00AM**

| | |
|---|---|
| FEES: | 27.00 |
| TAXES: | 0.00 |
| OTHER: | 0.00 |
| PAID: | 27.00 |





**L E A D S H E E T**



201910250260053

00017352369



010234191

**SEQ:**
**05**

SECURE - 8:00AM



**THIS FORM IS NOT TO BE DUPLICATED**

20_4760383_1__

E248971

RECORDING REQUEST
BY:  **" SYNRGO "**

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT FILER (optional)

B. E-MAIL CONTACT AT FILER (optional)

C. SEND ACKNOWLEDGMENT TO:    (Name and Address)

**ALT FINANCIAL NETWORK, INC.**
**18022 COWAN, SUITE 245**
**IRVINE, CA 92614**

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name, do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| OR 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| **GIRARDI** | **THOMAS** | **V.** | |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| **100 LOS ALTOS DRIVE** | **PASADENA** | **CA** | **91105** | **USA** |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Individual Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| OR 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| | | | |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| OR **ALT FINANCIAL NETWORK, INC., A CALIFORNIA CORPORATION** | | | |
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| **18022 COWAN, SUITE 245** | **IRVINE** | **CA** | **92614** | **USA** |

4. COLLATERAL: This financing statement covers the following collateral:
**ALL ASSETS OF THE DEBTOR, INCLUDING, WITHOUT LIMITATION, ALL OF THE COLLATERAL DESCRIBED ON EXHIBIT "B" ATTACHED HERETO AND MADE A PART HEREOF.**
and Exhibit "A"

Exempt from fee per GC
27388.1 (a) (1); fee cap of
$225 reached

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box.
☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility
6b. Check only if applicable and check only one box:
☐ Agricultural Lien ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:

UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)

## FINANCING STATEMENT; EXHIBIT "A"

Attached to that certain UCC-1 Financing Statement naming **GIRARDI, THOMAS V.** as "Debtor".

### LOCATION OF PERSONAL PROPERTY COLLATERAL
### LEGAL DESCRIPTION OF PROPERTY

THE LAND REFERRED TO HEREIN BELOW IS SITUATED IN THE CITY OF PASADENA, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AND IS DESCRIBED AS FOLLOWS:

LOTS 21 AND 22 OF TRACT NO. 8702, IN THE CITY OF PASADENA, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 118, PAGES 1 AND 2 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY AND THAT PORTION OF LOT 23 IN SAID TRACT NO. 8702, DESCRIBED AS FOLLOWS:

BEGINNING AT THE MOST SOUTHERLY CORNER OF SAID LOT 23; THENCE NORTHERLY ALONG THE CURVED WESTERLY LINE OF SAID LOT 23, A DISTANCE OF 26.54 FEET; THENCE NORTH 72° 48' 10" EAST 74.50 FEET TO A POINT IN THE SOUTHEASTERLY LINE OF SAID LOT 23 DISTANT THEREON NORTH 54° 44' 10" EAST 84.15 FEET FROM THE POINT OF BEGINNING; THENCE ALONG SAID SOUTHEASTERLY LINE SOUTH 54° 44' 10" WEST 84.15 FEET TO THE POINT OF BEGINNING.

APN: 5708-025-009, 5708-025-008

PROPERTY ADDRESS: 100 LOS ALTOS DRIVE, PASADENA, CA 91105

UCC1 Exhibits                                                                                     Page A-1

Doc: CALOSA:2019 01149335~06037                    Requested By: tammief, Printed: 6/22/2022 10:29 AM

## FINANCING STATEMENT; EXHIBIT "B"

Attached to that certain UCC-1 Financing Statement naming **GIRARDI, THOMAS V.** as "**Debtor**".

All assets of the Debtor, including, without limitation, all of Debtor's present and future right, title and interest in and to all of the following:

(1)    All of the following which are used now or in the future in connection with the ownership, management or operation of the real property described in Exhibit "A" and/or the improvements on such real property (the "**Property**"): machinery, equipment, engines, boilers, incinerators, installed building materials; systems and equipment for the purpose of supplying or distributing heating, cooling, electricity, gas, water, air, or light; antennas, cable, wiring and conduits used in connection with radio, television, security, fire prevention, or fire detection or otherwise used to carry electronic signals; telephone systems and equipment; elevators and related machinery and equipment; fire detection, prevention and extinguishing systems and apparatus; security and access control systems and apparatus; plumbing systems; water heaters, ranges, stoves, microwave ovens, refrigerators, dishwashers, garbage disposers, washers, dryers and other appliances; light fixtures, awnings, storm windows and storm doors; pictures, screens, blinds, shades, curtains and curtain rods; mirrors; cabinets, paneling, rugs and floor and wall coverings; fences, trees and plants; swimming pools; and exercise equipment (any of the foregoing that are so attached to the Property as to constitute fixtures under applicable law are referred to below as the "**Fixtures**");

(2)    All furniture, furnishings, equipment, machinery, building materials, appliances, goods, supplies, tools, books, records (whether in written or electronic form), computer equipment (hardware and software) and other tangible personal property (other than Fixtures) which are used now or in the future in connection with the ownership, management or operation of the Property or are located on the Property, and any operating agreements relating to the Property, and any surveys, plans and specifications and contracts for architectural, engineering and construction services relating to the Property and all other intangible property and rights relating to the operation of, or used in connection with, the Property, including all governmental permits relating to any activities on the Property (the "**Personalty**");

(3)    All current and future rights, including air rights, development rights, zoning rights and other similar rights or interests, easements, tenements, rights-of-way, strips and gores of land, streets, alleys, roads, sewer rights, waters, watercourses, and appurtenances related to or benefiting the Property, and all rights-of-way, streets, alleys and roads which may have been or may in the future be vacated;

(4)    All proceeds paid or to be paid by any insurer of the Property, the Fixtures, the Personalty or any other item listed in this Exhibit "B";

(5)    All awards, payments and other compensation made or to be made by any municipal, state or federal authority with respect to the Property, the Fixtures, the Personalty or any other item listed in this Exhibit "B", including any awards or settlements resulting from condemnation proceedings or the total or partial taking of the Property, the Fixtures, the Personalty or any other item listed in this Exhibit "B" under the power of eminent domain or otherwise and including any conveyance in lieu thereof;

(6)    All contracts, options and other agreements for the sale of the Property, the Fixtures, the Personalty or any other item listed in this Exhibit "B" entered into by Debtor now or in the future, including cash or securities deposited to secure performance by parties of their obligations;

(7)    All present and future leases, subleases, licenses, concessions or grants or other possessory interests now or hereafter in force, whether oral or written, covering or affecting the Property, or any portion of the Property (including proprietary leases or occupancy agreements if Debtor is a cooperative housing corporation), and all modifications, extensions or renewals (the "**Leases**");

UCC1 Exhibits                                                                                                    Page B-1

Doc: CALOSA:2019 01149335~06037                                    Requested By: tammief, Printed: 6/22/2022 10:29 AM

(8)    All earnings, royalties, accounts receivable (including accounts receivable for all rents, revenues and other income of the Property, including parking fees, charges for food, health care and other services), issues and profits from the Property, or any other item listed in this Exhibit "B", and all undisbursed proceeds of the loan secured by the security interests to which this financing statement relates and, if Debtor is a cooperative housing corporation, maintenance charges or assessments payable by shareholders or residents;

(9)    All refunds (other than real property tax refunds applicable to periods before the real property tax year in which the loan secured by the security interests to which this financing statement relates was made) or rebates of (a) water and sewer charges, (b) premiums for fire and other hazard insurance, rent loss insurance and any other insurance required by Secured Party, (c) taxes, assessments, vault rentals, and (d) other charges or expenses required by Secured Party to protect the Property, to prevent the imposition of liens on the Property, or otherwise to protect Secured Party's interests by any municipal, state or federal authority or insurance company;

(10)    All tenant security deposits which have not been forfeited by any tenant under any Lease;

(11)    All funds on deposit pursuant to any separate agreement between Debtor and Secured Party for the purpose of establishing replacement reserves for the Property, establishing a fund to assure the completion of repairs or improvements specified in that agreement, or assuring reduction of the outstanding principal balance of the Indebtedness if the occupancy of or income from the Property does not increase to a level specified in that agreement, or any other agreement or agreements between Debtor and Secured Party which provide for the establishment of any other fund, reserve or account;

(12)    All names under or by which the Property or any part of it may be operated or known, and all trademarks, trade names, and goodwill relating to any of the Property or any part of it; and

(13)    All proceeds from the conversion, voluntary or involuntary, of any of the above into cash or liquidated claims, and the right to collect such proceeds.

# EXHIBIT E

1   TIMOTHY J. YOO (State Bar No. 155531)
    tjy@lnbyb.com
2   CARMELA T. PAGAY (State Bar No. 195603)
    ctp@lnbyb.com
3   LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.
    10250 Constellation Boulevard, Ste. 1700
4   Los Angeles, California 90067
    Telephone: (310) 229-1234
5   Facsimile: (310) 229-1244

6
    Attorneys for Jason M. Rund
7   Chapter 7 Trustee

8                  UNITED STATES BANKRUPTCY COURT

9                  CENTRAL DISTRICT OF CALIFORNIA

10                      LOS ANGELES DIVISION

11

12  In re                               Case No. 2:20-bk-21020-BR

13  THOMAS VINCENT GIRARDI,             Chapter 7

14                        Debtor.       **CHAPTER 7 TRUSTEE'S MOTION TO
                                        APPROVE COMPROMISE UNDER FRBP
15                                      9019 WITH CALIFORNIA ATTORNEY
                                        LENDING II, INC.; MEMORANDUM OF
16                                      POINTS AND AUTHORITIES AND
                                        DECLARATIONS IN SUPPORT
17                                      THEREOF**

18                                      [No Hearing Required]

19

20  **TO THE HONORABLE BARRY RUSSELL, UNITED STATES BANKRUPTCY**

21  **JUDGE:**

22          Jason M. Rund, the Chapter 7 Trustee (the "Trustee") for the estate of Thomas Vincent

23  Girardi, debtor herein ("Debtor"), hereby moves this Court for an order pursuant to Rule 9019

24  of the Federal Rules of Bankruptcy Procedure and Local Bankruptcy Rule 9013-1(o), approving

25  the Settlement Agreement (the "Agreement") by and between the Trustee, on the one hand, and

26  California Attorney Lending II, Inc., a New York corporation ("CAL II"), on the other hand,

27  concerning the allowance of CAL II's claim in this case and the sale of certain assets of the

28  estate that are subject to CAL II's senior lien ("CAL II's Lien").

                                        1

The Agreement provides, in pertinent part, as follows:

1.      CAL II shall be allowed a claim ("CAL II's Claim") in the amount of $6,499,761.78 as of the date of commencement of the bankruptcy case (the "Petition Date"), with a perfected lien in all of the Debtor's personal property that existed on the Petition Date with the exception of cash and bank accounts ("CAL II's Collateral").  Further, CAL II shall reserve its right to seek post-petition interest under 11 U.S.C. § 506(b).

2.      CAL II consents to the Trustee's sale and disposition of CAL II's Collateral free and clear of CAL II's Lien.

3.      For each CAL II's Collateral that is administered, the sale proceeds shall be distributed in the following order of priority: (1) liens senior to CAL II's Lien, if any, allowed claim of exemption, taxes arising from the sale, and ordinary costs of sale (including broker commissions, escrow, etc.); (2) the reasonable, necessary administrative fees and costs of the bankruptcy estate assembling, acquiring and disposing of said collateral; (c) 80% of the balance to CAL II to be applied towards CAL II's Claim; and (d) the remainder (*i.e.*, 20%) of the balance to the Trustee to be held in trust for the allowed unsecured claimants of the bankruptcy estate.  Once CAL II is paid in full from this Case and the Girardi Keese bankruptcy case, the sale proceeds shall be distributed in accordance with the Settlement Agreement previously approved by the Bankruptcy Court between the Trustee and the Ruigomez Creditors [Doc 173].

4.      The Trustee releases and waives all claims against CAL II including, without limitation, claims related to Section 510 of the Code arising out of the Case, and CAL II releases and waives all claims against the Trustee and the Debtor's bankruptcy estate arising out of the Case.

This Motion is made pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure on the grounds that the Trustee, in the exercise of his business judgment, has determined that the Agreement is in the best interests of the estate.  The Agreement allows the Trustee to sell overencumbered assets and retain a portion of net proceeds from such sales for the benefit of the estate.  Accordingly, the Trustee submits that the compromise is fair and reasonable and should, therefore, be approved by the Court.

2

1    In support of this Motion, the Trustee will rely on these moving papers, the

2    Memorandum of Points and Authorities and Declarations of Jason M. Rund and Paul Cody

3    attached hereto, the pleadings and orders on file in this bankruptcy case, and such other and

4    further evidence and argument as may be made.

5    Accordingly, the Trustee respectfully requests that the Court enter an order:

6    1.    Granting the Motion;

7    2.    Approving the Agreement;

8    3.    Authorizing and directing the Trustee and CAL II to take any other steps

9    necessary to effectuate the Agreement;

10    4.    Authorizing the Trustee to make interim distributions to CAL II as described in

11    the Agreement; and

12    5.    Providing such other and further relief as is just and proper.

13    DATED: May 19, 2021                LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.

14                                By: */s/ Timothy J. Yoo*
15                                    TIMOTHY J. YOO
                                     CARMELA T. PAGAY
16                                    Attorneys for Jason M. Rund
                                     Chapter 7 Trustee
17

18

19

20

21

22

23

24

25

26

27

28

3

<div align="center">

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.**

**STATEMENT OF FACTS**

</div>

An Involuntary Petition was filed against Thomas Vincent Girardi, debtor herein ("Debtor"), on December 18, 2020 (the "Petition Date"), by petitioning creditors Robert M. Keese, John Abassian, Erika Saldana, Virginia Antonio and Kimberly Archie (the "Petitioning Creditors").  On the same date, the Petitioning Creditors also filed a Chapter 7 Involuntary Petition against the Debtor's law firm, Girardi Keese ("GK"), commencing Case No. 2:20-bk-21022-BR (the "Girardi Keese Case").

On December 24, 2020, the Petitioning Creditors filed an emergency motion for appointment of an interim trustee [Doc 13], which was granted by this Court on January 5, 2021 [Doc 39].  On January 6, 2021, the United States Trustee appointed Jason M. Rund ("Trustee") as the interim Chapter 7 Trustee for this bankruptcy case.

On January 13, 2021, the Order for Relief was entered [Doc 64], and the Trustee was reappointed.

In or around July 5, 2011, GK and CAL II entered into a loan transaction (as amended, the "Loan") pursuant to which GK borrowed the principal amount of $3,500,000.00 to fund its operations.  The Loan was secured against, among other things, GK's rights to payment for its representation of clients in various contingency fee cases.  CAL II perfected its security interest by filing a UCC Financing Statement with the California Secretary of State on July 6, 2011 as Inst. No. 11-7275806299 (the "UCC Financing Statement").  A true and correct copy of the UCC Financing Statement is attached as Exhibit 1.

Between 2011 and 2019, CAL II and GK entered into several iterations of the credit arrangement in which GK increased the principal amount of the debt up to $8,000,000.00.  CAL II filed several continuations and amendments to the UCC Financing Statement to maintain its perfected security interests in GK's assets.  The Debtor guaranteed the Loan by executing that certain Guaranty of Payment and Performance dated August 12, 2011 and subsequent guaranties in connection with each amendment to the Loan.

<div align="center">4</div>

On July 11, 2017, the Debtor executed that certain Third Amended and Restated Security Agreement, granting a security interest in substantially all of the Debtor's personal property (the "Collateral"). In its attempt to perfect its security interest in the Collateral, CAL II filed a UCC Amendment with the California Secretary of State on July 19, 2017 as Inst. No. 1775969950, which added the Debtor to the UCC Financing Statement (the "TVG Financing Statement"). True and correct copies of the Third Amended and Restated Security Agreement and the TVG Financing Statement are attached as Exhibits 2 and 3, respectively.

As part of the consideration given to CAL II, GK and the Debtor executed and delivered to CAL II certain Confessions of Judgment dated November 12, 2019, and agreed to entry of judgment without trial if, after GK's default under the Loan and notice thereof, GK or the Debtor did not cure the default.

After default, on October 27, 2020, CAL II obtained judgment against GK and the Debtor in the sum of $6,250,589.59 plus post-judgment interest and reasonable attorneys' fees and costs incurred in collecting the judgment from the Los Angeles Superior Court, in LASC Case No. 20STCP03546 (the "Judgment"). CAL II filed a Notice of Judgment Lien with the California Secretary of State on November 2, 2020 as Inst. No. U200033578428. CAL II also recorded Abstracts of Judgment, including Document No. 20201435462 on November 12, 2020 with the Los Angeles County Recorder's Office (the "Los Angeles Abstract"), and executed a levy on Morgan Stanley on November 24, 2020. The levied funds at the time of the execution totaled approximately $118,000 (the "Levied Funds"). True and correct copies of the Judgment, Los Angeles Abstract are attached as Exhibit 4 and 5, respectively.

CAL II asserts that, as of the Petition Date, the total sum of $6,668,484.21 was due and owing under the Judgment, comprised of (1) the Judgment balance of $6,250,589.59, (2) interest at the 10% California judgment interest rate of $89,049.50, (3) a deferred closing fee of $62,574.40, and (4) legal fees of $266,270.75 ("CAL II's Claim"). Of the $266,270.75 in legal fees, the amount of $168,722.46 is attributable to GK and the amount of $97,548.29 is attributable to the Debtor ("Debtor Legal Fees").

The Trustee contends that, because the TVG Financing Statement fails to describe any collateral, CAL II does not have a perfected security interest in the Collateral. The Trustee also contends that the Levied Funds should be returned to the bankruptcy estate as an avoidable preferential transfer under section 547 of the Code.  CAL II strenuously disputes these contentions.  Rather than litigate the foregoing issues, the Parties agree that Trustee's administration of assets of the bankruptcy estate on the terms set forth herein is in the best interest of CAL II and the bankruptcy estate.

Following numerous discussions, the Trustee and CAL II entered into a Settlement Agreement (the "Agreement") concerning the Trustee's administration of the Debtor's assets. The Agreement provides, in pertinent part, as follows: [1]

1.      CAL II's Claim shall be allowed in the amount of $6,402,213.49 plus the Debtor Legal Fees[2] as of the Petition Date, with a perfected interest in all of the Debtor's personal property that existed on the Petition Date with the exception of cash and bank accounts ("CAL II's Collateral"). Further, CAL II shall reserve its right to seek post-petition interest under section 506(b) of the Code.

2.      CAL II shall be allowed to retain the Levied Funds.  If CAL II has not received the Levied Funds, the Trustee shall instruct Morgan Stanley to release the Levied Funds to CAL II within 14 calendar days after the Effective Date.

3.      Within 14 calendar days after the Effective Date, CAL II shall provide the Trustee with a release of the Los Angeles Abstract in recordable form.  Further, if there are other Abstracts of Judgment recorded with 90 days of the Petition Date, CAL II shall provide releases of those Abstracts in recordable form at the request of the Trustee.

---

[1] The Trustee understands that the trustee in the Girardi Keese Case has negotiated a separate agreement with CAL II and will specifically state in the Order that the Girardi Keese estate preserves all of her estate's rights.

[2] It is anticipated that CAL II's Claim will be paid in full from this Case and the Girardi Keese Case.  Notwithstanding anything to the contrary, it is understood that the Debtor Legal Fees is a separate obligation of the Debtor's bankruptcy estate and must be paid to CAL II irrespective of the sum paid to CAL II from the Girardi Keese Case.

6

4.      CAL II consents to the Trustee's sale and disposition of CAL II's Collateral pursuant to section 363 of the Code free and clear of CAL II's Liens.

5.      For each CAL II's Collateral that is administered, the sale proceeds shall be distributed in the following order of priority: (1) liens senior to CAL II's Lien, if any, allowed claim of exemption, taxes arising from the sale, and ordinary costs of sale (including broker commissions, escrow, etc.); (2) the reasonable, necessary administrative fees and costs of the bankruptcy estate assembling, acquiring and disposing of said collateral; (c) 80% of the balance to CAL II to be applied towards CAL II's Claim; and (d) the remainder (*i.e.*, 20%) of the balance to the Trustee to be held in trust for the allowed unsecured claimants of the bankruptcy estate.  Once CAL II is paid in full from this Case and the Girardi Keese Case, the sale proceeds shall be distributed in accordance with the Settlement Agreement previously approved by the Bankruptcy Court between the Trustee and the Ruigomez Creditors [Doc 173].

6.      The distributions to CAL II under the Agreement shall take place no less than 120 calendar days apart, and for each distribution, the Trustee shall estimate the administrative fees and costs in good faith to determine the amount to be withheld by the bankruptcy estate.

7.      CAL II shall continue its best efforts to prosecute its claims in the Girardi Keese Case, and shall not withdraw or reduce their claims in that case without the written consent of the Trustee.

A true and correct copy of the Agreement is attached to the Declaration of Jason M. Rund as Exhibit 6 and is incorporated herein by this reference.

**II.**

**THE COMPROMISE SHOULD BE APPROVED**

**A.      The Bankruptcy Rules Allow The Court To Approve Compromises Of Controversies.**

Rule 9019 states that "the court may approve a compromise or settlement." Fed. R. Bankr. P. 9019(a). The "may" language of Rule 9019 indicates that the approval or disapproval of a proposed settlement lies within the sound discretion of the Court.  For the reasons set forth below, the Court should approve the proposed Agreement.

7

**B.**    <u>Case Law Supports Approval Of The Proposed Settlement.</u>

It is well-established that, as a matter of public policy, settlements are favored over continued litigation.  <u>See, e.g.</u>, <u>In re A & C Properties</u>, 784 F.2d 1377 (9th Cir. 1986); <u>In re Blair</u>, 538 F.2d 849, 851 (9th Cir. 1976); <u>In re Heissenger Resources, Ltd.</u>, 67 B.R. 378, 382 (C.D. Ill. 1986).

The focus of inquiry in reviewing and approving compromises is whether the settlement is reasonable under the particular circumstances of the case.  <u>See</u> <u>In re General Store of Beverly Hills</u>, 11 B.R. 539 (9th Cir. BAP 1981).  It is not the bankruptcy judge's responsibility to decide the numerous questions of law and fact with respect to the merits of the litigation, but rather to "canvas the issues and see whether the settlement falls below the lowest point of the range of reasonableness."  <u>Heissenger Resources</u>, <u>supra</u>, 67 B.R. at 383.

Among the factors to be considered in determining whether a settlement is fair, equitable and reasonable are the following:

    (a)    the probability of success in the litigation;

    (b)    any impediments to collection;

    (c)    the complexity, expense, inconvenience and delay of litigation; and

    (d)    the interest of creditors with deference to their reasonable opinions.

<u>See</u> <u>A & C Properties</u>, <u>supra</u>, 784 F.2d at 1381.

From an analysis of the foregoing factors, the Court should conclude that the terms of the Agreement are fair and equitable and well within the range of reasonableness.

    1.    <u>The Probability Of Success Is Uncertain</u>

The Judgment is not on appeal and is final.  Further, CAL II's Liens do not appear to be subject to dispute or avoidance. Pursuant to California Commercial Code 9601, if a secured party has reduced its claim to judgment, the lien of any levy that may be made upon the collateral [that is covered by a security interest] by virtue of an execution based upon the judgment relates back to the earliest of the date of perfection of the security interest in the

8

1  collateral, or the date of filing a financing statement covering the collateral.  In this Case, the

2  perfection date would be July 19, 2017 when the TGV Financing Statement was filed with

3  the California Secretary of State.  This UCC Amendment adding the Debtor should be found

4  to be effective.  The filing of an amended financing statement was authorized in the Third

5  Amended and Restated Security Agreement.  Further, the TGV Financing Statement

6  referenced the original UCC Financing Statement filed in 2011 and should be sufficient to

7  provide notice. *See*, *In re PA Record Outlet, Inc.,* 92 B.R. 139, 140–41 (Bankr. W.D. Pa.

8  1988), *subsequently aff'd sub nom. PA Record Outlet, Inc. v. Mellon Bank, N.A.*, 894 F.2d

9  631 (3d Cir. 1990) (filed financing statement amendment changing name of debtor gave

10  notice of collateral description in publicly filed original financing statement).

11      As such, there is no reason for the Trustee to litigate with CAL II concerning its lien

12  against estate assets.  Rather, this is a settlement of how best to liquidate the estate assets for

13  the benefit of not only CAL II but also to guarantee a distribution to the other allowed

14  unsecured claimants in this case.

15          2.      Impediments to Collection

16      There is no impediment to collection.  Rather, the Agreement provides the mechanism

17  by which the estate shall retain funds from the administration of CAL II's Collateral for the

18  benefit of the allowed unsecured claimants.

19          3.      Complexity of Issues And Proceeding With Administration Would

20                  Result In Additional Fees And Expense For The Estate And Would Be

21                  Inconvenient

22      There are no open issues since CAL II has a valid lien that is not subject to avoidance

23  claims.  The Agreement takes into consideration the fees and costs to liquidate the estate's

24  assets and makes sure that there would be funds available to be distributed to the allowed

25  unsecured claimants.

26          4.      Interest of Creditors

27      Depending on the success of the Girardi Keese Case, CAL II' sizeable secured claim

28  could render the personal property assets of this estate to be of no value to the Debtor's

<div align="center">9</div>

1  unsecured creditors.  In contrast, through the Agreement, the Trustee is able to administer the

2  assets of this estate with a portion of net proceeds specifically reserved for allowed unsecured

3  claimants of the bankruptcy estate.  Stated in another way, the Agreement only benefits the

4  estate – with no downside.

5       For these reasons, the Trustee has exercised sound business judgment in entering into the

6  Agreement with CAL II.  The Trustee respectfully submits that the Agreement is in the best

7  interest of the estate and should be approved by this Court.

8                                  **III.**

9                              <u>**CONCLUSION**</u>

10       Based upon the foregoing, the Trustee respectfully that the Court enter an order:

11     1.     Granting the Motion;

12     2.     Approving the Agreement;

13     3.     Authorizing and directing the Trustee and CAL II to take any other steps

14            necessary to effectuate the Agreement;

15     4.     Authorizing the Trustee to make interim distributions to CAL II as described in

16            the Agreement; and

17     5.     Providing such other and further relief as is just and proper.

18  DATED: May 19, 2021              LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.

19                                   By: */s/ Timothy J. Yoo*
20                                        TIMOTHY J. YOO
                                          CARMELA T. PAGAY
21                                        Attorneys for Jason M. Rund
                                          Chapter 7 Trustee
22

23

24

25

26

27

28

10

## DECLARATION OF JASON M. RUND

I, Jason M. Rund, declare as follows:

1.      I am the Chapter 7 Trustee for the bankruptcy estate of Thomas Vincent Girardi. This Declaration is made in support of the foregoing "Chapter 7 Trustee's Motion to Approve Compromise of Controversy" (the "Motion").  I have personal knowledge of the matters set forth herein and if called as a witness could and would testify competently thereto.  Unless the context indicates otherwise, capitalized terms herein shall have the meaning as defined in the Motion.

2.      I am requesting authority to enter into and consummate the Agreement that I entered into with CAL II, which allows the estate to administer assets that are subject to CAL II's Lien.

3.      A true and correct copy of the Agreement is attached hereto as <u>Exhibit 6</u> and is incorporated herein by reference.

4.      I believe that the terms of the Agreement are fair and equitable and well-within the range of reasonableness.  Depending on the success of the Girardi Keese Case, CAL II's sizeable secured claim could render the assets of this estate to be of no value to the Debtor's other creditors.  In contrast, through the Agreement, I am able to administer the assets of this estate with a portion of net proceeds specifically reserved for allowed unsecured claimants of the bankruptcy estate.  Stated in another way, the Agreement only benefits the estate – with no downside.

5.      Therefore, I believe that I have exercised sound business judgment in entering into the Agreement and respectfully request that it be approved by this Court.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that this declaration was executed on May _10_, 2021, at El Segundo, California.

_____
JASON M. RUND

11

1

2                                    **DECLARATION OF PAUL CODY**

3          I, Paul Cody, declare as follows:

4          1.       This Declaration is made in support of the foregoing "Chapter 7 Trustee's

5   Motion to Approve Compromise of Controversy" (the "Motion").  I am the Chief Executive

6   Officer of California Attorney Lending II, Inc. ("CAL II") and have personal knowledge of

7   the matters set forth herein and if called as a witness could and would testify competently

8   thereto.  Unless the context indicates otherwise, capitalized terms herein shall have the

9   meaning as defined in the Motion.

10         2.       In or around July 5, 2011, GK and CAL II entered into a loan transaction (as

11  amended, the "Loan") pursuant to which GK borrowed the principal amount of $3,500,000.00

12  to fund its operations.  The Loan was secured against, among other things, GK's rights to

13  payment for its representation of clients in various contingency fee cases.  CAL II perfected

14  its security interest by filing a UCC Financing Statement with the California Secretary of

15  State on July 6, 2011 as Inst. No. 11-7275806299 (the "UCC Financing Statement").  A true

16  and correct copy of the UCC Financing Statement is attached as Exhibit 1.

17         3.       Between 2011 and 2019, CAL II and GK entered into several iterations of the

18  credit arrangement in which GK increased the principal amount of the debt up to

19  $8,000,000.00.  CAL II filed several continuations and amendments to the UCC Financing

20  Statement to maintain its perfected security interests in GK's assets.  The Debtor guaranteed

21  the Loan by executing that certain Guaranty of Payment and Performance dated August 12,

22  2011 and subsequent guaranties in connection with each amendment to the Loan.

23         4.       On July 11, 2017, the Debtor executed that certain Third Amended and

24  Restated Security Agreement, granting a security interest in substantially all of the Debtor's

25  personal property (the "Collateral").  In its attempt to perfect its security interest in the

26  Collateral, CAL II filed a UCC Amendment with the California Secretary of State on July 19,

27  2017 as Inst. No. 1775969950, which added the Debtor to the UCC Financing Statement (the

28  "TVG Financing Statement").  True and correct copies of the Third Amended and Restated

1  Security Agreement and the TVG Financing Statement are attached as <u>Exhibits 2 and 3</u>,

2  respectively.

3          5.        As part of the consideration given to CAL II, GK and the Debtor executed and

4  delivered to CAL II certain Confessions of Judgment dated November 12, 2019, and agreed to

5  entry of judgment without trial if, after GK's default under the Loan and notice thereof, GK or

6  the Debtor did not cure the default.  After default, on October 27, 2020, CAL II obtained

7  judgment against GK and the Debtor in the sum of $6,250,589.59 plus post-judgment interest

8  and reasonable attorneys' fees and costs incurred in collecting the judgment from the Los

9  Angeles Superior Court, in LASC Case No. 20STCP03546 (the "Judgment").  CAL II filed a

10  Notice of Judgment Lien with the California Secretary of State on November 2, 2020 as Inst.

11  No. U200033578428. CAL II also recorded Abstracts of Judgment, including Document No.

12  20201435462 on November 12, 2020 with the Los Angeles County Recorder's Office (the

13  "Los Angeles Abstract"), and executed a levy on Morgan Stanley on November 24, 2020.

14  The levied funds at the time of the execution totaled approximately $118,000 (the "Levied

15  Funds").  True and correct copies of the Judgment, Los Angeles Abstract are attached as

16  <u>Exhibit 4 and 5</u>, respectively.

17          6.        As of the Petition Date, the total sum of $6,668,484.21 was due and owing

18  under the Judgment, comprised of (1) the Judgment balance of $6,250,589.59, (2) interest at

19  the 10% California judgment interest rate of $89,049.50, (3) a deferred closing fee of

20  $62,574.40, and (4) legal fees of $266,270.75.

21          7.        Besides for the lending relationship described above, CAL II has no other

22  relationship with GK or the Debtor.

23          I declare under penalty of perjury under the laws of the United States of America that

24  the foregoing is true and correct and that this declaration was executed on May __, 2021, in

25  Williamsville, New York.

26                                                          _____

27                                                                              PAUL CODY

28

13

# EXHIBIT "1"

## UCC FINANCING STATEMENT

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

**A. NAME & PHONE OF CONTACT AT FILER [optional]**
Timothy C Cashmore
716-858-3883

**B. SEND ACKNOWLEDGMENT TO: (Name and Address)**
Damon Morey LLP
The Avant Building - Suite 1200
200 Delaware Avenue
Buffalo, NY 14202
USA

DOCUMENT NUMBER: 29534010002
FILING NUMBER: 11-7275806299
FILING DATE: 07/06/2011 09:08
IMAGE GENERATED ELECTRONICALLY FOR WEB FILING
THE ABOVE SPACE IS FOR CA FILING OFFICE USE ONLY

**1. DEBTOR'S EXACT FULL LEGAL NAME** - insert only <u>one</u> debtor name (1a or 1b) - do not abbreviate or combine names

| 1a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| Girardi Keese | | | |

| 1b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 1126 Wilshire Blvd. | Los Angeles | CA | 90017 | USA |

| 1d. SEE INSTRUCTIONS | ADD'L DEBTOR INFO | 1e. TYPE OF ORGANIZATION general partnership | 1f. JURISDICTION OF ORGANIZATION CA | 1g. ORGANIZATIONAL ID#, if any ☑NONE |
|---|---|---|---|---|

**2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME** - insert only <u>one</u> debtor name (2a or 2b) - do not abbreviate or combine names

| 2a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| | | | |

| 2b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

| 2d. SEE INSTRUCTIONS | ADD'L DEBTOR INFO | 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION | 2g. ORGANIZATIONAL ID#, if any ☐NONE |
|---|---|---|---|---|

**3. SECURED PARTY'S NAME (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P)** - insert only <u>one</u> secured party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| California Attorney Lending II, Inc. | | | |

| 3b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 6400 Main Street, Suite 120 | Williamsville | NY | 14221 | USA |

**4. This FINANCING STATEMENT covers the following collateral:**

All Debtor's present and future right, title and interest in and to any and all accounts, choses in action, causes of action, settlement proceeds, attorneys' liens, attorneys' fees, general intangibles, contract rights, deposit and other bank accounts and instruments, instruments, documents, chattel paper and obligations in any form in each case arising out of or related to the rendition of services by Debtor whether earned by performance or otherwise in connection with the following: (i) all matters with respect to which the Borrower is representing one or more individuals or estates against SmithKline Beecham Corporation d/b/a GlaxoSmithKline, GlaxoSmithKline PLC, Glaxo Wellcome UK Ltd., GlaxoSmithKline UK Limited Brentford, McKesson Corporation and others, or any of them, in connection with the prescription drug Rosiglitazone, marketed under the trade names Avandia, Avandamet and Avandaryl; and (ii) all matters with respect to which the Borrower is representing one or more individuals or estates against Zimmer Inc., Zimmer Holdings Inc. and others, or any of them, in connection with the so-called "Zimmer Hip" litigation; all of Debtor's books related to the foregoing;

**5. ALT DESIGNATION:** ☐LESSEE/LESSOR ☐CONSIGNEE/CONSIGNOR ☐BAILEE/BAILOR ☐SELLER/BUYER ☐AG. LIEN ☐NON-UCC FILING

| ☐6. This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS Attach Addendum [if applicable] | 7. Check to REQUEST SEARCH REPORT(S) on Debtor(s) [ADDITIONAL FEE]    [optional] ☐All Debtors ☐Debtor 1 ☐Debtor 2 |
|---|---|

**8. OPTIONAL FILER REFERENCE DATA**
Girardi Keese

FILING OFFICE COPY

# UCC FINANCING STATEMENT ADDENDUM

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

**9. NAME OF FIRST DEBTOR (1a or 1b) ON RELATED FINANCING STATEMENT**

9a. ORGANIZATION'S NAME

Girardi Keese

OR | 9b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME, SUFFIX

**10. MISCELLANEOUS:**

DOCUMENT NUMBER: 29534010002
IMAGE GENERATED ELECTRONICALLY FOR WEB FILING
THE ABOVE SPACE IS FOR CA FILING OFFICE USE ONLY

**11. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (1a or 1b) - do not abbreviate or combine names**

11a. ORGANIZATION'S NAME

OR | 11b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX

11c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY

11d. SEE INSTRUCTIONS | ADD'L DEBTOR INFO | 11e. TYPE OF ORGANIZATION | 11f. JURISDICTION OF ORGANIZATION | 11g. ORGANIZATIONAL ID#, if any ☐ NONE

**12. ☐ ADDITIONAL SECURED PARTY'S or ☐ ASSIGNOR S/P'S NAME - insert only one name (12a or 12b)**

12a. ORGANIZATION'S NAME

OR | 12b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX

12c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY

**13. This FINANCING STATEMENT covers** ☐ timber to be cut or as-extracted collateral, or is filed as a ☐ fixture filing.

**14. Description of real estate:**

**16. Additional collateral description:**

and all cash and non-cash proceeds of any of the foregoing, in whatever form, including without limitation all proceeds of proceeds, all insurance policies covering same and all interest or dividends thereon.

**15. Name and address of RECORD OWNER of above-described real estate (if Debtor does not have a record interest):**

**17. Check only if applicable and check only one box.**
Debtor is a ☐ Trust or ☐ Trustee acting with respect to property held in trust or ☐ Decedent's Estate

**18. Check only if applicable and check only one box.**
☐ Debtor is a TRANSMITTING UTILITY
☐ Filed in connection with a Manufactured-Home Transaction - effective 30 years
☐ Filed in connection with a Public-Finance Transaction - effective 30 years

FILING OFFICE COPY

# UCC FINANCING STATEMENT AMENDMENT

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

**A. NAME & PHONE OF CONTACT AT FILER [optional]**
Timothy C. Cashmore
716-858-3883

**B. SEND ACKNOWLEDGMENT TO: (Name and Address)**
Damon Morey LLP
The Avant Building - Suite 1200
200 Delaware Avenue
Buffalo, NY 14202
USA

DOCUMENT NUMBER: 30040950002
FILING NUMBER: 11-72814762
FILING DATE: 08/18/2011 08:35
IMAGE GENERATED ELECTRONICALLY FOR WEB FILING
THE ABOVE SPACE IS FOR CA FILING OFFICE USE ONLY

| 1a. INITIAL FINANCING STATEMENT FILE # | 1b. ☐ This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS. |
|---|---|
| 11-7275806299 | |

**2. ☐ TERMINATION:** Effectiveness of the Financing Statement identified above is terminated with respect to security interest(s) of the Secured Party authorizing this Termination.

**3. ☐ CONTINUATION:** Effectiveness of the Financing Statement identified above with respect to security interest(s) of the Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law.

**4. ☐ ASSIGNMENT (full or partial):** Give name of assignee in item 7a or 7b and address of assignee in item 7c; and also give name of assignor in item 9.

**5. AMENDMENT (PARTY INFORMATION):** This Amendment affects ☐ Debtor or ☐ Secured Party of record. Check only one of these.
Also check one of the following three boxes and provide appropriate information in items 6 and/or 7.

| ☐ CHANGE name and/or address: Please refer to the detailed instructions in regards to changing the name/address of a party. | ☐ DELETE name: Give record name to be deleted in item 6a or 6b. | ☐ ADD name: Complete item 7a or 7b, and also item 7c |
|---|---|---|

**6. CURRENT RECORD INFORMATION:**

| | 6a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| OR | 6b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
| | | | | |

**7. CHANGED (NEW) OR ADDED INFORMATION:**

| | 7a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| OR | 7b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
| | | | | |

| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

| 7d. SEE INSTRUCTIONS | ADD'L DEBTOR INFO | 7e. TYPE OF ORGANIZATION | 7f. JURISDICTION OF ORGANIZATION | 7g. ORGANIZATIONAL ID#, if any ☐ NONE |
|---|---|---|---|---|
| | | | | |

**8. AMENDMENT (COLLATERAL CHANGE):** check only one box.
Describe collateral ☐ deleted or ☐ added, or give entire ☑ restated collateral description, or describe collateral ☐ assigned.

All Debtor's present and future right, title and interest in and to any and all accounts, choses in action, causes of action, settlement proceeds, attorneys' liens, attorneys' fees, general intangibles, contract rights, deposit and other bank accounts and instruments, instruments, documents, chattel paper and obligations in any form in each case arising out of or related to the rendition of services by Debtor whether earned by performance or otherwise in connection with the following: (i) all matters with respect to which the Borrower is representing one or more individuals or estates against SmithKline Beecham Corporation d/b/a GlaxoSmithKline, GlaxoSmithKline PLC, Glaxo Wellcome UK Ltd., GlaxoSmithKline UK Limited Brentford, McKesson Corporation and others, or any of them, in connection with the prescription drug Rosiglitazone, marketed under the trade names Avandia, Avandamet and Avandaryl; (ii) all matters with respect to which the Borrower is representing one or more individuals or estates against Zimmer Inc., Zimmer Holdings Inc. and others, or any of them, in connection with the so-called "Zimmer Hip" litigation; and (iii) all matters with respect to which the

**9. NAME of SECURED PARTY of RECORD AUTHORIZING THIS AMENDMENT** (name of assignor, if this is an Assignment). If this is an Amendment authorized by Debtor which adds collateral or adds the authorizing Debtor, or if this is a Termination authorized by a Debtor, check here ☑ and enter name of DEBTOR authorizing this amendment.

| | a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| | Girardi Keese | | | |
| OR | b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
| | | | | |

**10. OPTIONAL FILER REFERENCE DATA**
Girardi Keese

FILING OFFICE COPY

# EXHIBIT "2"

## THIRD AMENDED AND RESTATED
## SECURITY AGREEMENT
## CALIFORNIA ATTORNEY LENDING II, INC.

In consideration of **California Attorney Lending II, Inc.,** a New York corporation having its chief executive office at 6400 Main Street, Suite 120, Williamsville, NY 14221 ("Secured Party") heretofore or hereafter (1) extending or agreeing to extend any credit or other financial accommodation to or relying on any guaranty, endorsement or other assurance of payment of Girardi Keese, a California general partnership having an office at 1126 Wilshire Blvd., Los Angeles, CA 90017 ("Borrower") or (2) agreeing to any direct or indirect extension, renewal, refinancing or other modification or replacement of or waiving or forbearing from exercising any right or remedy relating to any obligation heretofore or hereafter arising or accruing as a result of any such credit or other financial accommodation to Borrower, and for other valuable consideration, the receipt and adequacy of which is acknowledged, **Borrower and Thomas V. Girardi, individually,** having his or her principal residence address at 100 Los Altos Drive, Pasadena, CA 91105 (Borrower and each such individual being, a "Debtor" and collectively the "Debtors"), agrees with Secured Party as follows:

Introductory Statement: Secured Party and some or each or all of the Debtors are parties to that certain Security Agreement dated July 5, 2011 as amended and/or restated on August 12, 2011 and August 1, 2013 (collectively, "Security Agreement") in reliance upon which Secured Party has made certain loans and financial accommodations available to Borrower. Borrower as of the date of this Third Amended and Restated Security Agreement has executed a Third Amended and Restated Revolving Promissory Note to Secured Party in the principal amount of $6,000,000. The parties now desire to consolidate, amend and restate the Security Agreement in all respects as hereinafter set forth.

**1.      DEFINITIONS.** In this Security Agreement (the "Agreement"):

**a.      Account Debtor.** "Account Debtor" means any person or entity with an obligation to pay or transfer cash, property or proceeds to any Debtor on an Account, Chattel Paper, General Intangible regardless whether such obligation arises from business or personal matters or assets of such Debtor.

**b.      Collateral.** "Collateral" means collectively the following:

All of each Debtor's right, title and interest in all Goods (including, Equipment, Fixtures and Inventory), Money, Instruments (including Promissory Notes), Accounts, Deposit Accounts, Chattel Paper, Investment Property, Letter-of-Credit Rights, Documents and General Intangibles (including payment intangibles), Commercial Tort Claims described in the Questionnaire, Insurance Proceeds and any other personal property (whether or not subject to the UCC), and all interest, dividends and other distributions thereon paid and payable in cash or in property; and all replacements and substitutions for, and all accessions and additions to, and all profits, offspring, Products and other Proceeds of, all of the foregoing. Each Debtor is prohibited from granting additional security interest in the Collateral or the Proceeds of the Collateral. (Notice to potential competing creditors under Official Note 5 of UCC Section 9-331).

The Collateral includes, without limitation, any right to payment of any Debtor for client representation or referral (whether such right to payment is on a contingent, hourly, fixed fee or other basis) and for Costs and Expenses (as defined in the Note), whether or not yet earned by performance, and the proceeds thereof, including Net Fees and Expenses (as defined in the Note).

**c.      Event of Default.** An "Event of Default" occurs or exists if:

(i)      there occurs or exists any event or condition of default under any Revolving Promissory Note or other instrument (A) now or hereafter evidencing any of the Obligations, hereinafter defined, or (B) the payment of which is now or hereafter guaranteed by any Debtor (including, but not limited to, that certain Note, dated the date of this Agreement, issued by Borrower to Secured Party, or any direct or indirect extension, renewal, refinance or other modification or

27

Initials

CONFIDENTIAL

replacement of such Note); or

(ii)    there occurs or exists any event or condition of default under any guaranty of the Obligations; or

(iii)    Secured Party deems itself insecure with respect to the Obligations or is of the opinion that the Collateral is or may not be sufficient or has decreased or may decrease in value, whether or not Secured Party has sought any Other Collateral from any Debtor or any Guarantor.

**d.**    **Fiduciary Obligations.** "Fiduciary Obligations" means the fiduciary obligations of any Debtor, as set forth in the Note.

**e.**    **Guarantor.** "Guarantor" means any Person, including Thomas V. Girardi, who or that is now or hereafter liable, whether directly or indirectly or absolutely or contingently, for the payment of any of the Obligations.

**f**    **Loan Documents**. "Loan Documents" shall have the same meaning as set forth in the Note.

**g.**    **Note.** "Note" means the Third Amended and Restated Revolving Promissory Note, dated on or about the date hereof, from Borrower to Secured Party as amended, increased, extended, amended and restated or replaced from time to time.

**h**    **Obligations.** "Obligations" means collectively all obligations that are now owing or in the future owing by each Debtor (including, any direct or indirect successor of any Debtor or any direct or indirect assignee or other transferee of all or substantially all of the assets of any Debtor) to Secured Party for the payment of any money or the performance of any other obligation  under the Loan Documents, regardless of type, class or form, whether direct or indirect, absolute or contingent (whether pursuant to any guaranty, endorsement or other assurance of payment or otherwise), whether for any business or commercial purpose or otherwise, including without limitation any such present and future obligations owing under the Loan Documents, (i) for the payment of any principal, interest, fee, charge, cost or expense, whether or not any such amounts arise or accrue after the commencement of any bankruptcy or other insolvency proceeding and whether or not allowed in any such proceeding, (ii) by such Debtor alone or with others, and (iii) whether owing from inception to Secured Party or acquired by assignment or other transfer to Secured Party.

**i.**    **Other Collateral.** "Other Collateral" means, other than the Collateral, any collateral, subordination, guaranty, endorsement or other security or assurance of payment, whether now existing or hereafter arising or accruing, that now or hereafter secures the payment of or is otherwise applicable to any of the Obligations.

**j.**    **Permitted Liens.** "Permitted Liens" means (i) any security interest in or other lien on any of the Collateral in favor of Secured Party or (ii) any security interest in or other lien on any of the Collateral existing on this date that is (A) fully and accurately described in the response to question 7 contained in the Questionnaire set forth in Exhibit A attached to and made a part of this Agreement but only to the extent  such security interest or other lien secures the indebtedness described in such response or (B) consented to in writing by Secured Party.

**k.**    **Person.** "Person" means (i) any individual, corporation, partnership, limited liability company, joint venture, trust, unincorporated association, government or political subdivision, (ii) any court, agency or other governmental body or (iii) any other entity, body, organization or group.

**l.**    **Record.** "Record" means any information that is now or hereafter (i) inscribed on a tangible medium or (ii) stored in an electronic or other medium and retrievable in perceivable form, except to the extent constituting confidential information (whether contained in any client file of any Debtor or otherwise) that any Debtor is not permitted to disclose to Secured Party by reason of any ethical or disciplinary rule, regulation or law governing such Debtor's conduct.

28

Initials

CONFIDENTIAL

**m.** **Security Interest.** "Security Interest" means any security interest or other lien granted or otherwise created pursuant to the first sentence of Section 2 of this Agreement.

**n.** **Uniform Commercial Code.** "Uniform Commercial Code" or "UCC" means the Uniform Commercial Code in effect at any time in the State of New York.

**o.** **Other Terms.** All capitalized terms not otherwise defined in this Agreement shall have the meanings set forth in the Uniform Commercial Code.

**2.** **GRANT OF SECURITY INTEREST.** To secure the payment and performance of the Obligations, each Debtor grants to Secured Party a security interest in and assigns, pledges and hypothecates to Secured Party the Collateral. Each Security Interest is a continuing, absolute and unconditional security interest or other lien.

**3.** **REINSTATEMENT OF OBLIGATIONS.** Each portion of the Obligations heretofore or hereafter paid or satisfied by any of the Collateral, or any money or Other Collateral, heretofore or hereafter received, applied or retained by Secured Party and later recovered from Secured Party as a result of any claim (including, but not limited to, any claim involving preference or fraudulent conveyance or any allegation that any money received by Secured Party constituted trust funds), however asserted and whether now existing or hereafter arising or accruing, shall be reinstated as part of the Obligations for purposes of this Agreement as of the date it originally arose or accrued.

**4.** **COVENANTS.**

**a.** **Affirmative Covenants.** Each Debtor shall (i) maintain complete and accurate Records relating to the Collateral, (ii) before the end of any applicable grace period, pay each tax, assessment, fee and charge imposed by any government or political subdivision upon any of the Collateral, this Agreement or any agreement, instrument or other Record evidencing any of the Collateral or any of the Obligations, (iii) defend the Collateral against each demand, claim, counterclaim, setoff and defense asserted by any Person (including, but not limited to, any Account Debtor) other than Secured Party and (iv) promptly notify Secured Party of (A) any threat or commencement of any action or other legal proceeding, any entry of any judgment or order of any court, agency or other governmental body, or any assertion by any Person (including, but not limited to, any Account Debtor) other than Secured Party of any demand, claim, counterclaim, setoff or defense, relating to any of the Collateral, (B) any occurrence or existence of any Event of Default, any event or condition that, after notice, lapse of time or both notice and lapse of time, would constitute any Event of Default or any event or condition that has or will or might have any material adverse effect on (I) any of the Collateral, (II) any Debtor, (III) any Guarantor or (IV) the business, operations, assets, affairs or condition (financial or other) of any Debtor or any Guarantor and (C) any change in the location of the chief executive office or principal place of business of any Debtor or the residence of any Debtor that is an individual.

**b.** **Negative Covenants.** Without the prior written consent of Secured Party, no Debtor shall (i) sell or otherwise dispose of any of the Collateral or any interest or right in any of the Collateral except in the ordinary course of business and in compliance with any Fiduciary Obligations relating thereto, or (ii) provide to Secured Party or permit to be provided to Secured Party on his, her or its behalf any certificate, financial statement or other Record that contains any statement of fact that is incorrect or misleading in any material respect or omits to state any fact necessary to make any statement of fact contained therein not incorrect or misleading in any material respect, or (iii) permit to be filed or remain on file in any public office any financing statement or amendment of any financing statement relating to any of the Collateral and naming any Person other than Secured Party as a secured party, except for any financing statement or amendment of any financing statement heretofore consented to by Secured Party in writing or relating solely to any Permitted Liens, or (iv) upon or at any time after any occurrence or existence of any Event of Default, (A) enforce, extend, renew, refinance or otherwise modify or replace, request, demand, accept, collect or otherwise realize upon, compromise, cancel, discharge, subordinate, accelerate, give any receipt, release or discharge relating to, commence,

29

Initials

CONFIDENTIAL

prosecute or settle any action or other legal proceeding relating to, waive or forbear from exercising any right or remedy relating to or adversely affect any obligation of any Person (including, but not limited to, any Account Debtor obligated with respect to any of the Collateral) relating to any of the Collateral, or (B) agree or otherwise incur any obligation to do anything described in clause (iv)(A) of this sentence, or (v) without giving Secured Party at least 30 days' prior written notice (A) change its location for purposes of Article 9 of the Uniform Commercial Code (including, but not limited to, its jurisdiction of organization if it is a Registered Organization), (B) make any change in its name, identity or structure or (C) participate in any merger, consolidation or other absorption, or (vi) grant or otherwise create, permit to exist or agree or otherwise incur any obligation to grant or otherwise create or permit to exist any security interest in or other lien on any of the Collateral other than Permitted Liens, or (vii) use any money of Borrower, funds in any Deposit Account of Borrower or funds represented by any certificate of deposit of Borrower in partial or complete satisfaction of any obligation of Borrower except for obligations incurred in the ordinary course of the business of Borrower and in full compliance with the Fiduciary Obligations, or (viii) create, incur, assume or have any indebtedness or other obligation (A) arising from the borrowing of any money or (B) pursuant to any guaranty or other contingent obligation, except for indebtedness and other obligations (I) to Secured Party, (II) constituting unsecured normal trade debt incurred upon customary terms in the ordinary course of its business or for any Debtor that is an individual, ordinary consumer debt, (III) arising from the endorsement in the ordinary course of its business of any check or other negotiable instrument for deposit or collection or (IV) fully and accurately described in the response to question 7 contained in the Questionnaire set forth in Exhibit A attached to and made a part of this Agreement.

**c.    Additional Covenants Triggered by Request of Secured Party.** Promptly upon the request of Secured Party, each Debtor shall (i) deliver to Secured Party each financing statement, amendment of any financing statement and other Record, and take each other action (including, but not limited to, making any endorsement), requested by Secured Party to perfect, maintain the validity, perfection or priority of, or enforce, any Security Interest, otherwise protect the interest of Secured Party in or collect, sell or otherwise dispose of or otherwise realize upon any of the Collateral, whether under applicable law or otherwise, verify any of the Collateral or otherwise accomplish any purpose of this Agreement, (ii) deliver to Secured Party each Record included in the Collateral, together with each endorsement, instrument of assignment and other Record that Secured Party requests to accomplish the assignment or other transfer of such Record to Secured Party, and, until such delivery, hold such Record in trust for Secured Party, (iii) cause each Instrument representing Proceeds or other proceeds of any of the Collateral to be made payable, as requested by Secured Party, to Secured Party alone or Secured Party and any one or more of Debtors jointly, (iv) provide to Secured Party all information requested by Secured Party and relating to (A) any of the Collateral, (B) any Person (including, but not limited to, any Account Debtor) obligated with respect to any of the Collateral, (C) any Debtor, (D) any Guarantor or (E) the business, operations, assets, affairs or condition (financial or other) of any Debtor or any Guarantor (including, but not limited to, financial statements prepared in a form satisfactory to Secured Party and, if requested by Secured Party, audited, reviewed or compiled by an independent certified public accountant satisfactory to Secured Party) and (v) permit each officer, employee, accountant, attorney and other agent of Secured Party to inspect the Collateral and audit, copy and extract each Record included in the Collateral.

**d.    Collateral Collections.** After an Event of Default shall have occurred, Secured Party shall have the right at any and all times to enforce any Debtor's rights against Account Debtors and other parties obligated on Collateral, including, but not limited to, the right to: (i) notify and/or require any Debtor to notify any or all Account Debtors and other parties obligated on Collateral to make payments directly to Secured Party or in the care of a post office lock box under the sole control of Secured Party established at Debtors' expense subject to Secured Party's customary arrangements and charges therefor, and to take any or all action with respect to Collateral as Secured Party shall determine in its sole discretion, including, without limitation, the right to demand, collect, sue for and receive any money or property at any time due, payable or receivable on account thereof, compromise and settle with any person liable thereon, and extend the time of payment or otherwise change the terms thereof, without incurring liability or responsibility to any Debtor; (ii) revoke any prior authorization given to any Debtor to use amounts held in trust by such Debtor pursuant to the Fiduciary Obligations and require any Debtor to also segregate and hold in trust for Secured Party any other Collateral not subject to the Fiduciary Obligations, and, on the day of such Debtor's receipt thereof,

30

Initials

CONFIDENTIAL

transmit to Secured Party in the exact form received by such Debtor (except for such assignments and endorsements as may be required by Secured Party), all cash, checks, drafts, money orders and other items of payments constituting Collateral or proceeds of Collateral; and/or (iii) establish and maintain at Secured Party a "Repayment Account," which shall be under the exclusive control and subject to the sole order of Secured Party and which shall be subject to the imposition of such customary charges as are imposed by Secured Party from time to time upon such accounts, for the deposit of cash, checks, drafts, money orders and other items of payments constituting Collateral or proceeds of Collateral from which Secured Party may, in its sole discretion, at any time and from time to time, withdraw all or any part. Secured Party's collection and enforcement of Collateral against Account Debtors and other persons obligated thereon shall be deemed to be commercially reasonable if Secured Party exercises due care and follows the procedures that Secured Party generally applies to the collection of obligations owed to Secured Party. All cash and non-cash proceeds of the Collateral may be applied by Secured Party upon Secured Party's actual receipt of cash proceeds against such of the Obligations, matured or unmatured, as Secured Party shall determine in its sole discretion. Secured Party may defer the application of non-cash proceeds of Collateral, including, but not limited to, non-cash proceeds collected from Account Debtors and other persons obligated on Collateral, to the Obligations until cash proceeds are actually received by Secured Party.

**e.** **Care of Collateral.** Each Debtor shall have all risk of loss of the Collateral. Secured Party shall have no liability or duty, either before or after an Event of Default, to collect or enforce any of its rights against the Collateral, to collect any income accruing on the Collateral, or to preserve rights against Account Debtors or other parties with any prior interest in the Collateral. If Secured Party actually receives any notices requiring action with respect to Collateral of a Debtor in Secured Party's possession, Secured Party shall take reasonable steps to forward such notices to such Debtor. Each Debtor is responsible for responding to notices concerning the Collateral, voting the Collateral, and exercising rights and options, calls and conversions of the Collateral. Secured Party's sole responsibility is to take such action as is reasonably required by such Debtor in writing, provided, however, Secured Party is not required to take any action that, in Secured Party's sole judgment, would adversely affect the value of the Collateral as security for the Obligations. While Secured Party is not required to take certain actions, if action is needed, in Secured Party's sole discretion, to preserve and maintain the Collateral, each Debtor authorizes Secured Party to take such actions, but Secured Party is not obligated to do so.

**5.** **POWER OF ATTORNEY.** Upon the occurrence or existence of any Event of Default, each Debtor irrevocably and unconditionally appoints Secured Party as the attorney-in-fact of such Debtor, with full power of substitution and revocation, to take, in the name and on behalf of such Debtor or otherwise, each action relating to any of the Collateral that such Debtor could take (subject to the limitations contained in Section 12(j) of this Agreement), provided such appointment and power does not violate any code of professional conduct and the ethical rules thereunder applicable to the legal profession. The power of attorney given pursuant to the preceding sentence is coupled with an interest in favor of Secured Party.

**6.** **CERTAIN RIGHTS, REMEDIES AND DUTIES.**

**a.** **Rights and Remedies Pursuant to Applicable Law.** With respect to the Collateral, Secured Party shall have each applicable right and remedy pursuant to applicable law (including, but not limited to, the Uniform Commercial Code) or this Agreement.

**b.** **Additional Rights Without Event of Default.** Secured Party shall have the right to (i) file in any public office each financing statement or amendment of any financing statement relating to any of the Collateral that Secured Party desires to file (which may describe the collateral as "all assets" or "all personal property and fixtures" of a Debtor or using other supergeneric terms) and (ii) verify any of the Collateral in any manner or through any medium, whether directly with any Person (including, but not limited to, any Account Debtor) obligated with respect thereto or otherwise or in the name of any Debtor or otherwise.

31

Initials

CONFIDENTIAL

**c.    Additional Rights Upon or After Event of Default.** Upon or at any time after any occurrence or existence of any Event of Default, Secured Party, for the purpose of preserving or enhancing the value of any of the Collateral or exercising any right or remedy of Secured Party pursuant to this Agreement or arising or accruing as a result of this Agreement, shall have the right to (i) perform each obligation of any Debtor pursuant to this Agreement and (ii) revoke any prior authorization given to any Debtor to use amounts held in trust by such Debtor pursuant to the Fiduciary Obligations, require such Debtor to forthwith remit to Secured Party all such amounts and take control of all Proceeds and other proceeds thereof.

**d.    Application of Proceeds.** Secured Party shall apply all proceeds received by Secured Party from any collection, sale or other disposition of or other recovery upon or otherwise on account of any of the Collateral (including, but not limited to, as money payable pursuant to any insurance on any of the Collateral) first to liabilities, costs and expenses described in Section 7 of this Agreement and then to the remainder of the Obligations, whether due or not due, in any order determined by Secured Party.

**e.    Notice of Disposition.** Debtor agrees with Secured Party that commercial reasonableness and good faith require Secured Party to give each Debtor no more than ten days' prior written notice of the time and place of any public disposition of Collateral or of the time after which any private disposition or other intended disposition is to be made. Debtor also agrees with Secured Party that it is commercially reasonable for Secured Party to disclaim all warranties which arise with respect to the disposition of the Collateral.

## 7.    EXPENSES; INDEMNIFICATION.

**a.    Expenses.** Each Debtor shall pay to Secured Party on demand each cost and expense (including, but not limited to, if Secured Party retains counsel for advice, litigation or any other purpose, reasonable attorneys' fees and disbursements) heretofore or hereafter incurred by Secured Party in (i) searching for, filing or recording or obtaining any information relating to any financing statement, amendment of any financing statement or other Record relating to any of the Collateral or otherwise obtaining any information relating to any Debtor or any of the Collateral or (ii) endeavoring to (A) enforce any obligation of any Debtor pursuant to this Agreement or preserve or exercise any right or remedy of Secured Party pursuant to this Agreement or arising or accruing as a result of this Agreement or (B) preserve or exercise any right or remedy relating to or collect, sell or otherwise dispose of or otherwise realize upon any of the Collateral. After such demand for the payment of any cost or expense incurred by Secured Party in performing any obligation of any Debtor pursuant to this Agreement, Debtors shall pay interest at an annual rate equal to the lesser of 24.9% or the highest rate permitted by applicable law on the portion of such cost or expense remaining unpaid.

**b.    Indemnification.** Each Debtor shall indemnify and defend Secured Party and each officer, employee, accountant, attorney, banker or lender and other agent of Secured Party on demand, without any limitation as to amount, against each liability, cost and expense (including, but not limited to, if Secured Party retains counsel for advice, litigation or any other purpose, reasonable attorneys' fees and disbursements) heretofore or hereafter imposed on, incurred by or asserted against Secured Party or such officer, employee, accountant, attorney or other agent as a result of any claim (including, but not limited to, any claim involving any allegation of any violation of applicable law (including, but not limited to, any criminal statute)), however asserted and whether now existing or hereafter arising or accruing, arising out of any collection, sale or other disposition of any of the Collateral or any breach by any Debtor of any representation or warranty or any covenant or other agreement contained in, or any other fact or circumstance relating to, this Agreement, except to the extent any such liability, cost or expense is determined in a final, non-appealable judgment of a court of competent jurisdiction to have been caused by the gross negligence, bad faith or willful misconduct of Secured Party or such officer, employee, accountant, banker, lender, attorney or other agent.

**8.    TERMINATION.** This Agreement shall remain in full force and effect until and shall terminate only upon the final and indefeasible payment in full of the Obligations and the termination of the Loan Documents, irrespective of any interruptions in the business relationships of any Debtor with Secured Party.

32

Initials

CONFIDENTIAL

**9.   REPRESENTATIONS, WARRANTIES AND ADDITIONAL COVENANTS.** Each Debtor represents, warrants and covenants with and to Secured Party as follows:

**a.   Authority.** The execution, delivery to Secured Party and performance of this Agreement and the grant or other creation of each Security Interest by such Debtor (i) do not and will not violate applicable law, any judgment or order of any court, agency or other governmental body by which such Debtor is bound or, if such Debtor is not an individual, any certificate or articles of incorporation or organization, by-laws, operating or partnership agreement or other charter, organizational or other governing document of such Debtor or any resolution or other action of record of any shareholders, members, partners, directors or managers of such Debtor, (ii) do not and will not violate or constitute any default under any agreement, instrument or other Record by which such Debtor is bound or to which such Debtor's property is subject, (iii) if such Debtor is not an individual, are and will be in furtherance of the purposes and within the power and authority of such Debtor and (iv) do not and will not require any authorization of, notice to or other act by or relating to any Person (including, but not limited to, any Account Debtor or, if any Debtor is not an individual, any shareholder, member, partner, director or manager of such Debtor) that has not been duly obtained, given or done and is not in full force and effect.

**b.   Enforceability.** This Agreement is enforceable in accordance with its terms against each Debtor.  All of each Debtor's Accounts, Chattel Paper, Deposit Accounts, Documents, General intangibles, Instruments, Investment Property, Letter-of-Credit Rights and other liens, contracts, leases and agreements constituting the Collateral are and shall be valid, genuine and legally enforceable obligations and rights belonging to such Debtor and not subject to any claim, defense, set-off, or counterclaim of any kind.

**c.   Ownership.** Debtors are and shall remain the owners of the Collateral.

**d.   Questionnaire.** Each answer contained in any questionnaire submitted by or on behalf of any Debtor to Secured Party in connection with this Agreement (including, but not limited to, the Questionnaire set forth in Exhibit A attached to and made a part of this Agreement) is complete and accurate.

**e.   Rights and Obligations with Respect to Collateral.** Except as heretofore disclosed by any Debtor to Secured Party in writing, there exists (i) no security interest in or other lien on any of the Collateral other than Permitted Liens, (ii) no presently effective financing statement or amendment of any financing statement relating to any of the Collateral and naming any Person other than Secured Party as a secured party other than those relating solely to Permitted Liens, (iii) no contractual or other restriction on the grant or other creation of any security interest in or assignment, pledge or hypothecation of any of the Collateral, and (iv) no demand, claim, counterclaim, setoff or defense, no action or other legal proceeding, and no outstanding judgment or order of any court, agency or other governmental body, relating to any of the Collateral.  Each Debtor (i) shall defend the Collateral against all claims and demands of all persons at any time claiming any interest therein; (ii) shall cooperate with Secured Party in obtaining and maintaining control with respect to all Deposit Accounts, Investment Property, Letter-of-Credit Rights and electronic chattel paper constituting the Collateral; (iii) shall not become a party to any restructuring of its form of business or participate in any consolidation, merger, liquidation or dissolution without Secured Party's prior written consent; (iv) shall not change its state of organization without first notifying Secured Party in writing; (v) shall immediately advise Lender in writing of any change in address of any Debtor or the Collateral; and (vi) shall provide Secured Party with possession of all Chattel Paper, Documents, Instruments and Investment Property constituting the Collateral that are embodied in a tangible document, instrument or certificate.

**f.   Actions with Respect to Collateral.** Except as heretofore disclosed by any Debtor to Secured Party in writing, no Debtor has (i) sold or otherwise disposed of any of the Collateral or any interest or right in any of the Collateral or (ii) extended, renewed, refinanced or otherwise modified or replaced, compromised, canceled, discharged, subordinated, accelerated, waived, forborne from exercising any right or remedy relating to or adversely affected any obligation of

<div style="text-align:center">33</div>



Initials

CONFIDENTIAL

any Person (including, but not limited to, any Account Debtor) relating to any of the Collateral.

**g.   Accounts and General Intangibles.** Each Account and General Intangible included in the Collateral is or, if not now existing, will be genuine, in all respects what it purports to be and enforceable in accordance with its terms against each Person (including, but not limited to, any Account Debtor) obligated with respect thereto, subject to no demand, claim, counterclaim, setoff or defense.

**h.   Incorrect or Misleading Information.** Each Debtor has not provided to Secured Party or permitted to be provided to Secured Party on his, her or its behalf any certificate, financial statement or other Record that contains any statement of fact that is incorrect or misleading in any material respect or omits to state any fact necessary to make any statement of fact contained therein not incorrect or misleading in any material respect.

**i.   Taxes.** Each Debtor has duly filed all applicable income or other tax returns and has paid all income or other taxes when due, and there are no outstanding tax liens against the assets of any Debtor.

## 10.   CERTAIN CONSENTS AND WAIVERS.

**a.   Consents.** Except to the extent expressly provided in this Agreement, this Agreement shall not be modified or terminated, no Security Interest, no obligation of any Debtor pursuant to this Agreement and no right or remedy of Secured Party pursuant to this Agreement or arising or accruing as a result of this Agreement shall be impaired or otherwise adversely affected, and no such right or remedy shall be waived, by any act, omission or other thing, whether heretofore occurred or hereafter occurring. Each Debtor knowingly, voluntarily, intentionally and irrevocably consents, without any notice, to each act, omission and other thing, whether heretofore occurred or hereafter occurring, that would or might, but for such consent, modify or terminate this Agreement, impair or otherwise adversely affect any Security Interest or any such obligation, right or remedy or operate as a waiver of any such right or remedy.

**b.   Waivers.** Each Debtor knowingly, voluntarily, intentionally and irrevocably waives, without any notice, each act and other thing upon which, but for such waiver, any Security Interest, any obligation of such Debtor pursuant to this Agreement or any right or remedy of Secured Party pursuant to this Agreement or arising or accruing as a result of this Agreement would or might be conditioned.

**11.   NOTICES.** Any notice required or permitted to be given hereunder must be in writing and must be delivered or transmitted to a party at the address or any fax number for such party set forth at the beginning of this Agreement or on the Signature Page to this Agreement, or to such other address or fax number as such party may designate in writing as provided herein for the purpose of receiving notices hereunder. Any such notice to a party is effective if by personal delivery, upon such delivery; if by nationally recognized overnight courier, on the next business day after delivery to such nationally recognized overnight courier; if by fax transmission, upon receipt by the sender of an electronic confirmation of a successful transmission; and otherwise upon receipt of such notice by such party. Each requirement under applicable law of reasonable notice of any event by Secured Party to any Debtor shall be deemed to have been met if a notice of such event is given by Secured Party to such Debtor at least 10 days before the date on or after which such event is to occur.

## 12.   MISCELLANEOUS.

**a.   Reliance by Other Persons.** Each Person (including, but not limited to, any Account Debtor) obligated with respect to any of the Collateral may accept without any question any exercise by Secured Party of any right or remedy of Secured Party pursuant to this Agreement or arising or accruing as a result of this Agreement.

**b.   Limitation on Security Interest.** The payment of the Obligations shall not be secured by any Security Interest to the extent of any amount in excess of the maximum amount the payment of which can be so secured without rendering

34

Initials

CONFIDENTIAL

such Security Interest unenforceable under applicable law as a fraudulent conveyance or transfer.

**c.   Obligations Relating to Collateral.** The grant or other creation of any Security Interest shall not constitute an assignment by any Debtor to Secured Party of any obligation of such Debtor relating to any of the Collateral. Each Debtor shall remain obligated to perform each such obligation, and Secured Party shall not be obligated to perform any such obligation, whether or not Secured Party exercises any right or remedy pursuant to this Agreement or arising or accruing as a result of this Agreement. The only obligations of Secured Party relating to the Collateral shall be, to the extent required by applicable law, to act in a commercially reasonable manner in exercising with respect to any of the Collateral any right or remedy pursuant to this Agreement or arising or accruing as a result of this Agreement.

**d.   Liability.** If more than one Person executes this Agreement, (i) each of them shall be jointly and severally liable pursuant to this Agreement, and (ii) this Agreement shall be construed, interpreted and enforced, whether in any action or other legal proceeding or otherwise, as to each of them as though each of them had executed and delivered to Secured Party a separate agreement identical to this Agreement.

**e.   Assignment or Grant of Participation.** In conjunction with any assignment or other transfer of or grant of any participation in any of the Obligations by Secured Party, Secured Party shall have the right to assign or otherwise transfer or grant any participation in this Agreement, any Security Interest, any obligation of any Debtor pursuant to this Agreement or any right or remedy of Secured Party pursuant to this Agreement or arising or accruing as a result of this Agreement.

**f.   Binding Effect.** This Agreement shall be binding upon each Debtor and each direct or indirect legal representative, successor and assignee of each Debtor and shall inure to the benefit of and be enforceable by Secured Party and each direct or indirect successor and assignee of Secured Party.

**g.   Entire Agreement, Modifications and Waivers.** This Agreement contains the entire agreement between Secured Party and each Debtor with respect to the subject matter of this Agreement and supersedes each action heretofore taken or not taken, each course of conduct heretofore pursued, accepted or acquiesced in, and each oral, written or other agreement and representation heretofore made, by or on behalf of Secured Party with respect thereto. No action heretofore or hereafter taken or not taken, no course of conduct heretofore or hereafter pursued, accepted or acquiesced in, no oral, written or other agreement or representation heretofore made, and no agreement or representation hereafter made other than in writing, by or on behalf of Secured Party shall modify or terminate this Agreement, impair or otherwise adversely affect any Security Interest, any obligation of any Debtor pursuant to this Agreement or any right or remedy of Secured Party pursuant to this Agreement or arising or accruing as a result of this Agreement or operate as a waiver of any such right or remedy. No modification of this Agreement or waiver of any such right or remedy shall be effective unless made in a writing duly executed by Secured Party and specifically referring to such modification or waiver.

**h.   Rights and Remedies Cumulative.** All rights and remedies of Secured Party pursuant to this Agreement or arising or accruing as a result of this Agreement shall be cumulative, and no such right or remedy shall be exclusive of any other such right or remedy.

**i.   Extent of Consents and Waivers.** Each consent and waiver of any Debtor contained in this Agreement shall be deemed to have been given to the extent permitted by applicable law.

**j.   Exercise of Rights; Requests.** Except as expressly provided in this Agreement, each right and remedy of Secured Party pursuant to this Agreement or arising or accruing as a result of this Agreement may be exercised (i) at any time and from time to time, (ii) in the sole discretion of Secured Party, (iii) without any notice or demand of any kind and (iv) whether or not any Event of Default or any other event or condition of default relating to any of the Obligations, any of the Collateral or any Other Collateral has occurred or existed, but Secured Party shall not be obligated to exercise

35

Initials

CONFIDENTIAL

any such right or remedy. Each such right and remedy may be exercised only to the extent that the exercise thereof does not (i) violate applicable law or (ii) if requiring any Debtor to take any action, require any Debtor to violate any ethical or disciplinary rule, regulation or law governing non-disclosure of confidential information by an attorney or prohibiting the unauthorized practice of law. Each request by Secured Party pursuant to this Agreement may be made (i) at any time and from time to time, (ii) in the sole discretion of Secured Party and (iii) whether or not any Event of Default or any other event or condition of default relating to any of the Obligations, any of the Collateral or any Other Collateral has occurred or existed.

**k.**   **Severability.** Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law. If, however, any such provision shall be prohibited by or invalid under such law, it shall be deemed modified to conform to the minimum requirements of such law, or, if for any reason it is not deemed so modified, it shall be prohibited or invalid only to the extent of such prohibition or invalidity without the remainder thereof or any other such provision being prohibited or invalid.

**l.**   **Governing Law.** This Agreement shall be governed by and construed, interpreted and enforced in accordance with the internal laws of the State of New York, without regard to principles of conflicts of law or to the law of any other jurisdiction.

**m.**   **Headings.** In this Agreement, headings of sections are for convenience of reference only and have no substantive effect.

**n.**   **Counterparts.** This Agreement may be executed in two or more counterparts, each of which together shall be deemed an original, but all of which together shall constitute one and the same instrument. In the event that any signature is delivered by facsimile transmission or by e-mail delivery of a \".pdf\" format data file, such signature shall create a valid and binding obligation of the party executing (or on whose behalf such signature is executed) with the same force and effect as if such facsimile or \".pdf\" signature page were an original thereof.

**13.   CONSENTS AND WAIVERS RELATING TO LEGAL PROCEEDINGS.**

**a.   JURISDICTIONAL CONSENTS AND WAIVERS. EACH DEBTOR KNOWINGLY, VOLUNTARILY, INTENTIONALLY AND IRREVOCABLY CONSENTS AND AGREES THAT ANY ACTION OR OTHER LEGAL PROCEEDING COMMENCED BY SECURED PARTY SHALL BE BROUGHT ONLY IN THE SUPREME COURT OF THE STATE OF NEW YORK LOCATED IN ERIE COUNTY, WHICH SHALL BE DEEMED TO BE THE COURT OF SOLE AND EXCLUSIVE VENUE FOR THE BRINGING OF SUCH ACTION; PROVIDED, HOWEVER, SECURED PARTY MAY, AT ITS OPTION, COMMENCE ANY ACTION, SUIT OR PROCEEDING IN ANY OTHER APPROPRIATE FORUM OR JURISDICTION TO OBTAIN POSSESSION OR FORECLOSURE UPON ANY COLLATERAL, TO OBTAIN EQUITABLE RELIEF OR TO ENFORCE ANY JUDGMENT OR ORDER OBTAINED BY SECURED PARTY AGAINST DEBTOR OR WITH RESPECT TO ANY COLLATERAL, TO ENFORCE ANY OTHER RIGHT OR REMEDY UNDER THIS AGREEMENT OR TO OBTAIN ANY OTHER RELIEF DEEMED APPROPRIATE BY SECURED PARTY. DEBTOR EXPRESSLY SUBMITS AND CONSENTS IN ADVANCE TO PERSONAL JURISDICTION IN ANY ACTION OR SUIT COMMENCED IN THE SUPREME COURT OF THE STATE OF NEW YORK LOCATED IN ERIE COUNTY, AND DEBTOR HEREBY WAIVES ANY OBJECTIONS WHICH DEBTOR MAY HAVE BASED UPON LACK OF PERSONAL JURISDICTION, IMPROPER VENUE OR FORUM NON CONVENIENS AND HEREBY CONSENTS TO THE GRANTING OF SUCH LEGAL OR EQUITABLE RELIEF AS IS DEEMED APPROPRIATE BY SUCH NEW YORK COURT.**

**b.   WAIVER OF TRIAL BY JURY. EACH DEBTOR KNOWINGLY, VOLUNTARILY, INTENTIONALLY AND IRREVOCABLY WAIVES EACH RIGHT SUCH DEBTOR MAY HAVE TO A TRIAL BY JURY WITH RESPECT TO ANY ACTION OR OTHER LEGAL PROCEEDING, WHETHER BASED ON ANY**

36

Initials

CONFIDENTIAL

**CONTRACT OR NEGLIGENT, INTENTIONAL OR OTHER TORT OR OTHERWISE, ARISING OUT OF OR OTHERWISE RELATING TO THIS AGREEMENT, ANY OF THE OBLIGATIONS, ANY OF THE COLLATERAL OR ANY OTHER COLLATERAL.**

c.    **SERVICE OF PROCESS**. PROCESS ON DEBTORS IN ANY SUIT, ACTION OR PROCEEDING ARISING OUT OF THIS AGREEMENT WILL BE DEEMED TO HAVE BEEN GIVEN TO A DEBTOR WHEN GIVEN IN ANY ONE OF THE FOLLOWING WAYS: (I) PERSONALLY DELIVERED, (II) TWO (2) BUSINESS DAYS AFTER DEPOSITED WITH A NATIONALLY RECOGNIZED OVERNIGHT COURIER, CHARGES PREPAID, THAT ROUTINELY ISSUES RECEIPTS, OR (III) FOUR (4) BUSINESS DAYS AFTER SENT BY CERTIFIED MAIL BY THE UNITED STATES POSTAL SERVICE, POSTAGE PREPAID, RETURN RECEIPT REQUESTED, ADDRESSED TO SUCH DEBTOR AT THE APPLICABLE ADDRESS SET FORTH IN THIS AGREEMENT. Such service on any Debtor shall be deemed in every respect effective service of process upon and shall, to the fullest extent permitted by law, be taken and held to be valid personal service upon such Debtor. Nothing in this Section shall affect Secured Party's right to serve process in any other manner permitted by law. Each Debtor may add additional addresses or change the address for purposes of service of process by giving 10 days' prior written notice of such change to Secured Party.

Dated: July 11, 2017

Girardi Keese

By:_____
Thomas V. Girardi, Partner
Facsimile No.

_____
Thomas V. Girardi, individually
Facsimile No.

37

Initials

# EXHIBIT "3"

# UCC FINANCING STATEMENT AMENDMENT

FOLLOW INSTRUCTIONS

**A. NAME & PHONE OF CONTACT AT FILER (optional)**
Jillian E. Deck, Esq.  716-853-5100

**B. E-MAIL CONTACT AT FILER (optional)**

**C. SEND ACKNOWLEDGMENT TO:  (Name and Address)**

⌐CT Fulfillment
│ 555 Capitol Mall, Suite 1000
│ Sacramento, CA 95814
│ **59857865-1**
└Account 60574850

1775969950

07/19/2017 14:47

FILED
CALIFORNIA
SECRETARY OF STATE

SOS

62796840002  UCC 3 FILING

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**1a. INITIAL FINANCING STATEMENT FILE NUMBER**
11-7275806299

**1b.** ☐ This FINANCING STATEMENT AMENDMENT is to be filed [for record]
(or recorded) in the REAL ESTATE RECORDS
Filer: **attach** Amendment Addendum (Form UCC3Ad) and provide Debtor's name in item 13

**2.** ☐ **TERMINATION:** Effectiveness of the Financing Statement identified above is terminated with respect to the security interest(s) of Secured Party authorizing this Termination
Statement

**3.** ☐ **ASSIGNMENT (full or partial):** Provide name of Assignee in item 7a or 7b, **and** address of Assignee in item 7c **and** name of Assignor in item 9
For partial assignment, complete items 7 and 9 **and** also indicate affected collateral in item 8

**4.** ☐ **CONTINUATION:** Effectiveness of the Financing Statement identified above with respect to the security interest(s) of Secured Party authorizing this Continuation Statement is
continued for the additional period provided by applicable law

**5.** ☑ **PARTY INFORMATION CHANGE:**

Check **one** of these two boxes:

This change affects ☑ Debtor **or** ☐ Secured Party of record

**AND** Check **one** of these three boxes to:

☐ CHANGE name and/or address: Complete item 6a or 6b; **and** item 7a or 7b **and** item 7c
☑ ADD name: Complete item 7a or 7b, **and** item 7c
☐ DELETE name: Give record name to be deleted in item 6a or 6b

**6. CURRENT RECORD INFORMATION:** Complete for Party Information Change - provide only **one** name (6a or 6b)

| 6a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| OR 6b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

**7. CHANGED OR ADDED INFORMATION:** Complete for Assignment or Party Information Change - provide only **one** name (7a or 7b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

| 7a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| OR 7b. INDIVIDUAL'S SURNAME  Girardi | | | |
| INDIVIDUAL'S FIRST PERSONAL NAME  Thomas | | | |
| INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S)  V. | | | SUFFIX |

| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 100 Los Altos Drive | Pasadena | CA | 91105 | USA |

**8.** ☐ **COLLATERAL CHANGE:** **Also** check **one** of these four boxes:  ☐ ADD collateral  ☐ DELETE collateral  ☐ RESTATE covered collateral  ☐ ASSIGN collateral

Indicate collateral:

**9. NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT:** Provide only **one** name (9a or 9b) (name of Assignor, if this is an Assignment)

If this is an Amendment authorized by a DEBTOR, check here ☐ and provide name of authorizing Debtor

| 9a. ORGANIZATION'S NAME  California Attorney Lending II, Inc. | | | |
|---|---|---|---|
| OR 9b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

**10. OPTIONAL FILER REFERENCE DATA:**
CASOS                #4384.78                                      JK-59857865-1

# EXHIBIT "4"

Electronically FILED by Superior Court of California, County of Los Angeles on 10/27/2020 03:19 PM Sherri R. Carter, Executive Officer/Clerk of Court, by N. Rose, Deputy Clerk

20STCP03546

1   SNELL & WILMER L.L.P.
    Clifford S. Davidson, Bar No. 246119
2   csdavidson@swlaw.com
    Keith M. Gregory, Bar No. 117837
3   kgregory@swlaw.com
    Marshall J. Hogan, Bar No. 286147
4   mhogan@swlaw.com
    350 South Grand Avenue
5   Suite 3100
    City National 2CAL
6   Los Angeles, California  90071
    Telephone:     213.929.2500
7   Facsimile:     213.929.2525

8   Attorneys for California Attorney Lending II, Inc.

9

10                  SUPERIOR COURT OF THE STATE OF CALIFORNIA

11                            COUNTY OF LOS ANGELES

12

13  California Attorney Lending II, Inc.,          Case No.  20STCP03546

14                Plaintiff,                       **JUDGMENT BY CONFESSION**

15        v.                                       **[Code Civ. Proc. §§ 1132 et seq.]**

16  Girardi & Keese, A California General
17  Partnership, Thomas V. Girardi, Individually,

18                Defendants.

19

20        Pursuant to the provisions of Code Civ. Proc., §§ 1132 et seq., it is hereby adjudged that

21  judgment be entered in favor of plaintiff, California Attorney Lending II, Inc., a California

22  corporation ("Lender"), and against defendants Girardi & Keese, a California General Partnership

23  ("Borrower"), and Thomas V. Girardi, an individual ("Guarantor"), as follows:

24        1.      Lender shall recover from Borrower and Guarantor the sum of $6,250,589.59

25  composed of the following:

26        Principal:                 $6,170,906.09

27        Interest and Fees:         $78,683.50

28        **Total:**                 **$6,250,589.59**

Electronically Received 10/27/2020 03:19 PM

SNELL & WILMER
L.L.P.
LAW OFFICES
350 SOUTH GRAND AVENUE
SUITE 3100
CITY NATIONAL 2CAL
LOS ANGELES, CALIFORNIA 90071

1       Lender shall also recover against Borrower and Guarantor $2,840.20 in interest for each

2  day between October 27, 2020 and the date of entry of this Judgment.

3      2.      Lender is entitled to add to the amounts set forth in paragraph 1 above post-

4  judgment legal expenses pursuant to the provisions of Code of Civil Procedure § 685.040 et seq.

5      3.      Lender shall have the immediate right to possession of all personal property of

6  Borrower including, without limitations, goods, inventory, equipment, accounts, contract rights,

7  deposit account, chattel paper, investment property, general intangibles, commercial tort claim,

8  and any right to payment for client representation or referral and for costs and expenses, whether

9  or not yet earned by performance, and the proceeds thereof, as well as all other rights to payment

10  by Borrower of every type and description, whether then existing or thereafter arising and all

11  proceeds thereof.

12

13  Dated: ___10/27/2020___            N. Rose  - Clerk of The Superior Court

14                                    Clerk
XXXXXJudge of the Superior Court

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SNELL & WILMER
L.L.P.
LAW OFFICES
350 SOUTH GRAND AVENUE
SUITE 3100
CITY NATIONAL PLAZA
LOS ANGELES, CALIFORNIA 90071

4826-1437-2815

- 2 -

1 | Submitted By:

2 | Dated: October 27, 2020                     SNELL & WILMER L.L.P.

3 |

4 |                                             By: _Marshall J Hogan_____

5 |                                                 Clifford S. Davidson
                                                    Keith M. Gregory
6 |                                                 Marshall J. Hogan

7 |                                             Attorneys for California Attorney Lending II,
                                                Inc.

8 |

9 |

10 |

11 |

12 |

13 |

14 |

15 |

16 |

17 |

18 |

19 |

20 |

21 |

22 |

23 |

24 |

25 |

26 |

27 |

28 |

# EXHIBIT "5"

 

**This page is part of your document - DO NOT DISCARD**

## 20201435462

 

**Pages:**
**0004**

**Recorded/Filed in Official Records**
**Recorder's Office, Los Angeles County,**
**California**

**11/12/20 AT 08:00AM**

| | |
|---|---|
| FEES: | 35.00 |
| TAXES: | 0.00 |
| OTHER: | 0.00 |
| SB2: | 75.00 |
| PAID: | 110.00 |





**L E A D S H E E T**



202011121010013

00019292435



011427085

**SEQ:**
**01**

SECURE - 8:00AM



**THIS FORM IS NOT TO BE DUPLICATED**

TS



*E629179*

Doc: CALOSA:2020 01435462~06037    Requested By: bob.taylor, Printed: 5/10/2021 11:55 AM

RECORDING REQUESTED BY:

FIRST AMERICAN TITLE COMPANY
NATIONAL COMMERCIAL SERVICES

AND WHEN RECORDED MAIL TO:
First American Title
4380 La Jolla Village Drive, 110
San Diego, CA  92122

_____ Space Above This Line for Recorder's Use Only _____

## Abstract of Judgment

SEPARATE PAGE PURSUANT TO GOVT CODE 27361.6

Doc: CALOSA:2020 01435462~06037
Requested By: bob.taylor, Printed: 5/10/2021 11:55 AM

EJ-001

| ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, address, State Bar number, and telephone number): Recording requested by and return to: |
|---|

Clifford S. Davidson   246119
Keith M. Gregory,117837/ Marshall Hogan, 286147
Snell & Wilmer L.L.P.
350 S. Grand Ave., Suite 3100 Los Angeles, CA 90071
TEL NO: 213.929.2500      FAX NO. (Optional): 213.929.2525
E-MAIL ADDRESS (Optional): mhogan@swlaw.com
☒ ATTORNEY   ☒ JUDGMENT   ☐ ASSIGNEE OF
   FOR         CREDITOR      RECORD

SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
STREET ADDRESS: 111 N  Hill Street
MAILING ADDRESS:
CITY AND ZIP CODE: Los Angeles, 90012
BRANCH NAME: Stanley Mosk

FOR RECORDER'S USE ONLY

PLAINTIFF: California Attorney Lending II, Inc

DEFENDANT: Girardi & Keese et al.

CASE NUMBER:
20STCP03546

## ABSTRACT OF JUDGMENT—CIVIL
## AND SMALL CLAIMS    ☐ Amended

FOR COURT USE ONLY

1  The  ☒ judgment creditor  ☐ assignee of record
applies for an abstract of judgment and represents the following:
 a. Judgment debtor's

    Name and last known address

    ┌─────────────────────────────────┐
    │ Girardi & Keese, a California general │
    │ partnership                          │
    │ 1126 Wilshire Blvd.                  │
    │ Los Angeles, CA 90017                │
    └─────────────────────────────────┘

 b. Driver's license no. [last 4 digits] and state: N/A          ☒ Unknown
 c  Social security no. [last 4 digits]: N/A                      ☒ Unknown
 d  Summons or notice of entry of sister-state judgment was personally served or mailed to (name and address):
    Notice of Entry of Judgment by Confession mailed to: Girardi & Keese,
    1126 Wilshire Blvd., Los Angeles, CA 90017

2. ☒ Information on additional judgment debtors is       4. ☐ Information on additional judgment creditors is
   shown on page 2.                                          shown on page 2.

3. Judgment creditor (name and address):                  5. ☐ Original abstract recorded in this county:
   California Attorney Lending II, Inc., a California
   corporation                                                a  Date:
                                                              b. Instrument No.:

Date: 10/29/2020
Marshall J. Hogan
         (TYPE OR PRINT NAME)                    ▷  [signature]
                                                    (SIGNATURE OF APPLICANT OR ATTORNEY)

6. Total amount of judgment as entered or last renewed:   10. ☐  An ☐ execution lien ☐ attachment lien
   $6,250,589.59                                               is endorsed on the judgment as follows:
                                                               a. Amount: $
7. All judgment creditors and debtors are listed on this abstract.   b. in favor of (name and address):

8 a. Judgment entered on (date): 10/27/20
   b. Renewal entered on (date):

9. ☐ This judgment is an installment judgment.          11  A stay of enforcement has
                                                            a. ☒ not been ordered by the court.
[SEAL]                                                      b. ☐ been ordered by the court effective until
                                                               (date):
         Sherri R  Carter Executive Officer / Clerk of Court
                                                        12. a ☒ I certify that this is a true and correct abstract of,
         This abstract issued on (date):                       the judgment entered in this action.
                                                           b ☐ A certified copy of the judgment is attached.
         11/04/2020
                                                         Clerk, by _____A. Barron_____, Deputy

| Form Adopted for Mandatory Use Judicial Council of California EJ-001 [Rev July 1, 2014] | ABSTRACT OF JUDGMENT—CIVIL AND SMALL CLAIMS | Page 1 of 2 Code of Civil Procedure, §§ 488 480, 674, 700 190 |
|---|---|---|

| PLAINTIFF. California Attorney Lending II, Inc. | COURT CASE NO : |
| DEFENDANT: Girardi & Keese et al. | 20STCP03546 |

**NAMES AND ADDRESSES OF ADDITIONAL JUDGMENT CREDITORS:**

13. Judgment creditor *(name and address):*

14. Judgment creditor *(name and address)*

15. ☐ Continued on Attachment 15

**INFORMATION ON ADDITIONAL JUDGMENT DEBTORS:**

16.  Name and last known address

Thomas V. Girardi
100 Los Altos Drive
Pasadena, CA 91105

Driver's license no. [last 4 digits] and state:
9964 / CA (EXP. 632015)    ☐ Unknown

Social security no. [last 4 digits]: 5134    ☐ Unknown

Summons was personally served at or mailed to *(address)*:
Notice of Entry of Judgment by Confession mailed to:
Thomas V. Girardi
100 Los Altos Drive
Pasadena, CA 91105

17.  Name and last known address

Driver's license no. [last 4 digits] and state:
☐ Unknown

Social security no. [last 4 digits]:    ☐ Unknown

Summons was personally served at or mailed to *(address)*

18.  Name and last known address

Driver's license no. [last 4 digits] and state:
☐ Unknown

Social security no. [last 4 digits]:    ☐ Unknown

Summons was personally served at or mailed to *(address)*:

19.  Name and last known address

Driver's license no. [last 4 digits] and state:
☐ Unknown

Social security no. [last 4 digits]:    ☐ Unknown

Summons was personally served at or mailed to *(address)*:

20. ☐ Continued on Attachment 20.

EJ-001 [Rev. January 1, 2014]

**ABSTRACT OF JUDGMENT—CIVIL
AND SMALL CLAIMS**

Page 2 of 2

American LegalNet, Inc.
www.FormsWorkFlow.com

# EXHIBIT "6"

# SETTLEMENT AGREEMENT

This Settlement Agreement ("**Agreement**") is entered into by and between Jason M. Rund, the chapter 7 trustee (the "**Trustee**") for the estate of Thomas Vincent Girardi (the "**Debtor**"), on the one hand, and California Attorney Lending II, Inc., a New York corporation ("**CAL II**"), on the other hand.  Together, the Trustee and CAL II are referred to as the "**Parties**."

## RECITALS

A.      In or around July 5, 2011, Girardi Keese ("**GK**") and CAL II entered into a loan transaction (as amended, the "Loan") pursuant to which GK borrowed the principal amount of $3,500,000.00 to fund its operations.  The Loan was secured against, among other things, GK's rights to payment for its representation of clients in various contingency fee cases.  CAL II perfected its security interest by filing a UCC Financing Statement with the California Secretary of State on July 6, 2011 as Inst. No. 11-7275806299 (the "**UCC Financing Statement**").

B.      Between 2011 and 2019, CAL II and GK entered into several iterations of the credit arrangement in which GK increased the principal amount of the debt up to $8,000,000.00.  CAL II filed several continuations and amendments to the UCC Financing Statement to maintain its perfected security interests in GK's assets.  The Debtor guaranteed the Loan by executing that certain Guaranty of Payment and Performance dated August 12, 2011, and subsequent guaranties in connection with each amendment to the Loan.

C.      On July 11, 2017, the Debtor executed that certain Third Amended and Restated Security Agreement, granting a security interest in substantially all of the Debtor's personal property (the "**Collateral**").  In its attempt to perfect its security interest in the Collateral, CAL II filed a UCC Amendment with the California Secretary of State on July 19, 2017 as Inst. No. 1775969950, which added Thomas V. Girardi to the UCC Financing Statement (the "**TVG Financing Statement**").

D.      As part of the consideration given to CAL II, GK and the Debtor executed and delivered to CAL II certain Confessions of Judgment dated November 12, 2019, and agreed to entry of judgment without trial if, after GK's default under the Loan and notice thereof, GK or the Debtor did not cure the default.

E.      After default, on October 27, 2020, CAL II obtained judgment against GK and the Debtor in the sum of $6,250,589.59 plus post-judgment interest and reasonable attorneys' fees and costs incurred in collecting the judgment from the Los Angeles Superior Court, in LASC Case No. 20STCP03546 (the "**Judgment**").  CAL II filed a Notice of Judgment Lien with the California Secretary of State on November 2, 2020 as Inst. No. U200033578428. CAL II also recorded Abstracts of Judgment, including Document No. 20201435462 on November 12, 2020 with the Los Angeles County Recorder's Office (the "**Los Angeles Abstract**"), and executed a levy on Morgan Stanley on November 24, 2020.  The levied funds at the time of the execution totaled approximately $118,000 (the "**Levied Funds**").

G.      On December 18, 2020 (the "**Petition Date**"), an Involuntary Petition was filed against the Debtor under chapter 7 of title 11 of the United States Code (the "**Code**").  The Order

for Relief was entered on January 13, 2021, and the Debtor's bankruptcy case (the "**Case**") is pending in the United States Bankruptcy Court for the Central District of California, Los Angeles Division (the "**Bankruptcy Court**") as Case No. 2:20-bk-21020-BR.

      H.     On the Petition Date, an Involuntary Petition was also filed against GK under chapter 7 of the Code. The Order for Relief was entered in that case on January 13, 2021, and the case is pending before the Bankruptcy Court as Case No. 2:20-bk-21022-BR (the "**Girardi Keese Case**").

      I.     CAL II assert that, as of the Petition Date, the total sum of $6,668,484.21 was due and owing under the Judgment, comprised of (1) the Judgment balance of $6,250,589.59, (2) interest at the 10% California judgment interest rate of $89,049.50, (3) a deferred closing fee of $62,574.40, and (4) legal fees of $266,270.75 ("**CAL II's Claim**"). Of the $266,270.75 in legal fees, the amount of $168,722.46 is attributable to GK and the amount of $97,548.29 is attributable to the Debtor ("**Debtor Legal Fees**").

      J.     The Trustee contends that, because the TVG Financing Statement fails to describe any collateral, CAL II does not have a perfected security interest in the Collateral. The Trustee also contends that the Levied Funds should be returned to the bankruptcy estate as an avoidable preferential transfer under section 547 of the Code. CAL II strenuously disputes these contentions. Rather than litigate the foregoing issues, the Parties agree that Trustee's administration of assets of the bankruptcy estate on the terms set forth herein is in the best interest of CAL II and the bankruptcy estate.

<u>TERMS AND CONDITIONS</u>

      Based on the mutual promises contained herein and for other good and valuable consideration, the receipt of which is acknowledged, the Parties agree as follows:

      1.     <u>Recitals Acknowledged</u>. Each of the Parties acknowledges that, to the best of the Party's knowledge, each of the above recitals is true and correct in every material respect.

      2.     <u>Conditions and Effective Date</u>.

      a.     This Agreement is subject to approval by the Bankruptcy Court. Within a reasonable time after execution of this Agreement by the Parties, the Trustee shall file a motion in the Case for entry of an order approving this Agreement and the terms hereof (the "**Order**"). Once it has been filed, the Trustee shall not withdraw the motion without the written consent of CAL II.

      b.     The "**Effective Date**" of this Agreement shall be the date on which the Order is entered unless there is a stay of enforcement of the Order. If there is a stay of enforcement of the Order, the Effective Date of this Agreement shall be the first business day after the expiration or lifting of the stay.

      3.     <u>Allowance of CAL II's Claim</u>. CAL II shall be allowed a claim in the amount of $6,402,213.49 plus the Debtor Legal Fees as of the Petition Date with a perfected security interest in all of the Debtor's personal property <u>with the exception of cash and bank accounts</u> ("**CAL II's Collateral**"). It is anticipated that CAL II's Claim will be paid in full from this Case and the Girardi

Keese Case. As such, CAL II reserves its right to seek post-petition interest under Section 506(b) of the Code. Notwithstanding anything to the contrary, it is understood that the Debtor Legal Fees is a separate obligation of the Debtor's bankruptcy estate and must be paid to CAL II irrespective of the sum paid to CAL II from the Girardi Keese Case.

4. **Release of Levied Funds**. CAL II shall be allowed to retain the Levied Funds. If CAL II has not received the Levied Funds, the Trustee shall instruct Morgan Stanley to release the Levied Funds to CAL II within 14 calendar days after the Effective Date.

5. **Release of Los Angeles Abstract**. Within 14 calendar days after the Effective Date, CAL II shall provide the Trustee with a release of the Los Angeles Abstract in recordable form. Further, if there are other Abstracts of Judgment recorded with 90 days of the Petition Date, CAL II shall provide releases of those Abstracts in recordable form at the request of the Trustee.

6. **Administration of CAL II's Collateral**.

a. CAL II consents to the Trustee's sale and disposition of CAL II's Collateral consistent with Section 363 of the Code free and clear of CAL II's liens.

b. For each CAL II's Collateral being administered, the sale proceeds shall be distributed in the following order of priority: (1) liens senior to CAL II's liens (if any), *allowed* claim of exemption, taxes arising from the sale (including transfer and income taxes), and *ordinary* costs of sale (including broker commissions, escrow, etc.); (2) the reasonable, necessary administrative fees and costs of the bankruptcy estate assembling, acquiring and disposing of said Collateral; (3) 80% of the balance to CAL II to be applied towards CAL II's Claim; and (4) the remainder (*i.e.*, 20%) to the Trustee to be held in trust for the allowed unsecured claimants of the bankruptcy estate. To be clear, CAL II will continue to receive the foregoing 80% distributions until CAL II's Claim if paid in full. Once CAL II has been paid in full from this Case and the Girardi Keese Case, the sale proceeds shall be distributed in accordance with the Settlement Agreement previously approved by the Bankruptcy Court between the Trustee and the Ruigomez Creditors.

c. The distributions to CAL II contemplated herein shall take place no less than 120 calendar days apart, and for each distribution, the Trustee will estimate the administrative fees and costs in good faith to determine the amount to be withheld by the bankruptcy estate. All distributions to CAL II shall be payable by check to "California Attorney Lending II, Inc." and delivered to P.O. Box 843758, Dallas, Texas 75284-3758.

7. **Releases**. Subject to the terms and conditions of this Agreement, the Trustee releases and waives all claims against CAL II including, without limitation, related to Section 510 of the Code arising out of the Case, and CAL II releases and waives all claims against the Trustee and the Debtor's bankruptcy estate arising out of the Case.

8. **Continued Prosecution of CAL II's Claim in Girardi Keese Case**. Based on the Judgment, CAL II also has a claim in the Girardi Keese Case. It is entirely possible that its recovery from the Debtor's Case and the Girardi Keese Case will satisfy CAL II's Claim in full. Hence, the amount recovered from the Girardi Keese Case directly impacts the Debtor's Case, and

CAL II shall use its best efforts to prosecute its claims in that case and shall not withdraw or reduce its claims in that case without the written consent of the Trustee.

9.      <u>Trustee as Representative of a Bankruptcy Estate</u>.  The Parties acknowledge that the Trustee is a trustee appointed to administer a bankruptcy estate.  The Parties acknowledge and agree that this Agreement is being made by the Trustee solely in his capacity as the chapter 7 trustee of the Debtor's estate, and not in a personal capacity, and no liability or obligations shall accrue to the Trustee personally.

10.      <u>Successors and Assigns</u>.  This Agreement is binding upon and shall inure to the benefit of the Parties hereto, and their respective attorneys, agents, heirs, administrators, predecessors, successors and assigns, including any successor trustees.

11.      <u>Severability</u>.  If any portion of this Agreement is found to be void, voidable or unenforceable at law, the remaining terms and conditions of this Agreement may be enforced.

12.      <u>Governing Law and Jurisdiction</u>.  This Agreement shall be governed by and construed in accordance with the laws of the State of California, without regard to choice of law principles of the State of California.  The Bankruptcy Court shall retain exclusive jurisdiction to resolve any and all disputes pertaining to this Agreement, including without limitation the enforcement and interpretation of any of its terms, and the Parties agree to submit to the jurisdiction of the Bankruptcy Court for the purpose of resolving such disputes.

13.      <u>Further Assurances</u>.  Each Party to this Agreement shall execute all instruments and documents and take all actions as may be reasonably required to effectuate the purpose of this Agreement.

14.      <u>Modification</u>.  This Agreement may be modified only by a writing executed by the Party to this Agreement against whom enforcement of such modification is sought.

15.      <u>Attorneys' Fees and Costs</u>.  Each Party shall bear his, her or its own attorneys' fees, court costs and related expenses incurred by or on behalf of said Party in connection with the preparation of this Agreement and seeking requisite approvals thereof.

16.      <u>Interpretation</u>.  This Agreement has been negotiated at arms' length, and between persons sophisticated and knowledgeable in matters dealt with in this Agreement.  Accordingly, any rule of law, statute, legal decision or common law principle that would require interpretation of any ambiguities in this Agreement against the Party that has drafted it is not applicable, and is waived.  The provisions of this Agreement shall be interpreted in a reasonable manner to effect the purpose and intent of this Agreement.

17.      <u>Authority to Sign</u>.  The person signing below on behalf of each Party, and each Party, represents that the signing person has the authority to execute this Agreement on behalf of said Party, and that it is not necessary for any other Party to inquire further into the validity of execution or authority to execute.

18.    <u>Counterparts</u>.    Each Party may sign a facsimile copy of this Agreement, in counterparts, with the same effect as if each Party had signed an original of the same document.

Dated:  May 3, 2021

_____
Jason M. Rund, Chapter 7 Trustee for the
estate of Thomas Vincent Girardi

Dated:  May 3, 2021

CALIFORNIA ATTORNEY LENDING II, INC.,
A New York Corporation

By _____
Paul Cody
Its Chief Executive Officer

18.   Counterparts.   Each Party may sign a facsimile copy of this Agreement, in counterparts, with the same effect as if each Party had signed an original of the same document.

Dated:  May 3, 2021

Jason M. Rund, Chapter 7 Trustee for the estate of Thomas Vincent Girardi

Dated:  May 3, 2021

CALIFORNIA ATTORNEY LENDING II, INC., A New York Corporation

By _____

Paul Cody
Its Chief Executive Officer

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is: 10250 Constellation Boulevard, Suite 1700, Los Angeles, CA 90067

A true and correct copy of the foregoing document entitled **CHAPTER 7 TRUSTEE'S MOTION TO APPROVE COMPROMISE UNDER FRBP 9019 WITH CALIFORNIA ATTORNEY LENDING II, INC.; MEMORANDUM OF POINTS AND AUTHORITIES AND DECLARATIONS IN SUPPORT THEREOF** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On **May 19, 2021**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- **Robert D Bass    bob.bass47@icloud.com**
- **William C Beall    will@beallandburkhardt.com, carissa@beallandburkhardt.com**
- **Daren Brinkman    office@brinkmanlaw.com, 7764052420@filings.docketbird.com**
- **Joseph P Buchman    jbuchman@bwslaw.com, dwetters@bwslaw.com**
- **Debra E Cardarelli    dcardarelli@lesnickprince.com, jmack@lesnickprince.com**
- **Jamie P Dreher    jdreher@downeybrand.com,
  mfrazier@downeybrand.com;courtfilings@downeybrand.com**
- **Brian D Fittipaldi    brian.fittipaldi@usdoj.gov**
- **Moriah Douglas Flahaut (TR)    douglas.flahaut@arentfox.com, C194@ecfcbis.com**
- **Brian S Healy    brian@tw2law.com**
- **Eve H Karasik    ehk@lnbyb.com**
- **Paul J Laurin    plaurin@btlaw.com, slmoore@btlaw.com;jboustani@btlaw.com**
- **Matthew A Lesnick    matt@lesnickprince.com,
  matt@ecf.inforuptcy.com;jmack@lesnickprince.com**
- **Gordon G May    hpc@ggb-law.com**
- **Randall P Mroczynski    randym@cookseylaw.com**
- **Lisa J Nilmeier    lnilmeier@milano-ri.com, lisanilmeier@gmail.com**
- **Juliet Y Oh    jyo@lnbrb.com, jyo@lnbrb.com**
- **Juliet Y Oh    jyo@lnbyb.com, jyo@lnbrb.com**
- **Brian A Paino    bpaino@mcglinchey.com, irvineECF@mcglinchey.com**
- **Laura J Portillo    Attorneys@portilloronk.com**
- **Christopher E Prince    cprince@lesnickprince.com,
  jmack@lesnickprince.com;cprince@ecf.courtdrive.com;jnavarro@lesnickprince.com**
- **Jonathan C Sandler    jsandler@bhfs.com, pherron@bhfs.com;sgrisham@bhfs.com**
- **Summer M Shaw    ss@shaw.law,
  shawsr70161@notify.bestcase.com;shawsr91811@notify.bestcase.com**
- **David B Shemano    dshemano@shemanolaw.com**
- **Felicita A Torres    torres@g-tlaw.com**
- **United States Trustee (ND)    ustpregion16.nd.ecf@usdoj.gov**
- **Beth Ann R Young    bry@lnbyb.com**
- **Christian J Younger    christian@youngerlawsb.com,
  youngercr88474@notify.bestcase.com**
- **Ryan D Zick    rzick@ppplaw.com, bnesbitt@ppplaw.com**

---

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

1

**2. SERVED BY UNITED STATES MAIL**: On **May 19, 2021**, I served the following persons and/or
entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true
and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and
addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be
completed</u> no later than 24 hours after the document is filed.

*Debtor*
Thomas Vincent Girardi
1126 Wilshire Boulevard
Los Angeles, CA 90017

*Debtor*
Thomas Vincent Girardi
100 Los Altos Drive
Pasadena, CA 91105

Robert Girardi
3662 Aquarius Drive
Huntington Beach, CA 92649

☐ *Service information continued on attached page*

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR
EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR,
on **May 19, 2021**, I served the following persons and/or entities by personal delivery, overnight mail
service, or (for those who consented in writing to such service method), by facsimile transmission and/or
email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight
mail to, the judge <u>will be completed</u> no later than 24 hours after the document is filed.

None.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is
true and correct.

| May 19, 2021 | Stephanie Reichert | /s/ Stephanie Reichert |
|---|---|---|
| *Date* | *Type Name* | *Signature* |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                Exhibit E                **F 9013-3.1.PROOF SERVICE**
Page 45 of 49

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is: 18101 Von Karman Avenue, Suite 1200, Irvine, CA 92612

A true and correct copy of the foregoing document entitled (*specify*): **RESPONSE OF SECURED CREDITOR ARSANI SIDAROUS TO TRUSTEE'S MOTION FOR ORDER (1) AUTHORIZING EMPLOYMENT OF JOHN MORAN AUCTIONEERS, INC. AS AUCTIONEER; (2) AUTHORIZING SALE OF CERTAIN PERSONAL PROPERTY OF THE ESTATE; AND (3) AUTHORIZING ABANDONMENT OR DESTRUCTION OF CERTAIN PERSONAL PROPERTY OF THE ESTATE; DECLARATION OF ARSANI SIDAROUS IN SUPPORT THEREOF** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On June 28, 2022, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☐ Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**:
On (*date*) June 28, 2022, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be completed</u> no later than 24 hours after the document is filed.

☐ Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) June 28, 2022, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge <u>will be completed</u> no later than 24 hours after the document is filed.

- The Honorable Barry Russell, USBC, 255 East Temple Street, Los Angeles, CA 90012
- (SUSPENDED DUE TO COVID-19 PROTOCOLS)

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| June 28, 2022 | Kerry A. Murphy | /s/Kerry A. Murphy |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

**1. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF):**

- **Rafey Balabanian**    rbalabanian@edelson.com, docket@edelson.com
- **Shraddha Bharatia**    notices@becket-lee.com
- **Ori S Blumenfeld**    oblumenfeld@laklawyers.com,
  nlessard@laklawyers.com;smcfadden@laklawyers.com
- **Evan C Borges**    eborges@ggtriallaw.com, cwinsten@ggtriallaw.com
- **Richard D Buckley**    richard.buckley@arentfox.com
- **Indira J. Cameron-Banks**    indira@cameron-banks.com, tiffany@cameronbankslaw.com
- **Marie E Christiansen**    mchristiansen@vedderprice.com, ecfladocket@vedderprice.com,marie-
  christiansen-4166@ecf.pacerpro.com
- **Jennifer Witherell Crastz**    jcrastz@hrhlaw.com
- **Ashleigh A Danker**    adanker731@gmail.com
- **Clifford S Davidson**    csdavidson@swlaw.com, jlanglois@swlaw.com;cliff-davidson-
  7586@ecf.pacerpro.com
- **Joseph C Delmotte**    ecfcacb@aldridgepite.com,
  JCD@ecf.inforuptcy.com;jdelmotte@aldridgepite.com
- **Lei Lei Wang Ekvall - DECEASED -**    lekvall@swelawfirm.com,
  lgarrett@swelawfirm.com;gcruz@swelawfirm.com;jchung@swelawfirm.com
- **Timothy W Evanston**    tevanston@swelawfirm.com,
  gcruz@swelawfirm.com;lgarrett@swelawfirm.com;jchung@swelawfirm.com
- **Jeremy Faith**    Jeremy@MarguliesFaithlaw.com,
  Helen@MarguliesFaithlaw.com;Angela@MarguliesFaithlaw.com;Vicky@MarguliesFaithlaw.com
- **James J Finsten**    , jimfinsten@hotmail.com
- **James J Finsten**    jfinsten@lurie-zepeda.com, jimfinsten@hotmail.com
- **Alan W Forsley**    alan.forsley@flpllp.com, awf@fkllawfirm.com,awf@fl-
  lawyers.net,addy.flores@flpllp.com
- **Larry W Gabriel**    lgabrielaw@outlook.com, tinadow17@gmail.com
- **Robert P Goe**    kmurphy@goeforlaw.com, rgoe@goeforlaw.com;goeforecf@gmail.com
- **Eric D Goldberg**    eric.goldberg@dlapiper.com, eric-goldberg-1103@ecf.pacerpro.com
- **Andrew Goodman**    agoodman@andyglaw.com,
  Goodman.AndrewR102467@notify.bestcase.com
- **Suzanne C Grandt**    suzanne.grandt@calbar.ca.gov,
  joan.randolph@calbar.ca.gov;vanessa.holton@calbar.ca.gov;robert.retana@calbar.ca.gov
- **M. Jonathan Hayes**    jhayes@rhmfirm.com,
  roksana@rhmfirm.com;matt@rhmfirm.com;rosario@rhmfirm.com;pardis@rhmfirm.com;russ@rhmfi
  rm.com;david@rhmfirm.com;sloan@rhmfirm.com;boshra@rhmfirm.com;rosario@rhmfirm.com
- **Marshall J Hogan**    mhogan@swlaw.com, knestuk@swlaw.com
- **Bradford G Hughes**    bhughes@Clarkhill.com, mdelosreyes@clarkhill.com
- **Razmig Izakelian**    razmigizakelian@quinnemanuel.com
- **Lewis R Landau**    Lew@Landaunet.com
- **Craig G Margulies**    Craig@MarguliesFaithlaw.com,
  Vicky@MarguliesFaithlaw.com;Helen@MarguliesFaithlaw.com;Angela@MarguliesFaithlaw.com
- **Peter J Mastan**    peter.mastan@dinsmore.com,
  SDCMLFiles@dinsmore.com;Katrice.ortiz@dinsmore.com
- **Edith R. Matthai**    ematthai@romalaw.com, lrobie@romalaw.com
- **Daniel J McCarthy**    dmccarthy@hillfarrer.com, spadilla@hillfarrer.com;nchacon@hfbllp.com
- **Jack Meyer**    jmeyer@ggtriallaw.com
- **Elissa Miller**    emiller@sulmeyerlaw.com,
  emillersk@ecf.inforuptcy.com;ccaldwell@sulmeyerlaw.com
- **Eric A Mitnick**    MitnickLaw@aol.com, mitnicklaw@gmail.com
- **Scott Olson**    scott.olson@bclplaw.com, scott-olson-
  2161@ecf.pacerpro.com,ecfsfdocket@vedderprice.com,nortega@vedderprice.com
- **Carmela Pagay**    ctp@lnbyg.com
- **Carmela Pagay**    ctp@lnbyb.com
- **Ambrish B Patel**    apatelEl@americaninfosource.com

- **Leonard Pena**    lpena@penalaw.com, penasomaecf@gmail.com;penalr72746@notify.bestcase.com
- **Michael J Quinn**    mquinn@vedderprice.com, ecfladocket@vedderprice.com,michael-quinn-2870@ecf.pacerpro.com
- **Matthew D. Resnik**    matt@rhmfirm.com, roksana@rhmfirm.com;rosario@rhmfirm.com;susie@rhmfirm.com;max@rhmfirm.com;priscilla@rhmfirm.com;pardis@rhmfirm.com;russ@rhmfirm.com;rebeca@rhmfirm.com;david@rhmfirm.com;sloan@rhmfirm.com
- **Ronald N Richards**    ron@ronaldrichards.com, 7206828420@filings.docketbird.com
- **Kevin C Ronk**    Kevin@portilloronk.com, Attorneys@portilloronk.com
- **Jason M Rund (TR)**    trustee@srlawyers.com, jrund@ecf.axosfs.com
- **William F Savino**    wsavino@woodsoviatt.com, lherald@woodsoviatt.com
- **Najah J Shariff**    najah.shariff@usdoj.gov, USACAC.criminal@usdoj.gov
- **Gary A Starre**    gastarre@gmail.com, mmoonniiee@gmail.com
- **Richard P Steelman**    rps@lnbyg.com, john@lnbyb.com
- **Philip E Strok**    pstrok@swelawfirm.com, gcruz@swelawfirm.com;1garrett@swelawfirm.com;jchung@swelawfirm.com
- **Terrence Swinson**    terrenceswinson@gmail.com
- **Boris Treyzon**    btreyzon@actslaw.com, sgonzales@actslaw.com
- **United States Trustee (LA)**    ustpregion16.la.ecf@usdoj.gov
- **Christopher K.S. Wong**    christopher.wong@arentfox.com, yvonne.li@arentfox.com
- **Timothy J Yoo**    tjy@lnbyb.com